# Exhibit 1



## In The Matter Of:

*UNITED STATES DEPT OF JUSTICE - ATF v.*
*UNCLE SAM'S LOANS, INC.*

---

*ADMINISTRATIVE HEARING*
*September 13, 2016*

---

*Missy L. Young, C.C.R.*
*Post Office Box 13622*
*Sissonville, WV 25360*

Original File ATF Hearing 09-13-2016MinUScript.prn

Min-U-Script® with Word Index

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 3 of 181 PageID #: 7

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

## Page 1

BEFORE THE UNITED STATES DEPARTMENT OF JUSTICE
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES

UNITED STATES GOVERNMENT,

    Plaintiff,

v.             FFL#4-55-045-8E-5E-08677

UNCLE SAM'S LOANS, INC.

    Licensee.

Transcript of an Administrative Hearing held in the above-styled case on September 13, 2016, before Claude Maraist, Hearing Examiner, at the Charleston Field Office, Kanawha County, Charleston, West Virginia.

APPEARANCES:

The Government, by it s counsel MARK LOWNEY, Attorney at Law;

The Defendants, by their counsel, JAMES M. CAGLE, Attorney at Law, 1200 Boulevard Tower, 1018 Kanawha Boulevard, Charleston, West Virginia 25301.

MISSY L. YOUNG, C.C.R.
Post Office Box 13622
Sissonville, West Virginia 25360
304-539-6192

## Page 2

### INDEX

| Government s Witness: | Dir | Cross | Redir | Recross |
|---|---|---|---|---|
| Rob Cunningham | 16 | 75 | 111 | 112 |
| Senior Special ATF Agent | | | | |

Licensee's Witnesses:

| | Dir | Cross | Redir | Recross |
|---|---|---|---|---|
| David Walls | 67 | -- | -- | -- |
| Shane Tyler Noel | 114 | 119 | 122 | -- |
| Brian West | 123 | -- | -- | -- |
| Phillip Gillespie | 130 | 136 | -- | -- |
| Eric Allen | 138 | 143 | -- | -- |
| Louise Muncy | 144 | 165 | -- | -- |
| Roger Muncy | 157 | -- | -- | -- |

### EXHIBITS

| Deposition Exhibits: | Marked | Admitted |
|---|---|---|
| HEARING EXAMINER EXHIBITS: | | |
| No. 1, Authority to Conduct Hearing | 11 | 12 |
| GOVERNMENT EXHIBITS: | | |
| No. 1, Notice of Revocation (Amended) | 15 | 15 |
| No. 2, Licensee Request for Hearing | 15 | 15 |
| No. 3, Notice of Hearing, Date, etc. | 15 | 15 |
| No. 4, Indictment of Steven Adkins | 56 | 58 |
| No. 5, 10 AFT 4473s - Shane Noel | 31 | 33 |
| No. 6, 7 AFT 4473s - Brian West | | 35 |
| No. 7, 4 ATF 4473s - C. Deer Miller | 39 | 40 |
| No. 8, ATF 4473s Scott Ellis | 24 | 26 |
| No. 9, Rep. of Invest. - Steven Adkins | 52 | 56 |
| No. 10, Rep. of Invest. Scott Ellis | 20 | 23 |
| No. 11, Rep. of Invest. - Shane Noel | 28 | 31 |
| No. 12, Rep. of Invest. - Brian West | 33 | 34 |

MISSY L. YOUNG, C.C.R. 304-539-6192

## Page 3

### EXHIBITS
(Continued)

| Deposition Exhibits: | Marked | Admitted |
|---|---|---|
| GOVERNMENT EXHIBITS (continued): | | |
| No. 13, Rep. of Invest. - C. Deer Miller | 37 | 39 |
| No. 14, Rep. of Invest. - Christy Vest | 41 | 42 |
| No. 15, Rep. of Invest. - C. L. Mullins | 43 | 44 |
| No. 16, Rep. of Invest. - S. B. Herndon | 44 | 47 |
| No. 17, Rep. of Invest. - Alice Blair | 47 | 49 |
| No. 18, Rep. of Invest. - E. A. Adkins | 50 | 51 |
| No. 19, Rep. of Invest. - Muncy Res. | 59 | 61 |
| No. 20, 2014 Compliance Insp. Docs. | 62 | 65 |
| No. 21, 2009 Compliance Insp. Docs. | 63 | 65 |
| No. 22, 2008 Compliance Insp. Docs. | 63 | 65 |
| No. 23, 2007 Compliance Insp. Docs. | 63 | 65 |
| No. 24, April, 1991 Rep. of Violations | 64 | 65 |
| No. 25, Stein's vs. Blumenthal, etc. | 64 | 65 |
| | | |
| LICENSEE EXHIBITS: | | |
| No. 1, 2 FEIN/SEIN - L B & T Forms | 78 | 81 |
| No. 2, Gary Wilson letter to Licensee | 82 | 84 |
| No. 3, Excerpt of S. Ellis Depo. | 87 | 104 |
| No. 4, Indictment of Steven Adkins | | |
| | | |
| GOVERNMENT'S CLOSING STATEMENT | | 167 |
| LICENSEE'S CLOSING STATEMENT | | 169 |
| Court Reporters Certification . . . . . . . . . 173/174 | | |

MISSY L. YOUNG, C.C.R. 304-539-6192

## Page 4

1    BE IT REMEMBERED that the following

2 proceedings were held in a closed hearing on September 13,

3 2016 to-wit:

4    HEARING EXAMINER: This is a hearing being

5 conducted under the provisions of Section 923(F)(2) Title

6 18 United States Code and Section 478.74, Title 27, Code of

7 Federal Regulations. The time is approximately 10:58 a.m.

8 The Date is September the 13th, 2016. An audio recording

9 is being made of these proceedings for the record. This

10 place is Suite 1400, 300 Summers Street - - what is the

11 name of this building, BB&T?

12    MR. CAGLE: BB&T.

13    HEARING EXAMINER: -- the BB & T Building.

14 We're in the City of Charleston. What county is this?

15    MR. CAGLE: Kanawha, K-a-n-a-w-h-a.

16    HEARING EXAMINER: K-a-n-a --

17    MR. CAGLE: -- w-h-a.

18    HEARING EXAMINER: -- w-h-a, Kanawha.

19    MR. CAGLE: Yes.

20    HEARING EXAMINER: -- West Virginia, Zip

21 Code 25301. At this time, I will ask the Licensee and

22 those present on his behalf to state and spell their last

23 name, give me the title and relationship to the hearing for

24 the Licensee?

MISSY L. YOUNG, C.C.R. 304-539-6192

| PROCEEDINGS | Page 5 |
|---|---|

1          MR. MUNCY: Roger Muncy.

2          HEARING EXAMINER: R-o-g-e-r?

3          MR. MUNCY: Uh-huh.

4          HEARING EXAMINER: M-u-n-c-y?

5          MR. MUNCY: M-u-n-c-y.

6          HEARING EXAMINER: Your title, sir?  Are

7 you the president?

8          MR. CAGLE: No, he's the former owner.

9          MR. MUNCY: Former.

10         HEARING EXAMINER: Okay.

11         MR. MUNCY: Former owner; my wife is owner

12 now.  I'm disabled.

13         HEARING EXAMINER: Okay.  So you're -- you

14 don't have an office in the corporation?

15         MR. MUNCY: I really don't have nothing.

16 I've got some -- no, I don't have any stock or anything.

17         HEARING EXAMINER: Okay.  Who is here as an

18 officer of the corporation?

19         MR. CAGLE: Louise.

20         MS. MUNCY: Louise Muncy.

21         HEARING EXAMINER: And your title, ma'am?

22         MS. MUNCY: I didn't hear you.

23         HEARING EXAMINER: Your title?

24         MS. MUNCY: I'm the owner and president.

| PROCEEDINGS | Page 6 |
|---|---|

1          HEARING EXAMINER: Okay.  Mr. Cagle, your

2 first name is James?

3          MR. CAGLE: James, yes.

4          HEARING EXAMINER: And you are here

5 representing the Licensee as counsel of record?

6          MR. CAGLE: Uncle Sam's, yes, sir.

7          HEARING EXAMINER: Now, is everyone in this

8 room going to testify?

9          MR. CAGLE: It's possible.  It's certainly

10 possible.  Dave, you want - - you want the names now?

11         HEARING EXAMINER: Yeah, and when you give

12 your name and title and relationship to the licensee,

13 please make sure you say it loudly and distinctly because

14 I'm going to try to write these down.

15         MR. WALLS: My name is David Walls.  I'm the

16 chief of police for the Town of Man Police Department.

17         HEARING EXAMINER: Okay.  Spell that for me.

18         MR. WALLS: D-a-v-l-d, W-a-l-l-s.

19         HEARING EXAMINER: Actually, you're

20 spelling that - - you're saying this for the record.  Okay.

21 And you are the --

22         MR. WALLS: Chief of police.

23         HEARING EXAMINER: For the City of

24 Charleston?

| PROCEEDINGS | Page 7 |
|---|---|

1          MR. WALLS: The Town of Man.

2          MR. CAGLE: M-a-n.

3          HEARING EXAMINER: Oh, Town of Man.  Okay,

4 yes, sir.  Okay.  The next one.

5          MR. ADKINS: Josh Adkins.

6          HEARING EXAMINER: You're going to have to

7 say that louder.

8          MR. ADKINS: Josh Adkins.

9          HEARING EXAMINER: And spell it for me.

10         MR. ADKINS: J-o-s-h, A-d-k-i--s.

11         HEARING EXAMINER: Okay.  And you are?

12         MR. ADKINS: Patrol officer.

13         HEARING EXAMINER: Are you here as a

14 witness?

15         MR. WALLS: He's just here to observe.

16         HEARING EXAMINER: Okay.  But you're here

17 as a witness?

18         MR. WALLS: Yes, sir.

19         HEARING EXAMINER: Okay.  The next --

20         MR. CAGLE: You want to start here?

21         MR. ALLEN: It's Eric Allen.  E-r-i-c, A-l-

22 l-e-n.

23         HEARING EXAMINER: I'm sorry, I didn't hear

24 that.

| PROCEEDINGS | Page 8 |
|---|---|

1          MR. ALLEN: Eric Allen.

2          HEARING EXAMINER: E-r-i-c, A-l-l-e-n?

3          MR. ALLEN: Yes, sir.

4          HEARING EXAMINER: Okay.  You're a witness

5 or you're an employee?

6          MR. ALLEN: I'm an employee, yeah.

7          HEARING EXAMINER: And you're going to be a

8 witness?

9          MR. ALLEN: Yes, sir.

10         HEARING EXAMINER: Okay.

11         MR. GILLESPIE: Phillip Gillespie.

12         HEARING EXAMINER: Spell it?

13         MR. GILLESPIE: P-h-i-l-l-l-p, G-i-l-l-e-s-

14 p-i-e.

15         HEARING EXAMINER: Employee?

16         MR. GILLESPIE: Employee.

17         HEARING EXAMINER: And witness?

18         MR. GILLESPIE: Yes.

19         MR. NOEL: Shane Noel.

20         HEARING EXAMINER: S-h-a-n-e --

21         MR. NOEL: S-h-a-n-e, N-o-e-l.

22         HEARING EXAMINER: Employee?

23         MR. NOEL: No.

24         HEARING EXAMINER: No?  What is you

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 5 of 181 PageID #: 9

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                           Page 9

1  relationship to the licensee?
2          MR. NOEL: Just a friend.
3          MR. CAGLE: Actually, he's listed in some
4  of the documents which were submitted on behalf of the ATF
5  as a --
6          HEARING EXAMINER: Okay.
7          MR. CAGLE: -- as a basis of their actions.
8          HEARING EXAMINER: I saw that -- I think I
9  saw his name on the notice.
10         MR. CAGLE: You would have seen his name,
11 yes.
12         HEARING EXAMINER: Okay.  So you're here as
13 a witness as well?
14         MR. NOEL: Yes, sir.
15         MR. WEST: Brian West, B-r-i-a-n, W-e-s-t.
16         HEARING EXAMINER: B-r-i-a-n?
17         MR. WEST: Yes, sir.
18         HEARING EXAMINER: William?
19         MR. WEST: W-e-s-t.
20         HEARING EXAMINER: Okay.
21         MR. WEST: A witness.
22         HEARING EXAMINER: Okay, for the Government.
23 Government counsel?
24         MR. LOWNEY: It's Mark, M-a-r-k, Lowney, L-

PROCEEDINGS                                           Page 10

1  o-w-n-e-y.  I'm the division counsel for the Louisville
2  field division, which covers this area.
3          MR. CUNNINGHAM: Senior Special Agent Rob
4  Cunningham, C-u-n-n-i--g-h-a-m.
5          HEARING EXAMINER: R-o-s-s?  Is that --
6          MR. CUNNINGHAM: Rob, R-o-b.
7          HEARING EXAMINER: Okay.
8          MR. CUNNINGHAM: Romeo, Oscar, Bravo.
9          HEARING EXAMINER: I can't see it, yeah.  I
10 can't see your name tag.  Okay.  Rob Cunningham, and you're
11 a senior special agent.  Okay.
12         MR. CUNNINGHAM: With ATF.
13         HEARING EXAMINER: You're a Government
14 witness?
15         MR. CUNNINGHAM: With AFT, yes.
16         HEARING EXAMINER: Okay.  Mr. Adam Rogers is
17 the director of industry operations for the Louisville
18 field division, of which the Charleston field office is
19 under his supervision and Mr. Rogers is here -- DIO Rogers
20 is here only as an observer and it would not be appropriate
21 to ask questions of him or ask him to make any spot
22 decisions here.  He's simply here as an observer to get a
23 sense of how the hearing goes and to prepare himself to
24 make a final decision after we leave here.

PROCEEDINGS                                           Page 11

1          My name is Claude Maraist and I'm the
2  hearing officer.  I'm acting as hearing officer by the
3  direction and under the authority of the chief of the
4  investigative support branch, Bureau of Alcohol, Tobacco,
5  Firearms and Explosives, United States Department of
6  Justice.  This hearing is an administrative proceeding.
7  The hearing is to review the Notice to Revoke and Suspend
8  or Suspend License and/or Impose a Civil Fine, ATF 14500,
9  issued under the provisions of Section 923, Title 18,
10 United States Code.
11         At this time, I'd like to enter into the
12 record as evidence Exhibit HX-1, which is evidence of my
13 authority to be here and conduct this hearing.
14             (WHEREUPON, the document referred to
15             was marked for identification as
16             Hearing Examiner Exhibit No. 1.)
17         HEARING EXAMINER: If there are no
18 objections from the Government or from either party for
19 that matter, I'll enter this into the record as evidence.
20         MR. LOWNEY: No objection.
21         MR. CAGLE: No objection.
22         HEARING EXAMINER: Okay.  Hearing Officer Exhibit
23 1, consisting of a one-page photocopy of a letter to Claude
24 Maraist from Charles R. Bartlett dated July 14, 2016, is

PROCEEDINGS                                           Page 12

1  hereby entered into the record as evidence.
2             (WHEREUPON, having been previously
3             marked for identification, Hearing
4             Officer Exhibit No. 1 is received
5             into evidence.)
6          HEARING EXAMINER: The license was issued
7  to Uncle Sam's Loans, Inc.; is that correct?
8          MR. CAGLE: That's correct, yes, sir.
9          HEARING EXAMINER: Not doing business under
10 any trade name that I'm aware of?
11         MR. CAGLE: Not doing business -- Roger, in
12 particular, doesn't hear well.
13         HEARING EXAMINER: Okay.
14         MR. CAGLE: He's had a stroke.  Any way,
15 the - - you're not operating under any other trade names
16 are you?
17         MS. MUNCY: No.
18         MR. CAGLE: Okay.
19         HEARING EXAMINER: Okay.  The address is
20 200 Main Street, Man, West Virginia, 25735.  The license
21 was issued as a dealer, including pawn brokering firearms
22 other than destructive devices?
23         MS. MUNCY: Yes.
24         HEARING EXAMINER: The license number, for

PROCEEDINGS                                    Page 13

1 the record, is 4-55-045-02-5E-08677; is that correct?
2            MR. LOWNEY: Yeah, that's it.
3            HEARING EXAMINER: And Mrs. Muncy, you are
4 president of the company?
5            MS. MUNCY: Yes.
6            HEARING EXAMINER: As a result of the
7 receipt of ATF Form 4500, Mr. James M. Cagle, on behalf of
8 the Licensee, requested in writing that a hearing be
9 granted. Does the Government stipulate that the request
10 for hearing was filed timely?
11           MR. LOWNEY: Yes.
12           HEARING EXAMINER: At this time, Mr. Lowney
13 - - am I pronouncing that correctly? Lowney, Lowney?
14           MR. LOWNEY: Lowney.
15           HEARING EXAMINER: Lowney? Would you care
16 to present the Government's case and review the
17 circumstances or investigative findings which have a
18 bearing on these proceedings?
19           MR. LOWNEY: Yes. I previously mailed Mr.
20 Cagle a copy of Government exhibits and, obviously, a
21 couple of changes that have been made in the last few days.
22           MR. CAGLE: Okay.
23           MR. LOWNEY: The Exhibit 8 that I sent you,
24 I am not going to use. It's going to be replaced with

PROCEEDINGS                                    Page 14

1 this, which are 4473, reflecting transfers to Mr. Ellis.
2 The 8 that I sent you was transferred to Ms. Vest, which
3 I'm not going to use in the proceeding. And the transfers
4 to Mr. Ellis were included in the notice.
5            MR. CAGLE: Oh, okay. Yeah, I - - all
6 right.
7            MR. LOWNEY: Then the last one was just - -
8 these are just some case cites and a copy of a case which
9 relates to the responsibility of licensed dealers for the
10 actions of their employees.
11           MR. CAGLE: Okay.
12           MR. LOWNEY: So, those are just your copies.
13 But -- and as far as Government exhibits for the Hearing
14 Officer, I'll offer Exhibit 1, which is the Notice of
15 Revocation that was issued to the Licensee, and Exhibit 2
16 which is Mr. Cagle's --
17           HEARING EXAMINER: You're going to enter
18 these one at a time or do you want me to accept them en
19 masse?
20           MR. LOWNEY: Yeah, if - - yeah, I can
21 introduce them all en masse and then, subject to any
22 objections Mr. Cagle has to any of them, then we'll just
23 refer to them as we go. That may be the quickest way to
24 work through it.

PROCEEDINGS                                    Page 15

1            HEARING EXAMINER: These are all of your --
2            MR. LOWNEY: These are all the Government's
3 exhibits.
4            HEARING EXAMINER: I'd rather not do it that
5 way; that's a little bit too much. Do you have any other
6 introductory exhibits besides --
7            MR. LOWNEY: The introductory exhibits would
8 be the Notice of Revocation, would be - - No. 2, would be
9 Mr. Cagle's Request for Hearing and No. 3 would just be the
10 Notice to Licensee and Counsel of the Date, Time and Place
11 of Hearing.
12                (WHEREUPON, the documents referred to
13                were marked for identification as
14                Government Exhibit Nos. 1, 2 and 3.)
15           HEARING EXAMINER: All right. Government
16 Exhibits 1 through 3 as described by Government Attorney
17 Lowney are hereby accepted for entry into the record as
18 evidence if there are no objections from the Licensee?
19           MR. CAGLE: Not to those exhibits.
20                (WHEREUPON, having been previously
21                marked for identification, Government
22                Exhibit Nos. 1, 2 and 3 are received
23                into evidence.)
24           HEARING EXAMINER: Proceed. For the - -

PROCEEDINGS                                    Page 16

1 just go ahead and do your entries one at a time on that. I
2 thought - - what I was asking for was the introduction.
3 Okay?
4            MR. LOWNEY: Okay, sure.
5            HEARING EXAMINER: All right.
6            MR. LOWNEY: Senior Special Agent Cunningham
7 is a Government witness and we'll start with him and
8 through him, virtually all of the exhibits will be entered.
9          R O B   C U N N I N G H A M,
10    having been called to tell the truth, testified as
11 follows:
12            DIRECT EXAMINATION
13     BY MR. LOWNEY:
14     Q     Agent Cunningham, can you just briefly
15 describe your background and experience as an AFT agent?
16     A     I'm - - I've been an ATF agent for a little
17 more than 15 years. I've been assigned to Charleston, West
18 Virginia and then also, I'm currently assigned to Ashland,
19 Kentucky. Prior to being employed with ATF, I was a West
20 Virginia State Trooper for 9 years.
21     Q     Uh-huh.
22     A     Prior to that, I was in college.
23     Q     So you had occasion to open a criminal
24 investigation into activities that were going on at the

UNITED STATES DEPT OF JUSTICE - ATF V.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 17

1  Licensee's business premise. Can you just give a little
2  bit of background of how that came about and, you know,
3  what took place?
4         A     Prior to my getting involved in this
5  particular investigation, I was aware of the investigation
6  involving the State Police Bureau of Criminal Investigation
7  along with the FBI. They were working a case that involved
8  a kick-back scheme where people were paying to be able to
9  work at places. And in talking to the investigators there,
10 I learned that there was a lot of guns being transferred in
11 this scheme.
12         So I was aware of that and then when I
13 opened my investigation, I had received a telephone call
14 from a lady by the name of Christy Vest and she called out
15 of the blue and said that she had - - she'd learned that
16 she had some guns listed in her name at Uncle Sam's and she
17 wanted to know how to get them out of her name.
18         I didn't really understand what she was
19 saying and she - - finally, she told me that one of the
20 employees at Uncle Sam's told her that there's five or six
21 guns in their records that she - - that shows up in their A
22 & D book that Christy Vest bought. Christ Vest told me, "I
23 didn't buy any guns."
24         So I, in turn, followed up on that. I went

PROCEEDINGS                                    Page 18

1  and got - - went to the Licensee, got the information from
2  the A & D book and the invest - - then I went back to
3  Christy and showed her copies of the 4473s. And, you know,
4  she ultimately told me that, yes, she filled those forms
5  out but she did not get the guns.
6         She was asked to fill them out by one of
7  the employees. She was asked - - one of the employees of
8  Uncle Sam's asked her to fill out the 4473s. She did not
9  get the guns; she received compensation in return for
10 filling out the forms.
11        Q     And who was the employee that was involved?
12        A     Stephen Adkins.
13        Q     And what was his relationship to the
14 business?
15        A     At that time, he was just an employee. He
16 ultimately became a part owner, but during the time of this
17 activity, he was an employee working in the gun section.
18        HEARING EXAMINER: Clarification: a part
19 owner of the business?
20        THE WITNESS: Ultimately, he became a
21 shareholder and listed on the FFL License as an owner - -
22 or a licensee and an owner of Uncle Sam's Loans.
23        HEARING EXAMINER: And his name is Steve - -
24        THE WITNESS: Steven Lamar Adkins. He also

PROCEEDINGS                                    Page 19

1  goes by "Noodle," as his nickname.
2  MR. LOWNEY (resuming):
3         Q     So just to briefly back, you mentioned this
4  - - when this originally came about, it was initially
5  related to an investigation concerning cashing of checks
6  for kick-backs. Can you describe what was going on with
7  that?
8         A     Vendors that worked at these different coal
9  mines had to pay money to be able to get employed to work
10 at the coal mines and these vendors had to come up with a
11 cash flow to be able to secure jobs for their company. So
12 what they would do - - what the ones, the people that I've
13 interviewed, said they would go to Uncle Sam's Loans, write
14 a check, get the amount of the check back less 10 percent
15 or also sometimes less 10 percent plus sales tax.
16        And we're talking thousands of dollars.
17 Like, they'd write a $15,000 check and get 10 percent less
18 back. Then they'd take that cash and pay the people at the
19 coal mines to be able to get contracts to work - - work for
20 the coal company.
21        Q     And, eventually, what you're saying is
22 firearm transactions became a part of that.
23        A     It - - that and it evolved. But the
24 earliest that I was able to track down was around 2003,

PROCEEDINGS                                    Page 20

1  2004 is when it was - - it started to be transactions
2  involving firearms and then these firearms were being taken
3  and provided to people at the coal mines in addition to
4  money to be able to secure jobs.
5         Q     And Uncle Sam's relationship to this was,
6  in essence, cashing these checks, giving the cash back in
7  exchange for the checks and then making money off that
8  interest and sales tax?
9         A     That and then it evolved into selling guns.
10        Q     Okay. So I'll refer you to an individual
11 named Scott Ellis, and you interviewed Mr. Ellis?
12        A     I have.
13        Q     I'll refer you to Government Exhibit 10,
14 which documents there were two interviews with Mr. Ellis.
15 Can you indicate what Mr. Ellis told you, both with regards
16 to what his role with this was and, specifically, what was
17 going on with his - - the firearms transactions involving
18 Mr. Ellis?
19        (WHEREUPON, the document referred to
20        was marked for identification as
21        Government Exhibit No. 10.)
22        A     I became - - I got introduced to Mr. Ellis
23 as a result of - - he pled guilty to one of these kick-back
24 schemes. He pled guilty and was cooperating with the

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 21

1    Government and one of the investigators who worked his
2    case, took me and introduced me to Mr. Ellis. I
3    interviewed him a couple different times.
4           He explained the kick-back scheme, how it
5    worked. How he - - you know, how he was originally writing
6    checks to himself and he got nervous because he was having
7    so many large business checks written to him in his name,
8    that he solicited Mr. Muncy to allow him to start cashing
9    checks at Uncle Sam's. He -- they struck a deal where it
10   was -- Mr. Muncy would charge him 10 percent for each
11   check. So this went on. Louise Muncy, when she would
12   charge -- when she would cash these checks, she would
13   charge the 10 percent plus the 6 percent sales tax. So he
14   said he didn't really like dealing with Louise, but
15   sometimes he had to.
16          And as the scheme continued, Mr. Muncy
17   became ill. He had some health problems and Mr. Ellis
18   transitioned straight from dealing with Roger Muncy, for
19   the most part, to dealing with Steven Adkins, who was an
20   employee there. He continued the check-cashing scheme, but
21   then he began purchasing firearms as I described earlier,
22   purchasing firearms and taking them to different people at
23   the coal mines as -- as an enticement to get more work.
24          That evolved into Mr. Ellis, when he would

PROCEEDINGS                                    Page 22

1    come to Uncle Sam's, Steven Adkins would already have guns
2    picked out and just tell -- you know, it would be $10,000
3    worth of guns. Mr. Ellis would fill out the 4473 as if he
4    was buying the guns. He would -- it would be sent to the
5    NIC center to be checked. He would get approved and Mr.
6    Ellis would leave with just cash in hand and Mr. Adkins
7    would take the guns.
8           There were occasions that Mr. Ellis would
9    show up. Mr. Adkins would have the guns already picked
10   out. He'd fill out the 4473, give him the check, he'd get
11   the cash, they'd load the guns up into Mr. Ellis' vehicle,
12   drive straight over to Mr. Adkins' house and Mr. Adkins
13   would then take the guns. I --
14          MR. LOWNEY: I refer you to Government
15   Exhibit 8, which are a series of 4473s reflecting
16   transactions --
17          HEARING EXAMINER: Let me enter this into
18   the record.
19          MR. CAGLE: Which one are we talking about
20   now you want to enter into the record? I'm accustom to
21   trying lawsuits. That is the rankest of hearsay and some
22   of it is hearsay upon hearsay. I supposed that you all
23   customarily allow that, whatever your procedure is. That
24   absolutely -- this man doesn't have even a particle of

PROCEEDINGS                                    Page 23

1    personal knowledge about what he's talking about and
2    everything in there is objectionable as hearsay.
3           HEARING EXAMINER: Okay. So I take it that
4    you're objecting to the entry of this?
5           MR. CAGLE: Yes, Your Honor. And I don't -
6    - I don't want to over state that, but you know, I'm not
7    going to waive that --
8           HEARING EXAMINER: Okay.
9           MR. CAGLE: Even if it's customary.
10          HEARING EXAMINER: Okay. For the record,
11   Attorney Cagle has objected to the entry of Government
12   Exhibit 10, which is a reportive investigation concerning
13   an interview with a Scott Edward Ellis. I will, however,
14   accept this record for entry into evidence, with the
15   notation that the Licensee has objected to this entry.
16          (WHEREUPON, having been previously
17          marked for identification, Government
18          Exhibit No. 10 is received into
19          evidence.)
20   MR. LOWNEY (resuming):
21      Q    So the next associated exhibit are the
22   firearms transaction records associated with Mr. Ellis.
23   And I'll refer you to those. They're Exhibit 8.
24          (WHEREUPON, the documents referred to

PROCEEDINGS                                    Page 24

1           were marked for identification as
2           Government Exhibit No. 8.)
3    MR. LOWNEY (resuming):
4           So you interviewed Mr. Ellis and he indicated
5    there were a number of these transactions involving him
6    where he filled out the 4473, which were illegal
7    transactions where he was not the actual purchaser of the
8    firearms?
9       A    That is correct.
10      Q    And --
11      A    More than 40 -- there's more than 40
12   firearms he identified as he definitely did not take
13   custody of.
14      Q    And he did this at the direction of Mr.
15   Adkins?
16      A    Yes.
17      Q    And his -- what he indicated to you was
18   that these guns, ultimately, just went to Mr. Adkins for
19   whatever he was going to do with them?
20      A    Not all of the them; some of them. The
21   majority of them went to Mr. Adkins and he took them
22   wherever. There was some occasions that Mr. Ellis came in,
23   picked out a gun for one of these people at the coal mine.
24   He'd pick it out, pay for it and fill out the 4473 and then

PROCEEDINGS                                      Page 25

1  leave the gun and the guy who was receiving the gun would
2  come and pick it up.
3      Q    Was the --
4      A    At least that's what he was - - he was lead
5  to believe that's what happened
6      Q    In Government Exhibit 8, those particular
7  transactions are ones that Mr. Ellis indicated to you were
8  fraudulent?
9      A    Absolutely.
10     Q.   That those guns were - - he was not the
11 actual purchaser of the gun despite indicating on the form
12 that he was.
13     A    That is correct.
14     Q    Okay.  And through the course of your
15 investigation, did you find other instances of individuals,
16 at the direction of Mr. Adkins, participating in the same
17 type of unlawful transactions?
18     A    Yes, I did.
19     Q    Okay.  I'll refer you to Exhibit 11.
20          HEARING EXAMINER: Let's enter this into
21 the record.
22          MR. LOWNEY: Exhibit 8?
23          HEARING EXAMINER: Exhibit 8, I'm pretty
24 sure --

PROCEEDINGS                                      Page 26

1          MR. LOWNEY: I'll offer Exhibit 8.
2          HEARING EXAMINER: Which consists of how
3  many -- quite a bit --
4          MR. LOWNEY: Five firearms transaction
5  records for sales -- well, for transfers that were
6  allegedly made to Mr. Ellis.
7          HEARING EXAMINER: Government Exhibit 8,
8  which consists of photo copies of five firearms transaction
9  records, Part 1, Over the counter, are hereby entered into
10 the record as evidence, if there are any -- if there aren't
11 any objections from the Licensee.
12         MR. CAGLE: There are none.  Those are
13 business records.
14         HEARING EXAMINER: Okay.
15             (WHEREUPON, having been previously
16             marked for identification, Government
17             Exhibit No. 8 is received into
18             evidence.)
19         HEARING EXAMINER: Before we proceed, this
20 is an administrative hearing and I'm going to ask the
21 Government, if it will, to discuss the admissibility of
22 hearsay in a Government -- I'm sorry, in an administrative
23 proceeding because I'm sure this is --
24         MR. LOWNEY: Well, the Rules of Evidence

PROCEEDINGS                                      Page 27

1  don't apply to this proceeding.
2          MR. CAGLE: And I understand that.  Let me
3  just be frank about it.  It would appear to me that there's
4  a - and I'll be kind - relaxed standard maybe, standard of
5  proof.  Certainly evidentiary standard.  I got that.
6  That's not lost on me.  However, if this goes poorly for
7  the Licensee, I obviously want to be able to raise those
8  issues in U.S. District Court because it seems to me there
9  are -- if you think about Bell versus Burson and what it
10 means, at least to people my age, licenses carry some due
11 process requirement or loss thereof so that I don't want to
12 waive that issue.  That's all.
13         MR. LOWNEY: No, absolutely, that's fine.
14         MR. CAGLE: You --
15         MR. LOWNEY: Mr. Cagle absolutely should,
16 you know, state on the record any objection he has --
17         MR. CAGLE: Yes.
18         MR. LOWNEY: -- but just, legally, it is a
19 - - it's an informal proceeding.  To a great extent, the
20 Rules of Evidence don't apply.  So that's - - you know,
21 that's the basis for the admission of hearsay and other
22 things that in a formal courtroom proceeding would not be
23 admissible.
24         HEARING EXAMINER: I understand that.  I

PROCEEDINGS                                      Page 28

1  just wanted the Government to make it part of the record.
2          MR. CAGLE: And now that I'm aware of that,
3  I don't want to be here all day --
4          HEARING EXAMINER: Okay.
5          MR. CAGLE: -- over everything I'm going to
6  lose on but the -- there is certainly a distinction between
7  the business records, which I will say were supplied by my
8  client, largely, through me gathering them and I -- I,
9  myself, delivered them to the Government in response to
10 their investigation.  We're not arguing over the accuracy
11 of those.
12         HEARING EXAMINER: Okay.
13         MR. CAGLE: But the hearsay issue is, I
14 think, at least an issue that my client deserves me to
15 protect.
16         HEARING EXAMINER: And it is a matter of
17 record.
18         MR. CAGLE: Yes, sir.
19         HEARING EXAMINER: Mr. Lowney, proceed.
20 MR. LOWNEY (resuming):
21     Q    So the next exhibit is Report of
22 Investigation.  It's Exhibit 11, which reflects an
23 interview of Mr. Noel, who ***30.46is here today, I
24 believe.**

PROCEEDINGS                                         Page 29

1              (WHEREUPON, the document referred to
2              was marked for identification as
3              Government Exhibit No. 11.)
4   MR. LOWNEY (resuming):
5        Q    So can you just describe your interview
6   with Mr. Noel and what was involved in those transactions?
7        A    I interviewed Mr. Noel a couple of
8   different times.  The first time we met, he explained to me
9   his relationship with the Muncys and the - - and Steven
10  Adkins and Uncle Sam's.  And how he was asked to complete
11  4473s on - - by Steven Adkins.  He was asked to complete
12  4473s as the purchaser of firearms when he wasn't the
13  actual purchaser.
14             He detailed several instances of that.  He
15  also detailed how he - - some of the guns he took, Steven
16  Adkins directed him to deliver them to someone who was a
17  convicted felon.  He told me about a - - there's a 4473
18  where there's several Smith and Wesson 500s.  He was real
19  specific about remembering that - - that instance where he
20  filled out the 4473 and those firearms were delivered to
21  separate people who were not the actual - - who, you know,
22  he - - Mr. Noel filled out the 4473.  He was not the actual
23  purchaser and he participated in distributing those
24  firearms to other people with Mr. Adkins.

PROCEEDINGS                                         Page 30

1        Q    And during this period of time, both for
2   Mr. Noel and other persons involved, is it your
3   understanding that Mr. Noels was not a person who could
4   even legally possess a firearm?
5        A    He could not.  In talking with Mr. Noel, he
6   - - the way he started associated with the Muncys and
7   Adkins and Uncle Sam's was that he was addicted to pills.
8   He was taking - - illegally taking a lot of prescription
9   medication and when he filled out the form, he did not
10  indicate that he was a user of illicit drugs.
11       Q    Were Mr. Adkins and other people associated
12  with Uncle Sam's aware of this?
13       A    Yes, it was - - I interviewed Mr. Noel's
14  father who told me he had discussions with Roger.  He had
15  discussions with Steven Adkins about Shane's addiction to
16  pills and, you know, the more - - the longer this
17  investigation went on, the more it became kind of common
18  knowledge that Shane had a pill problem.  You know, I think
19  pretty much in the community everyone realized that Shane
20  had a pill addiction problem.
21       Q    I'll refer you to Government Exhibit 5.
22             HEARING EXAMINER:  Government Exhibit 11?
23             MR. LOWNEY:  We'll offer 11 into evidence.
24             HEARING EXAMINER:  Mr. Cagle, you object to

PROCEEDINGS                                         Page 31

1   11 on the same basis?
2              MR. CAGLE:  11, no, Shane Noel is here, so
3   that is actually the exception to hearsay.  He's here and
4   will be examined and subject to cross examination.  I've
5   got that.
6              HEARING EXAMINER:  So you have no objection
7   to this?
8              MR. CAGLE:  No.
9              HEARING EXAMINER:  Okay.  Government
10  Exhibit 11 which consists of a photocopy of a Report of
11  Investigation concerning a certain individual, Shane Taylor
12  Noel is hereby accepted for entry into the record as
13  evidence.
14             (WHEREUPON, having been previously
15             marked for identification, Government
16             Exhibit No. 11 is received into
17             evidence.)
18  MR. LOWNEY (resuming):
19       Q    And the next exhibit is 5 and those 10 ATF
20  Form 4473, Firearms Transaction Records which were filled
21  out by Mr. Noel.
22             (WHEREUPON, the document referred to
23             was marked for identification as
24             Government Exhibit No. 5.)

PROCEEDINGS                                         Page 32

1        Q    Is that how you pronounce it?
2        A    Yes.
3        Q    And so, Agent Cunningham, based on your
4   interviews of Mr. Noel and Mr. Adkins and others, do those
5   transaction records all represent illegal purchases where
6   Mr. Noel falsified the form because he was not the actual
7   purchaser?
8        A    Yes, sir.  That is correct.
9        Q    And that either Mr. Adkins or in some
10  instances the other employee at Uncle Sam's that certified
11  the form was also knowingly falsifying the form?
12       A    That is correct.
13       Q    Because they understood that Mr. Noel was
14  not actually the person acquiring the firearms.
15       A    That's correct.
16       Q    And, again, these employees were aware that
17  he was a person who under Federal and State law could not
18  legally possess firearms?
19       A    That is correct.
20             MR. LOWNEY:  Offer Government Exhibit 5 into
21  evidence, those transaction records.
22             HEARING EXAMINER:  Government Exhibit 5 is
23  described by -- Government Attorney Lowney, you're taking
24  your card away.  You're taking your name card away.

PROCEEDINGS                                      Page 33

1          MR. LOWNEY: Oh.  It got buried in here.
2          HEARING EXAMINER: -- by Government
3    Attorney Lowney, consisting of photocopies of 10 ATF Forms
4    4473 executed by Shane Tyler Noel are hereby entered - -
5    accepted for entry into the record as evidence, if there
6    are no objections from the Licensee?
7          MR. CAGLE: No, no, business records.
8              (WHEREUPON, having been previously
9              marked for identification, Government
10             Exhibit No. 5 is received into
11             evidence.)
12   MR. LOWNEY (resuming):
13     Q    Next exhibit will be 12, which is a Report
14   of Investigation documenting an interview of Brian West,
15   who is also present today.
16             (WHEREUPON, the document referred to
17             was marked for identification as
18             Government Exhibit No. 12.)
19     Q    And if you can go ahead and describe your
20   interview with Mr. West and, again, what the - - what he
21   indicated to you with regards to the purchases - - or the
22   trans - - firearms transactions he was involved with at
23   Uncle Sam's?
24     A    In my investigation, I - - as I started

PROCEEDINGS                                      Page 34

1    uncovering more people and more people who had told me that
2    they filled these forms out fraudulently, I started getting
3    more names of different people who had - - who were alleged
4    to have done the same - - same type of action.  Mr. West
5    was one of them.  I went to him, spoke to him about his
6    purchase of - - there was some - - several high dollar
7    handguns.  I asked him about his purchase of them and where
8    they are.  He told me he never purchased them.  He said
9    that he was - - he was contacted by Steven Adkins, asked to
10   come to Uncle Sam's Loans.  He - - when he showed up, he
11   presented Mr. Adkins with his ID.  He completed the form
12   and received a nominal payment in exchange for completing
13   the form.  Mr. West said he never took possession of the
14   guns, didn't even recall even seeing the guns.  He just
15   completed a form and got - - and got his compensation.
16     Q    And that happened on a number of occasions?
17     A    Yes.
18     Q    Okay.  So I'll refer you to Government
19   Exhibit 6, which are, again, a series of ATF Form 4473
20   Firearm Transaction Records which Mr. West completed at the
21   direction of Mr. Adkins as just described by Agent
22   Cunningham.
23             HEARING EXAMINER: Okay.  In the meantime,
24   I'd like to accept Government Exhibit 12, which is a Report

PROCEEDINGS                                      Page 35

1    of Investigation and a photocopy of Report of Investigation
2    concerning an interview with a certain Brian Allen West.
3    And to accept this document for entry into the record as
4    evidence if there are no objections?
5          MR. CAGLE: I'm not objecting to anything
6    where the witness is present.
7          HEARING EXAMINER: Okay.
8              (WHEREUPON, having been previously
9              marked for identification, Government
10             Exhibit No. 12 is received into
11             evidence.)
12             (WHEREUPON, the document referred to
13             was marked for identification as
14             Government Exhibit No. 6.)
15   MR. LOWNEY (resuming):
16     Q    So, again, those - - all of those firearms
17   transaction records according to what Mr. West told you
18   and, ultimately, what Mr. Adkins told you were illegal
19   transactions?
20     A    Yes, they were.
21          HEARING EXAMINER: Exhibit 6 covers those
22   transactions?
23          MR. LOWNEY: It does.
24          HEARING EXAMINER: Okay.

PROCEEDINGS                                      Page 36

1          MR. CAGLE: How many transactions does that
2    cover, would you say?
3          MR. LOWNEY: It is - - Mr. West is - - two,
4    three, four, five, six, seven transactions.
5          HEARING EXAMINER: There are seven ATF Form
6    4473s?
7          MR. LOWNEY: There should be seven, yeah.
8    The days and the forms should match what's in the Notice of
9    Revocation.  Also, while we're discussing, I'll make one
10   clarification.  On the transfers to Mr. Ellis, there were
11   five.  In the Notice, there were eight listed, but because
12   we had to work through - - there were some lawful
13   transactions of Mr. Ellis and some of them were not lawful,
14   so there's - - three of the ones that were listed in the
15   Notice are not included.
16          HEARING EXAMINER: Have you amended the
17   Notice?
18          MR. LOWNEY: Yeah, we can go ahead and
19   amend the Notice.  The March 10, 2010, August 10, 2010, and
20   August 28, 2010, those three - -
21          HEARING EXAMINER: Okay.  I can't write
22   that fast.  March - -
23          MR. LOWNEY: March 10, 2010, August 10,
24   2010, and August 28, 2010.  Those are not included in the

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 37

1  exhibit, so there's five instead of eight.
2          HEARING EXAMINER: So you're basically for
3  the record amending the Notice, which is Exhibit 1, isn't
4  it?
5          MR. LOWNEY: Exhibit -- Government Exhibit
6  1 --
7          HEARING EXAMINER: To delete the reference
8  to the transactions occurring for Mr. Ellis?
9          MR. LOWNEY: Correct.
10          HEARING EXAMINER: Okay.  The Notice is so
11  amended.
12  MR. LOWNEY (resuming):
13      Q    Okay.  The next Government exhibit we'll
14  refer to is 13, which is a court investigation documenting
15  an interview of Christina Michelle Dear Miller.
16          (WHEREUPON, the document referred to
17            was marked for identification as
18            Government Exhibit No. 13.)
19  MR. LOWNEY (resuming):
20      Q    Agent Cunningham, can you describe what Ms.
21  Deer Miller told you with regards to her involvement with
22  the transaction -- firearm transactions at the Licensee's?
23      A    She was similarly situated as Mr. West.
24  She received a phone call and was asked just to come to the

PROCEEDINGS                                    Page 38

1  - - to Uncle Sam's Loans and fill out the form, fill out a
2  4473.  She said she did that a couple different times.  She
3  - - she had a valid ID.  She didn't have a criminal
4  history, so Mr. Adkins solicited her to - - fraudulently
5  divert these firearms.  She filled out the form, they - -
6  she didn't receive - - she didn't - - she told me she did
7  not receive any compensation, she just did it because she
8  was asked.  But she filled out the forms and she said she
9  never received any of the firearms, never even saw any of
10  the firearms.
11          HEARING EXAMINER: Are you stating on the
12  record that she didn't receive any compensation?
13          THE WITNESS: That's what she told me, yes.
14  MR. LOWNEY (resuming):
15      Q    And what was her association with Mr.
16  Adkins or other wise with the owners?
17      A    Mr. Adkins had a friend who's last name is
18  Cook.  I don't remember his first name, but Ms. Miller was
19  in a relationship with him at the time and that I - - they
20  were just friends and Adkins would - - he just picked up
21  the phone and asked her to come down to the store and fill
22  out the forms and she did.
23          MR. LOWNEY: So I'll offer Government
24  Exhibit --

PROCEEDINGS                                    Page 39

1          HEARING EXAMINER: 13 --
2          MR. LOWNEY: -- 13.
3          MR. CAGLE: That'd be subject to my hearsay
4  objection about that.
5          HEARING EXAMINER: Okay.  Government Exhibit
6  13 consisting of a photocopy of a Report of Investigation
7  concerning an interview of Christina Michelle Deer Miller,
8  subject to objection from the Licensee, is hereby accepted
9  for entry into the record as evidence.
10          (WHEREUPON, having been previously
11            marked for identification, Government
12            Exhibit No. 13 is received into
13            evidence.)
14  MR. LOWNEY (resuming):
15      Q    And the next exhibit will be Exhibit 7 which,
16  again, are four ATF firearms transaction records 4473s
17  reflecting transactions involving Ms. Deer where she
18  completed the form at the direction of Mr. Adkins and was
19  not the actual recipient or purchaser of the firearms as
20  described by Agent Cunningham.  And there's four of those
21  and that's -- those are consistent with what's listed in
22  the Notice of Revocation.
23          (WHEREUPON, the document referred to
24            was marked for identification as

PROCEEDINGS                                    Page 40

1          Government Exhibit No. 7 .)
2          HEARING EXAMINER: Do you intend to discuss
3  these any?
4          MR. LOWNEY: No, just that - - because he
5  discussed those - - those are consistent with these
6  previous transaction records.
7          HEARING EXAMINER: Okay.  Government Exhibit
8  7 consisting of photocopies of four ATF Form 4473, executed
9  by Christina Michelle Deer are hereby accepted for entry
10  into the record as evidence if there are no objections of
11  the Licensee.
12          MR. CAGLE: There's none.
13          HEARING EXAMINER: Okay.
14          (WHEREUPON, having been previously
15            marked for identification, Government
16            Exhibit No. 7 is received into
17            evidence.)
18  BY MR. LOWNEY (resuming):
19      Q    Okay.  So through your investigation -
20  we'll just go back on what we've covered - that - - it was
21  determined through your investigation that Mr. Adkins was
22  involved in directing and facilitating illegal - - or
23  falsification of ATF records both on his part, other
24  employees and these people that were filling out the forms

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 13 of 181 PageID #: 17

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 41

1   in order for him to get the firearms; is that correct?
2       A    That's correct.
3       Q    Can you describe - - what was he doing with
4   the firearms?
5       A    He was just - - the ones I was able to
6   track down, he was distributing firearms to people
7   associated - - or that owned coal mines or was responsible
8   - - were big money people in the coal mines is how it was
9   described to me.  People who were in the coal industry and
10  were wealthy.  He was distributing most of those guns to
11  those people.
12      Q    And when you said - - he was selling them
13  to those people?
14      A    Absolutely.
15      Q    So he - - from your investigation, he was
16  making money off this scheme?
17      A    Absolutely.
18      Q    I refer you to Exhibit 14, which is an
19  interview of a woman named Christy Vest.
20           (WHEREUPON, the document referred to
21           was marked for identification as
22           Government Exhibit No. 14.)
23      A    Yes.
24  MR. LOWNEY (resuming):

PROCEEDINGS                                    Page 42

1       Q    Can you just briefly describe what she told
2   you about her knowledge and involvement in this scheme?
3       A    She - - Christy Vest was the lady who
4   originally called me, that got me kind of started on this.
5   She - - she provided me the make, model and serial number
6   of these firearms that were quote\unquote in her name.  And
7   upon further investigation and talking to her, showed her
8   the 4473, she tells me that she completed the forms, but
9   she didn't - - she did not purchase the firearms, had no
10  intention of purchasing the firearms, just completed the
11  forms at Mr. Adkins' request.  And she was compensated for
12  completing them
13           MR. LOWNEY: I'll offer that exhibit into
14  evidence.
15           HEARING EXAMINER: Okay.  I'm assuming
16  there are no objections again?
17           MR. CAGLE: Yes, sir.  No objection on it.
18           HEARING EXAMINER: Government Exhibit 14,
19  consisting of a photocopy of a Report of Investigation
20  concerning an interview of Christy A. Vest is hereby
21  entered into the record as evidence, subject to objection
22  on the basis of hearsay by the Licensee.
23           (WHEREUPON, having been previously
24           marked for identification, Government

PROCEEDINGS                                    Page 43

1            Exhibit No. 14 is received into
2            evidence.)
3   MR. LOWNEY (resuming):
4       Q    The next exhibit I'll refer to is Exhibit
5   15, which is a Report of Investigation documenting an
6   interview of Clifford Mullins.
7            (WHEREUPON, the document referred to
8            was marked for identification as
9            Government Exhibit No. 15.)
10  MR. LOWNEY (resuming):
11      Q    Agent Cunningham, can you just describe
12  what Mr. Mullins - - who he was - - or relationship to this
13  and what he told you?
14      A    Clifford Mullins was or is Christy Vest's
15  live-in boyfriend.  I don't believe they're married.  He -
16  - he rented from Mr. Muncy.  He worked at Mr. Muncy's
17  business at one time.  He was - - he was fired from that -
18  - from the business.  He - - he also signed one of the
19  forms that Christy Vest completed for the fraudulent
20  transaction; he signed it as an employer - - or as the
21  employee conducting the transaction.
22      Q    So he's another person who was involved
23  with and familiar with all of these illegal transactions
24  that were going on at the business?

PROCEEDINGS                                    Page 44

1       A    Yes.
2            MR. LOWNEY: I'll offer Exhibit 15 into
3   evidence.
4            MR. CAGLE: Objection on the hearsay basis.
5            HEARING EXAMINER: Government Exhibit 15,
6   consisting of a photocopy of a Report of Investigation
7   concerning an individual Clifford Lee Mullins, subject to
8   objection on the part of the Licensee on the basis of
9   hearsay evidence, is hereby entered into the record as
10  evidence.
11           (WHEREUPON, having been previously
12           marked for identification, Government
13           Exhibit No. 15 is received into
14           evidence.)
15  MR. LOWNEY (resuming):
16      Q    My next exhibit will be referred to as
17  Exhibit 16, Report of Investigation documenting an
18  interview of Stephen Brent Herndon.
19           (WHEREUPON, the document referred to
20           was marked for identification as
21           Government Exhibit No. 16.)
22  MR. LOWNEY (resuming):
23      Q    Agent Cunningham, can you just describe
24  what - - who Mr. Herndon was and what information he

Case 2:16-cv-12549  Document 1-1  Filed 12/23/16  Page 14 of 181 PageID #: 18

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 45

1  provided you?
2       A    Mr. Herndon was one of the individuals who
3  were -- who was having to generate cash to pay kick backs
4  at the coal mines.  He, in interviewing him, what -- the
5  important part I got out of that was, he -- when he was
6  needing to generate money, he went to Uncle Sam's to cash
7  the checks because that's where his dad originally --
8  originally was generating money to pay kick backs and as
9  his dad got out of the business or moved on to a different
10  company, Stephen Herndon started going there and generating
11  his cash to pay the kick backs.
12       HEARING EXAMINER: Mr. Herndon's father was
13  originally an employee at Uncle Sam's?
14       THE WITNESS: No, sir.  He was -- the
15  Herndons are -- they were vendors at coal mines and the
16  senior Mr. Herndon originally started dealing with the
17  Muncys generating money so he could pay kick backs --
18       HEARING EXAMINER: Oh, he dealt with the
19  Muncys --
20       THE WITNESS: Yes.
21       HEARING EXAMINER: -- he wasn't employed
22  there.
23       THE WITNESS: No, he did not work there.
24       HEARING EXAMINER: I'm sorry,

PROCEEDINGS                                    Page 46

1  misunderstanding.  Thank you.
2  MR. LOWNEY (resuming):
3       Q    And through this, you indicated originally,
4  this -- all this came to your attention through the
5  investigation over this bribe or kick-back scheme that was
6  going on?
7       A    That was my first knowledge of what was
8  going on, yes.
9       Q    And, you know, to your understanding,
10  through that investigation and talking to other agencies
11  involved, were all these -- was this process of Uncle
12  Sam's cashing these checks for these persons something
13  their business should have been doing or was authorized to
14  do?
15       A    They were not licensed to do and they
16  shouldn't have.
17       Q    Also to clarify just for the hearing
18  officer for just background, were a number of people
19  ultimately federally prosecuted as a part of all that, the
20  kick backs and bribes that were going on?
21       A.   Yes, several.
22       MR. LOWNEY: Okay.  I'll offer that exhibit
23  into evidence, 16.
24       MR. CAGLE: I'll object on that, that's

PROCEEDINGS                                    Page 47

1  about three times hearsay removed, so ...
2       HEARING EXAMINER: Government Exhibit 16,
3  consisting of a photocopy of a Report of Investigation
4  relating to an interview with Stephen Brent Herndon is
5  hereby accepted for entry into the record as evidence, on
6  the objections -- based on the objections from the
7  Licensee.
8            (WHEREUPON, having been previously
9            marked for identification, Government
10           Exhibit No. 16 is received into
11           evidence.)
12  MR. LOWNEY (resuming):
13       Q    Next exhibit will be Exhibit 17 we'll refer
14  to which is a Report of Investigation documenting an
15  interview of Alice Faye Blair.
16            (WHEREUPON, the document referred to
17            was marked for identification as
18            Government Exhibit No. 17.)
19  MR. LOWNEY (resuming):
20       Q    Agent Cunningham, who was Ms. Blair and
21  what was her relationship to the business?
22       A    Ms. Blair is Steven Adkins' mother.  She
23  worked at Uncle Sam's Loans.  She described to me that she
24  worked there under the table is how she said it.  She'd get

PROCEEDINGS                                    Page 48

1  -- she wouldn't get a pay check.  She would get reimbursed
2  for her time, they' give her merchandise from the store.
3  She held up her fingers like showing me jewelry when I
4  asked her about that.
5       HEARING EXAMINER: She held up her fingers
6  --
7       THE WITNESS: Showing rings on her fingers.
8       HEARING EXAMINER: Okay.
9       THE WITNESS: But, you know, that's what
10  she -- indicating to me that, you know, the rings were her
11  compensation.  She also had signed -- she'd signed 4473s -
12  I believe they were Scotty Ellis'.  A couple, one or two of
13  the Scotty Ellis' transactions.
14  MR. LOWNEY (resuming):
15       Q    Was she another employee of the store that
16  was aware of Mr. Noel's drug problem?
17       A    She -- when I asked her about that, she
18  said that she'd been told by people in the community that
19  Shane had a real bad prescription pill addiction
20       HEARING EXAMINER: And when -- just a
21  clarification.  When you say she signed the 4473 for Mr.
22  Ellis, she signed it as representative of the Licensee or
23  as a purchaser?
24       THE WITNESS: Yeah, I'm sorry.  I should

PROCEEDINGS                                      Page 49

1  have made myself more clear. Yes, she - - she signed - -
2  she certified on the form that she was conducting the
3  transaction as an employee.
4              HEARING EXAMINER: She signed as a
5  Licensee?
6              THE WITNESS: Yes.
7              HEARING EXAMINER: Okay.
8              MR. LOWNEY: I'll offer Exhibit 17 into
9  evidence.
10             MR. CAGLE: Objection, hearsay.
11             HEARING EXAMINER: Okay. Government
12 Exhibit 17, consisting of a photocopy of a Report of
13 Investigation of an interview with Alice Faye Blair is
14 hereby entered into the record as evidence, with the
15 standing objection as to hearsay evidence from the
16 Licensee.
17             (WHEREUPON, having been previously
18             marked for identification, Government
19             Exhibit No. 17 is received into
20             evidence.)
21 MR. LOWNEY (resuming):
22     Q    Next exhibit would be 18, which is a Report
23 of Investigation documenting an interview of Elizabeth Ann
24 Adkins.

PROCEEDINGS                                      Page 50

1              (WHEREUPON, the document referred to
2              was marked for identification as
3              Government Exhibit No. 18.)
4  MR. LOWNEY (resuming):
5      Q    Agent Cunningham, can you indicate who Ms.
6  Adkins was and what she told you?
7      A    Ms. Adkins is Steven Adkins' ex-wife. She
8  told me she was an employee of Uncle Sam's but I've found
9  no record of her employment at Uncle Sam's. She told me
10 that when - - in 2012, when Steven Adkins and the Muncys
11 entered into an agreement to sell part of the - - Uncle
12 Sam's Loans to Steven Adkins, they were married at the
13 time. After they got divorced, she alleged that the
14 paperwork was changed and just showed Steven Adkins as
15 owner and didn't include her as the spouse.
16             HEARING EXAMINER: The paperwork as to --
17             THE WITNESS: To the transaction between
18 Steven Adkins and the Muncys for Steven Adkins to buy a
19 portion of Uncle Sam's Loans.
20     Q    And did Ms. Adkins indicate that she had
21 knowledge of all these illegal transactions that her ex-
22 husband had been involved with?
23     A    She provided me with the names of several
24 people who - - who I - - some of the people who are in this

PROCEEDINGS                                      Page 51

1  room who - - Brian West is her brother. She gave me the
2  names of several people who committed - - who completed
3  forms and did not - - completed a 4473 and did not receive
4  the guns.
5              MR. LOWNEY: I offer Exhibit 18 into
6  evidence.
7              HEARING EXAMINER: Objection?
8              MR. CAGLE: Objection, yes, sir.
9              HEARING EXAMINER: Government Exhibit 18,
10 consisting of a photocopy of a Report of Investigation of
11 an interview with Elizabeth Ann Adkins - - and the previous
12 Reports of Investigation, all of them were conducted by you
13 Special Agent Cunningham?
14             THE WITNESS: Yes, sir.
15             HEARING EXAMINER: Okay. For the record,
16 the previous Reports of Investigation would include Agent
17 Cunningham's name as a signatory to the report. At any
18 rate, with the objection - - with an objection from the
19 Licensee based on hearsay evidence, Government 18 as
20 described is hereby accepted for entry into the record as
21 evidence.
22             (WHEREUPON, having been previously
23             marked for identification, Government
24             Exhibit No. 18 is received into

PROCEEDINGS                                      Page 52

1              evidence.)
2  MR. LOWNEY (resuming):
3      Q    The next exhibit we'll refer to is 9, which
4  is a Report of Investigation, two of them, documenting
5  interviews of Steven Lamar aka Noodle Adkins, Exhibit 9
6              (WHEREUPON, the documents referred to
7              were marked for identification as
8              Government Exhibit No. 9.)
9  MR. LOWNEY (resuming):
10     Q    Agent Cunningham, you interviewed Mr.
11 Adkins twice during the course of this investigation. Can
12 you describe what he told you during those interviews?
13     A    He told me that he did not dream up this
14 scheme himself. He said he was told to do it by Muncys.
15 He said he was just following orders to move guns out of
16 the store. That's why he was getting people to complete
17 the forms and then distributing the guns to the big money
18 coal people.
19             He said that some of these people from the
20 coal companies would order guns. They'd come in and they'd
21 sit in the back room. He said that, you know, he was
22 getting pressure from the Muncys to get the guns out the
23 door as opposed to letting them set back there.
24             They wanted them out the door so they could

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 16 of 181 PageID #: 20
UNITED STATES DEPT OF JUSTICE - ATF v.       ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.       September 13, 2016

PROCEEDINGS    Page 53

1  make money. So he said he started - - well, he started
2  soliciting these people to complete the forms so he could
3  get the firearms off the A & D book and then he could
4  distribute them.
5     Q   And to go back, the first time that you
6  interviewed him, did he deny this activity?
7     A   He very much denied it. He was - - he
8  wasn't cooperative at all. He - - when confronted with
9  people like Shane Noel or Brian West, he denied his
10  involvement in that. And the second time, he came around
11  and what he told me coincided with exactly what they told
12  me. Well, I don't want to say exactly - for the most part.
13     Q   And what was involved the second time that
14  prompted him to change what he had told you the first time
15  and start to acknowledge some of this activity?
16     A   He came in - - first of all, he came in
17  with an attorney, Mr. Campbell. He had also just been
18  fired from Uncle Sam's and he - - I think he realized he
19  was going to get charged regardless of whether he told us
20  the truth or he didn't. And subsequently, he was charged -
21  charged and pled guilty and was convicted.
22     Q   And did he indicate that before the first
23  interview, he'd been pressured by the Muncys to not
24  disclose certain things to you?

PROCEEDINGS    Page 54

1          MR. CAGLE: Recognize a leading question.
2  I'll lodge an objection, but you can go ahead.
3          HEARING EXAMINER: I note your objection.
4          MR. CAGLE: Yes.
5          HEARING EXAMINER: But this is very
6  informal.
7          MR. CAGLE: All right.
8          THE WITNESS: When Mr. Adkins told us that,
9  you know, the first time he came up, he received
10  instructions from the Muncys to not discuss certain things,
11  kick backs being one of them, check cashing. And at the
12  time, he was employed - - he was an employee or part owner.
13  MR. LOWNEY (resuming):
14     Q   In the subsequent interview, the second
15  interview where he did acknowledge all the illegal
16  transactions involving various individuals including Mr.
17  West, Mr. Noel, Ms. Deer, Mr. Ellis did he indicate to you
18  to what extent the Muncys had knowledge of what was going
19  on with him and all these transactions?
20     A   He indicated that that's why he was doing
21  that was because he was directed by the Muncys to get the
22  guns out the door.
23     Q   Through the course of your investigation
24  and talking with various people that were employed by the

PROCEEDINGS    Page 55

1  business or present at the business everyday, was it
2  consistent that they all seemed to have knowledge of these
3  activities?
4     A   Do I think they had knowledge? Absolutely,
5  I think they had.
6     Q   Did other employees indicate to you that
7  they had some level of knowledge?
8     A   Some level of knowledge, yes, absolutely.
9  Maybe not the whole scheme, but some level and Mr. Allen
10  signed - - he signed one of the 4473s for, I think it was,
11  Mr. Ellis. You know, Mr. Ellis, he goes down and looks at
12  the guns. He says, "Those aren't my guns. I didn't
13  purchase - - they wasn't for me."
14     Q   In the second interview with Mr. Adkins,
15  did he also indicate to you that the Muncys were paying
16  employees in cash and otherwise compensating them and under
17  reporting the income that was coming in the business and
18  taking cash out?
19     A   Absolutely, and he said he was one of the
20  employees that got cash and said he was - - he was paid in
21  cash. His - - his income was reported as $20,000 yet he
22  lives in a nice brick house and there's a pool in the back
23  yard. And he explained that he wasn't the only one that
24  was getting cash.

PROCEEDINGS    Page 56

1          HEARING EXAMINER: You ready to enter it?
2          MR. LOWNEY: Enter Exhibit 9.
3          MR. CAGLE: Object as to the hearsay and
4  beyond hearsay, double.
5          HEARING EXAMINER: Government Exhibit 9,
6  consisting of a photocopy of a Report of Investigation by
7  Special Agent Cunningham of Steven Lamar aka Noodle Adkins
8  is hereby accepted for entry into the record as evidence
9  over the objections of counsel for the Licensee.
10          (WHEREUPON, having been previously
11          marked for identification, Government
12          Exhibit No. 9 is received into
13          evidence.)
14  MR. LOWNEY (resuming):
15     Q   Next exhibit is Government Exhibit 4, which
16  is a copy of an indictment in the Southern U.S. District
17  Court for the Southern District of West Virginia, United
18  States versus Steven Adkins. Also attached to that is a
19  subsequent plea agreement where Mr. Adkins pled guilty to a
20  criminal violation of the Gun Control Act involving an
21  illegal transaction involving Mr. Noel.
22          (WHEREUPON, the documents referred to
23          were marked for identification as
24          Government Exhibit No. 4.)

| PROCEEDINGS Page 57 | PROCEEDINGS Page 59 |

1  MR. LOWNEY (resuming):

2      Q     Agent Cunningham, can you describe how this

3  guilty plea came about involving Mr. Adkins?

4      A     After our second interview - around the

5  same time of our second interview, there was a - - Mr.

6  Adkins, through his attorney Mr. Campbell, spoke with the

7  Assistant United States Attorney handling the case and they

8  negotiated out this plea.  Mr. Adkins was indicted and then

9  he subsequently entered into a plea agreement for the

10  indictment.

11      Q     So he pled guilty to one felony charge,

12  correct?

13      A     That's correct.

14      Q     But in the course of that process,

15  including directly in the plea agreement, he acknowledged,

16  accepting responsibility for an extensive number of these

17  similar type of illegal transactions and, in fact, the

18  judge attributed a number of firearms to him as having been

19  trafficked.

20      A     Absolutely, the judge found it was

21  approximately 40 guns that he accepted and Mr. Adkins

22  admitted to trafficking.

23            COURT REPORTER: I can't hear your last few

24  words every time you trail off.  I'm sorry.  "He admitted

---

1  referred to.

2            (WHEREUPON, the document referred to

3            was marked for identification as

4            Government Exhibit No. 19.)

5  MR. LOWNEY (resuming):

6      Q     During the course of your investigation,

7  you had noticed something unusual about where the Muncys

8  were listing their residence and followed up on that.  Can

9  you describe what you did?

10      A     Yes, see, I had realized when we executed

11  the search warrant at Uncle Sam's Loans that when I ran

12  across transactions involving Roger and Louise Muncy, that

13  their - - they listed their residential address as their

14  business.  I subsequently - - their business address, 200

15  Main Street in Man.  I subsequently went and ran the - -

16  both of their drivers' license and found that their West

17  Virginia drivers' license also listed residential address

18  as 200 Main Street, Man, West Virginia.

19            Well, I knew that they didn't live at 200

20  Main Street.  I knew they lived in Hensley Heights, at 914

21  Hensley Heights, Man, West Virginia.  I couldn't figure out

22  why, why would - - it didn't make sense to me why you would

23  list, when it asks on the ATF 4473 your residential address

24  as - - you would give your business address when it's your

---

| PROCEEDINGS Page 58 | PROCEEDINGS Page 60 |

1  to the" - -

2            THE WITNESS: He admitted to the

3  transactions and to trafficking the firearms through Uncle

4  Sam's Loans.

5            COURT REPORTER: Thank you.

6  MR. LOWNEY (resuming):

7      Q     The next exhibit is Exhibit 19 - -

8            HEARING EXAMINER: Government Exhibit 4 - -

9            MR. LOWNEY: Oh, I'll offer Exhibit 4.

10            HEARING EXAMINER: - - consisting of a

11  photocopy of an indictment and related documents concerning

12  Steven Adkins is hereby accepted for entry into the record

13  as evidence if there are no objections from the Licensee.

14            MR. CAGLE: No objections.

15            (WHEREUPON, having been previously

16            marked for identification, Government

17            Exhibit No. 4 is received into

18            evidence.)

19            HEARING EXAMINER: Incidentally, for the

20  record, I'm describing the entry into the record in general

21  terms.  In the final report of this hearing, these

22  documents will all be specified in detail.  Go ahead.

23  MR. LOWNEY (resuming):

24      Q     Exhibit 19 will be the next exhibit

---

1  residential address.  That's what it asked for.

2            I wanted to confirm that they - - well, I

3  ended up I figured out that Mr. Muncy is on town council

4  and he lives outside of the city limits of Man, but his

5  business is inside the city limits.  So the only thing I

6  could deduct was that's why he listed his business address

7  as - - as his residential address on his driver's license.

8  I - - you know, I went and checked and, you know, their

9  residence is within - - it's less than a half mile of the

10  city limits or the town limits.

11            MR. LOWNEY: I offer that exhibit into

12  evidence.

13            HEARING EXAMINER: Government Exhibit 19,

14  which is a Report of Investigation relating to the location

15  of the Roger and Louise Muncy residence is hereby accepted

16  for entry into the record as evidence unless there are

17  objections from the Licensee.

18            MR. CAGLE: I'm not sure what it's probative

19  value is, okay, but I gather that those kinds of objections

20  don't matter here.  But that'd be it if I were in a court

21  of law.

22            HEARING EXAMINER: Exhibit 19 is so recorded

23  as in evidence.

24            (WHEREUPON, having been previously

PROCEEDINGS                                    Page 61

1             marked for identification, Government
2             Exhibit No. 19 is received into
3             evidence.)
4    MR. LOWNEY (resuming):
5        Q    So overall through this investigation from
6    Mr. Adkins and the other folks that you interviewed, you
7    know, it's not - - at this point there's nobody who has
8    disputed that a lot of unlawful transactions took place at
9    the business; is that correct?
10       A    That's correct.
11       Q    Ultimately, Mr. Adkins pled guilty to one
12   count.
13       A    That's correct.
14       Q    But the other persons involved, including
15   Mr. West, Mr. Noel, everybody that was involved and they -
16   - ultimately, when they were interviewed by you, admitted
17   to what had gone on.
18       A    That's correct.
19       Q    According to persons like Mr. Adkins and
20   Mr. Ellis, were the Muncys aware of these activities?
21       A    Absolutely.
22       Q    Was your - - from your understanding, were
23   Mr. and Mrs. Muncy present at the business on any sort of
24   regular basis during this time period?

PROCEEDINGS                                    Page 62

1        A    Which time period?
2        Q    The '09, 2010, 2011 when these transactions
3    were largely taking place?
4        A    Mr. Muncy was removed from the FFL license
5    in 2007, which 2007, '08 - - you can correct me, but around
6    there, he started having his health problems and he wasn't
7    around the store very much. My understanding was Louise
8    was there regularly during business hours.
9        Q    Next exhibit is Government Exhibit 20 and
10   the next series of exhibits are just documents that reflect
11   the compliance history of the business. So Exhibit 20 are
12   documents associated with an October -- or with a 2014
13   compliance inspection, that resulted in a warning
14   conference with the Licensee, so it's the letters
15   associated with that, a Report of Violations and the
16   acknowledgment of firearms regulations.
17            (WHEREUPON, the documents referred to
18            were marked for identification as
19            Government Exhibit No. 20.)
20   HEARING EXAMINER: Will you discuss these
21   in more detail?
22            MR. LOWNEY: No, I'm just going to
23   introduce them into the record as - - to establish the
24   previous compliance history of the Licensee.

PROCEEDINGS                                    Page 63

1            HEARING EXAMINER: Okay. Go ahead and
2    introduce them and I'll accept them en masse.
3            MR. LOWNEY: Exhibit 21 is an
4    acknowledgment of Federal firearms regulations following a
5    2009 compliance inspection that was signed by an individual
6    named Melinda Boyd on behalf of the Licensee.
7            (WHEREUPON, the document referred to
8            was marked for identification as
9            Government Exhibit No. 21.)
10           MR. LOWNEY: Exhibit 22 stems from a 2008
11   compliance inspection and consists of a warning letter that
12   was issued to Mrs. Muncy and also includes a report of
13   violations from that inspection and the acknowledgment of
14   Federal firearm regulations from that inspection.
15           (WHEREUPON, the documents referred to
16           were marked for identification as
17           Government Exhibit No. 22.)
18           MR. LOWNEY: Exhibit 23, documents
19   associated with a 2007 compliance inspection and also
20   includes a warning letter issued to the Licensee following
21   that inspection, a copy of the report of violations from
22   that inspection and an acknowledgment of the Federal
23   firearms regulations from that 2007 inspection.
24           (WHEREUPON, the documents referred to

PROCEEDINGS                                    Page 64

1            were marked for identification as
2            Government Exhibit No. 23.)
3            MR. LOWNEY: Exhibit 24 is a report of
4    violations issued to the Licensee that's dated April of
5    1991.
6            (WHEREUPON, the document referred to
7            was marked for identification as
8            Government Exhibit No. 24.)
9            MR. LOWNEY: The last exhibit is Government
10   Exhibit 25, which is a copy of the case of Stein's versus
11   Blumenthal and also a series of case citations. These
12   cases represent Federal firearms licensing revocations and
13   not denials. The courts have held that the owners and
14   responsible persons or Federal Firearms Licensees are
15   responsible for the conduct and actions of their employees.
16   That's Exhibit 25.
17           (WHEREUPON, the documents referred to
18           were marked for identification as
19           Government Exhibit No. 25.)
20           HEARING EXAMINER: Mr. Cagle you've had an
21   opportunity to go through these exhibits. Have you any
22   objection to entry of these records?
23           MR. CAGLE: No, I don't have any objections
24   --

PROCEEDINGS                                Page 65

1          HEARING EXAMINER: Okay.
2          MR. CAGLE: -- based on my understanding of
3    procedure here.
4          HEARING EXAMINER: Okay.  Government
5    Exhibits 20 through --
6          MR. LOWNEY: 25.
7          HEARING EXAMINER: -- 25 as described by
8    Government Lowney are hereby accepted for entry into the
9    record as evidence, there being no objection from the
10   Licensee.
11         (WHEREUPON, having been previously
12         marked for identification, Government
13         Exhibit Nos. 20, 21, 22, 23, 24 and
14         25 are received into evidence.)
15         MR. LOWNEY: The Government has nothing
16   further.
17         HEARING EXAMINER: Mr. Cagle, do you want
18   to cross examine now or do you want to take some time?
19         MR. CAGLE: It's up to you.  You tell me.
20   I'm ready to go if you are.  If you want -- you say you
21   want to take a break, if you want to do that, just talk to
22   these other two guys.
23         HEARING EXAMINER: Why don't we take about
24   10 minutes --

PROCEEDINGS                                Page 66

1          MR. CAGLE: Okay.
2          HEARING EXAMINER: -- because we've been in
3    here for over an hour.
4          MR. CAGLE: Okay.
5          HEARING EXAMINER: The time is
6    approximately 11:12.  We'll reconvene at approximately
7    11:25.
8          (A brief recess was had, after which the
9    proceeding continued as follows:)
10         HEARING EXAMINER: Okay.  The time is
11   approximately 11:24 and we're back on the record.  Before I
12   start again, a couple of corrections.  I misstated the time
13   the hearing began this morning.  I incorrectly said it was
14   10:58 a.m.  I was told that it was 9:58 a.m.  And the
15   second item is Missy Young, who is a certified court
16   reporter is also present at the hearing for the purpose of
17   making a recordation.
18         The Licensee has requested that, in lieu of
19   opening that part of the hearing, the cross examination,
20   that it bring David Walls, Chief of Police from the Town of
21   Man as it's first witness.
22         MR. CAGLE: Okay.  I appreciate the
23   courtesy to do that.
24         HEARING EXAMINER: Not at all.

PROCEEDINGS                                Page 67

1              D A V I D   W A L L S,
2    having been called to tell the truth, testified as
3    follows:
4              DIRECT EXAMINATION
5          BY MR. CAGLE:
6     Q    State your name, please.
7     A    My name is William David Walls but I go by
8    David.
9     Q    Mr. Walls, what's your occupation?
10    A    I'm the Chief of Police of the Town of Man.
11    Q    How long have you held that position?
12    A    Six or seven years.  It's been a while.
13    Q    Before that, what kind of work did you do?
14    A    I've had a bunch of different jobs.  The
15   job I had before being a police officer, I was a security
16   guard at a coal mine.
17    Q    Are you a life-long resident of Man or just
18   how many years have you lived there?
19    A    We moved to Man when I was seven years old
20   from Waukegan, Illinois.
21    Q    Since that time you and your family have
22   lived there?
23    A    Yes, sir.
24    Q    How well do you know Louise and Roger

PROCEEDINGS                                Page 68

1    Muncy?
2     A    I know them -- I've known them since I was
3    a kid.  I didn't really know them that well.  I played
4    football with their son, went all through high school and
5    middle school with their son and played football with him.
6    I didn't really get to know them until I became a police
7    officer.
8     Q    Okay.  How far is the police department
9    from Uncle Sam's?
10    A    A hundred feet.
11    Q    Do you associate Uncle Sam's with Louise
12   and Roger?
13    A    Yes, sir.
14    Q    In other words, in that - - how many people
15   are in Man?
16    A    Oh, not a whole lot, a few hundred,
17   probably --
18         MR. MUNCY: 750.
19         THE WITNESS: 750?
20         MR. CAGLE: Okay.  Now, Roger, you've got to
21   wait your turn, buddy.
22         MR. MUNCY: Okay.
23         MR. CAGLE: It's informal, but not that
24   informal.  We'll put a muzzle on Roger here in a second.

UNITED STATES DEPT OF JUSTICE – ATF v.                          ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.                                         September 13, 2016

PROCEEDINGS                                    Page 69

1   MR. CAGLE (resuming):
2       Q     In any event, this is a - - for the sake of
3   the gentleman who is acting as hearing examiner, this is
4   small town America; is it not?
5       A     Yes, sir.
6       Q     And what is - - what's the - - what's the
7   typical occupation in Man, West Virginia?
8       A     Coal mines.
9       Q     And what's the state of the coal mines in
10  Man, West Virginia?
11      A     It's going downhill.
12      Q     It's virtually --
13      A     It's pretty bad.
14      Q     The economy sucks --
15      A     Yeah.
16      Q     -- excuse the vernacular.
17      A     I started to say that, but I didn't know if
18  I should.
19      Q     Okay.  Well -- okay.  Well, people will
20  understand when you say that.  Now, with respect to Uncle
21  Sam's as a working environment or entity there in the Town
22  of Man, what's the reputation that Uncle Sam's has?
23      A     They have - - well, people come from all
24  over the place to Uncle Sam's.  I mean, it's a pretty well

PROCEEDINGS                                    Page 70

1   known place of business.
2       Q     How long, in your recollection, has Uncle
3   Sam's been in business in Man?
4       A     As long as I've lived here.
5       Q     And it's always been located the same
6   place?
7       A     Well, I think --
8       Q     Or has it moved?
9       A     I think - - if I'm not mistaken, I was a
10  little boy.  Was it down the street a little bit, maybe and
11  he had a fire.  They had a fire and they moved up - - down
12  the street a little ways, but --
13      Q     And I take it, Uncle Sam's has employees,
14  correct?
15      A     Yes, sir.
16      Q     And you know the employees?
17      A     Yes, sir.
18      Q     Have you had trouble with Uncle Sam's as
19  part of your policing?  Has that ever been a problem with
20  you?
21      A     No, sir.
22      Q     What is the reputation, as you understand
23  it in the community of Man, West Virginia, of the business
24  of Uncle Sam's --

PROCEEDINGS                                    Page 71

1       A     They've always --
2       Q     -- Loans or whatever their proper name
3   might be?
4       A     They've always had a good reputation.
5       Q     And what about Mr. and Mrs. Muncy as to
6   their reputation --
7       A     The same.
8       Q     -- in that community?
9       A     They have a good reputation also.
10      Q     Do you have a personal opinion, both about
11  their entity as a business entity in Man, West Virginia,
12  and Mr. and Mrs. Muncy?
13      A     I think they're good people.  Roger is one
14  of the best people I know, as far as being a person goes.
15      Q     Why do you say that?
16      A     Just being good to people.
17      Q     What do you mean?  Give me some - - give
18  this gentlemen, Mr. Maraist, who has a decision to make, an
19  idea of why you carry that opinion about Mr. Muncy.
20      A     He's just - - he's - - I've never seen him
21  be mean to anybody.  He is on the town council.  I know
22  that, as far as Noodle goes, that he treated Noodle like a
23  son.  I mean, Noodle didn't really have a father figure in
24  his life and he took Noodle in and was really good to him.

PROCEEDINGS                                    Page 72

1       Q     How long, in your recollection, was Noodle
2   working, at least during your tenure as chief?
3       A     I think, if I'm not mistaken, since he got
4   out of high school.  I think he worked there since he
5   graduated, if I'm not mistaken.
6       Q     Did you at sometime become cognizant of the
7   fact that Noodle was going to be allowed to buy in to the
8   business of Uncle Sam's?
9       A     I think he mentioned it to me one time.
10  It's been a long time ago.
11      Q     And the "he" you're referring to?
12      A     Noodle.
13      Q     Okay.
14      A     Steven Adkins.
15      Q     So you knew Noodle, right?
16      A     Yes, sir.
17      Q     Did you have any indication as a police
18  officer that Noodle was, basically, running a sham business
19  out of this ***6.46***?
20      A     No, sir, I didn't know any of this stuff.
21  Really, I didn't hardly know anything about it until today.
22  I mean, I know now more than - - I mean, I just - - I knew
23  what was said in the papers and on the news, but other than
24  that, I didn't know anything about any of this.

PROCEEDINGS                                    Page 73

1     Q    Okay. So there was nothing, at least to
2  your observation as a police officer, that would be
3  indicative of some sort of trafficking in firearms as this
4  earlier witness has alluded to?
5     A    No, sir, I didn't have any knowledge of any
6  of this stuff.
7     Q    Okay. It really wasn't in your - - your
8  area of investigation to be some how investigating the coal
9  mines or some kick back schemes at the coal mines, right?
10    A    No, sir.
11    Q    And all you know about that you might have
12 read in the papers; is that correct?
13    A    Yes, sir.
14    Q    Did you - - were you aware that - - that
15 Uncle Sam's had a license as a check cashing entity? Are
16 you familiar with that?
17    A    No, sir.
18    Q    Okay. So that's likewise something about
19 which you have no familiarity, right?
20    A    No, sir.
21    Q    Did you know people who would go there to
22 cash checks?
23    A    No, sir.
24    Q    Just that they were a pawn and they had

PROCEEDINGS                                    Page 74

1  items for sale which might include bows and arrows and
2  firearms.
3     A    Yes, sir.
4     Q    All right. You feel comfortable speaking
5  for the Town of Man today as to the reputation of Uncle
6  Sam's --
7     A    Yes, sir.
8     Q    -- and it's owners?
9     A    Yes, sir.
10         MR. CAGLE: I don't have any further
11 questions.
12         HEARING EXAMINER: Does the Government have
13 any questions?
14         MR. LOWNEY: I don't have any questions.
15         MR. CAGLE: You can go, then.
16         THE WITNESS: Okay.
17         MR. CAGLE: Thank you very much.
18         THE WITNESS: Thank you.
19         MR. LOWNEY: Thank you.
20         HEARING EXAMINER: Thank you for your
21 testimony.
22         THE WITNESS: You all have a good day.
23         HEARING EXAMINER: Mr. Adkins can leave as
24 well?

PROCEEDINGS                                    Page 75

1         MR. CAGLE: Yes. That was important to him
2  to be able to be there. All right I'm ready.
3         R O B   C U N N I N G H A M,
4  having been called to tell the truth, was recalled for
5  cross-examination and testified as follows:
6              CROSS-EXAMINATION
7  BY MR. CAGLE:
8     Q    Agent Cunningham, let me start with
9  something with you that we can go ahead and lay out our
10 exhibits. You had indicated that one of the individuals to
11 whom you referred was a Scott Ellis; is that correct?
12    A    That's correct.
13    Q    And another one whom you referred was a
14 Stephen Herndon, correct?
15    A    Correct.
16    Q    And likewise, over my objection, you
17 introduced - - or it was introduced their interviews or
18 copies thereof, correct?
19    A    Those were - - those where introduced, yes.
20    Q    Yes.
21    A    They were interviews that I conducted.
22    Q    Yes, sir. I understand. And you were
23 conducting it, as I understand it, as sort of a spin-off of
24 what has been referred to from time to time as some kick-

PROCEEDINGS                                    Page 76

1  back scheme in the coal mines, right?
2     A    That - - that was my initial - - that was
3  my initial knowledge of the firearms, a number of firearms
4  going to people at the coal mines, but I really didn't - -
5  my investigation didn't really gain traction until I spoke
6  with Ms. Vest and she said she - - you know, about the guns
7  that she said were in her name. That's kind of when my
8  investigation took off.
9     Q    Now, you recall during your earlier
10 testimony, you referred to a check cashing scheme that you
11 attributed to the Muncys; isn't that correct? Or - - and
12 specifically, to Roger and perhaps on occasions to Louise;
13 is that right?
14    A    Yes.
15    Q    Do you understand what's FEIN SEIN is?
16    A    I do.
17    Q    That's a check cashing license; isn't that
18 right? Or at least the --
19    A    I know - - I'm aware of what it is. I'm
20 aware that it's a tool used in financial investigations.
21    Q    And did you - - that's through - - that's
22 an out growth of the effort on the part of the U.S.
23 Government to take a closer look at cash and cash
24 transactions, right?

PROCEEDINGS                                         Page 77

```
 1      A    One of the tools used.
 2      Q    And that in order to be in the business of
 3  cashing checks for - - for a charge, these check-cashing
 4  places that we see all over America, entities have to get a
 5  license, do they not?
 6      A    My understanding they do, uh-huh.
 7      Q    Did you check to see whether they had a
 8  license?
 9      A    I did not.
10      Q    Do you recall that earlier today you
11  testified that they were - - "they" being either Louise or
12  Roger, was some how compliant in some illegal scheme by
13  virtue of having cashed checks?  Wasn't that your
14  implication?
15      A    What I was told by the financial people
16  that was working on the kick back scheme is that Uncle
17  Sam's Loans was not licensed to cash checks.
18      Q    Okay.  Now, here - -
19      A    I -- let me finish.
20      Q    All right.  Go ahead.
21      A    He - - they're - - they told me that.  I'm
22  not a financial investigator.  I took them at their word
23  that as far as I know, they're not licensed.
24      Q    That'd be a good point.  You took others at
```

PROCEEDINGS                                         Page 78

```
 1  their word, correct?
 2      A    Well, this is a retired IRS agent --
 3      Q    I don't care who it is.  You took that
 4  person at his word; is that correct?
 5      A    I did.
 6      Q    Okay.  As you've taken, like wise, Mr.
 7  Ellis at his word; is that correct?
 8      A    Well, I - - I interviewed Mr. Ellis and I
 9  confirmed much of what he told me with much of - - other
10  witnesses.
11      Q    Okay.  All right, sir.
12           MR. CAGLE: Let me - - let me have this
13  marked as - - are we going to 26?  Is that the way we go or
14  --
15           HEARING EXAMINER: No, this will be --
16           MR. CAGLE: Oh, Licensee 1?
17           MR. LOWNEY: LX 1.
18           MR. CAGLE: LX?
19           HEARING EXAMINER: Uh-huh.
20           MR. CAGLE: Okay.  LX 1.  All right.  If I
21  might pass that to the witness, please?
22           (WHEREUPON, the documents referred to
23           were marked for identification as LX
24           Exhibit No. 1 and 2.)
```

PROCEEDINGS                                         Page 79

```
 1  MR. CAGLE (resuming):
 2      Q    Agent Cunningham, I'm asking that you take
 3  a look at the second page of that which is now labeled LX
 4  Exhibit 2.
 5      A    I've got pretty good eyes, but that's tough
 6  to see.
 7      Q    Okay.  Well, let me help you.  In the lower
 8  quadrant of the second page of LX 2, you'll see the name
 9  Uncle Sam's Loans, Inc.  Do you see that?
10      A    I do.
11      Q    Okay.  Now, turn to the front - - first
12  page.  You see the reference, albeit just as good as what
13  we got from the bank, but nevertheless, it's referring to
14  FEIN/SEIN, Financial Crimes Enforcement.  Do you see that?
15      A    I do.
16      Q    All right, sir.  Do you see the FAX from
17  LB&T back in June 5 of 2014; is that correct?
18      A    Yes, sir.
19      Q    Now, with regard to that, was it within
20  your knowledge and consistent with your investigation in
21  this matter to which you've earlier referred, that it is
22  the banking institutions that keep the records, at least in
23  part, as to the entities who are licensed to cash checks?
24      A    I don't know if it's the banks.  I know the
```

PROCEEDINGS                                         Page 80

```
 1  banks keep records of the - - of the check transactions - -
 2  of large cash transactions, but I don't know if they're --
 3      Q    So you didn't know that?
 4      A    Yeah, like - - I mean, like I told you, I
 5  don't do financial investigations.
 6      Q    Okay.  All right, that's fine.  You didn't
 7  know that?
 8      A    That's correct.
 9      Q    And with respect, you didn't look in to
10  whether or not Uncle Sam's had such a right to do business
11  which involved cashing checks and getting a fee based on
12  the amount of the check cashed, right?
13      A    I had no need to.
14      Q    Okay.  Yet, you certainly have, in
15  investigations, been around the country and seen entities
16  on front that says "Check cashing here," right?
17      A    Correct.
18      Q    Okay.  Do you agree that - - with the date
19  of June 5 of 2014, on the FAX statement from LB&T?
20      A    That's what it says at the top of the page.
21      Q    All right.  Do you agree with at the bottom
22  of LX No. 1, it makes reference to FEIN/SEIN
23  Government/Financial Institution MSB?
24      A    Yes, sir.
```

| PROCEEDINGS | Page 81 |
|---|---|

1    Q    Okay. All right. Let me pass that which
2 is Exhibit 2, LX Exhibit 2.
3         HEARING EXAMINER: LX Exhibit 1, consisting
4 of a photocopy of a document - - I'm having trouble reading
5 it, too, but appearing to be from FEIN/SEIN, the Financial
6 Crimes Enforcement. Two pages of a photocopy are hereby
7 accepted for entry into the record as - - from the
8 Government.
9         MR. LOWNEY: No objection.
10        (WHEREUPON, having been previously
11        marked for identification, LX Exhibit
12        No. 1 is received into evidence.)
13        HEARING EXAMINER: I have a question about
14 that.
15        MR. CAGLE: Yes, sir.
16        HEARING EXAMINER: Again, my eyes are not
17 that good any more, but in the extreme right-hand column,
18 does that describe the dates of when this license was in
19 effect?
20        MR. CAGLE: Well, the facts would indicate
21 it was in effect in 2014, but likewise, you're correct.
22 Those are dates as I understand it that would relate to the
23 current license that they were referring to.
24        HEARING EXAMINER: Do these dates then - -

| PROCEEDINGS | Page 82 |
|---|---|

1 and, again, I apologize for not being able to see it very
2 well, but do they coincide with the period of the alleged
3 activities?
4         MR. CAGLE: They would actually - - our
5 testimony will be that at all times including that which
6 was No. 2, which is dated 2015, Uncle Sam's had such a
7 license. That's where we're going with it. I recognize
8 I'm starting with a witness who's not - - if I were in a
9 court of law, I'd be doing it another way, but I'm trying
10 to get - - as I can and make my point.
11        HEARING EXAMINER: Thank you, sir.
12        MR. CAGLE: Okay.
13 MR. CAGLE (resuming):
14        Q    I want to show you that which is LX Exhibit
15 2, Mr. Cunningham, if you would, please.
16        (WHEREUPON, the documents referred to
17        were marked for identification as LX
18        Exhibit No. 2.)
19 MR. CAGLE (resuming):
20        A    Okay.
21        Q    Have you got?
22        A    Yes, sir.
23        Q    Okay. Do you know Gary Wilson?
24        A    I do not.

| PROCEEDINGS | Page 83 |
|---|---|

1         Q    Do you know his wife?
2         A    I don't think so.
3         Q    Do you know the clerk in Judge Jonhston's
4 courtroom?
5         A    I do. As a matter of fact, I do know Mr.
6 Wilson. Yes, I've met him.
7         Q    Do you know him to be a president of a bank
8 in Logan County?
9         A    I knew he worked at Logan Bank and Trust.
10        Q    Okay.
11        A    I didn't know his position.
12        Q    So he certainly is a trustworthy
13 individual, is he not?
14        A    I have no reason not to trust him.
15        Q    Okay. And you see in there that - - that
16 they're - - "they" being Uncle Sam's had received a request
17 from - - on October 25th concerning a continuation of a
18 license for check cashing; do you not?
19        A    Yes, sir.
20        MR. CAGLE: I would move the introduction of
21 LX 2.
22        HEARING EXAMINER: Licensee Exhibit No. 2,
23 consisting of a letter from Gary Wilson, President of Logan
24 Bank and Trust Bank dated October 15, 2015, is hereby

| PROCEEDINGS | Page 84 |
|---|---|

1 accepted into the record as evidence, there being no
2 objection from the Government.
3         (WHEREUPON, having been previously
4         marked for identification, LX Exhibit
5         No. 2 is received into evidence.)
6 MR. CAGLE (resuming):
7         Q    In your testimony, Agent Cunningham, you
8 reflected that you became familiar by interviewing Scott
9 Ellis his association with - - with Uncle Sam's,
10 correct?
11        A    Well, I became - - I came to interview
12 Scott Ellis because he had entered into a plea agreement
13 and was cooperating with the Government.
14        Q    Right. Now, do you have - - well, do you
15 have available a copy of his interview - - or your
16 interview with him or would you get that, please?
17        A    With Mr. Ellis?
18        Q    Yes, Mr. Ellis. I think that's No. 9, I
19 believe, if I recollect.
20        A    No, it's 10.
21        Q    10? Okay. All right. Let me find mine
22 now. Within the exhibit that's No. 10, Scott Edward Ellis,
23 can you show me at any point of where Mr. Ellis says or
24 mentions either Louise or Roger Muncy? Just show me the

UNITED STATES DEP'T OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 85

1           HEARING EXAMINER: Which number are we
2 looking at?
3           MR. CAGLE: Exhibit 10.
4           MR. LOWNEY: It's the interview with Mr.
5 Ellis.
6      A    Paragraph 4.
7      Q    All right. You see that he makes reference
8 to the check cashing, right?
9
10     A    That's correct.
11     Q    Okay. What is it that would corroborate
12 that either Mr. or Mrs. Muncy knew anything about any
13 purpose of the check that Mr. Ellis cashed?
14     A    Mr. Ellis said, and I'll read what's in the
15 report. "Ellis related at this time Roger and Louise Muncy
16 were fully aware that Ellis needed a method to generate
17 cash flow in order to continue to secure work at the coal
18 mines."
19     Q    Well, that's a broad statement by an
20 individual who's now convicted of a felony, correct?
21     A    This is actually my statement. This isn't
22 a recorded interview. This is my statement of what Mr.
23 Ellis told me.
24     Q    Well, again - - well, that - - you don't
25 know because you weren't there, do you?

PROCEEDINGS                                    Page 86

1      A    That's correct.
2      Q    That'd be a fair statement on all occasions
3 where your not involved. Right? You don't know of your
4 personal knowledge?
5      A    Well, it's hearsay, absolutely.
6      Q    You've been in a courtroom many times. You
7 understand that, do you not?
8      A    Yes.
9      Q    Now, with respect to that, Mr. Ellis, of
10 course, was cooperating because he had become what I would
11 call a Government snitch; isn't that right?
12     A    Well, he entered into a plea agreement and
13 part of the plea agreement was to cooperate.
14     Q    Okay. Do you know that Mr. Ellis - - did
15 you send Mr. Ellis up to bang on the Muncys door at night?
16 Did you know that?
17     A    Did I? No, I did not.
18     Q    Is it your understanding then that Mr.
19 Ellis was dealing in the check cashing scheme with the
20 Muncys; is that right?
21     A    That was part - - that was part of it, yes.
22 That was - - and when you're saying, "the Muncys," are you
23 talking about them specifically - -
24     Q    Yeah, I'm talking about them specifically
25 as distinguished from the fellow we call Noodle, Mr.

PROCEEDINGS                                    Page 87

1 Adkins.
2      A    From the checks, absolutely.
3      Q    Okay. Did you know that Mr. Ellis had sued
4 Mr. Herndon, one of your other people?
5      A    I did learn that in - - I don't remember if
6 it was the first or second interview.
7      Q    Let me have this - -
8      A    But they were business partners at one
9 point. I knew that. They broke up.
10     Q    That would be a nicer way to put it. They
11 were co-conspirators; isn't that right?
12     A    Yeah, if the shoe fits - -
13     Q    Okay. Well, let me show that which is
14 Exhibit 3, which is an excerpt from a deposition that I
15 took from Mr. Ellis last year.
16           (WHEREUPON, the document referred to
17           was marked for identification as LX
18           Exhibit No. 3.)
19 MR. CAGLE (resuming):
20     Q    Now, let me call your attention so we don't
21 spend a whole lot of time, to Page 136 of the transcript.
22 Do you see the name, "Noodle"? It should be on Line 20 of
23 Page 136. Do you see that?
24     A    Yes, I do.
25     Q    Okay. All right and just for the record,

PROCEEDINGS                                    Page 88

1 it says, "about Noodle, a guy that goes by the name
2 Noodle;" correct?
3      A    Correct.
4      Q    And do you see up just above that, so that
5 we get the idea of what we're talking about, Line 13, about
6 cashing checks and again on Line 16; do you see that?
7      A    It says, "How about Uncle CD, if he can
8 cash checks," is what 13 says.
9      Q    Yeah, I understand that. Trying to get the
10 context here. We're talking about cashing checks and then
11 I ask about Noodle on Line 20, did I not?
12     A    That's what it appears, yes.
13     Q    And what did he answer there on Line 22 and
14 23?
15     A    22, answered, "Yes, he works at Uncle
16 Sam's."
17     Q    Okay.
18     A    "He's cashed" - -
19     Q    You see on 137, Question: Did he do it
20 personally, that is Noodle?" Do you see that?
21     A    I do.
22     Q    And he said, "I wrote him a couple of
23 checks personally and I wrote checks through Uncle Sam's
24 which he cashed for them," right?
25     A    That is correct.

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 89

1   Q   Okay.  And I said, "Noodle did that?"  His
2   answer: "Yes," right?
3   A   That's correct.
4   Q   He never mentions Mr. and Mrs. Muncy, did
5   he?
6   A   Not in that line of questioning, he does
7   not.
8   Q   Okay.  So, again, all you've got is his
9   word, correct, Mr. Ellis?
10  A   Concerning --
11  Q   Check cashing and some involvement in some
12  scheme, right?  That's not even --
13  A   Me, personally?
14  Q   Right.
15  A   Yes.  And I wasn't investigating check
16  cashing.  I was investigating violations of gun control.
17  Q   Show me, then, what you say is the - -
18  well, the next paragraph.  "Roger Muncy knew that Ellis was
19  buying firearms for Red."
20  A   Which --
21  Q   Paragraph 5.  What is that about?
22  A   Exhibit 10?
23  Q   Exhibit 10, Paragraph 5.
24  A   Okay.  Now, I've read it.  What's your
25  question?

PROCEEDINGS                                    Page 90

1   Q   Well, who is - - did you speak with Red?
2   A   Never could identify who Red was.
3   Q   Okay.  So there's no - - there's not even a
4   document to indicate some transaction that would reflect
5   wrongdoing certainly by anybody, much less Uncle Sam's or
6   Red is there?
7   A   I wouldn't say that.  There's --
8   Q   What document do you have?
9   A   Well, I'm thinking there'd be a 4473.
10  Q   I'm talking about today.  This is the
11  hearing today.  Is there a document about Red whom you're
12  not able to identify?
13  A   We didn't produce a document about Red.  As
14  far as I know, the only mention of Red is in this
15  interview.
16  Q   All right.  Next paragraph - - Atwell.  Did
17  you interview Mr. Atwell, said to be from the State of
18  Virginia.
19  A   Now what was your question?
20  Q   Him as with Red.  Did you locate and
21  interview Mr. Atwell?
22  A   I did not.
23  Q   So there's no document related to that, is
24  there?  That you have produced.  You produced a document
25  today.

PROCEEDINGS                                    Page 91

1   A   I'm not or sure because the list of
2   firearms from Scotty Ellis would have the firearms that - -
3   we delineated the firearms that he knows he didn't get.  So
4   to answer your question, I'm really not sure.
5   Q   Well, okay, you want to look at those
6   documents?  Would that help you answer that?
7   A   We can take a shot at it.
8       MR. LOWNEY:  The list of firearms where Mr.
9   Ellis indicated these are the ones he actually did purchase
10  versus ones that were straw purchased was not - -
11      MR. CAGLE:  Pardon?
12      MR. LOWNEY:  - - that was not included.
13  A   Well, then to answer your question, no, we
14  did not.
15  Q   Thank you.  Now, what evidence do you have
16  and I'm here referring to Paragraph 8 of Exhibit 10, the
17  Ellis interview, that some how Roger Muncy, before he
18  started having health issues, started this scheme to
19  traffic firearms?
20  A   The information came from - - Mr. Ellis
21  would be one of them.
22  Q   Okay.  Well --
23  A   But from my stand point, what I was
24  investigating is 2003 was outside the statute of
25  limitations, so I really wasn't looking - - well, not

PROCEEDINGS                                    Page 92

1   really, I wasn't looking at that activity.
2   Q   Well, that'd be a fair point.  There is no
3   corroboration that this statement you attribute to Mr.
4   Ellis, has been confirmed, corroborated or augmented by any
5   information; isn't that correct?
6   A   It was provided to me by Mr. Ellis and if
7   it wasn't - - I didn't expand upon it because it wasn't - -
8   it wasn't going to be something we was going to be able to
9   charge.
10  Q   When did Mr. Muncy's health issues start as
11  you understand?
12  A   I understand 2006, '07, somewhere around in
13  there.
14  Q   Okay.  Well, if I told you he'd had a
15  stroke in 2004 and became disabled not long there after,
16  declared disabled?
17  A   I wouldn't dispute that.  I don't know.  I
18  mean, I know that it's been a while ago.
19  Q   Now, in Paragraph 10 you indicate that Mr.
20  Ellis was contacted by Adkins, who recruited him to do
21  business with Uncle Sam, right?
22  A   Give me a chance to read it.
23  Q   Okay.  Paragraph 10 of Exhibit 10.  You got
24      that?
25  A   (Witness reviews document.)  Yes, sir.

PROCEEDINGS         Page 93

1   MR. CAGLE (resuming):
2     Q   So your recollection of the interview is
3  Ellis says Adkins, that is Noodle, contacted him and
4  recruited him to come back and do business with Uncle
5  Sam's?
6     A   That is correct.
7     Q   Okay. Now, as I understand your testimony
8  and that which you write here in the interview, is that
9  this fellow - - we're going to call Noodle, Adkins - - was
10  accumulating firearms that were said to have been falsely -
11  - said to have been purchased by Scotty Ellis, right?
12     A   In parts, yes.
13     Q   Okay. And that, in fact, they - - the
14  firearms landed, I guess, in Adkins' residence, right?
15     A   Some of them did, yes.
16     Q   Okay. And none of them landed in Roger
17  Muncy or Louise Muncy's house, did they?
18     A   None that I'm aware of.
19     Q   Okay. That's right. No investigation
20  showed that they were some how - - you can't corroborate
21  their complicity other than Noodle or some conjecture by
22  Mr. Ellis; isn't that right?
23     A   Well, no I can. We've got the 4473s.
24  We've got a number of witnesses that have corroborated they
25  just filled out the forms and the guns went wherever. Mr.

PROCEEDINGS         Page 94

1  Noel told me he - - you know, he went with Mr. Adkins and
2  delivered some of these guns. You know, so - - you know,
3  for that to be a blanket statement that there's none --
4     Q   Let's parse that, okay?
5     A   Okay.
6     Q   You've been very broad in your accusations
7  so let's parse it to where the personal knowledge, not bald
8  accusations, okay? Do you have any occasion in which Roger
9  Muncy or Louise Muncy was said to be there when a 4473 was
10  filled out illegally?
11     A   No, I don't have any interviews that - -
12  took that people specifically named those two as being
13  there, but Mrs. Muncy is the licensee.
14     Q   We got that and we're going to get to this,
15  okay. This is about what remedy, okay? Now, you don't - -
16  so I'm correct: Mr. Muncy was - - is disabled from a
17  stroke as far as you know or I know, right?
18     A   That's correct.
19     Q   Okay. You don't have him overlooking some
20  filling out of a phony straw purchase on a 4473, do you?
21     A   The only transactions I'm aware of that Mr.
22  Muncy would have participated in that were illegal would be
23  the transactions where he listed his residential address as
24  200 Main Street.
25     Q   Okay. So let - - of course, Roger Muncy

PROCEEDINGS         Page 95

1  hadn't been an owner, at least of any stock, for years,
2  because of his disability, right? He's not really involved
3  according to your investigation, is he?
4     A   He is not listed on the license. After the
5  search warrant, Mr. Muncy is the one that called me,
6  wanting to know when we could return his computer system.
7     Q   Sure, okay.
8     A   So to say he's not involved, I wouldn't - -
9  I wouldn't go that far.
10     Q   Mr. Muncy is a man in ill health who
11  started a business 41 years ago in a community that's
12  failing on account of the lack of activity in the mines;
13  isn't that a fair statement?
14     A   I think that's fair, yes.
15     Q   Okay. Now, do you have an occasion where -
16  - and I'm not talking about your surmise, I'm talking about
17  evidence. And by evidence I mean a document or an eye
18  witness that said Louise Muncy was present when a phony
19  straw purchase took place and a 4473 was filled out.
20     A   Again, her - - the transactions she - - she
21  completed where she was purchasing firearms, she uses the
22  same business address that is not their residential
23  address.
24     Q   Okay. So you - - you quarrel with using
25  200 Main Street on a document; is that what you're saying?

PROCEEDINGS         Page 96

1     A   The 4473 says, "Residential Address."
2     Q   Okay. Show me which document you're
3  referring to.
4     A   There's not one here.
5     Q   So is it part of the evidence in this case
6  that you say you rely on is not in the record before this
7  Hearing Officer, is it?
8     A   It's in my investigation that I found. Was
9  it cited in this? No.
10     Q   And that is a point. There is no document
11  here today that has what you now are relying on, is there?
12     A   I'm relying on my statement on - - is what
13  - - the information I derived in my investigation. Now,
14  whether it's been entered into the evidence? No, it
15  wasn't, but you're saying that it's -- you know, there's no
16  document. That's not true. There is a document. I think,
17  you know, at least for Roger Muncy, each time he did that
18  is a felony because he's not the FFL.
19     Q   Okay, so you're now calling Mr. Muncy a
20  felon, right?
21     A   No, I'm not.
22     Q   Let's talk about the common denominator in
23  these individuals that are named here, okay? Shane Noel,
24  okay, who's here today. Were all of his transactions that
25  you rely upon or that are being relied upon, in the

UNITED STATES DEP'T OF JUSTICE - ATF v.                    ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.                                     September 13, 2016

PROCEEDINGS                              Page 97      PROCEEDINGS                              Page 99

1    allegations made which bring this to hearing?  All of those      1    i.e., he's negotiating a plea, right?
2    were done with Noodle Adkins; isn't that right?                  2        A    He - - we were in plea negotiations and
3        A    I'd have to look at the 4473s.                          3    before we tendered the plea, we wanted to proffer about
4        Q    Well, you take your time and look at them,             4    what he knew.
5    then, okay?                                                      5        Q    And then - - you then get the information.
6        A    (Witness reviews document.) The answer to             6    It leads to the narrative that's set forth in his - -
7    your question is no. (Inaudible) Mr. Muncy was not involved      7    Exhibit 9, right?
8    in this                                                          8        A    Exhibit 9 is the two different interviews
9        Q    Okay.  Which ones was Louise Muncy involved           9    of Mr. Adkins, correct.
10   in, other than the Government's, other than that?               10       Q    So did the second, a later interview, take
11       A    I don't have any 4473s where Louise Muncy             11   place on the same day as the proffer or not?
12   certified that she signed these.                                12       A    There was one interview on August the 20th,
13       Q    And a lot of those where you say that a              13   2015, and the subsequent interview - - make sure - - the
14   person or persons other than Noodle Adkins was involved,       14   second interview was January 20th of 2016.
15   where - - you've got other employees that signed the form;    15       Q    Was that - - again, was that attendant to
16   is that what you're referring to?                               16   the proffer?
17       A    Yes, sir.                                              17       A    That is correct.
18       Q    Okay.  Did you ever interview those people?           18       Q    Okay.  That's what it says in Paragraph 1.
19       A    Yes.                                                   19       A    Yes, sir.
20       Q    Okay.  Did they not tell you in the                  20       Q    All right.  Now, so at that point, you
21   interviews that what Adkins would do and say, "Here, sign     21   collect the information that you rely on today in your
22   this," and as manager, he'd make them sign?                    22   presentation on behalf of the ATF; is that right?
23       A    There was - - there was times I was told            23       A    In part.
24   that.  I won't say specifically each one of these, but I       24       Q    Okay.  Is Mr. Noodle Adkins incarcerated
25   think that was fairly common practice.                          25   yet?

PROCEEDINGS                              Page 98      PROCEEDINGS                             Page 100

1        Q    Okay.  So the central figure, you would             1        A    He's been sentenced.  I'm not sure - - he
2    have to agree with me, is Noodle Adkins in this whole         2    was allowed to self report.  I don't know if he self-
3    affair that brings us here today; isn't that right?           3    reported yet or not.
4        A    He is a key player in it, yes, absolutely.          4        Q    Did you try to get him to come here today
5        Q    Okay.  Noodle Adkins, as you indicated was          5    and testify?
6    interviewed twice, right?                                      6        A    I didn't.
7        A    Correct.                                             7        Q    All right.  Let's go back to where we
8        Q    The first time, he didn't say anything            8    started.  We got to Shane Noel.  Okay, Brian West, who
9    about anybody, including himself; isn't that right?           9    likewise is here today.  Is there any transaction of Brian
10       A    In a nutshell, that's correct.                       10   West that doesn't involve our friend, Noodle Adkins?
11       Q    I mean, he didn't say, "I did these                11       A    Give me a second to look over the 4473s.
12   things."  In fact, he denied every even knowing - - I        12   (Witness reviews documents.) There's other employees, not
13   shouldn't say knowing, but never being involved in what      13   just him (inaudible).
14   we'd call a straw purchase, right?                            14       Q    Okay.
15       A    That would be correct, for the most part.           15       A    Shawn's story - -
16       Q    Then, afterwards, the second interview took        16            HEARING EXAMINER: Which exhibit are you
17   place subsequent to his having negotiated a deal with the    17   looking at?
18   Government, correct?                                          18            THE WITNESS: Excuse me?
19       A    It was in the midst of plea negotiations.           19            MR. LOWNEY: It's exhibit - -
20       Q    Okay, in what was done in what we call a           20            HEARING EXAMINER: Which exhibit are you
21   proffer, is that correct?                                     21   looking at?
22       A    That is correct.                                     22            MR. CAGLE: Exhibit 1.  Well, I'm looking
23       Q    Okay, so you - - so then, we have the             23   at Exhibit 1.
24   situation where this boy's situation, vis-a-vis the U.S.      24            MR. LOWNEY: He's looking at what, 6?
25   Government, is now taking a turn, a rather dramatic turn,    25            HEARING EXAMINER: Is that - -

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 101

1          THE WITNESS: Yes, sir.
2          MR. LOWNEY: Just to see who the employee
3   was that signed the form.
4   MR. CAGLE (resuming):
5          Q     None of those employees are named Muncy,
6   are they?
7          A     No, sir, they're not.
8          Q     Okay.  Is that likewise true of the next
9   individual named, Christina Deer?
10         A     The question is that none of the employees
11  names are Muncy?
12         Q     That's right.
13         A     That is correct.  None of the employees
14  signing the 4473s last name is Muncy.
15         Q     And as I understand it, Christina Deer was
16  dating a fellow who was a friend of Noodle Adkins; isn't
17  that right?
18         A     At the time, that's correct.
19         Q     Okay.  So, then, the connection is Mr.
20  Adkins; isn't that right?
21         A     That would be correct.
22         Q     This Christina Deer, is that the woman or
23  was the next woman who simply got a phone call to, "Come
24  down, I want you to sign something"?
25         A     Christina Deer told me that she just got a

PROCEEDINGS                                    Page 102

1   phone call asking her to run down to the store and fill out
2   a form and she got in the car and drove down there and
3   filled out the form.
4          Q     And you, of course, said as a good
5   interviewer, "From whom did you get the phone call"?
6          A     That is correct.
7          Q     And that person would have been Noodle
8   Adkins?
9          A     I think she told me it was Doug Cook, but
10  she - - she said Doug was - - he was her boyfriend, but who
11  - - but he was at Uncle Sam's at the time.
12         Q     But he's not an employee?
13         A     No, he's not.
14         Q     So you've got Noodle getting his friend,
15  Doug Cook, to call Christina to come own and sign a form,
16  right?
17         A     Yes, that - - I hate to tell you for sure
18  on it.  It was either Doug Cook was there with Noodle when
19  Noodle called or Noodle was there with Doug Cook and he got
20  Doug Cook to call her.  One of the two of them called her
21  and she went down there and filled out the form.
22         Q     Okay.  Let's see.  Let's take a second and
23  see if I've - - okay, Exhibit 4 which is the plea - - or
24  the indictment is the first page.
25         HEARING EXAMINER: We haven't accepted your

PROCEEDINGS                                    Page 103

1   Exhibit 3 yet, I don't think.
2          MR. CAGLE: Oh, I would move it's
3   admission.  Thank you for the reminder.  I got carried away
4   there.
5          HEARING EXAMINER: Licensee Exhibit 3,
6   consisting of a recordation in the matter of Scott Ellis,
7   et al., versus Stephen B. Herndon, prepared by a known
8   certified court reporter is hereby accepted for entry into
9   the record if the Government has no objections.
10         MR. LOWNEY: No objections.
11         (WHEREUPON, having been previously
12         marked for identification, LX Exhibit
13         No. 3 is received into evidence.)
14         MR. LOWNEY: Exhibit 4 is the indictment
15  and the subsequent plea --
16         MR. CAGLE: That's right.  I got them
17  transposed.  Let me take a second.
18  MR. CAGLE (resuming):
19         Q     I take it that Steven Adkins was not
20  charged with any crime but - - operating just sort of a
21  rogue gun store out of his residence; is that right?
22         A     He - - was he charged with it?
23         Q     Yeah.
24         A     No.
25         Q     He did it, didn't he?

PROCEEDINGS                                    Page 104

1          A     Oh, I don't doubt that.  I don't doubt it
2   and I don't - - I just make the recommendations.  The U.S.
3   Attorney's office is the one the charges them.
4          Q     Yeah.
5          A     I learned that a long time ago.
6          Q     How many guns could you trace that Mr.
7   Noodle Adkins took as his own from Mr. Ellis, being the
8   person identified in the 4473s.  Did you say 40?
9          A     I don't understand your question.
10         Q     Okay.  All right.  You mentioned the number
11  40 firearms in connection with Mr. Ellis.
12         A     Correct.
13         Q     Okay.  And when I say, "in connection," I'm
14  talking about the - - the Noodle Adkins/Scott Ellis
15  connection, okay?
16         A     Yeah.  And I may be able to clarify that.
17  There's a list of all the firearms that Ellis purchased
18  that I got from his 4473s and Ellis and I reviewed those -
19  - that list and he marked the ones that were definitely
20  firearms he bought for himself.  And he marked the ones
21  that he just couldn't afford.
22         Q     And as I recall your interview as I read it
23  a couple of nights ago, that in fact, that included time
24  when Ellis went to the Noodle Adkins house with a firearm;
25  is that right?

| PROCEEDINGS | Page 105 |
| --- | --- |

1    A   There was one occasion where Ellis told me
2  he went and purchased a shot gun from Adkins at Adkins'
3  house.
4    Q   Okay. All right. And I take it there's no
5  4473 on that is there?
6    A   There would not be, no.
7    Q.   All right. Let me ask you to turn to the
8  last attachment to that which is Exhibit 4 and that would
9  be Stipulation of Facts, correct? See that?
10    A   The Exhibit A, correct?
11    Q   Right.
12    A   Yes, Stipulation of Facts.
13    Q   Now, as I read it, it begins with a
14  background that indicates that Mr. Adkins was not listed
15  under the - - on the FFL of responsible persons; did you
16  read that?
17    A   At this time, that's correct, yes.
18    Q   Okay. Who is - in the second paragraph,
19  who is the "known person" you referred to?
20    A   Shane Noel.
21    Q   Okay. And the transaction - - or the plea
22  is predicated upon Shane's having been a drug user; is that
23  correct?
24    A   Yes. Well, let me back up. Let me make
25  sure.

| PROCEEDINGS | Page 106 |
| --- | --- |

1    Q   Yeah, I'm still on that and I'm just going
2  to jump to a later paragraph under "Offense Conduct."
3    A   "It was a violation of USC 924(a)(1)(A), by
4  a person known to the Grand Jury. The known person is
5  Shane Noel and that the Defendant, Steven Adkins, directed
6  and induced a known person to make false statements and
7  representations with respect to the information required by
8  Chapter 44, Title 18, United States Code."
9    Q   Okay. And the falsehood was that Mr. Noel
10  indicated "No" to - - in reference addiction or drugs,
11  right?
12    A   Yes, and the - -
13        MR. LOWNEY: And the fact that he was the
14  actual purchaser of the firearm.
15  MR. CAGLE (resuming):
16    Q   And the fact that he wasn't going to buy -
17  - he wasn't buying the gun.
18    A   That's correct.
19    Q   Who is the second actual transferee
20  referred to what I'll call the an ultimate paragraph there
21  on Page 3?
22        MR. LOWNEY: It's the Stipulation, second to
23  last paragraph.
24        THE WITNESS: The known person or the known
25  --

| PROCEEDINGS | Page 107 |
| --- | --- |

1  MR. CAGLE (resuming):
2    Q   The second actual transferee was the
3  question.
4    A   Hold on. He owns a daggone coal mine.
5    Q   Well, you can just describe him generally.
6  That's alright. Is it some mine owner?
7    A   He lives on Cub Creek in Wyoming County.
8  Let's see. Everett Gordon Justice.
9    Q   Okay. Now --
10    A   Gordon Justice.
11    Q   -- I have to note, just looking at the
12  substance of Paragraph No. 3, that it starts with Noodle
13  telling a person to drive his vehicle behind Uncle Sam's,
14  right?
15    A   Correct.
16    Q   Okay. In other words, referring to pretty
17  furtive act; isn't that correct?
18    A   Seems like a key conspiratorial act.
19    Q   Okay. And then they go, as you say, to
20  another county - Wyoming County, West Virginia - to the
21  home of a person, correct?
22    A   That's correct.
23    Q   What is your understanding of the time when
24  Noodle Adkins was given the option, the ability to buy in
25  to a piece of ownership of the business that this man

| PROCEEDINGS | Page 108 |
| --- | --- |

1  started 41 years ago; do you know?
2    A   I believe it was August 2014 when Adkins
3  was listed as a Licensee.
4    Q   And Mr. Adkins, at least as it would relate
5  to the allegations here, a gun - - the activities, at least
6  relied on here as early as July of 2009; is that right?
7    A   Which one are you speaking of?
8    Q   I'm just looking at the accusations of
9  Shane Noel, 7-10-09.
10    A   Yes - - rephrase your question?
11    Q   Okay. Did Mr. Noodle Adkins have a gun in
12  the activities that lead us here today as early as July of
13  2009?
14    A   That is correct.
15    Q   Now then, bracketing the dates there, the
16  latest you have there is Brian West in - - let's see, in
17  March of 2013; am I right?
18    A   March 22nd.
19    Q   Okay. Just one more line of inquiry here.
20  Let me have you turn to Exhibit 16, if you would and that's
21  Stephen Herndon. Just a second.
22    A   (Witness reviews document.) Look in
23  Paragraph 4 on Exhibit 16, Mr. Herndon's interview or your
24  notes of that interview. Do you agree with me that Stephen
25  Herndon tells you he'd only been to Uncle Sam's a few

PROCEEDINGS                          Page 109

1  times, right?
2      A   That's what he told me, yes.
3      Q   And he refers to Scott Ellis as being a
4  person who would routinely go to Uncle Sam's, right?
5      A   That's correct.
6      Q   Show me in the Herndon-related Exhibit No.
7  16 where you say - - or you rely upon to say that Mr.
8  Herndon engaged in some illegal act with Uncle Sam's.
9      A   (Witness reviews document.) So your
10 question is?
11     Q   I don't see any -- I'll make a statement
12 and you can agree or disagree: I don't see anything in here
13 where Stephen Herndon says that he, Stephen Herndon,
14 engaged in some illegal activity whether it be guns or
15 whether it be check cashing with Uncle Sam's.
16     A   He - - he talks about cashing checks - - or
17 people cashing checks there and he talks about Steven
18 Adkins running a business out of his house, selling the
19 same stuff that was at Uncle Sam's for cheaper or less
20 price.  Talks about people going to Uncle Sam's and getting
21 money to pay their kick back.
22     Q   Well, we've all talked about that but now
23 the rubber hits the road.  Tell me what transaction Stephen
24 Herndon says in here that he engaged in that was some how
25 illegal with Uncle Sam's.

PROCEEDINGS                          Page 110

1      A   It doesn't.  He talks about his business
2  partner.
3      Q   That's right.  Me and you have talked about
4  the business partner and we've gone over that.  That's
5  Scott Ellis, right?
6      A   Correct.
7      MR. CAGLE: Let's see.  Just let me have one
8  second to make sure I don't have something else.  I think
9  that's all.  Thank you.
10     THE WITNESS: Yes, sir.
11     HEARING EXAMINER: Does the Government have
12 any redirect?
13     MR. LOWNEY: Just very briefly.
14     REDIRECT EXAMINATION
15     BY MR. LOWNEY:
16     Q   When - - the second time you interviewed
17 Mr. Adkins which was in the part of the process where he
18 was going to enter a plea agreement and as a result started
19 cooperating as far as information he was providing, he gave
20 you some fairly specific detailed information about the way
21 the cash and the matter of the business worked; did he not?
22     A   He did.
23     Q   And he had worked at the business for many
24 years, correct?
25     A   That's correct.

PROCEEDINGS                          Page 111

1      Q   And he's not the only employee that
2  indicated he was paid under the table; is that correct?
3      A   That's correct.
4      MR. LOWNEY: That's all I have.
5      RE-CROSS EXAMINATION
6      BY MR. CAGLE:
7      Q   Are you seeking to take Uncle Sam's license
8  on the basis of payment under the table, I guess, some IRS
9  matters?
10     A   Are you asking me that question?
11     Q   Yeah, I'm asking you that question.
12     A   Sir, I'm not the one that makes that
13 decision whether the ATF takes a license or not.  I just
14 conducted an investigation and documented what I found.
15     MR. CAGLE: That's all I have of this
16 witness.
17     HEARING EXAMINER: At this point, the
18 Licensee can make it's own presentation.
19     MR. CAGLE: Okay.
20     HEARING EXAMINER: I'd like to ask - -
21 however, it's 12:35.  Would you want to take lunch or do
22 you want to go through lunch?  Are you ready to make your
23 presentation?
24     MR. CAGLE: I'm ready to make my
25 presentation, but Roger's also, among other things, a

PROCEEDINGS                          Page 112

1  diabetic and I want to get him out of here.
2      HEARING EXAMINER: Does he need to --
3      MR. CAGLE: Do you need to get something?
4      MR. MUNCY: I'm alright.
5      MR. CAGLE: You okay?  You know, I'm not
6  insensitive to that.  Other than that, I'd just as soon go.
7      HEARING EXAMINER: Okay.
8      MR. CAGLE: I've got people I've got to
9  talk to in other parts of town.
10     HEARING EXAMINER: Please proceed.
11     MR. LOWNEY: It's okay.
12     MR. CAGLE: How about Shane?  Do you want
13 him to come up here?  Would that make --
14     HEARING EXAMINER: That would be a lot
15 better.
16     MR. CAGLE: Go down to the end of the
17 table, would you?
18     S H A N E   N O E L,
19     having been called to tell the truth, testified as
20 follows:
21     DIRECT EXAMINATION
22     BY MR. CAGLE:
23     Q   Your full name for the record, please?
24     A   Shane Tyler Noel.
25     Q   Okay.  Shane, you're the individual

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                                    Page 113

1   referred to earlier in this case by Agent Cunningham,
2   correct?
3       A    Yes.
4       Q    And you were interviewed by him in July of
5   last year; is that right?
6       A    Yes.
7       Q    Okay.  Where do you reside?
8       A    I live at home with parents right now.
9       Q    Were you - - are you familiar with Louise
10  and Roger Muncy?
11      A    Yes.
12      Q    And I take it you have acknowledged some
13  involvement with this person we're referring to as Noodle
14  Adkins, right?
15      A    Yeah.
16      Q    Okay.  Can you tell the Hearing Examiner -
17  - just cut to the chase were you ever involved with Louise
18  or Roger for that matter --
19      A    No.
20      Q    -- in any illegal transaction involving
21  straw purchases of firearms?
22      A    No, it was always just Noodle by himself.
23      Q    How did that come about that you got
24  involved?
25      A    I had started hanging out there with Noodle

PROCEEDINGS                                                    Page 114

1   and stuff, going hunting with him and things like that and
2   then started hanging out at the store and one day he just
3   asked me if I would fill out a gun form for him.
4       Q    Do you - - was there any occasion when you
5   filled out a gun form as you say, is there any occasion
6   when either of the Muncys was involved?
7       A    No.
8       Q    Was there any - - were they standing
9   around?  Were they observing any transaction that we would
10  call a straw transaction?
11      A    No.
12      Q    Do you recall the layout of the premises of
13  Uncle Sam's?
14      A    Yeah.
15      Q    You've been in there.
16      A    Right.
17      Q    Okay.  Is that sort of a popular place for
18  folks to go?
19      A    I'd say they get business during the day,
20  but not a whole, whole lot.
21      Q    Okay.  So --
22      A    It's not a - - there's not always a bunch
23  of people in there, no.
24      Q    Okay.  Now, so you would know if you were
25  in there whether or not Roger was there at any time that

PROCEEDINGS                                                    Page 115

1   you were, right?
2       A    Yea.
3       Q    Tell this Hearing Examiner with what, you
4   know, what frequency you recall Roger being there at any
5   time you were dealing with Noodle in some straw purchase?
6       A    Most of the time I would say Roger was
7   never there because he was usually - - at that point in
8   time, he was pretty sick.  If you saw Roger there, it might
9   have been maybe once a month, if that much, I would say.
10      Q    Roger would - - and if he's there, he's
11  just sitting up there --
12      A    Yeah, up front in a rocking chair.
13      Q    Okay.  Would it be fair to - - no offense,
14  Roger - - sort of a Wal-Mart greeter if he's there?
15      A    Yeah.
16      Q    Okay.  Roger's well-known in the community,
17  well-liked and he's a fixture, correct?
18      A    Right.
19      Q    Just as the chief of police described him,
20  right?
21      A    Yes.
22      Q    Now, same question with respect to Louise.
23  Where would she be?
24      A    If she was there, when I done it, she would
25  be - - probably up front at the cash register.

PROCEEDINGS                                                    Page 116

1       Q    What kind of activity did you see Louise
2   engaged in when you were in Uncle Sam's?
3       A    Usually, she just checked people out or was
4   just - - a lot of times she would go to the jewelry
5   counter, but that was about it.
6       Q    So her area was jewelry and cash register;
7   is that right?
8       A    Yeah.
9       Q    Okay.  All right.  And you had been candid
10  with - - in your interviews with the AFT, I take it?
11      A    Right.
12      Q    Right?  You testified in front of the Grand
13  Jury?
14      A    No, sir.
15      Q    Okay.  You acknowledge having given this
16  statement to Agent Cunningham?
17      A    Yeah.
18      Q    Okay.  You and I looked at it before,
19  during the break here.
20      A    Right.
21      Q    Okay.  And you recognize and indicate that
22  that's relatively accurate portrayal of your interview?
23      A    Right.
24      Q    Is it fair to say that it was always Noodle
25  Adkins that got you involved in this?

PROCEEDINGS                                    Page 117

1    A    Yeah.
2    Q    Okay.  Do you know whether he was operating
3  out of his house?
4    A    Yeah.
5    Q    What was he doing, stealing this stuff?  Is
6  that the essence of what he was doing?  Putting it in
7  people's names, taking it out, selling it out of his house
8  to other people?
9    A    Yeah, for the most part.  He would take and
10  a lot of times out the back door or just take them home
11  with him or whatever and then sell them later.
12    Q    Okay.
13    A    Or even, later that evening.
14    Q    Were you in that transaction that Noodle
15  pleaded to that I was reading about --
16    A    Yeah.
17    Q    -- with the fellow in Wyoming County?
18    A    Yeah.
19    Q    No indication that either of the Muncys had
20  any idea what he was doing?
21    A    No, they didn't.
22        MR. CAGLE: Nothing further.
23        HEARING EXAMINER: Does the Government have
24  any questions of this witness?
25        MR. LOWNEY: Sure.

PROCEEDINGS                                    Page 118

1              CROSS-EXAMINATION
2        BY MR. LOWNEY:
3    Q    Mr. Noel, have you ever worked at the
4  store?
5    A    No, sir.
6    Q    Okay.  I guess, what is your relationship
7  with the Muncys?
8    A    I just -- I've known Roger most of my
9  life, but I just become friends with them through Noodle,
10  just got to know them from where I was with him so much
11  probably for two years.  Maybe longer than that, I really
12  don't know.
13    Q    And to your knowledge - and you may not
14  know this - were other employees that were in the store
15  during these transactions with you and Adkins and firearms,
16  were other employees aware what was going on or maybe even
17  signed some of the forms?
18    A    I would say at the beginning of it,
19  probably no.  But I would say through some of it, I know
20  Clifford had to know because of his girlfriend when he
21  worked there.  But most of the other ones, I didn't -- I
22  don't think Noodle would ask or stuff a lot of times.  Most
23  times, if I done a gun form, it was with Noodle.  I think
24  Clifford might have done one or two, if that.  But most of
25  it was through Noodle.

PROCEEDINGS                                    Page 119

1    Q    And when you were filling out the form to,
2  you know, so that the guns would apparently go to him, was
3  there -- were you paying for the firearms or was he giving
4  you -- what was the cash asked for that, if anything?
5    A    He was actually supposed to give me like
6  $50 each time I done it, but he never did.
7    Q    Okay.  As to the guns themselves, if you're
8  purchasing a few guns and they cost X amount at the store,
9  was -- you know, was he depositing --
10    A    Somebody would --
11    Q    -- money for those guns --
12    A    -- come in and pay for them or he would pay
13  for them or a lot of times, he would take care of that.  He
14  would -- I'd fill out the gun form a lot of times and he
15  would say, you know, "Take these guns out and put them in
16  your truck and when we get off work, we'll take them to the
17  house," or take them wherever we had to take them to.
18    Q    Yeah, but I guess what I'm trying to get
19  at, is at least to your knowledge, was he, you know, paying
20  the store for those guns or just simply stealing them?
21    A    A lot of times he would take them before
22  they were paid for and then he would receive payment later
23  and then pay for the guns.
24    Q    So put money back into the store --
25    A    Right.

PROCEEDINGS                                    Page 120

1    Q    -- or register or whatever.
2    A    Right.
3    Q    And during the course of these transactions
4  when you filling out the form, you acknowledge when you're
5  indicating you were the actual purchaser, that that was not
6  the case?
7    A    Right.
8    Q    And also on the part of the form where you
9  were to indicate that you were not somebody that was
10  illegally using controlled substances, that was also false?
11    A    Yes, sir.
12    Q    Were -- did you ever take -- did you ever
13  own any of these firearms or did --
14    A    There's some, I think, that I bought myself
15  when I was still working and stuff before I got a problem.
16  Most of the later ones, I think, were all straw purchases.
17    Q    Once the purchases were completed, you
18  know, would you take the guns out of the store and bring
19  them to him or how did that typically -- the way it
20  typically worked, how did that work?
21    A    A lot of times, he would have me just
22  take them out and put it in my truck and then I would stay
23  there till he got off work and then we would leave in my
24  truck a lot of times or I would meet him at his house and
25  pick him up or something -- meet him there and get in his

PROCEEDINGS                                    Page 121

1  truck and take him to wherever, whatever.
2      Q     To your knowledge, he was selling those or
3  many of them?
4      A     Yeah.
5            MR. LOWNEY: That's all I have.
6            REDIRECT EXAMINATION
7  BY MR. CAGLE:
8      Q     Now, you mentioned Clifford Mullins.
9  That's the fellow that the Muncys fired, wasn't it?
10     A     Yes, sir.
11           MR. CAGLE: Okay.  Thank you.
12           MR. LOWNEY: I don't have anything.
13           MR. CAGLE: Okay.  What about Mr. West.
14           B R I A N   W E S T,
15     having been called to tell the truth, testified as
16  follows:
17           DIRECT EXAMINATION
18  BY MR. CAGLE:
19     Q     State your full name, please.
20     A     Brian Allen West.
21     Q     Okay.  Mr. West, as I asked Shane a moment
22  ago, you gave a statement to Agent Cunningham, right?
23     A     Yes, sir.
24     Q     And you would stand by that statement?
25     A     Yes, sir.

PROCEEDINGS                                    Page 122

1      Q     Okay.  Now, what was your relationship to
2  Noodle?
3      A     He was my brother-in-law.
4      Q     Is he still?
5      A     No.
6      Q     He and your sister divorced, right?
7      A     Yes, sir.
8      Q     Now, with regard to how you became
9  involved, who contacted you to say, "I want you to sign
10  some documents"?
11     A     Noodle.
12           HEARING EXAMINER: Do we need a recess?
13           MR. CAGLE: Why don't we do that.
14           MR. LOWNEY: Sure.
15           MR. CAGLE: For his comfort so we don't have
16  to worry about him.
17           HEARING EXAMINER: We'll take a short
18  recess.  The time is approximately 10 minutes to 1:00.
19  We're taking a short recess.
20           (A brief recess was had, after which the
21  proceeding continued as follows:)
22           HEARING EXAMINER: The time is approximately
23  12:55.  We're back on the record.
24  MR. CAGLE (resuming):
25     Q     Mr. West, I think I asked you something

PROCEEDINGS                                    Page 123

1  about your relationship to Noodle, right?
2      A     Yes, sir.
3      Q     Your former brother-in-law.  How - - just
4  tell the Hearing Examiner how it was that you became
5  involved in what we have called illegal or straw purchases.
6      A     He called me and asked me to come down to
7  the store and fill out papers.
8      Q     Who called you?
9      A     Noodle.
10     Q     Noodle.  Okay.  Was that at a time when he
11  was still married and living with your sister?
12     A     Yes, sir.
13     Q     All right.  And I take it you did that?
14     A     Yes, sir.
15     Q     Did he tell you when he called you what it
16  was?
17     A     No, he just asked me to come to the store.
18     Q     All right.  Did he pay you for doing that?
19     A     Yes, he did.  He paid me $20.
20     Q     At that time, were you living - - where
21  were you living?
22     A     I was living at the Town of Man Fire
23  Department.
24     Q     Is that where you still live?
25     A.    Yes, sir.

PROCEEDINGS                                    Page 124

1      Q     Okay.  You didn't otherwise have a home; is
2  that right?
3      A     That's right.
4      Q     So Noodle recruits you for $20 --
5      A     Yes, sir.
6      Q     -- to do this?  Okay.  Now, let me ask you,
7  then, whether at any time that a transaction of this nature
8  - and I'll call it straw transaction.  You know what I'm
9  talking about?
10     A     Yes, sir.
11     Q     Okay.  An illegal transaction.  At any time
12  that you were at Uncle Sam's for that purpose, was either
13  of the Muncys involved in the transaction in any way?
14     A     No, they wasn't.
15     Q     Were they present so that they could see
16  what was going on --
17     A     No.
18     Q     -- or hear what was said?
19     A     No.
20     Q     At any time?
21     A     Not -- no.
22     Q     Now, with what frequency would you have
23  gone in to Uncle Sam's since your brother-in-law was there?
24     A     I'd go in at least may two, three times a
25  week.

UNITED STATES DEPT OF JUSTICE - ATF v.          ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.                                September 13, 2016

| PROCEEDINGS | Page 125 |
|---|---|

1  Q    When you would go in, with what frequency
2  would you see Roger Muncy?
3  A    Not too often.
4  Q    Okay.  You knew Roger before.
5  A    Yes, sir.
6  Q    Do you agree that Roger's sort of a well-
7  known fixture in this small town of Man?
8  A    Yes, sir.
9  Q    Okay.  Now, about Louise, what would she be
10  doing and would you see her --
11  A    When I --
12  Q    -- and with what frequency?
13  A    When I did see her, she'd be standing at
14  the register or at the jewelry counter.
15  Q    I mean that's - - you agree with Shane on
16  that?
17  A    Yes, sir.
18  Q    That's Louise's thing, right?
19  A    Yes, sir.
20
21  Q    Okay.  She's not - - she's not involved in
22  the - - in filling out the forms or doing the --
23  A    No. No.
24  Q    -- jewelry and stuff?
25  A    Right.

| PROCEEDINGS | Page 126 |
|---|---|

1  Q    What was your understanding of your former
2  brother-in-law Noodle's interest in Uncle Sam's based on
3  what he told you?  What'd you understand his relationship
4  was?
5  A    He would just work there and he - - there
6  at one time, he said he was going to try to own the store.
7  Q    Okay.  Were the Muncys being good to him?
8  A    Oh, yeah, they was good to him.  Roger
9  treated Noodle like his own son.
10  Q    Okay.  When did you first become aware that
11  Noodle was stealing from the Muncys?
12  A    It was after that - - it was after it come
13  out that he was.
14  Q    Okay.
15  A    I mean, I knew - - I knew he was doing
16  something, but I didn't know what it was.
17  Q    Okay.
18  A    Because being his brother-in-law, I mean,
19  he all the time carried around a wad of money that I knew he
20  wasn't making from just working at Uncle Sam's.
21  Q    Okay.  But you didn't know what was going
22  on?
23  A    No, no.
24  Q    Would you visit in the home of him and your
25  sister?

| PROCEEDINGS | Page 127 |
|---|---|

1  A    Yeah, every once in a while.
2  Q    Never saw anything out of the ordinary with
3  regard to the guns or other equipment?
4  A    No, he did most of his transactions, from
5  what I can understand, out of the basement of his house and
6  when he'd do it - - I was there one time and a man come and
7  knocked on his door and he took him down in the basement
8  and then the man walked out with a bow.
9  Q    Okay.
10  A    You know, I didn't know -- you know, if
11  he'd just brought the bow home to work on it for him or - -
12  I didn't know what was going on.
13  Q    Okay.  All right.  When did your sister and
14  Noodle divorce?  Or maybe more correct, when did they last
15  live together as husband and wife?
16  A    A year or two ago?  A couple of years ago I
17  believe.
18  Q    Okay.  You think maybe 2014 sound about
19  right?
20  A    Yeah.
21  Q    Okay.  And your sister moved out of the
22  house and he stayed in the house --
23  A    Yes, sir.
24  Q    -- that you were talking about?
25  A    Yes, sir.

| PROCEEDINGS | Page 128 |
|---|---|

1       MR. CAGLE: All right.  Thank you very
2  much.
3       THE WITNESS: Uh-huh.
4       MR. LOWNEY: I don't have any questions.
5       MR. CAGLE: All right, who wants to go
6  first?  Mr. Gillespie.
7       P H I L L I P   G I L L E S P I E,
8    having been called to tell the truth, testified as
9  follows:
10       DIRECT EXAMINATION
11       BY MR. CAGLE:
12  Q    State your name, please?
13  A    Phillip Gillespie.
14  Q    All right.  Phillip, where do you reside.
15  A    Bruno, West Virginia.
16  Q    And in relation to Man, where is that?
17  A    I'm on Route 80 towards Gilbert.
18  Q    Where do you work?
19  A    Uncle Sam's Loans.
20  Q    How long have you worked at Uncle Sam's?
21  A    I've been there for 12 years.
22  Q    Okay.  You married?
23  A    Yes.
24  Q    Have kids?
25  A    No.

UNITED STATES DEPT OF JUSTICE - ATF v.   ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.                                         September 13, 2016

PROCEEDINGS                                           Page 129

1   Q   Okay. This is your sole occupation?
2   A   Yes.
3   Q   Are you a sales person, is that - - what's
4   the description of your position?
5   A   As of now, manager.
6   Q   Okay. When did that become the case?
7   A   I've actually been listed as the manager
8   for a while, but at the time, where Noodle was there at the
9   store, he pretty much run the day-to-day operations and I
10  never had any managerial responsibilities or anything. It
11  was more or less a title.
12  Q   Okay. Did you ever - - did you ever sign
13  any of these documents that are straw transactions?
14  A   No, not that I know of. I'm really not
15  sure.
16  Q   Do you know what - - do you know the
17  individuals that did - - I'll name them for you. It would
18  be Scott Ellis? Do you know him?
19  A   I know him as a customer, nothing personal.
20  Q   All right. In your time there, with whom
21  did Scott Ellis deal?
22  A   He always dealt with Noodle.
23  Q   And when you say "always," was that - - had
24  that become a common sight at some point?
25  A   Oh, yeah, he would come straight in and

PROCEEDINGS                                           Page 130

1   they would go in the back.
2   Q   Okay. And by "the back," what are you
3   talking about?
4   A   A back room in the store.
5   Q   In other words, they would get away from
6   others?
7   A   Yes.
8   Q   Okay. Now, let's see. Do you recognize
9   the names of any of the - - that's okay. Do you recognize
10  the name of the others involved in that - - let me find
11  that for you. I'm sorry.
12     MR. CAGLE: What is that, Exhibit 1? I'm
13  looking for the names.
14     MR. LOWNEY: Exhibit 1 has the names of the
15  various individuals that were involved in the transactions.
16  MR. CAGLE (resuming):
17  Q   Christina Deer, do you know - - do you
18  remember Christina Deer?
19  A   I've met her two or three times. That's
20  really about it as she's come to the store.
21  Q   Do you ever remember having seen her at
22  Uncle Sam's?
23  A   Two or three times maybe. Not many.
24  Q   Did you - - do you recall with whom she
25  dealt?

PROCEEDINGS                                           Page 131

1   A   She always dealt with Noodle.
2   Q   Okay. And you had seen her in there,
3   right?
4   A   Yes.
5   Q   Okay. Would - - would Noodle have others
6   sign the From 4473?
7   A   On the most part, yes.
8   Q   How did that happen? How did that become
9   the case?
10  A   Well, he would wait on a customer and as he
11  finished up with whatever, you know, he was doing with the
12  customer, he'd say, "Here, register these guns to them,"
13  and the employee would do the form, call it in.
14  Q   Okay. To your knowledge, did any other
15  employee know what Noodle was up to?
16  A   Not to my knowledge.
17  Q   Was Noodle working there when you first
18  came to work at Uncle Sam's?
19  A   Yes.
20  Q   Okay. I take it you know Shane and Brian;
21  is that right?
22  A   Yes.
23  Q   Did you ever either Shane or Brian deal
24  with one of the Muncys in any transaction?
25  A   None that I've ever seen.

PROCEEDINGS                                           Page 132

1   Q   Okay. Did you see them with Noodle?
2   A   Yes.
3   Q   Okay. Were any of those transactions done
4   in the back of the premises?
5   A   Most of the time, yeah.
6   Q   Okay. Describe that because this gentleman
7   and others here --
8   A   There's a whole back corner of the store we
9   keep, you know, there's a computer and all the guns are
10  back there. And generally at that back counter is where
11  all the forms are filled out and called in and everything.
12  And then most of the time like in -- like with Scott Ellis,
13  he would be in the back talking with them or whatever,
14  doing his thing and then send them out, have one of us do
15  the form and then afterwards, they would go to speak with
16  him after they filled out the forms.
17  Q   Okay. When was the first time you
18  discovered that Noodle was involved in these - - well,
19  these crimes?
20  A   Really when it all come about, when ATF
21  come to the store the first time and done their search and
22  investigation. It all kind of come about then.
23  Q   Did you testify in front of the Grand Jury?
24  A   Yes, sir.
25  Q   Okay. Do you know of any involvement of

UNITED STATES DEPT OF JUSTICE - ATF v.        ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.                        September 13, 2016

| PROCEEDINGS | Page 133 |
| --- | --- |

1   either of the Muncys, Roger or Louise?
2       A    Not that I know of.
3       Q    You were in front of the Grand Jury?
4       A    Yes, sir.
5       Q    Were you interviewed before that?
6       A    No.
7       Q    Okay.  If you know, it's not your - - you
8   don't know when Noodle first come to work at Uncle Sam's?
9       A    No, I have no idea.
10      Q    You just know he was there when you go
11  there?
12      A    Yeah.
13      Q    Did you answer to him from the very
14  inception of your work there?
15      A    Yeah, it was him and Melinda mostly.
16      Q    Okay.  You don't know what year Melinda
17  left?
18      A    I'm thinking it was around 2010, but I'm
19  really not for sure.
20      Q    Okay.  That's Melinda Bowles; is that
21  right?
22      A    Yes.
23      MR. CAGLE: That's all I have.  Thank you,
24  Phillip.
25      THE WITNESS: Uh-huh.

| PROCEEDINGS | Page 134 |
| --- | --- |

1          CROSS-EXAMINATION
2   BY MR. LOWNEY:
3       Q    What was your - - do you have a role as far
4   as the firearms part of the business?  To what extent were
5   you involve in that?
6       A    Just sales and I would take the forms and
7   put them in the computer.
8       Q    Okay.
9       A    Just copy the information.
10      Q    To your recollection, did you ever complete
11  any of the forms at the direction of Mr. Adkins?
12      A    Not that I know of.  I'm not going to say
13  that I did or I didn't because I really don't know.
14      Q    But you had some involvement in the
15  firearms part of the business --
16      A    Yes.
17      Q    -- in terms of sales or paperwork.
18      A    Yes.
19      Q    And, you know, the time line when this was
20  going on was over a couple year period.
21      A    Uh-huh.
22      Q    And then two of the gentlemen are here
23  today where, like Mr. Noel and Mr. West would repeatedly
24  becoming into the store and buying three and four, five
25  firearms at a time.

| PROCEEDINGS | Page 135 |
| --- | --- |

1       A    Uh-huh.
2       Q    You know, was there ever any concern on
3   your part or any concern on anybody's part about, you know,
4   why these individuals were buying all these guns and what
5   was going on with it?
6       A    Never really paid much attention to it.  I
7   mean, they were dealing with another person.  You was just
8   kind of there.  You was just doing your job.
9       Q    Was there ever any discussion among
10  employees about what - - they obviously had some discussion
11  about the fact that Mr. Adkins was taking some of these
12  firearms and apparently other property out of the business
13  and selling it.  Was there any knowledge of you or that you
14  heard from other employees about any of that?
15      A    No, actually, today is the first time I've
16  heard that other than hearsay on the street.
17      MR. LOWNEY: That's all I have.
18      MR. CAGLE: Eric, ready?
19      E R I C   A L L E N,
20  having been called to tell the truth, testified as
21  follows:
22          DIRECT EXAMINATION
23  BY MR. CAGLE:
24      Q    State your full name, please?
25      A    Eric Allen.

| PROCEEDINGS | Page 136 |
| --- | --- |

1       Q    Where do you work, Eric?
2       A    At Uncle Sam's Loans.
3       Q    How long have you been working there?
4       A    Eleven years.
5       Q    So you've been there almost as long as
6   Phillip, right?
7       A    Uh-huh.
8       Q    What's your job there?
9       A    Sales.  I mainly work on bows.
10      Q    Bow?
11      A    Yeah.
12      Q    Okay.  So you're kind of a bow specialist?
13      A    Yeah.
14      Q    Okay.  Those are hunting bows, the real
15  powerful ones?
16      A    Right.
17      Q    Now, with regard to your personal
18  situation, are you a resident of Man?
19      A    No.
20      Q    Where do you live?
21      A    I live in Greenville.
22      Q    Where?
23      A    Greenville.
24      Q    South Carolina?
25      A    No.

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                   Page 137

1    Q    Where is that in relationship to Man?
2    A    It's probably two miles, maybe, from Man.
3    Q    Okay. Are you married?
4    A    Yes.
5    Q    Have children?
6    A    Three.
7    Q    What are their ages?
8    A    10, 6 and 2.
9    Q    And you rely on this job to feed your
10   family?
11   A    Yes.
12   Q    Eric, you've heard from Shane and Brian.
13   You know each of them when you see them.
14   A    Yeah.
15   Q    Do you know Christina Deer?
16   A    Now, I do. At the time when I was
17   questioned the first time, I wasn't sure who she was
18   because they explained to me once I got back to work who
19   she was, but yeah, I know who she is?
20   Q    So you know from what other people have
21   told you?
22   A    Yes.
23   Q    So and I'm sure you know her when you see
24   her?
25   A    Oh, I know her.

PROCEEDINGS                                   Page 138

1    Q    Okay.
2    A    I didn't know her last name at that time.
3    Q    Do you know Scott Ellis?
4    A    Yes.
5    Q    All right. With respect to each of those
6    individuals, did you ever sign any of the transactions?
7    A    Yeah.
8    Q    Okay. Tell the Hearing Examiner how that
9    came about.
10   A    Pretty much what Phillip said. I mean, he
11   done his own thing in the back room or just walking around
12   talking to them, laughing, joking, carrying on. And when
13   it come down to time to do the actual paperwork, he would
14   never do it. He would always holler at one of us to come
15   and do it.
16   Q    And the "he" is?
17   A    Noodle.
18   Q    Noodle? And what was your relationship as
19   an employee to Noodle during the relevant period? What --
20   did you answer to him?
21   A    Oh, yeah.
22   Q    You understood that he had some management
23   authority there; is that right?
24   A    Yeah.
25   Q    Now, with regard to that, was there any

PROCEEDINGS                                   Page 139

1    time in the transaction that you were enlisted to sign off
2    on the transaction by Noodle that -- was there any time
3    when you recall Louise or for that matter Roger being in on
4    the transaction, that is there, physically?
5    A    No.
6    Q    Did that ever happen?
7    A    No.
8    Q    Did they ever -- was there any insinuation
9    there of involvement of the Muncys with what we now know
10   Noodle was up to?
11   A    No.
12   Q    Did you -- that time that you signed, I
13   take it you didn't have -- when you signed the 4473, you
14   didn't know that there was something wrong with it, did
15   you?
16   A    Well, no, not really. I mean, you don't
17   really question where people get their money from, for the
18   most part. Especially in Scott Ellis' case, you know. A
19   mine owner, you know, you just thought he liked guns. I
20   mean, I never knew all that was going on until today.
21   Q    Okay. Did you know how to fill out the
22   4473? Is that something that you -- have a familiarity?
23   A    Not till I started work there, no.
24   Q    Yeah, I'm talking about in the last decade
25   or so --

PROCEEDINGS                                   Page 140

1    A    Oh, yeah.
2    Q    -- you've become familiar with that.
3    A    Oh, yeah.
4    Q    Okay. You've never filled one out
5    knowingly that it was -- something was wrong, fraudulent
6    or illegal about it?
7    A    No. No.
8    Q    Okay. Well, you hesitated some there.
9    This is your chance to -- did -- when Noodle would tell
10   you to sign off on that -- on a form, kind of give us a
11   sense of how that would happen.
12   A    Well, like I said, after he done his thing,
13   we'd have the person fill out the form and as we're calling
14   it in that they still -- whoever he was waiting on would
15   just, they'd go chit chat and talk till I got done and they
16   would come and sign it and Noodle would throw me the little
17   card that you put on the back of the gun forms and I
18   finished the gun form after he signed it and then move on
19   to the next customer.
20   Q    You'd have the customer fill out the form
21   or would you sometimes --
22   A    The customer filled it out and we signed
23   it.
24   Q    Okay.
25   A    Is all we done.

PROCEEDINGS                                    Page 141

1   Q    And you just signed that they'd - - you had
2   witnessed their filling it?
3   A    Uh-huh.
4   Q    Is that the essence of it?
5   A    Yeah.
6         MR. CAGLE: That's all I have, Eric.  Thank
7   you, sir.
8         CROSS-EXAMINATION
9         BY MR. LOWNEY:
10  Q    During the time period when all this was
11  going on - - which I assume at this point you're aware of
12  what was going on.  Again, from your perspective as
13  somebody who was in the store working on a regular basis
14  and apparently supervised by Mr. Adkins, I mean, was there
15  any awareness or discussion among employees about, again,
16  these gentlemen repeatedly coming into the store, acquiring
17  hundreds and hundreds of dollars worth of firearms?  You
18  know, was there - - there was never any discussion about
19  that or anybody wondering about it?
20  A    Not really, no.  I mean, at the time, it
21  was - - I mean, in 2009, '10, '11, I mean, we was a pretty
22  busy place.  I mean, I was from customer to customer to
23  customer.  So we was - - really didn't pay much mind to
24  anything.
25  Q    And there was - - you had no knowledge that

PROCEEDINGS                                    Page 142

1   Mr. Adkins was taking possession of a lot of these
2   firearms?
3   A    No, not until today, no.
4         MR. LOWNEY: That's all I have.
5         MR. CAGLE: Thank you, Eric.  Okay
6         D O R O T H Y   L O U I S E   M U N C Y,
7   having been called to tell the truth, testified as
8   follows:
9         DIRECT EXAMINATION
10        BY MR. CAGLE:
11  Q    Well, Louise?
12  A    Yes?
13  Q    How about you?
14  A    You want my name?
15  Q    Yes, if you would, please?
16  A    Dorothy Louise Muncy.
17  Q    Louise, tell the Hearing Examiner your
18  relationship to Uncle Sam's.
19  A    I'm the owner for about three years.
20  Q    Okay.  And Uncle Sam's, it was started by
21  your husband, right?
22  A    Yes.
23  Q    And for each of you, this is a second
24  marriage, right?
25  A    I couldn't hear you.

PROCEEDINGS                                    Page 143

1   Q    For each of you, Roger and you --
2   A    Second marriage?  Yes.
3   Q    How long have you and Roger been married?
4   A    Thirty-four years.
5   Q    Okay.  That counts as a first, doesn't?
6   For three decades.  Each of you have children; is that
7   right?
8   A    Uh-huh.
9   Q    Well, he said don't "uh-huh."
10  A    Yes.
11  Q    All right.  So how long is it that you have
12  owned the business?  And by that, is it a stock ownership?
13  A    Yes.
14  Q    Uncle Sam's is - - well, what kind of
15  corporation is it, do you know?  Is it a C corporation or
16  is it a --
17  A    Yeah.
18  Q    Okay.
19        MR. CAGLE: You have to wait your turn,
20  Roger.
21        THE WITNESS: He knows a lot more than I do.
22  MR CAGLE: (resuming):
23  Q    If you don't know, you just say you don't
24  know.
25        HEARING EXAMINER: I didn't hear the

PROCEEDINGS                                    Page 144

1   response.  What kind of corporation?
2   MR. CAGLE (resuming):
3   Q    What kind of corporation?
4   A    C.
5         HEARING EXAMINER: C.  Thank you.
6   MR. CAGLE (resuming):
7   Q    All right.  Now, and how long have you been
8   what we call the owner of this C corp?
9   A    Three years.
10  Q    Do you own 100 percent of the stock or is
11  there some question about that?
12  A    No, I own 9 percent and Steven Adkins right
13  now has 1 percent.
14  Q    Or 90 percent versus 10 percent, on a 100?
15  Is that right?
16  A    Yeah.
17  Q    Okay.  Tell the Hearing Examiner how it is
18  that Steven became a - - at least a claimant for ownership.
19  A    Well, like you say, he's been sick for - -
20  off and on for years.  He's had strokes, heart attacks,
21  everything else.  I told him that I needed someone else to
22  help me more because I didn't know anything about the guns.
23  I didn't - - you know, I was always just the register girl.
24  I do the register, pay the bills and work the jewelry.
25        I don't - - as far as I know, except for

UNITED STATES DEPT OF JUSTICE - ATF v.          ADMINISTRATIVE HEARING
UNCLE SAM'S LOANS, INC.                         September 13, 2016

| PROCEEDINGS | Page 145 |
| --- | --- |

1  one time when I went to a gun show and somebody showed me
2  how to do a gun form, I've never filled out a gun form.
3  Never, unless I bought the gun. But for somebody, I've
4  never called one in. I don't even know the number - - or
5  our number.
6      Q    So you're not - - you've not been - -
7  traditionally, you've not been involved in gun sales?
8      A    No, I don't know anything about guns.
9      Q    So we were getting to, then, how it is that
10 Noodle Adkins become somewhat of an --
11     A    Right.
12     Q    -- partial owner or a part - - or a
13 claimant at least --
14     A    Right.
15     Q    Okay. Go ahead.
16     A    We had always told him when we retired that
17 he would have a chance to get the store. And when all this
18 happened, this last thing with him, we decided to make him
19 a one-tenth, one share of the store, so that way I'd have
20 more help and he could help me, you know.
21     Q    So you - - was Noodle sort of considered
22 like a son?
23     A    Oh, yeah. We loved him. It killed him.
24     Q    You'd said something about, "this last
25 thing." What are you talking about?

| PROCEEDINGS | Page 146 |
| --- | --- |

1      A    Well, he had a piece of plaque break off,
2  went up to his eye, made him blind and had to go up in
3  there - - I don't know. He couldn't help me with anything
4  because of the stroke. He lost his memory, short time - -
5  or long time. So I needed somebody that knew more about
6  the business than just me, which I didn't - - these boys
7  will tell you, I don't know much - - I'm just throwed in
8  there.
9      Q    Okay. So when did Roger have his stroke?
10     A    The first - - let's see. The first heart
11 attack was 2000 - - 2004 he whispered. I didn't remember.
12     Q    When was his stroke?
13     A    The stroke, they give him a clot buster
14 when he had his attack and he had the stroke the same time.
15     Q    Okay. So in 2004 was the stroke. His
16 current condition --
17         MR. CAGLE: And Roger, I don't want to talk
18 about you like you're not here, so you can't hear so –
19 MR. CAGLE (resuming):
20     Q    He's had that since '04; is that fair to
21 say?
22     A    He had a first - - one heart attack back in
23 '97. That was his first one and then he started having
24 everything combined going down.
25     Q    Did you ever have any hint --

| PROCEEDINGS | Page 147 |
| --- | --- |

1          MR. MUNCY: Snitch.
2  MR. CAGLE (resuming):
3      Q    No. Did you ever have any hint that Noodle
4  was - - what he was up to?
5      A    I never dreamed it. I mean, because, like
6  I said, he was part owner. Why would he do it to himself?
7      Q    What happened --
8      A    We still don't understand that part.
9      Q    Okay. What happened to the ownership? Is
10 there a controversy about that?
11     A    Right now, it's just - - we don't know.
12 We're seeing what's going on and stuff. We haven't heard
13 anything on his part or our part.
14     Q    Okay. You've hired a lawyer down in Logan
15 on that?
16     A    No, not really.
17     Q    Okay. But you did put him out, right?
18     A    Yeah.
19     Q    And when you found out what he had been up
20 to, you put him out?
21     A    Right.
22     Q    There was a suggestion by the agent that
23 some how you put him out because he, Noodle had signed a
24 plea agreement. That wasn't the case, was it?
25     A    No.

| PROCEEDINGS | Page 148 |
| --- | --- |

1      Q    In fact, I apprised you of a deposition
2  with Scott Ellis and what I understood to be his
3  involvement --
4      A    Uh-huh.
5      Q    -- with Noodle from another case; isn't
6  that right?
7      A    Right.
8      Q    And that you had an employee that was bad,
9  that was doing things that were going to put Uncle Sam's at
10 risk.
11     A    Uh-huh.
12     Q    Right?
13     A    Uh-huh.
14     Q    That's the reason you put him out, isn't
15 it?
16     A    Right. We'd had enough of that other.
17     Q    You found out you were dealing - - you had
18 a skunk in your midst, correct?
19     A    Correct.
20     Q    Did you have any idea that he was stealing
21 and doing these fraudulent actions?
22     A    No.
23     Q    Did Roger - - did you know before now what
24 a straw transaction was?
25     A    No.

PROCEEDINGS                                    Page 149

1    Q    Okay.
2    A    I still don't really understand it.  I
3    know, hearing all this, I've picked up on it, but other
4    than --
5    Q    Okay.  Do you know these individuals that
6    I'm going to go through?  You knew Shane and Brian, right?
7    A    Yes.
8    Q    Okay.  Christina Deer, do you know her?
9    A    I don't know her.  Those boys says I've
10   probably seen her in the store, but I wouldn't know her if
11   she'd walk in here.
12   Q    Scotty Ellis, do you know him?  Do you
13   remember him?  Do you remember him coming in and cashing
14   checks?
15   A    Yes.
16   Q    Okay.  Now the document that I had made
17   exhibits before, you got from Gary Wilson at the bank.  At
18   the time it was called Exhibit 1 and 2, right?  These?
19   Take a look.
20   A    Yeah.  I had it all the way up till - - I
21   didn't renew this time.
22   Q    Okay.
23   A    Because business has been so bad, I didn't
24   have the money really to cash it in the store.  So I've not
25   got the check cashing right now.

PROCEEDINGS                                    Page 150

1    Q    Okay.  Explain that business to the Hearing
2    Examiner, that check cashing --
3    A    Explain what?
4    Q    Explain the check cashing business that you
5    had to the Hearing Examiner.
6    A    Yeah, well people come in and we'd cash a
7    check and, you know, I'd tell them it's 10 percent and then
8    I'd charge tax.  Excuse me.  But we didn't have a whole
9    lot.  You know, anything over, I think, a thousand dollars,
10   something like that, you had to have a cash check to do
11   that.
12   Q    Okay.
13   A    So we didn't - - I didn't renew it.
14   Q    Okay.  But, in other words, the value of
15   the check cashing business was you could cash large checks,
16   right?
17   A    Right, yeah.
18   Q    And then that is designed, as you
19   understand it, to follow the money --
20   A    Right.
21   Q    -- as the Government wants to do, right?
22   A    You can't cash over a thousand unless you
23   had the cash check.
24   Q    Okay.  And you got that through working
25   with the bank there in Logan?

PROCEEDINGS                                    Page 151

1    A    Yes.
2    Q    Okay.  With Mr. Wilson.
3    A    Yeah, that's who comes to the store and we
4    deal with.  We have a Logan Bank and Trust in Man, too, so
5    that's our main bank.
6    Q    Okay.  But in any event, up until the
7    renewal in 2015, you had the license, right?
8    A    Right.
9    Q    Okay.  And with any transaction - - how
10   many transactions do you remember yourself having with this
11   Scott Ellis?
12   A    You mean, me cashing his checks?
13   Q    Yes.
14   A    Well, the only thing I remember is
15   sometimes he'd come in and get something and put it on a
16   ticket and come back with a check to pay for it later, like
17   a week later or, you know, he would actually charge
18   something and come back and bring a check.  Probably a
19   couple times he had one larger than what he owed and I just
20   give his change back, $200 something like that.
21          But as far as cashing a big check, I never
22   did.  Because he never liked a woman to wait on him.  He
23   always thought we was beneath him.  That's the kind of
24   person Scott Ellis was.  He thought he was just - - we
25   didn't know what we was doing, which he might have been a

PROCEEDINGS                                    Page 152

1    little right.
2    Q    So, who'd he deal with?
3    A    Huh?
4    Q    Who'd he deal with?
5    A    Steven Noodle Adkins.  That's the only one
6    he'd go to every time he come in.
7    Q    At that time that he came back a little
8    later, do you now know that maybe that was some shenanigan
9    he was pulling?
10   A    It probably was.  I know everything --
11   almost ever person that walks in the store right now, they
12   tell us, "We wanted to tell you, but we was afraid you'd
13   get mad at us," you know, that he was stealing the guns out
14   the back door.  I mean, they just walk in everyday and tell
15   us something.  It's just really - - really been rough on
16   this one, Roger.
17   Q    Roger thought of him as like his own,
18   didn't he?
19   A    Oh, yeah.
20   Q    Okay.  What's been the effect on Roger?
21   A    Do what?
22   Q    What's been the effect of this on Roger?
23   A    Look at him.  Does that tell you?  He stays
24   in bed a lot.  He sleeps a lot.  It changed him.
25   Q    How many people do you all currently

PROCEEDINGS                                    Page 153

1  employ?
2      A    Counting me - he's not employed - we've got
3  five.
4      Q    Okay.  What's the most you all have
5  employed?
6      A    Most that we've had at one time?
7      Q    Yes.
8      A    Probably 6.  It's never been more than
9  that.
10     Q    Do you know --
11          MR. MUNCY:  At one time we had the three
12  stores.
13          MR. CAGLE:  Hold on, Roger.
14  MR. CAGLE (resuming):
15     Q    Do you know how many of your employees rely
16  upon Uncle Sam's for their family?
17     A    Every one of them.  That's their only main
18  job.
19          MR. CAGLE:  That's all I have of Louise.
20          HEARING EXAMINER:  Has the Licensee
21  completed it's presentation?
22          MR. CAGLE:  Maybe.  I'd like a second to
23  speak with Roger and Louise, perhaps.  But other than that,
24  yes, sir.
25          HEARING EXAMINER:  Do you want to do that

PROCEEDINGS                                    Page 154

1  now?
2          MR. CAGLE:  Yes, sir.  Let me have a two-
3  minute - - five-minute break.  Is that all right?
4          HEARING EXAMINER:  Two.  The time is
5  approximately 1:28.
6          (A brief recess was had, after which the
7  proceeding continued as follows:)
8          HEARING EXAMINER:  The time is approximately
9  1:33.  We're back on the record.
10         R O G E R   D A L E   M U N C Y,
11     having been called to tell the truth, testified as
12  follows:
13          DIRECT EXAMINATION
14  BY MR. CAGLE:
15     Q    Roger, state your full name for us?  Can
16  you hear me all right?
17     A    I'm just fine.
18     Q    Can you hear me?  Look at me.
19     A    Yes, sir.
20     Q    Okay.  State your full name.
21     A    Roger Dale Muncy.  Birthday 11-1-52.  Want
22  my Social Security?
23
24     Q    No.
25          MRS. MUNCY:  No, they have that.

PROCEEDINGS                                    Page 155

1      MR. CAGLE (resuming):
2      Q    Turn around here.  I want to ask you
3  something and I don't want you to have to ask me back - -
4  to repeat it, okay.  When did you start the business that's
5  known as Uncle Sam's?
6      A    In February the 15th of 1975.
7      Q    Okay.  And how did you become involved in
8  that - - this kind of business?
9      A    I grew up in this business.  My father and
10  mother died when I was very young and my brother raised me
11  and I worked at the B & B Loans in Logan for a guy named
12  John Gilliam when I was in junior high.  And I learned the
13  business of pawn and all that kind of stuff.
14     Q    Okay.  So you go back to your junior high
15  days?
16     A    Junior high days.
17     Q    And this business that you started, has it
18  been in existence at all times since '75?
19     A    Right.
20     Q    Were there - - was there more than one
21  store?
22     A    Absolutely.  I had three stores at one time
23  and then I got sick.  I had my first heart attack in 1997
24  and I had a boy that worked for me 20 years and that was
25  the Oceana store.

PROCEEDINGS                                    Page 156

1      Q    And you sold that to him?
2      A    I sold that to him.  And --
3      Q    So you have a history --
4      A    Well, we had a bargain.  I said, "I need
5  you to go over there and run that store," so he'd have a
6  job.
7      Q    Just answer the question and we'll get
8  through this thing.  So you have had a history of trying to
9  bring on some of your workers or your employees into the
10  business, right?  Is that how you all determined to bring
11  Noodle Adkins involved; is that right?
12     A    Yes, sir.
13     Q    Was as far as you knew, Noodle a good
14  employee?
15     A    As far as I knew.  I loved him.
16     Q    As if he were yours?
17     A    He was more than my son.
18     Q    Okay.  How would you describe Noodle?
19  Before you knew about this, how would you describe Noodle?
20     A    He was great.  He done everything for me.
21  He helped me put my clothes on.  He done everything I asked
22  of him.  I mean, when Louise would go someplace, he'd stay
23  with me at night to help me.  I mean, I didn't have my son
24  that lived here in town.  My son was so jealous of him, you
25  wouldn't believe.

PROCEEDINGS                                    Page 157

1    Q    Did you ever tell Noodle that - - did you
2  say, "I want you to start doing these straw transactions"?
3    A    No way.
4    Q    How many years have you been in business
5  now?
6    A    Forty-one, be  42 in February.
7    Q    And you'd had three different operations,
8  right, in three different locations; is that right?
9    A    Well, I had this - - the Cleveland Clinic -
10 -
11         MRS. MUNCY: No, honey, he's talking about
12 the store.
13 MR. CAGLE (resuming):
14    Q    I'm sorry.  That's my fault.  You had had
15 three different stores, hadn't you?
16    A    Three different stores.
17    Q    Yes, sir.  Yeah, that's what I was saying.
18         HEARING EXAMINER: I misunderstood too.
19         MR. CAGLE: Yeah. No, no, I recognize my
20 error.
21 MR. CAGLE (resuming):
22    Q    What were the names of the three stores?
23    A    Uncle Sam's, Uncle Tom's and Uncle Bill's.
24
25    Q    All right.  Are the other two still in

PROCEEDINGS                                    Page 158

1  operation?
2    A    Yes.
3    Q    But you sold your interest in them?
4    A    Right.
5    Q    Now, have you ever had any trouble with the
6  AFT before this?
7    A    Never a problem.  Larry's computer system
8  and I'd like to address that.
9    Q    Okay.  I understand.  The - - did you make
10 - - what's your margin of profit on a typical firearm
11 transaction?
12    A    If I make a hundred dollars, that's a lot
13 any more.  There's more competition out there than there
14 used to be.  The smaller sales, you may get $50.
15    Q    All right.  Did you -- let me just be point
16 blank: Did you ever engage in a straw transaction just to
17 make $50 or $100 or whatever it might be?
18    A    No, why would I take a chance.  Why would I
19 take a chance?
20    Q    When was it that you started not coming in
21 as much?  What time period was that?
22    A    When I had the -- I got on 24 pills and
23 they just - - I keep telling the doctor today - - the brain
24 doctor that I just don't have no energy.  Just the other
25 day, he gave me --

PROCEEDINGS                                    Page 159

1    Q    Now, here's my question.
2    A    Okay.
3    Q    When was it that you quit coming in to
4  Uncle Sam's at any --
5    A    I'm going to say five years ago.
6    Q    So that's 2011, 2010?  Would that be - -
7  are you on disability?
8    A    Yes, sir.
9    Q    When were you declared disabled?
10    A    I think somewhere around 2 -- 2005 or '06.
11    Q    When was your stroke?
12    A    2004.
13    Q    Okay.
14    A    I had a stroke and heart attack at the same
15 time.
16    Q    Okay.  So what was the effect of the stroke
17 and heart attack?
18    A    The heart attack and they gave me the clot
19 buster and it made me have a brain bleed and then I had a
20 stroke.
21    Q    How did that affect you?
22    A    Oh, all ways.  Couldn't walk, talk, do
23 anything for along time.  Six months walking and getting
24 straight.  I was embarrassed, still embarrassed.  I think
25 it's called a stroller.

PROCEEDINGS                                    Page 160

1    Q    Okay.  Roger, you said you wanted to tell
2  these folks.  Now, you're not an owner of Uncle Sam's and
3  haven't been for a number of years.
4    A    Right.
5    Q    And you all were actually trying to bring
6  in Noodle Adkins to try to help and at some point you all
7  would just fade out and he'd handle it all.  Was that the
8  plan?
9    A    Now, I think I'm - - I've talked with Mr.
10 Robinson, a State Trooper, which is a good friend of mine.
11 He's offered me - - he's been working about three days a
12 week.  He's been coming in the store about three days a
13 week and he is with the Governor thing and I told him that
14 - - that I would co-sign for it - - I'd sell it to him for
15 a million dollars, building and all and if he'll pay a
16 hundred thousand dollars down, that I would - - that he
17 would need to stay with me a year to learn the business and
18 continue his job with State Police and then you'd stay with
19 the State Police.
20    Q    Let me ask you something, Roger.  This is
21 kind of out in left field, but let me ask you something.
22 Is there a - - is there a system under which you can more
23 quickly register firearms and do the things that the law
24 requires?  In other words, something that perhaps is a
25 little bit --

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

PROCEEDINGS                                    Page 161

1        A    That's what I wanted to tell them. Boys,
2   here - - Michael, my son, has got the new system at Cross
3   Lanes where the dog track is at, over in that holler, and
4   they log everything in on a computer. They log everything
5   out, every sale and I've never - - I have no control of
6   what goes out. He gets every sale, every day at Fox
7   Business Firearms and some of the little tiny things like a
8   fishing plug or something, he might not put on the thing.
9   But I'm going to buy that system, if I can keep my license,
10  and --
11       Q    So if we're plain, you're not an owner
12  right now, are you?
13       A    Well, my wife is, okay?
14       Q    Okay.
15       A    My wife will buy that system and we'll
16  learn the system, learn what to do and how to do it and
17  lay-aways and track everything and I just - - it should've
18  been done a long time ago. And I'd like to present that to
19  you all and start on it as soon as - - I'm just asking you
20  for that. I don't want to lose my store. I don't care a
21  bit for - -
22           Uncle Sam's Loans has been in that town for
23  41 years and I just hate - - it just - - I'd hate not being
24  able to go in there and sit in my rocking chair and just
25  talk to people. They're my friends. City council, I get

PROCEEDINGS                                    Page 162

1   more votes than anybody. They know where I live.
2        Q    Well, Agent Cunningham's going to get you
3   knocked off city council, so you'd have to move.
4        A    Okay.
5        Q    All right. Roger, that's enough. You made
6   your point.
7        A    Okay.
8            MR. CAGLE: I have any further questions.
9            MR. LOWNEY: I just have a few questions.
10           THE WITNESS: Okay.
11           MR. LOWNEY: I'll address them to Mrs.
12  Muncy, since she's the business owner.
13           MR. CAGLE: Sure. Absolutely.
14           CROSS-EXAMINATION
15   D O R O T H Y   L O U I S E   M U N C Y,
16   BY MR. LOWNEY:
17       Q    In the past, do you recall being involved
18  with ATF regulatory officials concerning --
19       A    Have we come over here before?
20       Q    Right.
21       A    Yeah.
22       Q    Right, and that was the purpose of
23  discussing regulatory violations at the store?
24       A    Yeah, some of them, I missed putting the
25  call back number on or something like that. We had some

PROCEEDINGS                                    Page 163

1   violations.
2        Q    And then you were involved in those
3   meetings and discussions?
4        A    Yeah, I came over once and then one time,
5   Steven and Phillip Gillespie went one time because Steven
6   was on the license.
7        Q    I think the last one was 2014 and I think
8   Mr. Adkins --
9        A    Yeah.
10       Q    -- was involved in that.
11       A    Now, he come over to one meeting here, him
12  and Phillip and then the first one was Melinda, which was
13  over it, and me.
14       Q    Okay and do you have any working knowledge
15  at all of how the record keeping and inventory control
16  process works for the firearms?
17       A    No. But I always had somebody that worked
18  for us that knew how to do it all.
19       Q    And currently who's running the firearms
20  part of the business?
21       A    Me and Phillip.
22       Q    The gentleman who --
23           MR. CAGLE: Phillip Gillespie.
24           THE WITNESS: Phillip Gillespie, yeah.
25

PROCEEDINGS                                    Page 164

1   MR. LOWNEY (resuming):
2        Q    Uh-huh. And, I guess, the overall
3   business, what -- you know, describe the business overall.
4   Obviously, you sell firearms. What else does the business
5   do?
6        A    We have a jewelry. We have fishing. We
7   have hunting. We have bows. We have guns. We have work
8   boots. We've got everything. If you need it, we call it
9   if we don't have. It's a big store and it's full.
10       Q    Do you know approximately how many firearms
11  you currently have?
12       A    No, sir, I sure don't. I couldn't even
13  give you a guess.
14           MR. MUNCY: I think, if he ain't stole them
15  all on me. My safes used to stay full.
16           MR. LOWNEY: I don't think I have anything
17  more.
18           MR. CAGLE: That's all we have.
19           HEARING EXAMINER: Does the Government have
20  any closing statements to make?
21           MR. LOWNEY: Just very briefly.
22           GOVERNMENT'S CLOSING STATEMENT
23           MR. LOWNEY: I think the violations that are
24  alleged in the Notice of Revocation are clearly willful
25  violations of the Gun Control Act are extensive. You know,

PROCEEDINGS                                    Page 165

1   a lot of firearms have got in the hands of the the
2   inappropriate person and a significant number of illegal
3   straw transactions facilitated by the person running the
4   store, in essence. At least the owner of the store.
5            If you look, the compliance history of the
6   business prior to all this, was not good. There's
7   documents indicating violations and a warning conference
8   held in 2007. Violations and another warning conference
9   held again in 2008. In both of those instances, the
10  business was warned about future violations potentially
11  could cost the license.
12           And then subsequent to those two warning
13  conferences, there was yet a third one held in 2014 after
14  all these events. That was not associated with these
15  events. It was associated with more compliance issues.
16  Rarely do Federal Firearms Licensees get more than one
17  warning conference.
18           This business has now had three and that
19  doesn't include at all, all this intentional criminal
20  conduct that was going on inside the store for a couple of
21  years. So the violations are there. They're clearly
22  willfully committed and the Licensee in this case, the
23  corporation and Mrs. Muncy are legally responsible for all
24  of the conduct of these employees, particularly Mr. Adkins.
25           That's what the law says and so even - -

PROCEEDINGS                                    Page 166

1   even if you believe that there was absolutely no knowledge
2   or involvement on the part of the Muncys, legally, Mrs.
3   Muncy is responsible for what took place in the store. And
4   again, there is a history prior to this of violations and
5   warnings about it.
6            So that's all I have.
7            HEARING EXAMINER: Does the Licensee have
8   any closing statements?
9            MR. CAGLE: I do. I do.
10           LICENSEE CLOSING STATEMENTS
11           MR. CAGLE: You know, Dickens says, the
12  law's an ass and this may be representative of what he
13  wrote about centuries ago. What you have is an effort to
14  put people out of business. Individuals who have families,
15  make them unemployed, because of one bad apple who took
16  advantage of the fact that the man who thought of him as a
17  son, had a stroke and couldn't keep up with what was going
18  on. Took advantage of a lady, Louise Muncy, who had to
19  fill in for her husband in the business.
20           Now, you know what, you can come in and
21  offer a pot full of hearsay and prove that you didn't need
22  to prove violations by an individual. It's not these
23  individuals. It's not the - - it's not the 90 percent
24  owner. So that there ought to be a remedy, short of
25  destroying at least five lives, from making them unemployed

PROCEEDINGS                                    Page 167

1   and destroying a business that has existed for 41 years.
2            Now, if that's what our Government's about,
3   then go ahead. If that's -- if you think that, in fact,
4   based on this evidence that an individual by the name of
5   Noodle did all this and, therefore, they should suffer the
6   harm and these young men who have families - some of them -
7   then so be it. Then we will fight on, if that's it. If
8   that's what this is about.
9            Roger Muncy, in his own way, has stated how
10  he feels, what he would like to do as a remedy. But if the
11  remedy is to destroy all those people, then that law is an
12  ass.
13           HEARING EXAMINER: Does anyone have
14  anything further to offer?
15           MR. LOWNEY: No, sir.
16           HEARING EXAMINER: One minor thing before
17  we close, there was a minor typo on the original Notice as
18  to the city.
19  Would you mind if I make a pen and ink amendment to that
20  to strike out the misspelling of Main.
21           MR. LOWNEY: It should be Man.
22           HEARING EXAMINER: It should be Man. Does
23  anybody have any objection to that? I'll make the
24  correction while I'm here. Okay, the director of industry
25  operations for the Louisville Field Division of the Bureau

PROCEEDINGS                                    Page 168

1   of Alcohol, Tobacco, Fire and Explosives will make the
2   final decision on your license based on this hearing. If
3   the decision is that the license is not revoked, you will
4   receive a written notice that he has made that decision.
5            In the event that the DIO reaches the
6   decision that the license is to be revoked, you will
7   receive a Final Notice of Revocation of License on ATF Form
8   4501 and a copy of the Findings and Conclusions of the DIO.
9   If you do receive a Final Notice of Revocation on ATF Form
10  4501, you may file a request in Federal District Court in
11  the district where you conduct business under the
12  provisions of Section 923(f)(3), Title 18, United States
13  Code for a de novo review. This request is to be submitted
14  within 30 - - I'm sorry, within 60 days of your receipt of
15  the ATF Form 4501.
16           Mrs. Muncy and Mr. Cagle, do you have
17  anything further to add or offer?
18           MR. CAGLE: I do not. Louise?
19           MRS. MUNCY: No.
20           HEARING EXAMINER: Does anyone have
21  anything further to add before I close the hearing?
22           MR. LOWNEY: Nothing from the Government.
23           MR. MUNCY: He said we'll get a notice
24  within --
25           MR. CAGLE: Yeah, I'll tell you about that.

| PROCEEDINGS | Page 169 |
|---|---|

```
 1          HEARING EXAMINER: The time is
 2   approximately 1:55 p.m.  I declare this hearing closed.
 3
 4          (WHEREUPON, the proceeding was concluded.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

| PROCEEDINGS | Page 170 |
|---|---|

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, TO-WIT:


     I, Missy L. Young, Certified Court Reporter and Notary Public in and for the State of West Virginia, do hereby certify that the foregoing is a true and accurate record of the proceedings had on the 13th day of September 2016, in the matter of The United States Department of Justice, Bureau of Alchol, Tobbacco, Firearms and Explosives versus Uncle Sam's Loans, Inc., FFL#4-55-045-5E-08677, as reported by me.

     Given under my hand this 27th day of September, 2016.


*Missy L. Young*

Missy L. Young, C.C.R.
My commission expires on April 15, 2018.


MISSY L. YOUNG, C.C.R.   304-539-6192

| PROCEEDINGS | Page 171 |
|---|---|

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, to-wit:


     I, Missy L. Young, Certified Court Reporter and Notary Public for the State of West Virginia, do hereby verify that the foregoing transcript meets the requirements of the Code of West Virginia, Chapter 51, Article 7, Section 4, and all rules pertaining thereto, as promulgated by the Supreme Court of Appeals.


_____

Missy L. Young, C.C.R.
Notary Public for the State of West Virginia


MISSY L. YOUNG, C.C.R.   304-539-6192

OFFICIAL SEAL
Notary Public, State Of West Virginia
MISSY L YOUNG CCR
PO Box 13622
Sissonville, WV  25360
My Commission Expires April 15, 2018

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

## $

**$10,000 (1)**
22:2
**$100 (1)**
158:17
**$15,000 (1)**
19:17
**$20 (2)**
123:19;124:4
**$20,000 (1)**
55:21
**$200 (1)**
151:20
**$50 (3)**
119:6;158:14,17

## *

**\*\*\*30.46is (1)**
28:23
**\*\*\*6.46\*\*\* (1)**
72:19

## '

**'04 (1)**
146:20
**'06 (1)**
159:10
**'07 (1)**
92:12
**'08 (1)**
62:5
**'09 (1)**
62:2
**'10 (1)**
141:21
**'11 (1)**
141:21
**'75 (1)**
155:18
**'97 (1)**
146:23

## A

**ability (1)**
107:24
**able (14)**
17:8;19:9,11,19,24;
20:4;27:7;41:5;75:2;
82:1;90:12;92:8;
104:16;161:24
**above (1)**
88:4
**absolutely (17)**
22:24;25:9;27:13,15;
41:14,17;55:4,8,19;
57:20;61:21;86:5;87:2;
98:4;155:22;162:13;
166:1

**accept (5)**
14:18;23:14;34:24;
35:3;63:2
**accepted (16)**
15:17;31:12;33:5;
39:8;40:9;47:5;51:20;
56:8;57:21;58:12;
60:15;65:8;81:7;84:1;
102:25;103:8
**accepting (1)**
57:16
**according (3)**
35:17;61:19;95:3
**account (1)**
95:12
**accumulating (1)**
93:10
**accuracy (1)**
28:10
**accurate (1)**
116:22
**accusations (3)**
94:6,8;108:8
**accustom (1)**
22:20
**acknowledge (4)**
53:15;54:15;116:15;
120:4
**acknowledged (2)**
57:15;113:12
**acknowledgment (4)**
62:16;63:4,13,22
**acquiring (2)**
32:14;141:16
**across (1)**
59:12
**Act (5)**
56:20;107:17,18;
109:8;164:25
**acting (1)**
11:2;69:3
**action (1)**
34:4
**actions (4)**
9:7;14:10;64:15;
148:21
**activities (6)**
16:24;55:3;61:20;
82:3;108:5,12
**activity (7)**
18:17;53:6,15;92:1;
95:12;109:14;116:1
**actual (12)**
24:7;25:11;29:13,21,
22;32:6;39:19;106:14,
19;107:2;120:5;138:13
**Actually (12)**
6:19;9:3;31:3;32:14;
82:4;85:21;91:9;119:5;
129:7;135:15;151:17;
160:5
**Adam (1)**
10:16

**add (2)**
168:17,21
**addicted (1)**
30:7
**addiction (4)**
30:15,20;48:19;
106:10
**addition (1)**
20:3
**address (15)**
12:19;59:13,14,17,
23,24;60:1,6,7;94:23;
95:22,23;96:1;158:8;
162:11
**ADKINS (105)**
7:5,5,8,8,10,12;
18:12,24;21:19;22:1,6,
9,12;24:15,18,21;
25:16;29:10,11,16,24;
30:7,11,15;32:4,9;34:9,
11,21;35:18;38:4,16,
17,20;39:18;40:21;
49:24;50:6,7,10,12,14,
18,18,20;51:11;52:5,
11;54:8;55:14;56:7,18,
19;57:3,6,8,21;58:12;
61:6,11,19;72:14;
74:23;87:1;92:20;93:3,
9;94:1;97:2,14,21;
98:2,5;99:9,24;100:10;
101:16,20;102:8;
103:19;104:7,24;
105:2,14;106:5;
107:24;108:2,4,11;
109:18;110:17;113:14;
116:25;118:15;134:11;
135:11;141:14;142:1;
144:12;145:10;152:5;
156:11;160:6;163:8;
165:24
**Adkins/Scott (1)**
104:14
**Adkins' (6)**
22:12;42:11;47:22;
50:7;93:14;105:2
**A-d-k-i--s (1)**
7:10
**administrative (3)**
11:6;26:20,22
**admissibility (1)**
26:21
**admissible (1)**
27:23
**admission (2)**
27:21;103:3
**admitted (4)**
57:22,24;58:2;61:16
**advantage (2)**
166:16,18
**affair (1)**
98:3
**affect (1)**
159:21

**afford (1)**
104:21
**afraid (1)**
152:12
**AFT (4)**
10:15;16:15;116:10;
158:6
**afterwards (2)**
98:16;132:15
**again (18)**
32:16;33:20;34:19;
35:16;39:10;42:16;
66:12;81:16;82:1;
85:24;88:6;89:8;95:20;
99:15;141:12,15;
165:9;166:4
**age (1)**
27:10
**agencies (1)**
46:10
**Agent (28)**
10:3,11;16:6,14,15,
16;32:3;34:21;37:20;
39:20;43:11;44:23;
47:20;50:5;51:13,16;
52:10;56:7;57:2;75:8;
78:2;79:2;84:7;113:1;
116:16;121:22;147:22;
162:2
**ages (1)**
137:7
**ago (12)**
72:10;92:18;95:11;
104:5,23;108:1;
121:22;127:16,16;
159:5;161:18;166:13
**agree (7)**
80:18,21;98:2;
108:24;109:12;125:6,
15
**agreement (9)**
50:11;56:19;57:9,15;
84:12;86:12,13;
110:18;147:24
**ahead (10)**
16:1;33:19;36:18;
54:2;58:22;63:1;75:9;
77:20;145:15;167:3
**ain't (1)**
164:14
**aka (2)**
52:5;56:7
**al (1)**
103:7
**A-l- (1)**
7:21
**albeit (1)**
79:12
**Alcohol (2)**
11:4;168:1
**Alice (2)**
47:15;49:13
**allegations (2)**

**97:1;108:5**
**alleged (4)**
34:3;50:13;82:2;
164:24
**allegedly (1)**
26:6
**Allen (11)**
7:21,21;8:1,1,3,6,9;
35:2;55:9;121:20;
135:25
**A-l-l-e-n (1)**
8:2
**allow (1)**
21:8;22:23
**allowed (2)**
72:7;100:2
**alluded (1)**
73:4
**almost (2)**
136:5;152:11
**along (2)**
17:7;159:23
**alright (2)**
107:6;112:4
**always (14)**
70:5;71:1,4;113:22;
114:22;116:24;129:22,
23;131:1;138:14;
144:23;145:16;151:23;
163:17
**amend (1)**
36:19
**amended (2)**
36:16;37:11
**amending (1)**
37:3
**amendment (1)**
167:19
**America (2)**
69:4;77:4
**among (3)**
111:25;135:9;141:15
**amount (3)**
19:14;80:12;119:8
**and/or (1)**
11:8
**Ann (2)**
49:23;51:11
**answered (1)**
88:15
**anybody's (1)**
135:3
**apologize (1)**
82:1
**apparently (3)**
119:2;135:12;141:14
**appear (1)**
27:3
**appearing (1)**
81:5
**appears (1)**
88:12
**apple (1)**

166:15
**apply (2)**
  27:1,20
**appreciate (1)**
  66:22
**apprised (1)**
  148:1
**appropriate (1)**
  10:20
**approved (1)**
  22:5
**approximately (11)**
  4:7;57:21;66:6,6,11;
  122:18,22;154:5,8;
  164:10;169:2
**April (1)**
  64:4
**area (3)**
  10:2;73:8;116:6
**aren't (2)**
  26:10;55:12
**arguing (1)**
  28:10
**around (13)**
  19:24;53:10;57:4;
  62:5,7;80:15;92:12;
  114:9;126:19;133:18;
  138:11;155:2;159:10
**arrows (1)**
  74:1
**Ashland (1)**
  16:18
**ass (2)**
  166:12;167:12
**assigned (2)**
  16:17,18
**Assistant (1)**
  57:7
**associate (1)**
  68:11
**associated (10)**
  23:21,22;30:6,11;
  41:7;62:12,15;63:19;
  165:14,15
**association (2)**
  38:15;84:9
**assume (1)**
  141:11
**assuming (1)**
  42:15
**ATF (21)**
  9:4;10:12;11:8;13:7;
  16:16,19;31:19;33:3;
  34:19;36:5;39:16;40:8,
  23;59:23;99:22;
  111:13;132:20;162:18;
  168:7,9,15
**attached (1)**
  56:18
**attachment (1)**
  105:8
**attack (7)**
  146:11,14,22;

155:23;159:14,17,18
**attacks (1)**
  144:20
**attendant (1)**
  99:15
**attention (3)**
  46:4;87:20;135:6
**Attorney (7)**
  15:16;23:11;32:23;
  33:3;53:17;57:6,7
**Attorney's (1)**
  104:3
**attribute (1)**
  92:3
**attributed (2)**
  57:18;76:11
**Atwell (3)**
  90:16,17,21
**audio (1)**
  4:8
**augmented (1)**
  92:4
**August (6)**
  36:19,20,23,24;
  99:12;108:2
**authority (3)**
  11:3,13;138:23
**authorized (1)**
  46:13
**available (1)**
  84:15
**aware (17)**
  12:10;17:5,12;28:2;
  30:12;32:16;48:16;
  61:20;73:14;76:19,20;
  85:16;93:18;94:21;
  118:16;126:10;141:11
**awareness (1)**
  141:15
**away (4)**
  32:24,24;103:3;
  130:5

**B**

**back (43)**
  18:2;19:3,14,18;
  20:6;40:20;52:21,23;
  53:5;55:22;66:11;73:9;
  76:1;77:16;79:17;93:4;
  100:7;105:24;109:21;
  117:10;119:24;122:23;
  130:1,2,4;132:4,8,10,
  10,13;137:18;138:11;
  140:17;146:22;151:16,
  18,20;152:7,14;154:9;
  155:3,14;162:25
**background (4)**
  16:15;17:2;46:18;
  105:14
**backs (6)**
  45:3,8,11,17;46:20;
  54:11

**bad (5)**
  48:19;69:13;148:8;
  149:23;166:15
**bald (1)**
  94:7
**bang (1)**
  86:15
**bank (9)**
  79:13;83:7,9,24,24;
  149:17;150:25;151:4,5
**banking (1)**
  79:22
**banks (2)**
  79:24;80:1
**bargain (1)**
  156:4
**Bartlett (1)**
  11:24
**based (8)**
  32:3;47:6;51:19;
  65:2;80:11;126:2;
  167:4;168:2
**basement (2)**
  127:5,7
**basically (2)**
  37:2;72:18
**basis (9)**
  9:7;27:21;31:1;
  42:22;44:4,8;61:24;
  111:8;141:13
**BB (1)**
  4:13
**BB&T (2)**
  4:11,12
**bearing (1)**
  13:18
**became (13)**
  18:16,20;19:22;
  20:22;21:17;30:17;
  68:6;84:8,11;92:15;
  122:8;123:4;144:18
**become (10)**
  72:6;86:10;118:9;
  126:10;129:6,24;
  131:8;140:2;145:10;
  155:7
**becoming (1)**
  134:24
**bed (1)**
  152:24
**began (2)**
  21:21;66:13
**beginning (1)**
  118:18
**begins (1)**
  105:13
**behalf (5)**
  4:22;9:4;13:7;63:6;
  99:22
**behind (1)**
  107:13
**believe** (1)**
  28:24

**Bell (1)**
  27:9
**beneath (1)**
  151:23
**besides (1)**
  15:6
**best (1)**
  71:14
**better (1)**
  112:15
**beyond (1)**
  56:4
**big (3)**
  41:8;52:17;151:21;
  164:9
**Bill's (1)**
  157:23
**bills (1)**
  144:24
**Birthday (1)**
  154:21
**bit (6)**
  15:5;17:2;26:3;
  70:10;160:25;161:21
**Blair (4)**
  47:15,20,22;49:13
**blank (1)**
  158:16
**blanket (1)**
  94:3
**bleed (1)**
  159:19
**blind (1)**
  146:2
**blue (1)**
  17:15
**Blumenthal (1)**
  64:11
**book (3)**
  17:22;18:2;53:3
**boots (1)**
  164:8
**both (6)**
  20:15;30:1;40:23;
  59:16;71:10;165:9
**bottom (1)**
  80:21
**bought (2)**
  17:22;104:20;
  120:14;145:3
**bow (1)**
  127:8,11;136:10,12
**Bowles (1)**
  133:20
**bows (4)**
  74:1;136:9,14;164:7
**boy (2)**
  70:10;155:24
**boy's (1)**
  98:24
**Boyd (1)**
  63:6
**boyfriend (2)**

43:15;102:10
**boys (3)**
  146:6;149:9;161:1
**bracketing (1)**
  108:15
**brain (2)**
  158:23;159:19
**branch (1)**
  11:4
**Bravo (1)**
  10:8
**break (4)**
  65:21;116:19;146:1;
  154:3
**Brent (2)**
  44:18;47:4
**Brian (13)**
  9:15;33:14;35:2;
  51:1;53:9;100:8,9;
  108:16;121:20;131:20,
  23;137:12;149:6
**B-r-i-a-n (2)**
  9:15,16
**bribe (1)**
  46:5
**bribes (1)**
  46:20
**brick (1)**
  55:22
**brief (3)**
  66:8;122:20;154:6
**briefly (5)**
  16:14;19:3;42:1;
  110:13;164:21
**bring (7)**
  66:20;97:1;120:18;
  151:18;156:9,10;160:5
**brings (1)**
  98:3
**broad (2)**
  85:19;94:6
**broke (1)**
  87:9
**brokering (1)**
  12:21
**brother (2)**
  51:1;155:10
**brother-in-law (5)**
  122:3;123:3;124:23;
  126:2,18
**brought (1)**
  127:11
**Bruno (1)**
  128:15
**buddy (1)**
  68:21
**building (3)**
  4:11,13;160:15
**bunch (2)**
  67:14;114:22
**Bureau (3)**
  11:4;17:6;167:25
**buried (1)**

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 48 of 181 PageID #: 52

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

33:1
**Burson (1)**
  27:9
**business (77)**
  12:9,11;17:1;18:14,
  19;21:7;26:13;28:7;
  33:7;43:17,18,24;45:9;
  46:13;47:21;55:1,1,17;
  59:14,14,24;60:5,6;
  61:9,23;62:8,11;70:1,3,
  23;71:11;72:8,18;77:2;
  80:10;87:8;92:21;93:4;
  95:11,22;107:25;
  109:18;110:1,4,21,23;
  114:19;134:4,15;
  135:12;143:12;146:6;
  149:23;150:1,4,15;
  155:4,8,9,13,17;
  156:10;157:4;160:17;
  161:7;162:12;163:20;
  164:3,3,4;165:6,10,18;
  166:14,19;167:1;
  168:11
**buster (2)**
  146:13;159:19
**busy (1)**
  141:22
**buy (7)**
  17:23;50:18;72:7;
  106:16;107:24;161:9,
  15
**buying (5)**
  22:4;89:19;106:17;
  134:24;135:4

**C**

**CAGLE (156)**
  4:12,15,17,19;5:8,
  19;6:1,3,6,9;7:2,20;9:3,
  7,10;11:21;12:8,11,14,
  18;13:7,20,22;14:5,11,
  22;15:19;22:19;23:5,9,
  11;26:12;27:2,14,15,
  17;28:2,5,13,18;30:24;
  31:2,8,33:7;35:5;36:1;
  39:3;40:12;42:17;44:4;
  46:24;49:10;51:8;54:1,
  4,7;56:3;58:14;60:18;
  64:20,23;65:2,17,19;
  66:1,4,22;67:5;68:20,
  23;69:1;74:10,15,17;
  75:1,7;78:12,16,18,20;
  79:1;81:15,20;82:4,12,
  13,19;83:20;84:6;85:3;
  87:19;91:11;93:1;
  100:22;101:4;103:2,
  16,18;106:15;107:1;
  110:7;111:6,15,19,24;
  112:3,5,8,12,16,22;
  117:22;121:7,11,13,18;
  122:13,15,24;128:1,5,
  11;130:12,16;133:23;

135:18,23;141:6;
  142:5,10;143:19,22;
  144:2,6;146:17,19;
  147:2;153:13,14,19,22;
  154:2,14;155:1;
  157:13,19,21;162:8,13;
  163:23;164:18;166:9,
  11;168:16,18,25
**Cagle's (2)**
  14:16;15:9
**call (20)**
  17:13;37:24;86:11,
  25;87:20;93:9;98:14,
  20;101:23;102:1,5,15,
  20;106:20;114:10;
  124:8;131:13;144:8;
  162:25;164:8
**called (22)**
  16:10;17:14;42:4;
  67:2;75:4;95:5;102:19,
  20;112:19;121:15;
  123:5,6,8,15;128:8;
  132:11;135:20;142:7;
  145:4;149:18;154:11;
  159:25
**calling (2)**
  96:19;140:13
**came (15)**
  17:2;19:4;24:22;
  46:4;53:10,16,16;54:9;
  57:3;84:11;91:20;
  131:18;138:9;152:7;
  163:4
**Campbell (2)**
  53:17;57:6
**can (37)**
  14:20;16:14;17:1;
  19:6;20:15;29:5;33:19;
  36:18;37:20;41:3;42:1;
  43:11;44:23;50:5;
  52:11;54:2;57:2;59:8;
  62:5;74:15,23;75:9;
  82:10;84:23;88:7;91:7;
  93:23;107:5;109:12;
  111:18;113:16;127:5;
  154:15,18;160:22;
  161:9;166:20
**can't (7)**
  10:9,10;36:21;57:23;
  93:20;146:18;150:22
**candid (1)**
  116:9
**car (1)**
  102:2
**card (3)**
  32:24,24;140:17
**care (4)**
  13:15;78:3;119:13;
  161:20
**Carolina (1)**
  136:24
**carried (2)**
  103:3;126:19

**carry (2)**
  27:10;71:19
**carrying (1)**
  138:12
**case (17)**
  13:16;14:8,8;17:7;
  21:2;57:7;64:10,11;
  96:5;113:1;120:6;
  129:6;131:9;139:18;
  147:24;148:5;165:22
**cases (1)**
  64:12
**cash (32)**
  19:11,18;20:6;21:12;
  22:6,11;45:3,6,11;
  55:16,18,20,21,24;
  73:22;76:23,23;77:17;
  79:23;80:2;85:17;88:8;
  110:21;115:25;116:6;
  119:4;149:24;150:6,
  10,15,22,23
**cashed (5)**
  77:13;80:12;85:13;
  88:18,24
**cashing (28)**
  19:5;20:6;21:8;
  46:12;54:11;73:15;
  76:10,17,77:3;80:11,
  16;83:18;85:8;86:19;
  88:6,10;89:11,16;
  109:15,16,17;149:13,
  25;150:2,4,15;151:12,
  21
**CD (1)**
  88:7
**center (1)**
  22:5
**central (1)**
  98:1
**centuries (1)**
  166:13
**certain (4)**
  31:11;35:2;53:24;
  54:10
**certainly (6)**
  6:9;27:5;28:6;80:14;
  83:12;90:5
**certified (5)**
  32:10;49:2;66:15;
  97:12;103:8
**chair (2)**
  115:12;161:24
**chance (5)**
  92:22;140:9;145:17;
  158:18,19
**change (2)**
  53:14;151:20
**changed (2)**
  50:14;152:24
**changes (1)**
  13:21
**Chapter (1)**
  106:8

**charge (8)**
  21:10,12,13;57:11;
  77:3;92:9;150:8;
  151:17
**charged (5)**
  53:19,20,21;103:20,
  22
**charges (1)**
  104:3
**Charles (1)**
  11:24
**Charleston (4)**
  4:14;6:24;10:18;
  16:17
**chase (1)**
  113:17
**chat (1)**
  140:15
**cheaper (1)**
  109:19
**check (31)**
  19:14,14,17;21:11;
  22:10;48:1;54:11;
  73:15;76:10,17;77:7;
  80:1,12,16;83:18;85:8,
  13;86:19;89:11,15;
  109:15;149:25;150:2,
  4,7,10,15,23;151:16,
  18,21
**check-cashing (2)**
  21:20;77:3
**checked (3)**
  22:5;60:8;116:3
**checks (26)**
  19:5;20:6,7;21:6,7,9,
  12;45:7;46:12;73:22;
  77:3,13,17;79:23;
  80:11;87:2;88:6,8,10,
  23,23;109:16,17;
  149:14;150:15;151:12
**chief (7)**
  6:16,22;11:3;66:20;
  67:10;72:2;115:19
**children (2)**
  137:5;143:6
**chit (1)**
  140:15
**Christ (1)**
  17:22
**Christina (12)**
  37:15;39:7;40:9;
  101:9,15,22,25;102:15;
  130:17,18;137:15;
  149:8
**Christy (8)**
  17:14,22;18:3;41:19;
  42:3,20;43:14,19
**circumstances (1)**
  13:17
**citations (1)**
  64:11
**cited (1)**
  96:9

**cites (1)**
  14:8
**City (8)**
  4:14;6:23;60:4,5,10;
  161:25;162:3;167:18
**Civil (1)**
  11:8
**claimant (2)**
  144:18;145:13
**Clarification (3)**
  18:18;36:10;48:21
**clarify (2)**
  46:17;104:16
**Claude (2)**
  11:1,23
**clear (1)**
  49:1
**clearly (2)**
  164:24;165:21
**clerk (1)**
  83:3
**Cleveland (1)**
  157:9
**client (2)**
  28:8,14
**Clifford (6)**
  43:6,14;44:7;118:20,
  24;121:8
**Clinic (1)**
  157:9
**close (2)**
  167:17;168:21
**closed (2)**
  4:2;169:2
**closer (1)**
  76:23
**closing (4)**
  164:20,22;166:8,10
**clot (2)**
  146:13;159:18
**clothes (1)**
  156:21
**coal (23)**
  19:8,10,19,20;20:3;
  21:23;24:23;41:7,8,9;
  45:4,15;52:18,20;
  67:16;69:8,9;73:8,9;
  76:1,4;85:17;107:4
**co-conspirators (1)**
  87:11
**Code (6)**
  4:6,6,21;11:10;
  106:8;168:13
**cognizant (1)**
  72:6
**coincide (1)**
  82:2
**coincided (1)**
  53:11
**collect (1)**
  99:21
**college (1)**
  16:22

**column (1)**
  81:17
**combined (1)**
  146:24
**comfort (1)**
  122:15
**comfortable (1)**
  74:4
**coming (6)**
  55:17;141:16;
  149:13;158:20;159:3;
  160:12
**committed (2)**
  51:2;165:22
**common (4)**
  30:17;96:22;97:25;
  129:24
**community (6)**
  30:19;48:18;70:23;
  71:8;95:11;115:16
**companies (1)**
  52:20
**company (4)**
  13:4;19:11,20;45:10
**compensated (1)**
  42:11
**compensating (1)**
  55:16
**compensation (5)**
  18:9;34:15;38:7,12;
  48:11
**competition (1)**
  158:13
**complete (5)**
  29:10,11;52:16;53:2;
  134:10
**completed (12)**
  34:11,15,20;39:18;
  42:8,10;43:19;51:2,3;
  95:21;120:17;153:21
**completing (2)**
  34:12;42:12
**compliance (8)**
  62:11,13,24;63:5,11,
  19;165:5,15
**compliant (1)**
  77:12
**complicity (1)**
  93:21
**computer (5)**
  95:6;132:9;134:7;
  158:7;161:4
**concern (2)**
  135:2,3
**concerning (11)**
  19:5;23:12;31:11;
  35:2;39:7;42:20;44:7;
  58:11;83:17;89:10;
  162:18
**concluded (1)**
  169:4
**Conclusions (1)**
  168:8

**condition (1)**
  146:16
**conduct (6)**
  11:13;64:15;106:2;
  165:20,24;168:11
**conducted (4)**
  4:5;51:12;75:21;
  111:14
**conducting (3)**
  43:21;49:2;75:23
**conference (4)**
  62:14;165:7,8,17
**conferences (1)**
  165:13
**confirm (1)**
  60:2
**confirmed (2)**
  78:9;92:4
**confronted (1)**
  53:8
**conjecture (1)**
  93:21
**connection (4)**
  101:19;104:11,13,15
**considered (1)**
  145:21
**consistent (4)**
  39:21;40:5;55:2;
  79:20
**consisting (14)**
  11:23;33:3;39:6;
  40:8;42:19;44:6;47:3;
  49:12;51:10;56:6;
  58:10;81:3;83:23;
  103:6
**consists (4)**
  26:2,8;31:10;63:11
**conspiratorial (1)**
  107:18
**contacted (4)**
  34:9;92:20;93:3;
  122:9
**context (1)**
  88:10
**continuation (1)**
  83:17
**continue (2)**
  85:17;160:18
**continued (5)**
  21:16,20;66:9;
  122:21;154:7
**contracts (1)**
  19:19
**Control (5)**
  56:20;89:16;161:5;
  163:15;164:25
**controlled (1)**
  120:10
**controversy (1)**
  147:10
**convicted (3)**
  29:17;53:21;85:20
**Cook (6)**

38:18;102:9,15,18,
  19,20
**cooperate (1)**
  86:13
**cooperating (4)**
  20:24;84:13;86:10;
  110:19
**cooperative (1)**
  53:8
**copies (4)**
  14:12;18:3;26:8;
  75:18
**copy (8)**
  13:20;14:8;56:16;
  63:21;64:10;84:15;
  134:9;168:8
**corner (1)**
  132:8
**corp (1)**
  144:8
**corporation (7)**
  5:14,18;143:15,15;
  144:1,3;165:23
**correction (1)**
  167:24
**corrections (1)**
  66:12
**correctly (1)**
  13:13
**corroborate (2)**
  85:11;93:20
**corroborated (2)**
  92:4;93:24
**corroboration (1)**
  92:3
**co-sign (1)**
  160:14
**cost (2)**
  119:8;165:11
**couldn't (7)**
  59:21;104:21;
  142:25;146:3;159:22;
  164:12;166:17
**council (4)**
  60:3;71:21;161:25;
  162:3
**counsel (5)**
  6:5;9:23;10:1;15:10;
  56:9
**count (1)**
  61:12
**counter (4)**
  26:9;116:5;125:14;
  132:10
**Counting (1)**
  153:2
**country (1)**
  80:15
**counts (1)**
  143:5
**county (6)**
  4:14;83:8;107:7,20,
  20;117:17

**couple (12)**
  13:21;21:3;29:7;
  38:2;48:12;66:12;
  88:22;104:23;127:16;
  134:20;151:19;165:20
**course (9)**
  25:14;52:11;54:23;
  57:14;59:6;86:10;
  94:25;102:4;120:3
**Court (10)**
  27:8;37:14;56:17;
  57:23;58:5;60:20;
  66:15;82:9;103:8;
  168:10
**courtesy (1)**
  66:23
**courtroom (3)**
  27:22;83:4;86:6
**courts (1)**
  64:13
**cover (1)**
  36:2
**covered (1)**
  40:20
**covers (2)**
  10:2;35:21
**Creek (1)**
  107:7
**crime (1)**
  103:20
**Crimes (3)**
  79:14;81:6;132:19
**criminal (5)**
  16:23;17:6;38:3;
  56:20;165:19
**cross (4)**
  31:4;65:18;66:19;
  161:2
**cross-examination (6)**
  75:5,6;118:1;134:1;
  141:8;162:14
**Cub (1)**
  107:7
**C-u-n-n-i—g-h-a-m (1)**
  10:4
**CUNNINGHAM (28)**
  10:3,4,6,8,10,12,15;
  16:6,14;32:3;34:22;
  37:20;39:20;43:11;
  44:23;47:20;50:5;
  51:13;52:10;56:7;57:2;
  75:8;79:2;82:15;84:7;
  113:1;116:16;121:22
**Cunningham's (2)**
  51:17;162:2
**current (2)**
  81:23;146:16
**currently (4)**
  16:18;152:25;
  163:19;164:11
**custody (1)**
  24:13
**customarily (1)**

  22:23
**customary (1)**
  23:9
**customer (9)**
  129:19;131:10,12;
  140:19,20,22;141:22,
  22,23
**cut (1)**
  113:17

## D

**dad (2)**
  45:7,9
**daggone (1)**
  107:4
**Dale (1)**
  154:21
**date (3)**
  4:8;15:10;80:18
**dated (4)**
  11:24;64:4;82:6;
  83:24
**dates (3)**
  81:18,22,24;108:15
**dating (1)**
  101:16
**Dave (1)**
  6:10
**David (4)**
  6:15;66:20;67:7,8
**D-a-v-I-d (1)**
  6:18
**day (7)**
  28:3;74:22;99:11;
  114:2,19;158:25;161:6
**days (7)**
  13:21;36:8;155:15,
  16;160:11,12;168:14
**day-to-day (1)**
  129:9
**de (1)**
  168:13
**deal (7)**
  21:9;98:17;129:21;
  131:23;151:4;152:2,4
**dealer (1)**
  12:21
**dealers (1)**
  14:9
**dealing (8)**
  21:14,18,19;45:16;
  86:19;115:5;135:7;
  148:17
**dealt (4)**
  45:18;129:22;
  130:25;131:1
**Dear (1)**
  37:15
**decade (1)**
  139:24
**decades (1)**
  143:6

**decided (1)**
145:18
**decision (7)**
10:24;71:18;111:13;
168:2,3,4,6
**decisions (1)**
10:22
**declare (1)**
169:2
**declared (2)**
92:16;159:9
**deduct (1)**
60:6
**Deer (13)**
37:21;39:7,17;40:9;
54:17;101:9,15,22,25;
130:17,18;137:15;
149:8
**Defendant (1)**
106:5
**definitely (2)**
24:12;104:19
**delete (1)**
37:7
**delineated (1)**
91:3
**deliver (1)**
29:16
**delivered (3)**
28:9;29:20;94:2
**denials (1)**
64:13
**denied (3)**
53:7,9;98:12
**denominator (1)**
96:22
**deny (1)**
53:6
**Department (4)**
6:16;11:5;68:8;
123:23
**depositing (1)**
119:9
**deposition (2)**
87:14;148:1
**derived (1)**
96:13
**describe (18)**
16:15;19:6;29:5;
33:19;37:20;41:3;42:1;
43:11;44:23;52:12;
57:2;59:9;81:18;107:5;
132:6;156:18,19;164:3
**described (10)**
15:16;21:21;32:23;
34:21;39:20;41:9;
47:23;51:20;65:7;
115:19
**describing (1)**
58:20
**description (1)**
129:4
**deserves (1)**

**28:14**
**designed (1)**
150:18
**despite (1)**
25:11
**destroy (1)**
167:11
**destroying (2)**
166:25;167:1
**destructive (1)**
12:22
**detail (2)**
58:22;62:21
**detailed (3)**
29:14,15;110:20
**determined (2)**
40:21;156:10
**devices (1)**
12:22
**diabetic (1)**
112:1
**Dickens (1)**
166:11
**didn't (63)**
5:22;7:23;17:18,23;
21:14;34:14;38:3,6,6,
12;42:9;50:15;53:20;
55:12;59:19,22;68:3,6;
69:17;71:23;72:20,21,
24;73:5;76:4,5;80:3,6,
9;83:11;90:13;91:3;
92:7;98:8,11;100:6;
103:25;117:21;118:21;
124:1;126:16,21;
127:10,12;134:13;
138:2;139:13,14;
141:23;143:25;144:22,
23;146:6,11;149:21,
23;150:8,13,13;
151:25;152:18;156:23;
166:21
**died (1)**
155:10
**different (13)**
19:8;21:3,22;29:8;
34:3;38:2;45:9;67:14;
99:8;157:7,8,15,16
**DIO (1)**
10:19;168:5,8
**DIRECT (8)**
16:12;67:4;112:21;
121:17;128:10;135:22;
142:9;154:13
**directed (3)**
29:16;54:21;106:5
**directing (1)**
40:22
**direction (6)**
11:3;24:14;25:16;
34:21;39:18;134:11
**directly (1)**
57:15
**director (2)**

**10:17;167:24**
**disability (2)**
95:2;159:7
**disabled (5)**
5:12;92:15,16;94:16;
159:9
**disagree (1)**
109:12
**disclose (1)**
53:24
**discovered (1)**
132:18
**discuss (4)**
26:21;40:2;54:10;
62:20
**discussed (1)**
40:5
**discussing (2)**
36:9;162:23
**discussion (4)**
135:9,10;141:15,18
**discussions (3)**
30:14,15;163:3
**dispute (1)**
92:17
**disputed (1)**
61:8
**distinction (1)**
28:6
**distinctly (1)**
6:13
**distinguished (1)**
86:25
**distribute (1)**
53:4
**distributing (4)**
29:23;41:6,10;52:17
**District (5)**
27:8;56:16,17;
168:10,11
**divert (1)**
38:5
**division (4)**
10:1,2,18;167:25
**divorce (1)**
127:14
**divorced (2)**
50:13;122:6
**doctor (2)**
158:23,24
**document (36)**
11:14;20:19;29:1;
31:22;33:16;35:3,12;
37:16;39:23;41:20;
43:7;44:19;47:16;50:1;
59:2;63:7;64:6;81:4;
87:16;90:4,8,11,13,23,
24;92:25;95:17,25;
96:2,10,16,16;97:6;
108:22;109:9;149:16
**documented (1)**
111:14
**documenting (7)**

**33:14;37:14;43:5;**
44:17;47:14;49:23;
52:4
**documents (22)**
9:4;15:12;20:14;
23:24;52:6,56:22;
58:11,22;62:10,12,17;
63:15,18,24;64:17;
78:22;82:16;91:6;
100:12;122:10;129:13;
165:7
**doesn't (6)**
12:12;22:24;100:10;
110:1;143:5;165:19
**dog (1)**
161:3
**dollar (1)**
34:6
**dollars (6)**
19:16;141:17;150:9;
158:12;160:15,16
**don't (70)**
5:14,15,16;23:5,6;
27:1,11,20;28:3;38:18;
43:15;53:12;60:20;
64:23;65:23;74:10,14;
78:3;79:24;80:2,5;
83:2;85:24;86:3;87:5,
20;92:17;94:11,15,19;
97:11;100:2;103:1;
104:1,1,2,9;109:11,12;
110:8;118:12,22;
121:12;122:13,15;
128:4;133:8,16;
134:13;139:16;143:9,
23,23;144:25;145:4,8;
146:3,7,17;147:8,11;
149:2,9;155:3;158:24;
161:20,20;164:9,12,16
**done (16)**
34:4;97:2;98:20;
115:24;118:23,24;
119:6;132:3,21;
138:11;140:12,15,25;
156:20,21;161:18
**door (1)**
52:23,24;54:22;
86:15;117:10;127:7;
152:14
**Dorothy (1)**
142:16
**double (1)**
56:4
**doubt (2)**
104:1,1
**Doug (6)**
102:9,10,15,18,19,20
**down (18)**
6:14;19:24;38:21;
41:6;55:11;70:10,11;
101:24;102:1,2,21;
112:16;123:6;127:7;
138:13;146:24;147:14;

**160:16**
**downhill (1)**
69:11
**dramatic (1)**
98:25
**dream (1)**
52:13
**dreamed (1)**
147:5
**drive (2)**
22:12;107:13
**driver's (1)**
60:7
**drivers' (2)**
59:16,17
**drove (1)**
102:2
**drug (2)**
48:16;105:22
**drugs (2)**
30:10;106:10
**due (1)**
27:10
**during (15)**
18:16;30:1;52:11,12;
59:6;61:24;62:8;72:2;
76:9;114:19;116:19;
118:15;120:3;138:19;
141:10

**E**

**earlier (6)**
21:21;73:4;76:9;
77:10;79:21;113:1
**earliest (1)**
19:24
**early (2)**
108:6,12
**economy (1)**
69:14
**Edward (2)**
23:13;84:22
**effect (5)**
81:19,21;152:20,22;
159:16
**effort (2)**
76:22;166:13
**eight (2)**
36:11;37:1
**either (11)**
11:18;32:9;77:11;
84:24;85:12;102:18;
114:6;117:19;124:12;
131:23;133:1
**Eleven (1)**
136:4
**Elizabeth (2)**
49:23;51:11
**Ellis (79)**
14:1,4;20:11,11,14,
15,18,22;21:2,17,24;
22:3,6,8;23:13,22;24:4,

22;25:7;26:6;36:10,13;
37:8;48:22;54:17;
55:11,11;61:20;75:11;
78:7,8;84:9,12,17,18,
22,23;85:5,13,14,15,
16,23;86:9,14,15,19;
87:3,15;89:9,18;91:2,9,
17,20;92:4,6,20;93:3,
11,22;103:6;104:7,11,
14,17,18,24;105:1;
109:3;110:5;129:18,
21;132:12;138:3;
148:2;149:12;151:11,
24

Ellis' (4)
22:11;48:12,13;
139:18

else (4)
110:8;144:21,21;
164:4

embarrassed (2)
159:24,24

employ (1)
153:1

employed (7)
16:19;19:9;45:21;
54:12,24;153:2,5

employee (24)
8:5,6,15,16,22;18:11,
15,17;21:20;32:10;
43:21;45:13;48:15;
49:3;50:8;54:12;101:2;
102:12;111:1;131:13,
15;138:19;148:8;
156:14

employees (25)
14:10;17:20;18:7,7;
32:16;40:24;55:6,16,
20;64:15;70:13,16;
97:15;100:12;101:5,
10,13;118:14,16;
135:10,14;141:15;
153:15;156:9;165:24

employer (1)
43:20

employment (1)
50:9

en (3)
14:18,21;63:2

end (1)
112:16

ended (1)
60:3

energy (1)
158:24

Enforcement (2)
79:14;81:6

engage (1)
158:16

engaged (4)
109:8,14,24;116:2

enlisted (1)
139:1

enough (2)
148:16;162:5

enter (9)
11:11,19;14:17;
22:17,20;25:20;56:1,2;
110:18

entered (12)
12:1;16:8;26:9;33:4;
42:21;44:9;49:14;
50:11;57:9;84:12;
86:12;96:14

enticement (1)
21:23

entities (3)
77:4;79:23;80:15

entity (4)
69:21;71:11,11;
73:15

entries (1)
16:1

entry (20)
15:17;23:4,11,14,15;
31:12;33:5;35:3;39:9;
40:9;47:5;51:20;56:8;
58:12,20;60:16;64:22;
65:8;81:7;103:8

environment (1)
69:21

equipment (1)
127:3

Eric (8)
7:21;8:1;135:18,25;
136:1;137:12;141:6;
142:5

E-r-i-c (2)
7:21;8:2

error (1)
157:20

Especially (1)
139:18

essence (4)
20:6;117:6;141:4;
165:4

establish (1)
62:23

et (1)
103:7

even (15)
22:24;23:9;30:4;
34:14,14;38:9;89:12;
90:3;98:12;117:13;
118:16;145:4;164:12;
165:25;166:1

evening (1)
117:13

event (3)
69:2;151:6;168:5

events (2)
165:14,15

eventually (1)
19:21

Everett (1)
107:8

everybody (1)
61:15

everyday (1)
55:1;152:14

everyone (2)
6:7;30:19

evidence (63)
11:12,12,19;12:1,5;
15:18,23;23:14,19;
26:10,18,24;27:20;
30:23;31:13,17;32:21;
33:5,11;35:4,11;39:9,
13;40:10,17;42:14,21;
43:2;44:3,9,10,14;
46:23;47:5,11;49:9,14,
15,20;51:6,19,21;52:1;
56:8,13;58:13,18;
60:12,16,23;61:3;65:9,
14;81:12;84:1,5;91:15;
95:17,17;96:5,14;
103:13;167:4

evidentiary (1)
27:5

evolved (3)
19:23;20:9;21:24

ex- (1)
50:21

exactly (2)
53:11,12

EXAMINATION (13)
16:12;31:4;66:19;
67:4;110:14;111:5;
112:21;121:6,17;
128:10;135:22;142:9;
154:13

examine (1)
65:18

examined (1)
31:4

EXAMINER (197)
4:4,13,16,18,20;5:2,
4,6,10,13,17,21,23;6:1,
4,7,11,17,19,23;7:3,6,9,
11,13,16,19,23;8:2,4,7,
10,12,15,17,20,22,24;
9:6,8,12,16,18,20,22;
10:5,7,9,13,16;11:16,
17,22;12:6,9,13,19,24;
13:3,6,12,15;14:17;
15:1,4,15,24;16:5;
18:18,23;22:17;23:3,8,
10;25:20,23;26:2,7,14,
19;27:24;28:4,12,16,
19;30:22,24;31:6,9;
32:22;33:2;34:23;35:7,
21;24;36:5,16,21;37:2,
7,10;38:11;39:1,5;
40:2,7,13;42:15,18;
44:5;45:12,18,21,24;
47:2;48:5,8,20;49:4,7,
11;50:16;51:7,9,15;
54:3,5;56:1,5;58:8,10,
19;60:13,22;62:20;

63:1;64:20;65:1,4,7,17,
23;66:2,5,10,24;69:3;
74:12,20,23;78:15,19;
81:3,13,16,24;82:11;
83:22;85:1;100:16,20,
25;102:25;103:5;
110:11;111:17,20;
112:2,7,10,14;113:16;
115:3;117:23;122:12,
17,22;123:4;138:8;
142:17;143:25;144:5,
17;150:2,5;153:20,25;
154:4,8;157:18;
164:19;166:7;167:13,
16,22;168:20;169:1

except (1)
144:25

exception (1)
31:3

excerpt (1)
87:14

exchange (2)
20:7;34:12

excuse (3)
69:16;100:18;150:8

executed (3)
33:4;40:8;59:10

Exhibit (161)
11:12,16,22;12:4;
13:23;14:14,15;15:14,
22;20:13,21;22:15;
23:12,18,21,23;24:2;
25:6,19,22,23;26:1,7,
17;28:21,22;29:3;
30:21,22;31:10,16,19,
24;32:20,22;33:10,13,
18;34:19,24;35:10,14,
21;37:1,3,5,5,13,18;
38:24;39:5,12,15,15;
40:1,7,16,41:18,22;
42:13,18;43:1,4,4,9;
44:2,5,13,16,17,21;
46:22;47:2,10,13,13,
18;49:8,12,19,22;50:3;
51:5,9,24;52:3,5,8;
56:2,5,12,15,15,24;
58:7,7,8,9,17,24,24;
59:4;60:11,13,22;61:2;
62:9,9,11,19;63:3,9,10,
17,18;64:2,3,8,9,10,16,
19;65:13;78:24;79:4;
81:2,2,3,11;82:14,18;
83:22;84:4,22;85:3;
87:14,18;89:22,23;
91:16;92:23;99:7,8;
100:16,19,20,22,23;
102:23;103:1,5,12,14;
105:8,10;108:20,23;
109:6;130:12,14;
149:18

exhibits (13)
13:20;14:13;15:3,6,
7,16,19;16:8;62:10;

64:21;65:5;75:10;
149:17

existed (1)
167:1

existence (1)
155:18

expand (1)
92:7

experience (1)
16:15

Explain (3)
150:1,3,4

explained (4)
21:4;29:8;55:23;
137:18

Explosives (2)
11:5;168:1

extensive (1)
57:16;164:25

extent (3)
27:19;54:18;134:4

extreme (1)
81:17

ex-wife (1)
50:7

eye (2)
95:17;146:2

eyes (2)
79:5;81:16

F

facilitated (1)
165:3

facilitating (1)
40:22

fact (12)
57:17;72:7;83:5;
93:13;98:12;104:23;
106:13,16;135:11;
148:1;166:16;167:3

facts (3)
81:20;105:9,12

fade (1)
160:7

failing (1)
95:12

fair (7)
86:2;92:2;95:13,14;
115:13;116:24;146:20

fairly (2)
97:25;110:20

false (2)
106:6;120:10

falsehood (1)
106:9

falsely (1)
93:10

falsification (1)
40:23

falsified (1)
32:6

falsifying (1)

32:11
familiar (5)
    43:23;73:16;84:8;
    113:9;140:2
familiarity (2)
    73:19;139:22
families (2)
    166:14;167:6
family (3)
    67:21;137:10;153:16
far (14)
    14:13;68:8;71:14,22;
    77:23;90:14;94:17;
    95:9;110:19;134:3;
    144:25;151:21;156:13,
    15
fast (1)
    36:22
father (4)
    30:14;45:12;71:23;
    155:9
fault (1)
    157:14
FAX (2)
    79:16;80:19
Faye (2)
    47:15;49:13
FBI (1)
    17:7
February (2)
    155:6;157:6
Federal (9)
    4:7;32:17;63:4,14,
    22;64:12,14;165:16;
    168:10
federally (1)
    46:19
fee (1)
    80:11
feed (1)
    137:9
feel (1)
    74:4
feels (1)
    167:10
feet (1)
    68:10
FEIN (1)
    76:15
FEIN/SEIN (3)
    79:14;80:22;81:5
fellow (5)
    86:25;93:9;101:16;
    117:17;121:9
felon (2)
    29:17;96:20
felony (3)
    57:11;85:20;96:18
few (6)
    13:21;57:23;68:16;
    108:25;119:8;162:9
FFL (4)
    18:21;62:4;96:18;

105:15
field (5)
    10:2,18,18;160:21;
    167:25
fight (1)
    167:7
figure (3)
    59:21;71:23;98:1
figured (1)
    60:3
file (1)
    168:10
filed (1)
    13:10
fill (16)
    18:6,8;22:3,10;
    24:24;38:1,1,21;102:1;
    114:3;119:14;123:7;
    139:21;140:13,20;
    166:19
filled (20)
    18:4;24:6;29:20,22;
    30:9;31:20;34:2;38:5,
    8;93:25;94:10;95:19;
    102:3,21;114:5;
    132:11,16;140:4,22;
    145:2
filling (7)
    18:10;40:24;94:20;
    119:1;120:4;125:22;
    141:2
final (5)
    10:24;58:21;168:2,7,
    9
finally (1)
    17:19
financial (6)
    76:20;77:15,22;
    79:14;80:5;81:5
find (3)
    25:15;84:21;130:10
findings (2)
    13:17;168:8
Fine (4)
    11:8;27:13;80:6;
    154:17
fingers (3)
    48:3,5,7
finish (1)
    77:19
finished (2)
    131:11;140:18
fire (4)
    70:11,11;123:22;
    168:1
firearm (8)
    19:22;30:4;34:20;
    37:22;63:14;104:24;
    106:14;158:10
Firearms (73)
    11:5;12:21;20:2,2,
    17;21:21,22;23:22;
    24:8,12;26:4,8;29:12,

20,24;31:20;32:14,18;
    33:22;35:16;38:5,9,10;
    39:16,19;41:1,4,6;42:6,
    9,10;53:3;57:18;58:3;
    62:16;63:4,23;64:12,
    14;73:3;74:2;76:3,3;
    89:19;91:2,2,3,8,19;
    93:10,14;95:21;
    104:11,17,20;113:21;
    118:15;119:3;120:13;
    134:4,15,25;135:12;
    141:17;142:2;160:23;
    161:7;163:16,19;
    164:4,10;165:1,16
fired (3)
    43:17;53:18;121:9
first (29)
    6:2;29:8;38:18;46:7;
    53:5,14,16,22;54:9;
    66:21;79:11;87:6;98:8;
    102:24;126:10;128:6;
    131:17;132:17,21;
    133:8;135:15;137:17;
    143:5;146:10,10,22,23;
    155:23;163:12
fishing (2)
    161:8;164:6
fits (1)
    87:12
five (10)
    17:20;26:4,8;36:4,
    11;37:1;134:24;153:3;
    159:5;166:25
five-minute (1)
    154:3
fixture (2)
    115:17;125:7
flow (2)
    19:11;85:17
folks (3)
    61:6;114:18;160:2
follow (1)
    150:19
followed (2)
    17:24;59:8
following (4)
    4:1;52:15;63:4,20
follows (12)
    16:11;66:9;67:3;
    75:5;112:20;121:16;
    122:21;128:9;135:21;
    142:8;154:7,12
football (2)
    68:4,5
Form (41)
    13:7;25:11;30:9;
    31:20;32:6,11,11;
    34:11,13,15,19;36:5;
    38:1,5;39:18;40:8;
    49:2;97:15;101:3;
    102:2,3,15,21;114:3,5;
    118:23;119:1,14;
    120:4,8;131:13;

132:15;140:10,13,18,
    20;145:2,2;168:7,9,15
formal (1)
    27:22
former (5)
    5:8,9,11;123:3;126:1
forms (22)
    18:4,10;33:3;34:2;
    36:8;38:8,22;40:24;
    42:8,11;43:19;51:3;
    52:17;53:2;93:25;
    118:17;125:22;132:11,
    16;134:6,11;140:17
forth (1)
    99:6
Forty-one (1)
    157:6
found (7)
    50:8;57:20;59:16;
    96:8;111:14;147:19;
    148:17
four (5)
    36:4;39:16,20;40:8;
    134:24
Fox (1)
    161:6
frank (1)
    27:3
fraudulent (4)
    25:8;43:19;140:5;
    148:21
fraudulently (2)
    34:2;38:4
frequency (4)
    115:4;124:22;125:1,
    12
friend (6)
    9:2;38:17;100:10;
    101:16;102:14;160:10
friends (3)
    38:20;118:9;161:25
front (7)
    79:11;80:16;115:12,
    25;116:12;132:23;
    133:3
full (8)
    112:23;121:19;
    135:24;154:15,20;
    164:9,15;166:21
fully (1)
    85:16
further (8)
    42:7;65:16;74:10;
    117:22;162:8;167:14;
    168:17,21
furtive (1)
    107:17
future (1)
    165:10

76:5
Gary (3)
    82:23;83:23;149:17
gather (1)
    60:19
gathering (1)
    28:8
gave (5)
    51:1;110:19;121:22;
    158:25;159:18
general (1)
    58:20
generally (2)
    107:5;132:10
generate (3)
    45:3,6;85:16
generating (3)
    45:8,10,17
gentleman (3)
    69:3;132:6;163:22
gentlemen (3)
    71:18;134:22;141:16
gets (1)
    161:6
Gilbert (1)
    128:17
G-i-l-l-e-s- (1)
    8:13
GILLESPIE (10)
    8:11,11,13,16,18;
    128:6,13;163:5,23,24
Gilliam (1)
    155:12
girl (1)
    144:23
girlfriend (1)
    118:20
given (2)
    107:24;116:15
giving (2)
    20:6;119:3
goes (8)
    10:23;19:1;27:6;
    55:11;71:14,22;88:1;
    161:6
good (16)
    71:4,9,13,16,24;
    74:22;77:24;79:5,12;
    81:17;102:4;126:7,8;
    156:13;160:10;165:6
Gordon (2)
    107:8,10
Government (103)
    9:22,23;10:13;11:18;
    13:9,20;14:13;15:14,
    15,16,21;16:7;20:13,
    21;21:1;22:14;23:11,
    17;24:2;25:6;26:7,16,
    21,22;28:1,9;29:3;
    30:21,22;31:9,15,24;
    32:20,22,23;33:2,9,18;
    34:18,24;35:9,14;37:5,
    13,18;38:23;39:5,11;

G

gain (1)

40:1,7,15;41:22;42:18,
24;43:9;44:5,12,21;
47:2,9,18;49:11,18;
50:3;51:9,19,23;52:8;
56:5,11,15,24;58:8,16;
59:4;60:13;61:1;62:9,
19;63:9,17;64:2,8,9,19;
65:4,8,12,15;74:12;
76:23;81:8;84:2,13;
86:11;98:18,25;103:9;
110:11;117:23;150:21;
164:19;168:22

**Government/Financial (1)**
80:23

**Government's (5)**
13:16;15:2;97:10;
164:22;167:2

**Governor (1)**
160:13

**graduated (1)**
72:5

**Grand (4)**
106:4;116:12;
132:23;133:3

**granted (1)**
13:9

**great (2)**
27:19;156:20

**Greenville (2)**
136:21,23

**greeter (1)**
115:14

**grew (1)**
155:9

**growth (1)**
76:22

**guard (1)**
67:16

**guess (6)**
93:14;111:8;118:6;
119:18;164:2,13

**guilty (7)**
20:23,24;53:21;
56:19;57:3,11;61:11

**gun (24)**
18:17;24:23;25:1,1,
11;56:20;89:16;
103:21;105:2;106:17;
108:5,11;114:3,5;
118:23;119:14;140:17,
18;145:1,2,2,3,7;
164:25

**guns (51)**
17:10,16,21,23;18:5,
9;20:9;22:1,3,4,7,9,11,
13;24:18;25:10;29:15;
34:14,14;41:10;51:4;
52:15,17,20,22;54:22;
55:12,12;57:21;76:6;
93:25;94:2;104:6;
109:14;119:2,7,8,11,
15,20,23;120:18;
127:3;131:12;132:9;

135:4;139:19;144:22;
145:8;152:13;164:7

**guy (3)**
25:1;88:1;155:11

**guys (1)**
65:22

# H

**hadn't (2)**
95:1;157:15

**half (1)**
60:9

**hand (1)**
22:6

**handguns (1)**
34:7

**handle (1)**
160:7

**handling (1)**
57:7

**hands (1)**
165:1

**hanging (2)**
113:25;114:2

**happen (3)**
131:8;139:6;140:11

**happened (5)**
25:5;34:16;145:18;
147:7,9

**hardly (1)**
72:21

**harm (1)**
167:6

**hate (3)**
102:17;161:23,23

**haven't (3)**
102:25;147:12;160:3

**he'd (5)**
22:10,10;24:24;
53:23;92:14;97:22;
108:25;127:6,11;
131:12;151:15;152:6;
156:5,22;160:7

**he'll (1)**
160:15

**he's (32)**
5:8;7:15;9:3;10:22;
12:14;23:1;31:3;43:22;
71:20,20;88:18;95:2,8;
96:18;99:1;100:1,24;
102:12,13;111:1;
115:10,10,14,17;
144:19,20;146:20;
153:2;157:11;160:11,
11,12

**health (5)**
21:17;62:6;91:18;
92:10;95:10

**hear (10)**
5:22;7:23;12:12;
57:23;124:18;142:25;
143:25;146:18;154:16,

18
**heard (4)**
135:14,16;137:12;
147:12

**hearing (226)**
4:2,4,4,13,16,18,20,
23;5:2,4,6,10,13,17,21,
23;6:1,4,7,11,17,19,23;
7:3,6,9,11,13,16,19,23;
8:2,4,7,10,12,15,17,20,
22,24;9:6,8,12,16,18,
20,22;10:5,7,9,13,16,
23;11:2,2,6,7,13,16,17,
22,22;12:3,6,9,13,19,
24;13:3,6,8,10,12,15;
14:13,17;15:1,4,9,11,
15,24;16:5;18:18,23;
22:17;23:3,8,10;25:20,
23;26:2,7,14,19,20;
27:24;28:4,12,16,19;
30:22,24;31:6,9;32:22;
33:2;34:23;35:7,21,24;
36:5,16,21;37:2,7,10;
38:11;39:1,5;40:2,7,
13;42:15,18;44:5;
45:12,18,21,24;46:17;
47:2;48:5,8,20;49:4,7,
11;50:16;51:7,9,15;
54:3,5;56:1,5;58:8,10,
19,21;60:13,22;62:20;
63:1;64:20;65:1,4,7,17,
23;66:2,5,10,13,16,19,
24;69:3;74:12,20,23;
78:15,19;81:3,13,16,
24;82:11;83:22;85:1;
90:11;96:7;97:1;
100:16,20,25;102:25;
103:5;110:11;111:17,
20;112:2,7,10,14;
113:16;115:3;117:23;
122:12,17,22;123:4;
138:8;142:17;143:25;
144:5,17;149:3;150:1,
5;153:20,25;154:4,8;
157:18;164:19;166:7;
167:13,16,22;168:2,20,
21;169:1,2

**hearsay (21)**
22:21,22,22;23:2;
26:22;27:21;28:13;
31:3;39:3;42:22;44:4,
9;47:1;49:10,15;51:19;
56:3,4;86:5;135:16;
166:21

**heart (2)**
144:20;146:10,22;
155:23;159:14,17,18

**Heights (2)**
59:20,21

**held (8)**
4:2;48:3,5;64:13;
67:11;165:8,9,13

**help (8)**

18
79:7;91:6;144:22;
145:20,20;146:3;
156:23;160:6

**helped (1)**
156:21

**Hensley (2)**
59:20,21

**here's (1)**
159:1

**hereby (19)**
12:1;15:17;26:9;
31:12;33:4;39:8;40:9;
42:20;44:9;47:5;49:14;
51:20;56:8;58:12;
60:15;65:8;81:6;83:24;
103:8

**Herndon (15)**
44:18,24;45:2,10,16;
47:4;75:14;87:4;103:7;
108:21,25;109:8,13,13,
24

**Herndon's (2)**
45:12;108:23

**Herndon-related (1)**
109:6

**Herndons (1)**
45:15

**hesitated (1)**
140:8

**high (6)**
34:6;68:4;72:4;
155:12,14,16

**himself (7)**
10:23;21:6;52:14;
98:9;104:20;113:22;
147:6

**hint (2)**
146:25;147:3

**hired (1)**
147:14

**history (7)**
38:4;62:11,24;156:3,
8;165:5;166:4

**hits (1)**
109:23

**Hold (2)**
107:4;153:13

**holler (2)**
138:14;161:3

**home (6)**
107:21;113:8;
117:10;124:1;126:24;
127:11

**honey (1)**
157:11

**Honor (1)**
23:5

**hour (1)**
66:3

**hours (1)**
62:8

**house (13)**
22:12;55:22;93:17;

104:24;105:3;109:18;
117:3,7;119:17;
120:24;127:5,22,22

**Huh (1)**
152:3

**hundred (4)**
68:10,16;158:12;
160:16

**hundreds (2)**
141:17,17

**hunting (3)**
114:1;136:14;164:7

**husband (4)**
50:22;127:15;
142:21;166:19

**HX-1 (1)**
11:12

# I

**I'd (18)**
11:11;15:4;34:24;
82:9;97:3;111:20;
112:6;114:19;119:14;
124:24;145:19;150:7,
8;153:22;158:8;
160:14;161:18,23

**I'll (29)**
11:19;14:14;20:10,
13;23:23;25:19;26:1;
27:4;30:21;34:18;36:9;
38:23;42:13;43:4;44:2;
46:22,24;49:8;54:2;
58:9;63:2;85:14;
106:20;109:11;124:8;
129:17;162:11;167:23;
168:25

**I'm (88)**
5:12,24;6:14,15;
7:23;8:6;10:1;11:1,2;
12:10;14:3;16:16,18;
22:20;23:6;25:23;
26:20,22,23;28:2,5;
35:5;42:15;45:24;
48:24;57:24;58:20;
60:18;62:22;65:20;
67:10;70:9;72:3,5;
75:2;76:19,19;77:21;
79:2;81:4;82:8,9;
86:24;90:9,10;91:1,4,
16;93:18;94:16,21;
95:16,16;96:12,21;
100:1,22;104:13;
106:1,1;108:8;111:11,
12,24;112:4,5;119:18;
124:8;128:17;129:14;
130:11,12;133:18,18;
134:12;137:23;139:24;
142:19;146:7;149:6;
154:17;157:14;159:5;
160:9;161:9,19;
167:24;168:14

**I've (29)**

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 54 of 181 PageID #: 58

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

5:16;16:16,17;19:12;
31:4;50:8;67:14;68:2;
70:4;71:20;79:5;83:6;
89:24;102:23;112:8,8;
118:8;128:21;129:7;
130:19;131:25;135:15;
145:2,3;149:3,9,24;
160:9;161:5
ID (2)
34:11;38:3
idea (5)
71:19;88:5;117:20;
133:9;148:20
identification (48)
11:15;12:3;15:13,21;
20:20;23:17;24:1;
26:16;29:2;31:15,23;
33:9,17;35:9,13;37:17;
39:11,24;40:15;41:21;
42:24;43:8;44:12,20;
47:9,17;49:18;50:2;
51:23;52:7;56:11,23;
58:16;59:3;61:1;62:18;
63:8,16;64:1,7,18;
65:12;78:23;81:11;
82:17;84:4;87:17;
103:12
identified (2)
24:12;104:8
identify (2)
90:2,12
ie (1)
99:1
ill (2)
21:17;95:10
illegal (19)
24:6;32:5;35:18;
40:22;43:23;50:21;
54:15;56:21;57:17;
77:12;94:22;109:8,14,
25;113:20;123:5;
124:11;140:6;165:2
illegally (3)
30:8;94:10;120:10
illicit (1)
30:10
Illinois (1)
67:20
implication (1)
77:14
important (2)
45:5;75:1
Impose (1)
11:8
inappropriate (1)
165:2
Inaudible (2)
97:7;100:13
Inc (2)
12:7;79:9
incarcerated (1)
99:24
inception (1)

133:14
Incidentally (1)
58:19
include (4)
50:15;51:16;74:1;
165:19
included (5)
14:4;36:15,24;91:12;
104:23
includes (2)
63:12,20
including (6)
12:21;54:16;57:15;
61:14;82:5;98:9
income (2)
55:17,21
incorrectly (1)
66:13
indicate (13)
20:15;30:10;50:5,20;
53:22;54:17;55:6,15;
81:20;90:4;92:19;
116:21;120:9
indicated (11)
24:4,17;25:7;33:21;
46:3;54:20;75:10;91:9;
98:5;106:10;111:2
indicates (1)
105:14
indicating (4)
25:11;48:10;120:5;
165:7
indication (2)
72:17;117:19
indicative (1)
73:3
indicted (1)
57:8
indictment (5)
56:16;57:10;58:11;
102:24;103:14
individual (10)
20:10;31:11;44:7;
63:5;83:13;85:20;
101:9;112:25;166:22;
167:4
individuals (12)
25:15;45:2;54:16;
75:10;96:23;129:17;
130:15;135:4;138:6;
149:5;166:14,23
induced (1)
106:6
industry (3)
10:17;41:9;167:24
informal (4)
27:19;54:6;68:23,24
information (11)
18:1;44:24;91:20;
92:5;96:13;99:5,21;
106:7;110:19,20;134:9
initial (2)
76:2,3

initially (1)
19:4
ink (1)
167:19
inquiry (1)
108:19
insensitive (1)
112:6
inside (2)
60:5;165:20
insinuation (1)
139:8
inspection (9)
62:13;63:5,11,13,14,
19,21,22,23
instance (1)
29:19
instances (4)
25:15;29:14;32:10;
165:9
instead (1)
37:1
Institution (1)
80:23
institutions (1)
79:22
instructions (1)
54:10
intend (1)
40:2
intention (1)
42:10
intentional (1)
165:19
interest (3)
20:8;126:2;158:3
interview (45)
23:13;28:23;29:5;
33:14,20;35:2;37:15;
39:7;41:19;42:20;43:6;
44:18;47:4,15;49:13,
23;51:11;53:23;54:14,
15;55:14;57:4,5;84:11,
15,16;85:4,22;87:6;
90:15,17,21;91:17;
93:2,8;97:18;98:16;
99:10,12,13,14;104:22;
108:23,24;116:22
interviewed (15)
19:13;20:11;21:3;
24:4;29:7;30:13;52:10;
53:6;61:6,16;78:8;
98:6;110:16;113:4;
133:5
interviewer (1)
102:5
interviewing (2)
45:4;84:8
interviews (10)
20:14;32:4;52:5,12;
75:17,21;94:11;97:21;
99:8;116:10
into (70)

11:11,19;12:1,5;
15:17,23;16:24;20:9;
21:24;22:11,17,20;
23:14,18;25:20;26:9,
17;30:23;31:12,16;
32:20;33:5,10;35:3,10;
39:9,12;40:10,16;
42:13,21;43:1;44:2,9,
13;46:23;47:5,10;49:8,
14,19;50:11;51:5,20,
24;56:8,12;57:9;58:12,
17,20;60:11,16;61:2;
62:23;65:8,14;81:7,12;
84:1,5,12;86:12;96:14;
103:8,13;119:24;
134:24;141:16;156:9
introduce (3)
14:21;62:23;63:2
introduced (5)
20:22;21:2;75:17,17,
19
introduction (2)
16:2;83:20
introductory (2)
15:6,7
inventory (1)
163:15
invest (1)
18:2
investigating (4)
73:8;89:15,16;91:24
investigation (52)
16:24;17:5,5,6,13;
19:5;23:12;25:15;
28:10,22;30:17;31:11;
33:14,24;35:1,1;37:14;
39:6;40:19,21;41:15;
42:7,19;43:5;44:6,17;
46:5,10;47:3,14;49:13,
23;51:10,12,16;52:4,
11;54:23;56:6;59:6;
60:14;61:5;73:8;76:5,
8;79:20;93:19;95:3;
96:8,13;111:14;132:22
investigations (3)
76:20;80:5,15
investigative (2)
11:4;13:17
investigator (1)
77:22
investigators (2)
17:9;21:1
involve (2)
100:10;134:5
involved (38)
17:4,7;18:11;29:6;
30:2;33:22;40:22;
43:22;46:11;50:22;
53:13;61:14,15;80:11;
86:3;95:2,8;97:7,9,14;
98:13;113:17,24;
114:6;116:25;122:9;
123:5;124:13;125:21;

130:10,15;132:18;
145:7;155:7;156:11;
162:17;163:2,10
involvement (10)
37:21;42:2;53:10;
39:17;54:16;53:17;
134:14;139:9;148:3;
166:2
involving (11)
17:6;20:2,17;24:5;
39:17;54:16;56:20,21;
57:3;59:12;113:20
IRS (2)
78:2;111:8
isn't (17)
37:3;76:11,17;85:21;
86:11;87:11;92:5;
93:22;95:13;97:2;98:3,
9;101:16,20;107:17;
148:5,14
issue (3)
27:12;28:13,14
issued (7)
11:9;12:6,21;14:15;
63:12,20;64:4
issues (4)
27:8;91:18;92:10;
165:15
It's (54)
6:9,9;7:21;9:24;
13:24;23:9;27:19;
28:22;59:24;60:9,18;
61:7;62:14;65:19;
66:21;67:12,68:23;
69:11,12,13,24;70:5;
72:10;74:8;76:20;
79:13,24;84:20;85:4;
86:5;92:18;96:8,14,15;
100:19;103:2;106:22;
111:18,21;112:11;
114:22;133:7;137:2;
147:11;150:7;152:15;
153:8,21;159:25;
164:9,9;166:22,23,23
item (1)
66:15
items (1)
74:1

J

James (3)
6:2,3;13:7
January (1)
99:14
jealous (1)
156:24
jewelry (7)
48:3;116:4,6;125:14,
24;144:24;164:6
job (7)
67:15;135:8;136:8;
137:9;153:18;156:6;

160:18
**jobs (3)**
  19:11;20:4;67:14
**John (1)**
  155:12
**joking (1)**
  138:12
**Jonhston's (1)**
  83:3
**Josh (2)**
  7:5,8
**J-o-s-h (1)**
  7:10
**judge (3)**
  57:18,20;83:3
**July (4)**
  11:24;108:6,12;
  113:4
**jump (1)**
  106:2
**June (2)**
  79:17;80:19
**junior (3)**
  155:12,14,16
**Jury (4)**
  106:4;116:13;
  132:23;133:3
**Justice (3)**
  11:6;107:8,10

**K**

**K-a-n-a (1)**
  4:16
**Kanawha (2)**
  4:15,18
**K-a-n-a-w-h-a (1)**
  4:15
**keep (6)**
  79:22;80:1;132:9;
  158:23;161:9;166:17
**keeping (1)**
  163:15
**Kentucky (1)**
  16:19
**key (2)**
  98:4;107:18
**kick (9)**
  45:3,8,11,17;46:20;
  54:11;73:9;77:16;
  109:21
**kick- (1)**
  75:24
**kick-back (4)**
  17:8;20:23;21:4;
  46:5
**kick-backs (1)**
  19:6
**kid (1)**
  68:3
**kids (1)**
  128:24
**killed (1)**

145:23
**kind (17)**
  27:4;30:17;42:4;
  67:13;76:7;116:1;
  132:22;135:8;136:12;
  140:10;143:14;144:1,
  3;151:23;155:8,13;
  160:21
**kinds (1)**
  60:19
**knew (20)**
  59:19,20;72:15,22;
  83:9;85:12;87:9;89:18;
  99:4;125:4;126:15,15,
  19;139:20;146:5;
  149:6;156:13,15,19;
  163:18
**knocked (2)**
  127:7;162:3
**knowing (2)**
  98:12,13
**knowingly (2)**
  32:11;140:5
**knowledge (24)**
  23:1;30:18;42:2;
  46:7;50:21;54:18;55:2,
  4,7,8;73:5;76:3;79:20;
  86:4;94:7;118:13;
  119:19;121:2;131:14,
  16;135:13;141:25;
  163:14;166:1
**known (12)**
  68:2;70:1;103:7;
  105:19;106:4,6,24,
  24;118:8;125:7;155:5
**knows (2)**
  91:3;143:21

**L**

**L- (1)**
  9:24
**labeled (1)**
  79:3
**lack (1)**
  95:12
**lady (3)**
  17:14;42:3;166:18
**Lamar (3)**
  18:24;52:5;56:7
**landed (2)**
  93:14,16
**Lanes (1)**
  161:3
**large (3)**
  21:7;80:2;150:15
**largely (2)**
  28:8;62:3
**larger (1)**
  151:19
**Larry's (1)**
  158:7
**last (17)**

4:22;13:21;14:7;
  38:17;57:23;64:9;
  87:15;101:14;105:8;
  106:23;113:5;127:14;
  138:2;139:24;145:18,
  24;163:7
**later (9)**
  99:10;106:2;117:11,
  13;119:22;120:16;
  151:16,17;152:8
**latest (1)**
  108:16
**laughing (1)**
  138:12
**law (6)**
  32:17;60:21;82:9;
  160:23;165:25;167:11
**law's (1)**
  166:12
**lawful (2)**
  36:12,13
**lawsuits (1)**
  22:21
**lawyer (1)**
  147:14
**lay (1)**
  75:9
**lay-aways (1)**
  161:17
**layout (1)**
  114:12
**LB&T (2)**
  79:17;80:19
**lead (2)**
  25:4;108:12
**leading (1)**
  54:1
**leads (1)**
  99:6
**learn (4)**
  87:5;160:17;161:16,
  16
**learned (4)**
  17:10,15;104:5;
  155:12
**least (17)**
  25:4;27:10;28:14;
  72:2;73:1;76:18;79:22;
  95:1;96:17;108:4,5;
  119:19;124:24;144:18;
  145:13;165:4;166:25
**leave (5)**
  10:24;22:6;25:1;
  74:23;120:23
**Lee (1)**
  44:7
**left (2)**
  133:17;160:21
**legally (5)**
  27:18;30:4;32:18;
  165:23;166:2
**l-e-n (1)**
  7:22

less (7)
  19:14,15,17;60:9;
  90:5;109:19;129:11
**Let's (12)**
  25:20;94:4,7;96:22;
  100:7;102:22,22;
  107:8;108:16;110:7;
  130:8;146:10
**letter (4)**
  11:23;63:11,20;
  83:23
**letters (1)**
  62:14
**letting (1)**
  52:23
**level (3)**
  55:7,8,9
**License (28)**
  11:8;12:6,20,24;
  18:21;59:16,17;60:7;
  62:4;73:15;76:17;77:5,
  8;81:18,23;82:7;83:18;
  95:4;111:7,13;151:7;
  161:9;163:6;165:11;
  168:2,3,6,7
**licensed (5)**
  14:9;46:15;77:17,23;
  79:23
**Licensee (44)**
  4:21,24;6:5,12;9:1;
  13:8;14:15;15:10,18;
  18:1,22;23:15;26:11;
  27:7;33:6;39:8;40:11;
  42:22;44:8;47:7;48:22;
  49:5,16;51:19;56:9;
  58:13;60:17;62:14,24;
  63:6,20;64:4;65:10;
  66:18;78:16;83:22;
  94:13;103:5;108:3;
  111:18;153:20;165:22;
  166:7,10
**Licensee's (2)**
  17:1;37:22
**Licensees (2)**
  64:14;165:16
**licenses (1)**
  27:10
**licensing (1)**
  64:12
**lieu (1)**
  66:18
**life (2)**
  71:24;118:9
**life-long (1)**
  67:17
**liked (2)**
  139:19;151:22
**likewise (5)**
  73:18;75:16;81:21;
  100:9;101:8
**limitations (1)**
  91:25
**limits (4)**

60:4,5,10,10
**Line (8)**
  87:22;88:5,6,11,13;
  89:6;108:19;134:19
**list (5)**
  59:23;91:1,8;104:17,
  19
**listed (14)**
  9:3;17:16;18:21;
  36:11,14;39:21;59:13,
  17;60:6;94:23;95:4;
  105:14;108:3;129:7
**listing (1)**
  59:8
**little (11)**
  15:5;16:16;17:1;
  70:10,10,12;140:16;
  152:1,7;160:25;161:7
**live (7)**
  59:19;113:8;123:24;
  127:15;136:20,21;
  162:1
**lived (5)**
  59:20;67:18,22;70:4;
  156:24
**live-in (1)**
  43:15
**lives (4)**
  55:22;60:4;107:7;
  166:25
**living (4)**
  123:11,20,21,22
**load (1)**
  22:11
**Loans (17)**
  12:7;18:22;19:13;
  34:10;38:1;47:23;
  50:12,19;58:4;59:11;
  71:2;77:17;79:9;
  128:19;136:2;155:11;
  161:22
**locate (1)**
  90:20
**located (1)**
  70:5
**location (1)**
  60:14
**locations (1)**
  157:8
**lodge (1)**
  54:2
**log (2)**
  161:4,4
**Logan (7)**
  83:8,9,23;147:14;
  150:25;151:4;155:11
**long (15)**
  67:11;70:2,4;72:1,
  10;92:15;104:5;
  128:20;136:3,5;143:3,
  11;144:7;146:5;161:18
**longer (2)**
  30:16;118:11

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 56 of 181 PageID #: 60

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

look (12)
76:23;79:3;80:9;
91:5;97:3,4;100:11;
108:22;149:19;152:23;
154:18;165:5
looked (1)
116:18
looking (10)
85:2;91:25;92:1;
100:17,21,22,24;
107:11;108:8;130:13
looks (1)
55:11
lose (2)
28:6;161:20
loss (1)
27:11
lost (2)
27:6;146:4
lot (23)
17:10;30:8;61:8;
68:16;87:21;97:13;
112:14;114:20;116:4;
117:10;118:22;119:13,
14,21;120:21,24;
142:1;143:21;150:9;
152:24,24;158:12;
165:1
louder (1)
7:7
loudly (1)
6:13
Louise (33)
5:19,20;21:11,14;
59:12;60:15;62:7;
67:24;68:11;76:12;
77:11;84:24;85:15;
93:17;94:9;95:18;97:9,
11;113:9,17;115:22;
116:1;125:9;133:1;
139:3;142:11,16,17;
153:19,23;156:22;
166:18;168:18
Louise's (1)
125:18
Louisville (3)
10:1,17;167:25
loved (2)
145:23;156:15
lower (1)
79:7
Lowney (135)
9:24,24;11:20;13:2,
11,12,13,13,14,14,15,
19,23;14:7,12,20;15:2,
7,17;16:4,6,13;19:2;
22:14;23:20;24:3;
25:22;26:1,4,24;27:13,
15,18;28:19,20;29:4;
30:23;31:18;32:20,23;
33:1,3,12;35:15,23;
36:3,7,18,23;37:5,9,12,
19;38:14,23;39:2,14;

40:4,18;41:24;42:13;
43:3,10;44:2,15,22;
46:2,22;47:12,19;
48:14;49:8,21;50:4;
51:5;52:2,9;54:13;
56:2,14;57:1;58:6,9,
23;59:5;60:11;61:4;
62:22;63:3,10,18;64:3,
9;65:6,8,15;74:14,19;
78:17;81:9;85:4;91:8,
12;100:19,24;101:2;
103:10,14;106:13,22;
110:13,15;111:4;
112:11;117:25;118:2;
121:5,12;122:14;
128:4;130:14;134:2;
135:17;141:9;142:4;
162:9,11,16;164:1,16,
21,23;167:15,21;
168:22
lunch (2)
111:21,22
LX (16)
78:17,18,20,23;79:3,
8;80:22;81:2,3,11;
82:14,17;83:21;84:4;
87:17;103:12

M

ma'am (1)
5:21
mad (1)
152:13
mailed (1)
13:19
Main (9)
12:20;59:15,18,20;
94:24;95:25;151:5;
153:17;167:20
mainly (1)
136:9
majority (1)
24:21
makes (1)
80:22;85:7;111:12
making (5)
20:7;41:16;66:17;
126:20;166:25
Man (35)
6:16;7:1,3;12:20;
22:24;59:15,18,21;
60:4;66:21;67:10,17,
19;68:15;69:7,10,22;
70:3,23;71:11;74:5;
95:10;107:25;123:22;
125:7;127:6,8;128:16;
136:18;137:1,2;151:4;
166:16;167:21,22
M-a-n (1)
7:2
management (1)
138:22

manager (3)
97:22;129:5,7
managerial (1)
129:10
many (15)
21:7;26:3;36:1;
67:18;68:14;86:6;
104:6;110:23;121:3;
130:23;151:10;152:25;
153:15;157:4;164:10
Maraist (3)
11:1,24;71:18
March (5)
36:19,22,23;108:17,
18
margin (1)
158:10
Mark (1)
9:24
M-a-r-k (1)
9:24
marked (51)
11:15;12:3;15:13,21;
20:20;23:17;24:1;
26:16;29:2;31:15,23;
33:9,17;35:9,13;37:17;
39:11,24;40:15;41:21;
42:24;43:8;44:12,20;
47:9,17;49:18;50:2;
51:23;52:7;56:11,23;
58:16;59:3;61:1;62:18;
63:8,16;64:1,7,18;
65:12;78:13,23;81:11;
82:17;84:4;87:17;
103:12;104:19,20
marriage (2)
142:24;143:2
married (6)
43:15;50:12;123:11;
128:22;137:3;143:3
masse (3)
14:19,21;63:2
match (1)
36:8
matter (9)
11:19;28:16;60:20;
79:21;83:5;103:6;
110:21;113:18;139:3
matters (1)
111:9
may (7)
14:23;104:16;
118:13;124:24;158:14;
166:12;168:10
maybe (12)
27:4;55:9;70:10;
115:9;118:11,16;
127:14,18;130:23;
137:2;152:8;153:22
mean (27)
69:24;71:17,21,23;
72:22,22;80:4;92:18;
95:17;98:11;125:15;

126:15,18;135:7;
138:10;139:16,20;
141:14,20,21,22,22;
147:5;151:12;152:14;
156:22,23
means (1)
27:10
meantime (1)
34:23
medication (1)
30:9
meet (2)
120:24,25
meeting (1)
163:11
meetings (1)
163:3
Melinda (5)
63:6;133:15,16,20;
163:12
memory (1)
146:4
men (1)
167:6
mention (1)
90:14
mentioned (4)
19:3;72:9;104:10;
121:8
mentions (2)
84:24;89:4
merchandise (1)
48:2
met (3)
29:8;83:6;130:19
method (1)
85:16
Michael (1)
161:2
Michelle (3)
37:15;39:7;40:9
middle (1)
68:5
midst (2)
98:19;148:18
might (9)
71:3;73:11;74:1;
78:21;115:8;118:24;
151:25;158:17;161:8
mile (1)
60:9
miles (1)
137:2
Miller (4)
37:15,21;38:18;39:7
million (1)
160:15
mind (2)
141:23;167:19
mine (7)
24:23;67:16;84:21;
107:4,6;139:19;160:10
mines (17)

19:9,10,19;20:3;
21:23;41:7,8;45:4,15;
69:8,9;73:9,9;76:1,4;
85:18;95:12
minor (2)
167:16,17
minute (1)
154:3
minutes (2)
65:24;122:18
missed (1)
162:24
misspelling (1)
167:20
misstated (1)
66:12
Missy (1)
66:15
mistaken (3)
70:9;72:3,5
misunderstanding (1)
46:1
misunderstood (1)
157:18
model (1)
42:5
moment (1)
121:21
money (17)
19:9;20:4,7;41:8,16;
45:6,8,17;52:17;53:1;
109:21;119:11,24;
126:19;139:17;149:24;
150:19
month (1)
115:9
months (1)
159:23
more (30)
16:17;21:23;24:11,
11;30:16,17;34:1,1,3;
49:1;62:21;72:22;
81:17;108:19;127:14;
129:11;143:21;144:22;
145:20;146:5;153:8;
155:20;156:17;158:13,
13;160:22;162:1;
164:17;165:15,16
morning (1)
66:13
most (18)
21:19;41:10;53:12;
98:15;115:6;117:9;
118:8,21,22,24;120:16;
127:4;131:7;132:5,12;
139:18;153:4,6
mostly (1)
133:15
mother (2)
47:22;155:10
move (5)
52:15;83:20;103:2;
140:18;162:3

Case 2:16-cv-12549 Document 1-1 Filed 12/23/16 Page 57 of 181 PageID #: 61

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

**moved (5)**
45:9;67:19;70:8,11;
127:21
**Mrs (15)**
13:3;61:23;63:12;
71:5,12;85:12;89:4;
94:13;154:25;157:11;
162:11;165:23;166:2;
168:16,19
**MSB (1)**
80:23
**much (17)**
15:5;30:19;53:7;
62:7;74:17;78:9,9;
90:5;115:9;118:10;
128:2;129:9;135:6;
138:10;141:23;146:7;
158:21
**Mullins (5)**
43:6,12,14;44:7;
121:8
**Muncy (75)**
5:1,1,3,5,9,11,15,20,
20,22,24;12:17,23;
13:3,5;21:8,10,11,16,
18;43:16;59:12;60:3,
15;61:23;62:4;63:12;
68:1,18,22;71:5,12,19;
84:24;85:12,15;89:4,
18;91:17;93:17;94:9,9,
13,16,22,25;95:5,10,
18;96:17,19;97:7,9,11;
101:5,11,14;112:4;
113:10;125:2;142:16;
147:1;153:11;154:21,
25;157:11;162:12;
164:14;165:23;166:3,
18;167:9;168:16,19,23
**M-u-n-c-y (2)**
5:4,5
**Muncy's (3)**
43:16;92:10;93:17
**Muncys (30)**
29:9;30:6;45:17,19;
50:10,18;52:14,22;
53:23;54:10,18,21;
55:15;59:7;61:20;
76:11;86:15,20,22;
114:6;117:19;118:7;
121:9;124:13;126:7,
11;131:24;133:1;
139:9;166:2
**muzzle (1)**
68:24
**myself (3)**
28:9;49:1;120:14

**N**

**name (39)**
4:11,23;6:2,12,15;
9:9,10;10:10;11:1;
12:10;17:14,16,17;

**18:23;21:7;32:24;**
38:17,18;42:6;51:17;
67:6,7;71:2;76:7;79:8;
87:22;88:1;101:14;
112:23;121:19;128:12;
129:17;130:10;135:24;
138:2;142:14;154:15,
20;167:4
**named (8)**
20:11;41:19;63:6;
94:12;96:23;101:5,9;
155:11
**names (11)**
6:10;12:15;34:3;
50:23;51:2;101:11;
117:7;130:9,13,14;
157:22
**narrative (1)**
99:6
**nature (1)**
124:7
**need (8)**
80:13;112:2,3;
122:12;156:4;160:17;
164:8;166:21
**needed (3)**
85:16;144:21;146:5
**needing (1)**
45:6
**negotiated (2)**
57:8;98:17
**negotiating (1)**
99:1
**negotiations (2)**
98:19;99:2
**nervous (1)**
21:6
**nevertheless (1)**
79:13
**new (1)**
161:2
**news (1)**
72:23
**next (23)**
7:4,19;23:21;28:21;
31:19;33:13;37:13;
39:15;43:4;44:16;
47:13;49:22;52:3;
56:15;58:7,24;62:9,10;
89:18;90:16;101:8,23;
140:19
**NIC (1)**
22:5
**nice (1)**
55:22
**nicer (1)**
87:10
**nickname (1)**
19:1
**night (2)**
86:15;156:23
**nights (1)**
104:23

**nobody (1)**
61:7
**NOEL (33)**
8:19,19,21,23;9:2,
14;28:23;29:6,7,22;
30:2,5;31:2,12,21;32:4,
6,13;33:4;53:9;54:17;
56:21;61:15;94:1;
96:23;100:8;105:20;
106:5,9;108:9;112:24;
118:3;134:23
**N-o-e-l (1)**
8:21
**Noel's (2)**
30:13;48:16
**Noels (1)**
30:3
**nominal (1)**
34:12
**none (9)**
26:12;40:12;93:16,
18;94:3;101:5,10,13;
131:25
**Noodle (88)**
19:1;52:5;56:7;
71:22,22,23,24;72:1,7,
12,15,18;86:25;87:22;
88:1,2,11,20;89:1;93:3,
9,21;97:2,14;98:2,5;
99:24;100:10;101:16;
102:7,14,18,19,19;
104:7,14,24;107:12,24;
108:11;113:13,22,25;
115:5;116:24;117:14;
118:9,22,23,25;122:2,
11;123:1,9,10;124:4;
126:9,11;127:14;
129:8,22;131:1,5,15,
17;132:1,18;133:8;
138:17,18,19;139:2,10;
140:9,16;145:10,21;
147:3,23;148:5;152:5;
156:11,13,18,19;157:1;
160:6;167:5
**Noodle's (1)**
126:2
**Nos (3)**
15:14,22;65:13
**notation (1)**
23:15
**note (2)**
54:3;107:11
**notes (1)**
108:24
**notice (20)**
9:9;11:7;14:4,14;
15:8,10;36:8,11,15,17,
19;37:3,10;39:22;
164:24;167:17;168:4,
7,9,23
**noticed (1)**
59:7
**novo (1)**

**168:13**
**number (16)**
12:24;24:5;34:16;
42:5;46:18;57:16,18;
76:3;85:1;93:24;
104:10;145:4,5;160:3;
162:25;165:2
**nutshell (1)**
98:10

**O**

**object (3)**
30:24;46:24;56:3
**objected (2)**
23:11,15
**objecting (2)**
23:4;35:5
**objection (24)**
11:20,21;27:16;31:6;
39:4,8;42:17,21;44:4,
8;49:10,15;51:7,8,18,
18;54:2,3;64:22;65:9;
75:16;81:9;84:2;
167:23
**objectionable (1)**
23:2
**objections (18)**
11:18;14:22;15:18;
26:11;33:6;35:4;40:10;
42:16;47:6,6;56:9;
58:13,14;60:17,19;
64:23;103:9,10
**observation (1)**
73:2
**observe (1)**
7:15
**observer (2)**
10:20,22
**observing (1)**
114:9
**obviously (4)**
13:20;27:7;135:10;
164:4
**occasion (6)**
16:23;94:8;95:15;
105:1;114:4,5
**occasions (5)**
22:8;24:22;34:16;
76:12;86:2
**occupation (3)**
67:9;69:7;129:1
**occurring (1)**
37:8
**Oceana (1)**
155:25
**October (3)**
62:12;83:17,24
**off (12)**
20:7;41:16;53:3;
57:24;76:8;119:16;
120:23;139:1;140:10;
144:20;146:1;162:3

**Offense (2)**
106:2;115:13
**offer (5)**
14:14;26:1;30:23;
32:20;38:23;42:13;
44:2;46:22;49:8;51:5;
58:9;60:11;166:21;
167:14;168:17
**offered (1)**
160:11
**office (3)**
5:14;10:18;104:3
**officer (13)**
5:18;7:12;11:2,2,22;
12:4;14:14;46:18;
67:15;68:7;72:18;73:2;
96:7
**officials (1)**
162:18
**often (1)**
125:3
**old (1)**
67:19
**once (5)**
115:9;120:17;127:1;
137:18;163:4
**one (72)**
7:4;14:7,18;16:1;
17:19;18:6,7;20:23;
21:1,22:19;24:23;34:5;
36:9;43:17,18;45:2;
48:12;54:11;55:10,19,
23;57:11;61:11;71:13;
72:9;75:10,13;77:1;
87:4,8;91:21;95:5;
96:4;97:24;99:12;
102:20;104:3;105:1;
108:7,19;110:7;
111:12;114:2;118:24;
126:6;127:6;131:24;
132:14;138:14;140:4;
145:1,4,19;146:22,23;
151:19;152:5,16;
153:6,11,17;155:20,22;
163:4,5,7,11,12;
165:13,16;166:15;
167:16
**one-page (1)**
11:23
**ones (12)**
19:12;25:7;36:14;
41:5;91:9,10;97:9;
104:19,20;118:21;
120:16;136:15
**one-tenth (1)**
145:19
**only (10)**
10:20;55:23;60:5;
90:14;94:21;108:23;
111:1;151:14;152:5;
153:17
**open (1)**
16:23

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 58 of 181 PageID #: 62

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

opened (1)
    17:13
opening (1)
    66:19
operating (3)
    12:15;103:20;117:2
operation (1)
    158:1
operations (4)
    10:17;129:9;157:7;
    167:25
opinion (2)
    71:10,19
opportunity (1)
    64:21
opposed (1)
    52:23
option (1)
    107:24
order (4)
    41:1;52:20;77:2;
    85:17
orders (1)
    52:15
ordinary (1)
    127:2
original (1)
    167:17
originally (8)
    19:4;21:5;42:4;45:7,
    8,13,16;46:3
Oscar (1)
    10:8
others (6)
    32:4;77:24;130:6,10;
    131:5;132:7
otherwise (2)
    55:16;124:1
ought (1)
    166:24
out (95)
    17:14,17;18:5,6,8,
    10;22:2,3,10,10;24:6,
    23,24,24;29:20,22;
    30:9;31:21;34:2;38:1,
    1,5,8,22;40:24;45:5,9;
    52:15,22,24;54:22;
    55:18;57:8;59:21;60:3;
    72:4,19;75:9;76:22;
    93:25;94:10,20;95:19;
    102:1,3,21;103:21;
    109:18;112:1;113:25;
    114:2,3,5;116:3;117:3,
    7,7,10;119:1,14,15;
    120:4,18,22;123:7;
    125:22;126:13;127:2,
    5,8,21;132:11,14,16;
    135:12;139:21;140:4,
    13,20,22;145:2;147:17,
    19,20,23;148:14,17;
    152:13;158:13;160:7,
    21;161:5,6;166:14;
    167:20

outside (2)
    60:4;91:24
over (22)
    22:12;23:6;26:9;
    28:5,10;46:5;56:9;
    66:3;69:24;75:16;77:4;
    100:11;110:4;134:20;
    150:9,22;156:5;161:3;
    162:19;163:4,11,13
overall (3)
    61:5;164:2,3
overlooking (1)
    94:19
owed (1)
    151:19
own (11)
    102:15;104:7;
    111:18;120:13;126:6,
    9;138:11;144:10,12;
    152:17;167:9
owned (2)
    41:7;143:12
owner (22)
    5:8,11,11,24;18:16,
    19,21,22;50:15;54:12;
    95:1;107:6;139:19;
    142:19;144:8;145:12;
    147:6;160:2;161:11;
    162:12;165:4;166:24
owners (3)
    38:16;64:13;74:8
ownership (4)
    107:25;143:12;
    144:18;147:9
o-w-n-e-y (1)
    10:1
owns (1)
    107:4

P

page (8)
    79:3,8,12;80:20;
    87:21,23;102:24;
    106:21
pages (1)
    81:6
paid (5)
    55:20;111:2;119:22;
    123:19;135:6
papers (3)
    72:23;73:12;123:7
paperwork (4)
    50:14,16;134:17;
    138:13
Paragraph (15)
    85:6;89:18,21,23;
    90:16;91:16;92:19,23;
    99:18;105:18;106:2,
    20,23;107:12;108:23
Pardon (1)
    91:11
parents (1)

113:8
parse (2)
    94:4,7
part (39)
    18:16,18;19:22;
    21:19;26:9;28:1;40:23;
    44:8;45:5;46:19;50:11;
    53:12;54:12;66:19;
    70:19;76:22;79:23;
    86:13,21,21;96:5;
    98:15;99:23;110:17;
    117:9;120:8;131:7;
    134:4,15;135:3,3;
    139:18;145:12;147:6,
    8,13,13;163:20;166:2
partial (1)
    145:12
participated (2)
    29:23;94:22
participating (1)
    25:16
particle (1)
    22:24
particular (3)
    12:12;17:5;25:6
particularly (1)
    165:24
partner (2)
    110:2,4
partners (1)
    87:8
parts (2)
    93:12;112:9
party (1)
    11:18
pass (2)
    78:21;81:1
past (1)
    162:17
Patrol (1)
    7:12
pawn (3)
    12:21;73:24;155:13
pay (17)
    19:9,18;24:24;45:3,
    8,11,17;48:1;109:21;
    119:12,12,23;123:18;
    141:23;144:24;151:16;
    160:15
paying (4)
    17:8;55:15;119:3,19
payment (3)
    34:12;111:8;119:22
pen (1)
    167:19
people (55)
    17:8;19:12,18;20:3;
    21:22;24:23;27:10;
    29:21,24;30:11;34:1,1,
    3;40:24;41:6,8,9,11,13;
    46:18;48:18;50:24,24;
    51:2;52:16,18,19;53:2,
    9;54:24;68:14;69:19,

23;71:13,14,16;73:21;
    76:4;77:15;87:4;94:12;
    97:18;109:17,20;
    112:8;114:23;116:3;
    117:8;137:20;139:17;
    150:6;152:25;161:25;
    166:14;167:11
people's (1)
    117:7
percent (13)
    19:14,15,17;21:10,
    13,13;144:10,12,13,14,
    14;150:7;166:23
perhaps (3)
    76:12;153:23;160:24
period (8)
    30:1;61:24;62:1;
    82:2;134:20;138:19;
    141:10;158:21
person (25)
    30:3;32:14,17;43:22;
    71:14;78:4;97:14;
    102:7;104:8;105:19;
    106:4,4,6,24;107:13,
    21;109:4;113:13;
    129:3;135:7;140:13;
    151:24;152:11;165:2,3
personal (6)
    23:1;71:10;86:4;
    94:7;129:19;136:17
personally (1)
    88:20,23;89:13
persons (7)
    30:2;46:12;61:14,19;
    64:14;97:14;105:15
perspective (1)
    141:12
Phillip (11)
    8:11;128:13,14;
    133:24;136:6;138:10;
    153:5,12,21,23,24
P-h-i-l-l-i-p (1)
    8:13
phone (5)
    37:24;38:21;101:23;
    102:1,5
phony (2)
    94:20;95:18
photo (1)
    26:8
photocopies (2)
    33:3;40:8
photocopy (13)
    11:23;31:10;35:1;
    39:6;42:19;44:6;47:3;
    49:12;51:10;56:6;
    58:11;81:4,6
physically (1)
    139:4
pick (3)
    24:24;25:2;120:25
picked (5)
    22:2,9;24:23;38:20;

149:3
p-i-e (1)
    8:14
piece (2)
    107:25;146:1
pill (1)
    30:18,20;48:19
pills (3)
    30:7,16;158:22
place (14)
    4:10;15:10;17:3;
    61:8;62:3;69:24;70:1,
    6;95:19;98:17;99:11;
    114:17;141:22;166:3
places (2)
    17:9;77:4
plain (1)
    161:11
plan (1)
    160:8
plaque (1)
    146:1
played (2)
    68:3,5
player (1)
    98:4
plea (17)
    56:19;57:3,8,9,15;
    84:12;86:12,13;98:19;
    99:1,2,3;102:23;
    103:15;105:21;110:18;
    147:24
pleaded (2)
    117:15
please (11)
    6:13;67:6;78:21;
    82:15;84:16;112:10,
    23;121:19;128:12;
    135:24;142:15
pled (6)
    20:23,24;53:21;
    56:19;57:11;61:11
plug (1)
    161:8
plus (2)
    19:15;21:13
pm (1)
    169:2
point (16)
    61:7;77:24;82:10;
    84:23;87:9;91:23;92:2;
    96:10;99:20;111:17;
    115:7;129:24;141:11;
    158:15;160:6;162:6
Police (14)
    6:16,16,22;17:6;
    66:20;67:10,15;68:6,8;
    72:17;73:2;115:19;
    160:18,19
policing (1)
    70:19
pool (1)
    55:22

**poorly (1)**
 27:6
**popular (1)**
 114:17
**portion (1)**
 50:19
**portrayal (1)**
 116:22
**position (3)**
 67:11;83:11;129:4
**possess (2)**
 30:4;32:18
**possession (2)**
 34:13;142:1
**possible (2)**
 6:9,10
**pot (1)**
 166:21
**potentially (1)**
 165:10
**powerful (1)**
 136:15
**practice (1)**
 97:25
**predicated (1)**
 105:22
**premise (1)**
 17:1
**premises (2)**
 114:12;132:4
**prepare (1)**
 10:23
**prepared (1)**
 103:7
**prescription (2)**
 30:8;48:19
**present (10)**
 4:22;13:16;33:15;
 35:6;55:1;61:23;66:16;
 95:18;124:15;161:18
**presentation (5)**
 99:22;111:18,23,25;
 153:21
**presented (1)**
 34:11
**president (5)**
 5:7,24;13:4;83:7,23
**pressure (1)**
 52:22
**pressured (1)**
 53:23
**pretty (10)**
 25:23;30:19;69:13,
 24;79:5;107:16;115:8;
 129:9;138:10;141:21
**previous (4)**
 40:6;51:11,16;62:24
**previously (22)**
 12:2;13:19;15:20;
 23:16;26:15;31:14;
 33:8;35:8;39:10;40:14;
 42:23;44:11;47:8;
 49:17;51:22;56:10;

 58:15;60:24;65:11;
 81:10;84:3;103:11
**price (1)**
 109:20
**Prior (5)**
 16:19,22;17:4;165:6;
 166:4
**probably (9)**
 68:17;115:25;
 118:11,19;137:2;
 149:10;151:18;152:10;
 153:8
**probative (1)**
 60:18
**problem (6)**
 30:18,20;48:16;
 70:19;120:15;158:7
**problems (2)**
 21:17;62:6
**procedure (2)**
 22:23;65:3
**Proceed (4)**
 15:24;26:19;28:19;
 112:10
**proceeding (10)**
 11:6;14:3;26:23;
 27:1,19,22;66:9;
 122:21;154:7;169:4
**proceedings (3)**
 4:2,9;13:18
**process (5)**
 27:11;46:11;57:14;
 110:17;163:16
**produce (1)**
 90:13
**produced (2)**
 90:24,24
**proffer (4)**
 98:21;99:3,11,16
**profit (1)**
 158:10
**prompted (1)**
 53:14
**pronounce (1)**
 32:1
**pronouncing (1)**
 13:13
**proof (1)**
 27:5
**proper (1)**
 71:2
**property (1)**
 135:12
**prosecuted (1)**
 46:19
**protect (1)**
 28:15
**prove (2)**
 166:21,22
**provided (5)**
 20:3;42:5;45:1;
 50:23;92:6
**providing (1)**

 110:19
**provisions (3)**
 4:5;11:9;168:12
**pulling (1)**
 152:9
**purchase (9)**
 34:6,7;42:9;55:13;
 91:9;94:20;95:19;
 98:14;115:5
**purchased (5)**
 34:8;91:10;93:11;
 104:17;105:2
**purchaser (10)**
 24:7;25:11;29:12,13,
 23;32:7;39:19;48:23;
 106:14;120:5
**purchases (6)**
 32:5;33:21;113:21;
 120:16,17;123:5
**purchasing (5)**
 21:21,22;42:10;
 95:21;119:8
**purpose (6)**
 66:16;85:13;124:12;
 162:22
**put (16)**
 68:24;87:10;119:15,
 24;120:22;134:7;
 140:17;147:17,20,23;
 148:9,14;151:15;
 156:21;161:8;166:14
**Putting (2)**
 117:6;162:24

**Q**

**quadrant (1)**
 79:8
**quarrel (1)**
 95:24
**quickest (1)**
 14:23
**quickly (1)**
 160:23
**quit (1)**
 159:3
**quite (1)**
 26:3
**quote/unquote (1)**
 42:6

**R**

**raise (1)**
 27:7
**raised (1)**
 155:10
**ran (1)**
 59:11,15
**rankest (1)**
 22:21
**Rarely (1)**
 165:16

**rate (1)**
 51:18
**rather (2)**
 15:4;98:25
**reaches (1)**
 168:5
**read (7)**
 73:12;85:14;89:24;
 92:22;104:22;105:13,
 16
**reading (2)**
 81:4;117:15
**ready (6)**
 56:1;65:20;75:2;
 111:22,24;135:18
**real (3)**
 29:18;48:19;136:14
**realized (3)**
 30:19;53:18;59:10
**really (31)**
 5:15;17:18;21:14;
 68:3,6;71:23,24;72:21;
 73:7;76:4,5;91:4,25;
 92:1;95:2;118:11;
 129:14;130:20;132:20;
 133:19;134:13;135:6;
 139:16,17;141:20,23;
 147:16;149:2,24;
 152:15,15
**reason (2)**
 83:14;148:14
**recall (9)**
 34:14;76:9;77:10;
 104:22;114:12;115:4;
 130:24;139:3;162:17
**recalled (1)**
 75:4
**receipt (2)**
 13:7;168:14
**receive (8)**
 38:6,7,12;51:3;
 119:22;168:4,7,9
**received (28)**
 12:4;15:22;17:13;
 18:9;23:18;26:17;
 31:16;33:10;34:12;
 35:10;37:24;38:9;
 39:12;40:16;43:1;
 44:13;47:10;49:19;
 51:24;54:9;56:12;
 58:17;61:2;65:14;
 81:12;83:16;84:5;
 103:13
**receiving (1)**
 25:1
**recess (6)**
 66:8;122:12,18,19,
 20;154:6
**recipient (1)**
 39:19
**Recognize (6)**
 54:1;82:7;116:21;
 130:8,9;157:19

**recollect (1)**
 84:19
**recollection (4)**
 70:2;72:1;93:2;
 134:10
**recommendations (1)**
 104:2
**reconvene (1)**
 66:6
**record (48)**
 4:9;6:5,20;11:12,19;
 12:1;13:1;15:17;22:18,
 20;23:10,14;25:21;
 26:10;27:16;28:1,17;
 31:12;33:5;35:3;37:3;
 38:12;39:9;40:10;
 42:21;44:9;47:5;49:14;
 50:9;51:15,20;56:8;
 58:12,20,20;60:16;
 62:23;65:9;66:11;81:7;
 84:1;87:25;96:6;103:9;
 112:23;122:23;154:9;
 163:15
**recordation (2)**
 66:17;103:6
**recorded (2)**
 60:22;85:22
**recording (1)**
 4:8
**records (18)**
 17:21;23:22;26:5,9,
 13;28:7;31:20;32:5,21;
 33:7;34:20;35:17;
 39:16;40:6,23;64:22;
 79:22;80:1
**RE-CROSS (1)**
 111:5
**recruited (2)**
 92:20;93:4
**recruits (1)**
 124:4
**Red (8)**
 89:19;90:1,2,6,11,13,
 14,20
**redirect (3)**
 110:12,14;121:6
**refer (13)**
 14:23;20:10,13;
 22:14;23:23;25:19;
 30:21;34:18;37:14;
 41:18;43:4;47:13;52:3
**reference (5)**
 37:7;79:12;80:22;
 85:7;106:10
**referred (37)**
 11:14;15:12;20:19;
 23:24;29:1;31:22;
 33:16;35:12;37:16;
 39:23;41:20;43:7;
 44:16,19;47:16;50:1;
 52:6;56:22;59:1,2;
 62:17;63:7,15,24;64:6,
 17;75:11,13,24;76:10;

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 60 of 181 PageID #: 64

UNITED STATES DEPT OF JUSTICE - ATF v.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

78:22;79:21;82:16;
87:16;105:19;106:20;
113:1
**referring (8)**
72:11;79:13;81:23;
91:16;96:3;97:16;
107:16;113:13
**refers (1)**
109:3
**reflect (2)**
62:10;90:4
**reflected (1)**
84:8
**reflecting (3)**
14:1;22:15;39:17
**reflects (1)**
28:22
**regard (5)**
79:19;122:8;127:3;
136:17;138:25
**regardless (1)**
53:19
**regards (3)**
20:15;33:21;37:21
**register (8)**
115:25;116:6;120:1;
125:14;131:12;144:23,
24;160:23
**regular (2)**
61:24;141:13
**regularly (1)**
62:8
**Regulations (5)**
4:7;62:16;63:4,14,23
**regulatory (2)**
162:18,23
**reimbursed (1)**
48:1
**relate (2)**
81:22;108:4
**related (4)**
19:5;58:11;85:15;
90:23
**relates (1)**
14:9
**relating (2)**
47:4;60:14
**relation (1)**
128:16
**relationship (16)**
4:23;6:12;9:1;18:13;
20:5;29:9;38:19;43:12;
47:21;118:6;122:1;
123:1;126:3;137:1;
138:18;142:18
**relatively (1)**
116:22
**relaxed (1)**
27:4
**relevant (1)**
138:19
**relied (2)**
96:25;108:6

**rely (6)**
96:6,25;99:21;109:7;
137:9;153:15
**relying (2)**
96:11,12
**remedy (4)**
94:15;166:24;
167:10,11
**remember (9)**
38:18;87:5;130:18,
21;146:11;149:13,13;
151:10,14
**REMEMBERED (1)**
4:1
**remembering (1)**
29:19
**reminder (1)**
103:3
**removed (1)**
47:1;62:4
**renew (2)**
149:21;150:13
**renewal (1)**
151:7
**rented (1)**
43:16
**repeat (1)**
155:4
**repeatedly (2)**
134:23;141:16
**rephrase (1)**
108:10
**replaced (1)**
13:24
**Report (26)**
28:21;31:10;33:13;
34:24;35:1;39:6;42:19;
43:5;44:6,17;47:3,14;
49:12,22;51:10,17;
52:4;56:6;58:21;60:14;
62:15;63:12,21;64:3;
85:15;100:2
**reported (2)**
55:21;100:3
**REPORTER (4)**
57:23;58:5;66:16;
103:8
**reporting (1)**
55:17
**reportive (1)**
23:12
**Reports (2)**
51:12,16
**represent (2)**
32:5;64:12
**representations (1)**
106:7
**representative (2)**
48:22;166:12
**representing (1)**
6:5
**reputation (6)**
69:22;70:22;71:4,6,

9;74:5
**request (6)**
13:9;15:9;42:11;
83:16;168:10,13
**requested (2)**
13:8;66:18
**required (1)**
106:7
**requirement (1)**
27:11
**requires (1)**
160:24
**reside (2)**
113:7;128:14
**residence (5)**
59:8;60:9,15;93:14;
103:21
**resident (2)**
67:17;136:18
**residential (8)**
59:13,17,23;60:1,7;
94:23;95:22;96:1
**respect (6)**
69:20;80:9;86:9;
106:7;115:22;138:5
**response (2)**
28:9;144:1
**responsibilities (1)**
129:10
**responsibility (2)**
14:9;57:16
**responsible (6)**
41:7;64:14,15;
105:15;165:23;166:3
**result (3)**
13:6;20:23;110:18
**resulted (1)**
62:13
**resuming (56)**
19:2;23:20;24:3;
28:20;29:4;31:18;
33:12;35:15;37:12,19;
38:14;39:14;40:18;
41:24;43:3,10;44:15,
22;46:2;47:12,19;
48:14;49:21;50:4;52:2,
9;54:13;56:14;57:1;
58:6,23;59:5;61:4;
69:1;79:12;82:13,19;
84:6;87:19;93:1;101:4;
103:18;106:15;107:1;
122:24;130:16;143:22;
144:2,6;146:19;147:2;
153:14;155:1;157:13,
21;164:1
**retired (2)**
78:2;145:16
**return (2)**
18:9;95:6
**review (3)**
11:7;13:16;168:13
**reviewed (1)**
104:18

**reviews (5)**
92:25;97:6;100:12;
108:22;109:9
**Revocation (7)**
14:15;15:8;36:9;
39:22;164:24;168:7,9
**revocations (1)**
64:12
**Revoke (1)**
11:7
**revoked (2)**
168:3,6
**right (154)**
14:6;15:15;16:5;
54:7;72:15;73:9,19;
74:4;75:2;76:1,13,18,
24;77:20;78:11,20;
79:16;80:6,10,12,16,
21;81:1;84:14,21;85:7,
8;86:3,11,20;87:11,25;
88:24;89:2,12,14;
90:16;92:21;93:11,14,
19,22;94:17;95:2;
96:20;97:2;98:3,6,9,
14;99:1,7,20,22;100:7;
101:12,17,20;102:16;
103:16,21;104:10,25;
105:4,7,11;106:11;
107:14;108:6,17;
109:1,4;110:3,5;113:5,
8,14;114:16;115:1,18,
20;116:7,9,11,12,20,
23;119:25;120:2,7;
121:22;122:6;123:1,
13,18;124:2,3;125:18,
25;127:13,19;128:1,5,
14;129:20;131:3,21;
133:21;136:6,16;
138:5,23;142:21,24;
143:7,11;144:7,12,15;
145:11,14;147:11,17,
21;148:6,7,12,16;
149:6,18,25;150:16,17,
20,21;151:7,8;152:1,
11;154:3,16;155:19;
156:10,11;157:8,8,25;
158:4,15;160:4;
161:12;162:5,20,22
**right-hand (1)**
81:17
**rings (2)**
48:7,10
**risk (1)**
148:10
**road (1)**
109:23
**Rob (3)**
10:3,6,10
**R-o-b (1)**
10:6
**Robinson (1)**
160:10
**rocking (2)**

115:12;161:24
**Roger (53)**
5:1;12:11;21:18;
30:14;59:12;60:15;
67:24;68:12,20,24;
71:13;76:12;77:12;
84:24;85:15;89:18;
91:17;93:16;94:8,25;
96:17;113:10,18;
114:25;115:4,6,8,10,
14;118:8;125:2,4;
126:8;133:1;139:3;
143:1,3,20;146:9;17;
148:23;152:16,17,20,
22;153:13,23;154:15,
21;160:1,20;162:5;
167:9
**R-o-g-e-r (1)**
5:2
**Roger's (3)**
111:25;115:16;125:6
**Rogers (3)**
10:16,19,19
**rogue (1)**
103:21
**role (2)**
20:16;134:3
**Romeo (1)**
10:8
**room (5)**
6:8;51:1;52:21;
130:4;138:11
**R-o-s-s (1)**
10:5
**rough (1)**
152:15
**Route (1)**
128:17
**routinely (1)**
109:4
**rubber (1)**
109:23
**Rules (2)**
26:24;27:20
**run (3)**
102:1;129:9;156:5
**running (4)**
72:18;109:18;
163:19;165:3

**S**

**safes (1)**
164:15
**sake (1)**
69:2
**sale (3)**
74:1;161:5,6
**sales (10)**
19:15;20:8;21:13;
26:5;129:3;134:6,17;
136:9;145:7;158:14
**Sam (1)**

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 61 of 181 PageID #: 65

UNITED STATES DEPT OF JUSTICE - ATF V.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

92:21
Sam's (82)
  6:6;12:7;17:16,20;
  18:8,22;19:13;20:5;
  21:9;22:1;29:10;30:7,
  12;32:10;33:23;34:10;
  38:1;45:6,13;46:12;
  47:23;50:8,9,12,19;
  53:18;58:4;59:11;68:9,
  11;69:21,22,24;70:3,
  13,18,24;72:8;73:15;
  74:6;77:17;79:9;80:10;
  82:6;83:16;84:9;88:16,
  23;90:5;93:5;102:11;
  107:13;108:25;109:4,
  8,15,19,20,25;111:7;
  114:13;116:2;124:12,
  23;126:2,20;128:19,
  20;130:22;131:18;
  133:8;136:2;142:18,
  20;143:14;148:9;
  153:16;155:5;157:23;
  159:4;160:2;161:22
same (13)
  25:16;31:1;34:4,4;
  57:5;70:5;71:7;95:22;
  99:11;109:19;115:22;
  146:14;159:14
saw (5)
  9:8,9;38:9;115:8;
  127:2
saying (7)
  6:20;17:19;19:21;
  86:22;95:25;96:15;
  157:17
scheme (17)
  17:8,11;21:4,16,20;
  41:16;42:2;46:5;52:14;
  55:9;76:1,10;77:12,16;
  86:19;89:12;91:18
schemes (2)
  20:24;73:9
school (3)
  68:4,5;72:4
Scott (17)
  20:11;23:13;75:11;
  84:8,12,22;103:6;
  109:3;110:5;129:18,
  21;132:12;138:3;
  139:18;148:2;151:11,
  24
Scotty (5)
  48:12,13;91:2;93:11;
  149:12
search (3)
  59:11;95:5;132:21
second (27)
  53:10,13;54:14;
  55:14;57:4,5;66:15;
  68:24;79:3,8;87:6;
  98:16;99:10,14;
  100:11;102:22;103:17;
  105:18;106:19,22;

107:2;108:21;110:8,
  16;142:23;143:2;
  153:22
Section (5)
  4:5,6;11:9;18:17;
  168:12
secure (3)
  19:11;20:4;85:17
security (2)
  67:15;154:22
seeing (2)
  34:14;147:12
seeking (1)
  111:7
seemed (1)
  55:2
seems (2)
  27:8;107:18
SEIN (1)
  76:15
self (1)
  100:2
self- (1)
  100:2
sell (4)
  50:11;117:11;
  160:14;164:4
selling (6)
  20:9;41:12;109:18;
  117:7;121:2;135:13
send (2)
  86:15;132:14
Senior (4)
  10:3,11;16:6;45:16
sense (3)
  10:23;59:22;140:11
sent (3)
  13:23;14:2;22:4
sentenced (1)
  100:1
separate (1)
  29:21
September (2)
  4:2,8
serial (1)
  42:5
series (4)
  22:15;34:19;62:10;
  64:11
set (2)
  52:23;99:6
seven (5)
  36:4,5,7;67:12,19
several (6)
  29:14,18;34:6;46:21;
  50:23;51:2
sham (1)
  72:18
Shane (22)
  8:19;30:18,19;31:2,
  11;33:4;48:19;53:9;
  96:23;100:8;105:20;
  106:5;108:9;112:12,

24,25;121:21;125:15;
  131:10,23;137:12;
  149:6
S-h-a-n-e (2)
  8:20,21
Shane's (2)
  30:15;105:22
share (1)
  145:19
shareholder (1)
  18:21
Shawn's (1)
  100:15
she'd (6)
  17:15;47:24;48:11,
  18;125:13;149:11
she's (4)
  125:21,21;130:20;
  162:12
shenanigan (1)
  152:8
shoe (1)
  87:12
short (4)
  122:17,19;146:4;
  166:24
shot (2)
  91:7;105:2
should've (1)
  161:17
shouldn't (2)
  46:16;98:13
show (9)
  22:9;82:14;84:23,24;
  87:13;89:17;96:2;
  109:6;145:1
showed (6)
  18:3;34:10;42:7;
  50:14;93:20;145:1
showing (2)
  48:3,7
shows (1)
  17:21
sick (3)
  115:8;144:19;155:23
sight (1)
  129:24
sign (11)
  97:21,22;101:24;
  102:15;122:9;129:12;
  131:6;138:6;139:1;
  140:10,16
signatory (1)
  51:17
signed (21)
  43:18,20;48:11,11,
  21,22;49:1,4;55:10,10;
  63:5;97:12,15;101:3;
  118:17;139:12,13;
  140:18,22;141:1;
  147:23
significant (1)
  165:2

signing (1)
  101:14
similar (1)
  57:17
similarly (1)
  37:23
simply (3)
  10:22;101:23;119:20
sister (5)
  122:6;123:11;
  126:25;127:13,21
sit (2)
  52:21;161:24
sitting (1)
  115:11
situated (1)
  37:23
situation (3)
  98:24,24;136:18
six (4)
  17:20;36:4;67:12;
  159:23
skunk (1)
  148:18
sleeps (1)
  152:24
small (2)
  69:4;125:7
smaller (1)
  158:14
Smith (1)
  29:18
snitch (2)
  86:11;147:1
Social (1)
  154:22
sold (3)
  156:1,2;158:3
sole (1)
  129:1
solicited (2)
  21:8;38:4
soliciting (1)
  53:2
Somebody (7)
  119:10;120:9;
  141:13;145:1,3;146:5;
  163:17
someone (2)
  29:16;144:21
someplace (1)
  156:22
sometime (1)
  72:6
sometimes (4)
  19:15;21:15;140:21;
  151:15
somewhat (1)
  145:10
somewhere (2)
  92:12;159:10
son (10)
  68:4,5;71:23;126:9;

145:22;156:17,23,24;
  161:2;166:17
soon (2)
  112:6;161:19
sorry (8)
  7:23;26:22;45:24;
  48:24;57:24;130:11;
  157:14;168:14
sort (8)
  61:23;73:3;75:23;
  103:20;114:17;115:14;
  125:6;145:21
sound (1)
  127:18
South (1)
  136:24
Southern (2)
  56:16,17
speak (3)
  90:1;132:15;153:23
speaking (2)
  74:4;108:7
Special (5)
  10:3,11;16:6;51:13;
  56:7
specialist (1)
  136:12
specific (2)
  29:19;110:20
specifically (6)
  20:16;76:12;86:23,
  24;94:12;97:24
specified (1)
  58:22
spell (4)
  4:22;6:17;7:9;8:12
spelling (1)
  6:20
spend (1)
  87:21
spin-off (1)
  75:23
spoke (5)
  34:5;57:6;76:5
spot (1)
  10:21
spouse (1)
  50:15
stand (2)
  91:23;121:24
standard (3)
  27:4,4,5
standing (3)
  49:15;114:8;125:13
start (10)
  7:20;16:7;21:8;
  53:15;66:12;75:8;
  92:10;155:4;157:2;
  161:19
started (24)
  20:1;30:6;33:24;
  34:2;42:4;45:10,16;
  53:1,1;62:6;69:17;

91:18,18;95:11;100:8;
108:1;110:18;113:25;
114:2;139:23;142:20;
146:23;155:17;158:20
**starting (1)**
82:8
**starts (1)**
107:12
**state (17)**
4:22;16:20;17:6;
23:6;27:16;32:17;67:6;
69:9;90:17;121:19;
128:12;135:24;154:15,
20;160:10,18,19
**stated (1)**
167:9
**statement (14)**
80:19;85:19,21,22;
86:2;92:3;94:3;95:13;
96:12;109:11;116:16;
121:22,24;164:22
**statements (4)**
106:6;164:20;166:8,
10
**States (7)**
4:6;11:5,10;56:18;
57:7;106:8;168:12
**stating (1)**
38:11
**statute (1)**
91:24
**stay (5)**
120:22;156:22;
160:17,18;164:15
**stayed (1)**
127:22
**stays (1)**
152:23
**stealing (5)**
117:5;119:20;
126:11;148:20;152:13
**Stein's (1)**
64:10
**stems (1)**
63:10
**Stephen (11)**
18:12;44:18;45:10;
47:4;75:14;103:7;
108:21,24;109:13,13,
23
**Steve (1)**
18:23
**Steven (28)**
18:24;21:19;22:1;
29:9,11,15;30:15;34:9;
47:22;50:7,10,12,14,
18,18;52:5;56:7,18;
58:12;72:14;103:19;
106:5;109:17;144:12,
18;152:5;163:5,5
**still (10)**
106:1;120:15;122:4;
123:11,24;140:14;

147:8;149:2;157:25;
159:24
**stipulate (1)**
13:9
**Stipulation (3)**
105:9,12;106:22
**stock (1)**
5:16;95:1;143:12;
144:10
**stole (1)**
164:14
**store (43)**
38:21;48:2,15;52:16;
62:7;102:1;103:21;
114:2;118:4,14;119:8,
20,24;120:18;123:7,
17;126:6;129:9;130:4,
20;132:8,21;134:24;
141:13,16;145:17,19;
149:10,24;151:3;
152:11;155:21,25;
156:5;157:12;160:12;
161:20;162:23;164:9;
165:4,4,20;166:3
**stores (5)**
153:12;155:22;
157:15,16,22
**story (1)**
100:15
**straight (4)**
21:18;22:12;129:25;
159:24
**straw (15)**
91:10;94:20;95:19;
98:14;113:21;114:10;
115:5;120:16;123:5;
124:8;129:13;148:24;
157:2;158:16;165:3
**Street (10)**
4:10;12:20;59:15,18,
20;70:10,12;94:24;
95:25;135:16
**strike (1)**
167:20
**stroke (14)**
12:14;92:15;94:17;
146:4,9,12,13,14,15;
159:11,14,16,20;
166:17
**strokes (1)**
144:20
**stroller (1)**
159:25
**struck (1)**
21:9
**stuff (10)**
72:20;73:6;109:19;
114:1;117:5;118:22;
120:15;125:24;147:12;
155:13
**subject (6)**
14:21;31:4;39:3,8;
42:21;44:7

**submitted (2)**
9:4;168:13
**subsequent (6)**
54:14;56:19;98:17;
99:13;103:15;165:12
**subsequently (4)**
53:20;57:9;59:14,15
**substance (1)**
107:12
**substances (1)**
120:10
**sucks (1)**
69:14
**sued (1)**
87:3
**suffer (1)**
167:5
**suggestion (1)**
147:22
**Suite (1)**
4:10
**Summers (1)**
4:10
**supervised (1)**
141:14
**supervision (1)**
10:19
**supplied (1)**
28:7
**support (1)**
11:4
**supposed (2)**
22:22;119:5
**sure (21)**
6:13;16:4;25:24;
26:23;60:18;91:1,4;
95:7;99:13;100:1;
102:17;105:25;110:8;
117:25;122:14;129:15;
133:19;137:17,23;
162:13;164:12
**surmise (1)**
95:16
**Suspend (2)**
11:7,8
**system (7)**
95:6;158:7;160:22;
161:2,9,15,16

---

**T**

**table (4)**
47:24;111:2,8;
112:17
**tag (1)**
10:10
**talk (7)**
65:21;96:22;112:9;
140:15;146:17;159:22;
161:25
**talked (3)**
109:22;110:3;160:9
**talking (24)**

17:9;19:16;22:19;
23:1;30:5;42:7;46:10;
54:24;86:23,24;88:5,
10;90:10;95:16,16;
104:14;124:9;127:24;
130:3;132:13;138:12;
139:24;145:25;157:11
**talks (4)**
109:16,17,20;110:1
**tax (4)**
19:15;20:8;21:13;
150:8
**Taylor (1)**
31:11
**telephone (1)**
17:13
**telling (2)**
107:13;158:23
**tells (2)**
42:8;108:25
**tendered (1)**
99:3
**tenure (1)**
72:2
**terms (2)**
58:21;134:17
**testified (11)**
16:10;67:2;75:5;
77:11;112:19;116:12;
121:15;128:8;135:20;
142:7;154:11
**testify (3)**
6:8;100:5;132:23
**testimony (5)**
74:21;76:10;82:5;
84:7;93:7
**That'd (5)**
39:3;60:20;77:24;
86:2;92:2
**That's (105)**
12:8;13:2;15:5;25:4,
5;27:6,12,13,20,21;
32:15;38:13;39:21;
41:2;45:7;46:24;48:9;
52:16;54:20;57:13;
60:1,6;61:10,13,18;
64:4,16;73:18;75:12;
76:7,17,21,21;79:5;
80:6,8,20;82:7;84:18,
22;85:10,19;86:1;
88:12;89:3,12;93:19;
94:18;95:11,14;96:16;
98:10;99:6,18;101:12,
18;103:16;105:17;
106:18;107:6,22;
108:20;109:2,5;110:3,
4,9,25;111:3,4,15;
116:22;121:5,9;124:3;
125:15,18;130:9,19;
133:20,23;135:17;
141:6;142:4;148:14;
151:3,5,23;152:5;
153:17,19;155:4;

157:14,17;158:12;
159:6;161:1;162:5;
164:18;165:25;166:6;
167:2,3,7,8
**there'd (1)**
90:9
**there's (27)**
17:20;24:11;27:3;
29:17,18;36:14;37:1;
39:20;40:12;55:22;
61:7;90:3,3,7,23;94:3;
96:4,15;100:12;
104:17;105:4;114:22;
120:14;132:8,9;
158:13;165:6
**therefore (1)**
167:5
**thereof (2)**
27:11;75:18
**they' (1)**
48:2
**they'd (7)**
19:17,18;22:11;
52:20,20;140:15;141:1
**They're (10)**
23:23;43:15;71:13;
77:21,23;80:2;83:16;
101:7;161:25;165:21
**They've (2)**
71:1,4
**thinking (2)**
90:9;133:18
**third (1)**
165:13
**Thirty-four (1)**
143:4
**thought (6)**
16:2;139:19;151:23,
24;152:17;166:16
**thousand (3)**
150:9,22;160:16
**thousands (1)**
19:16
**three (22)**
36:4,14,20;47:1;
124:24;130:19,23;
134:24;137:6;142:19;
143:6;144:9;153:11;
155:22;157:7,8,15,16,
22;160:11,12;165:18
**throw (1)**
140:16
**throwed (1)**
146:7
**ticket (1)**
151:16
**till (4)**
120:23;139:23;
140:15;149:20
**timely (1)**
13:10
**times (22)**
21:3;29:8;38:2;47:1;

82:5;86:6;97:23;109:1;
116:4;117:10;118:22,
23;119:13,14,21;
120:21,24;124:24;
130:19,23;151:19;
155:18
tiny (1)
161:7
Title (11)
4:5,6,23;5:6,21,23;
6:12;11:9;106:8;
129:11;168:12
Tobacco (2)
11:4;168:1
today (20)
28:23;33:15;72:21;
74:5;77:10;90:10,11,
25;96:11,24;98:3;
99:21;100:4,9;108:12;
134:23;135:15;139:20;
142:3;158:23
together (1)
127:15
told (46)
17:19,20,22;18:4;
20:15;29:17;30:14;
34:1,8;35:17,18;37:21;
38:6,13;42:1;43:13;
48:18;50:6,8,9;52:12,
13,14;53:11,11,14,19;
54:8;66:14;77:15,21;
78:9;80:4;85:23;92:14;
94:1;97:23;101:25;
102:9;105:1;109:2;
126:3;137:21;144:21;
145:16;160:13
Tom's (1)
157:23
took (20)
17:3;21:2;24:21;
29:15;34:13;61:8;
71:24;76:8;77:22,24;
78:3;87:15;94:12;
95:19;98:16;104:7;
127:7;166:3,15,18
tool (1)
76:20
tools (1)
77:1
top (1)
80:20
tough (1)
79:5
towards (1)
128:17
to-wit (1)
4:3
Town (16)
6:16;7:1,3;60:3,10;
66:20;67:10;69:4,21;
71:21;74:5;112:9;
123:22;125:7;156:24;
161:22

trace (1)
104:6
track (1)
19:24;41:6;161:3,17
traction (1)
76:5
trade (2)
12:10,15
traditionally (1)
145:7
traffic (1)
91:19
trafficked (1)
57:19
trafficking (3)
57:22;58:3;73:3
trail (1)
57:24
trans (1)
33:22
transaction (36)
23:22;26:4,8;31:20;
32:5,21;34:20;35:17;
37:22;39:16;40:6;
43:20,21;49:3;50:17;
56:21;90:4;100:9;
105:21;109:23;113:20;
114:9,10;117:14;
124:7,8,11,13;131:24;
139:1,2,4;148:24;
151:9;158:11,16
transactions (45)
19:22;20:1,17;22:16;
24:5,7;25:7,17;29:6;
33:22;35:19,22;36:1,4,
13;37:8,22;39:17;
43:23;48:13;50:21;
54:16,19;57:17;58:3;
59:12;61:8;62:2;76:24;
80:1,2;94:21,23;95:20;
96:24;118:15;120:3;
127:4;129:13;130:15;
132:3;138:6;151:10;
157:2;165:3
transcript (1)
87:21
transferee (2)
106:19;107:2
transferred (2)
14:2;17:10
transfers (4)
14:1,3;26:5;36:10
transitioned (1)
21:18
transposed (1)
103:17
treated (2)
71:22;126:9
Trooper (2)
16:20;160:10
trouble (3)
70:18;81:4;158:5
truck (4)

119:16;120:22,24;
121:1
true (2)
96:16;101:8
Trust (4)
83:9,14,24;151:4
trustworthy (1)
83:12
truth (10)
16:10;53:20;67:2;
75:4;112:19;121:15;
128:8;135:20;142:7;
154:11
try (4)
6:14;100:4;126:6;
160:6
trying (6)
22:21;82:9;88:9;
119:18;156:8;160:5
turn (9)
17:24;68:21;79:11;
98:25,25;105:7;
108:20;143:19;155:2
twice (2)
52:11;98:6
two (20)
20:14;36:3;48:12;
52:4;65:22;81:6;94:12;
99:8;102:20;118:11,
24;124:24;127:16;
130:19,23;134:22;
137:2;154:4;157:25;
165:12
two- (1)
154:2
Tyler (2)
33:4;112:24
type (3)
25:17;34:4;57:17
typical (2)
69:7;158:10
typically (2)
120:19,20
typo (1)
167:17

U

ultimate (1)
106:20
ultimately (8)
18:4,16,20;24:18;
35:18;46:19;61:11,16
Uncle (86)
6:6;12:7;17:16,20;
18:8,22;19:13;20:5;
21:9;22:1;29:10;30:7,
12;32:10;33:23;34:10;
38:1;45:6,13;46:11;
47:23;50:8,9,11,19;
53:18;58:3;59:11;68:9,
11;69:20,22,24;70:2,
13,18,24;72:8;73:15;

74:5;77:16;79:9;80:10;
82:6;83:16;84:9;88:7,
15,23;90:5;92:21;93:4;
102:11;107:13;108:25;
109:4,8,15,19,20,25;
111:7;114:13;116:2;
124:12,23;126:2,20;
128:19,20;130:22;
131:18;133:8;136:2;
142:18,20;143:14;
148:9;153:16;155:5;
157:23,23,23;159:4;
160:2;161:22
uncovering (1)
34:1
under (15)
4:5;10:19;11:3,9;
12:9,15;32:17;47:24;
55:16;105:15;106:2;
111:2,8;160:22;168:11
understood (3)
32:13;138:22;148:2
unemployed (2)
166:15,25
United (7)
4:6;11:5,10;56:17;
57:7;106:8;168:12
unlawful (2)
25:17;61:8
unless (3)
60:16;145:3;150:22
unusual (1)
59:7
up (37)
17:21,24;19:10;22:9,
11;25:2;34:10;38:20;
48:3,5;52:13;54:9;
59:8;60:3;65:19;70:11;
86:15;87:9;88:4;
105:24;112:13;115:11,
12,25;120:25;131:11,
15;139:10;146:2,2;
147:4,19;149:3,20;
151:6;155:9;166:17
upon (8)
22:22;42:7;92:7;
96:25,25;105:22;
109:7;153:16
USC (1)
106:3
use (2)
13:24;14:3
used (4)
76:20;77:1;158:14;
164:15
user (2)
30:10;105:22
uses (1)
95:21
using (2)
95:24;120:10
usually (2)
115:7;116:3

V

valid (1)
38:3
value (2)
60:19;150:14
various (3)
54:16,24;130:15
vehicle (2)
22:11;107:13
Vendors (3)
19:8,10;45:15
vernacular (1)
69:16
versus (3)
27:9;56:18;64:10;
91:10;103:7;144:14
Vest (9)
14:2;17:14,22,22;
41:19;42:3,20;43:19;
76:6
Vest's (1)
43:14
violation (2)
56:20;106:3
Violations (15)
62:15;63:13,21;64:4;
89:16;162:23;163:1;
164:23,25;165:7,8,10,
21;166:4,22
Virginia (15)
4:20;12:20;16:18,20;
56:17;59:17,18,21;
69:7,10,70:23;71:11;
90:18;107:20;128:15
virtually (1)
16:8;69:12
virtue (1)
77:13
vis-a-vis (1)
98:24
visit (1)
126:24
votes (1)
162:1

W

wad (1)
126:19
wait (4)
68:21;131:10;
143:19;151:22
waiting (1)
140:14
waive (2)
23:7;27:12
walk (3)
149:11;152:14;
159:22
walked (1)
127:8

walking (2)
138:11;159:23
walks (1)
152:11
Walls (10)
6:15,15,18,22;7:1,15,
18;66:20;67:7,9
W-a-l-l-s (1)
6:18
Wal-Mart (1)
115:14
wants (2)
128:5;150:21
warned (1)
165:10
warning (7)
62:13;63:11,20;
165:7,8,12,17
warnings (1)
166:5
warrant (2)
59:11;95:5
wasn't (24)
29:12;45:21;53:8;
55:13,23;62:6;73:7;
77:13;89:15;91:25;
92:1,7,7,8;96:15;
106:16,17;121:9;
124:14;126:20;137:17;
147:24
Waukegan (1)
67:20
way (14)
12:14;14:23;15:5;
30:6;78:13;82:9;87:10;
110:20;120:19;124:13;
145:19;149:20;157:3;
167:9
ways (2)
70:12;159:22
we'd (4)
98:14;140:13;
148:16;150:6
we'll (14)
14:22;16:7;30:23;
37:13;40:20;47:13;
52:3;66:6;68:24;
119:16;122:17;156:7;
161:15;168:23
We're (17)
4:14;19:16;28:10;
36:9;66:11;82:7;88:5,
10;93:9;94:14;113:13;
122:19,23;140:13;
147:12;154:9;161:11
we've (9)
40:20;66:2;93:23,24;
109:22;110:4;153:2,6;
164:8
wealthy (1)
41:10
week (4)
124:25;151:17;

160:12,13
well- (1)
125:6
well-known (1)
115:16
well-liked (1)
115:17
weren't (1)
85:25
Wesson (1)
29:18
West (40)
4:20;9:15,15,17,19,
21;12:20;16:17,19;
33:14,20;34:4,13,20;
35:2,17;36:3;37:23;
51:1;53:9;54:17;56:17;
59:16,18,21;61:15;
69:7,10;70:23;71:11;
100:8,10;107:20;
108:16;121:13,20,21;
122:25;128:15;134:23
W-e-s-t (2)
9:15,19
w-h-a (2)
4:17,18
What'd (1)
126:3
what's (17)
36:8;39:21;67:9;
69:6,6,9,22;76:15;
85:14;89:24;129:3;
136:8;147:12;152:20,
22;153:4;158:10
WHEREUPON (49)
11:14;12:2;15:12,20;
20:19;23:16,24;26:15;
29:1;31:14,22;33:8,16;
35:8,12;37:16;39:10,
23;40:14;41:20;42:23;
43:7;44:11,19;47:8,16;
49:17;50:1;51:22;52:6;
56:10,22;58:15;59:2;
60:24;62:17;63:7,15,
24;64:6,17;65:11;
78:22;81:10;82:16;
84:3;87:16;103:11;
169:4
wherever (4)
24:22;93:25;119:17;
121:1
whispered (1)
146:11
who'd (2)
152:2,4
who's (5)
38:17;82:8;85:20;
96:24;163:19
whole (8)
55:9;68:16;87:21;
98:2;114:20,20;132:8;
150:8
wife (5)

5:11;83:1;127:15;
161:13,15
willful (1)
164:24
willfully (1)
165:22
William (2)
9:18;67:7
Wilson (5)
82:23;83:6,23;
149:17;151:2
wise (2)
38:16;78:6
within (6)
60:9;79:19;84:22;
168:14,14,24
witness (49)
7:14,17;8:4,8,17;
9:13,21;10:14;16:7;
18:20,24;35:6;38:13;
45:14,20,23;48:7,9,24;
49:6;50:17;51:14;54:8;
58:2;66:21;68:19;73:4;
74:16,18,22;78:21;
82:8;92:25;95:18;97:6;
100:12,18;101:1;
106:24;108:22;109:9;
110:10;111:16;117:24;
128:3;133:25;143:21;
162:10;163:24
witnessed (1)
141:2
witnesses (2)
78:10;93:24
woman (4)
41:19;101:22,23;
151:22
won't (1)
97:24
wondering (1)
141:19
word (5)
77:22;78:1,4,7;89:9
words (6)
57:24;68:14;107:16;
130:5;150:14;160:24
work (25)
14:24;17:9;19:9,19,
19;21:23;36:12;45:23;
67:13;85:17;119:16;
120:20,23;126:5;
127:11;128:18;131:18;
133:8,14;136:1,9;
137:18;139:23;144:24;
164:7
worked (17)
19:8;21:1,5;43:16;
47:23,24;72:4;83:9;
110:21,23;118:3,21;
120:20;128:20;155:11,
24;163:17
workers (1)
156:9

working (13)
17:7;18:17;69:21;
72:2;77:16;120:15;
126:20;131:17;136:3;
141:13;150:24;160:11;
163:14
works (2)
88:15;163:16
worry (1)
122:16
worth (2)
22:3;141:17
wouldn't (7)
48:1;90:7;92:17;
95:8,9;149:10;156:25
write (5)
6:14;19:13,17;36:21;
93:8
writing (2)
13:8;21:5
written (2)
21:7;168:4
wrong (2)
139:14;140:5
wrongdoing (1)
90:5
wrote (3)
88:22,23;166:13
Wyoming (3)
107:7,20;117:17

Y

yard (1)
55:23
Yea (1)
115:2
year (7)
87:15;113:5;127:16;
133:16;134:20;160:17
years (24)
16:17,20;67:12,18,
19;95:1,11;108:1;
110:24;118:11;127:16;
128:21;136:4;142:19;
143:4;144:9,20;
155:24;157:4;159:5;
160:3;161:23;165:21;
167:1
You'd (6)
140:20;145:24;
152:12;157:7;160:18;
162:3
you'll (1)
79:8
you're (36)
5:13;6:19,20;7:6,16;
8:4,5,7;9:12;10:10,13;
12:15;14:17;19:21;
23:4;32:23,24;37:2;
72:11;81:21;86:22;
90:11;95:25;96:2,15,
19;97:16;112:25;

119:7;120:4;136:12;
141:11;145:6;146:18;
160:2;161:11
you've (17)
64:20;68:20;78:6;
79:21;86:6;89:8;94:6;
97:15;102:14;114:15;
136:5;137:12;140:2,4;
145:6,7;147:14
Young (3)
66:15;155:10;167:6

Z

Zip (1)
4:20

1

1 (24)
11:16,23;12:4;14:14;
15:14,16,22;26:9;37:3,
6;78:16,17,20,24;
80:22;81:3,12;99:18;
100:22,23;130:12,14;
144:13;149:18
1:00 (1)
122:18
1:28 (1)
154:5
1:33 (1)
154:9
1:55 (1)
169:2
10 (30)
19:14,15,17;20:13,
21;21:10,13,23;12,18;
31:19;33:3;36:19,19,
23,23;65:24;84:20,21,
22;85:3;89:22,23;
91:16;92:19,23,23;
122:18;137:8;144:14;
150:7
10:58 (2)
4:7;66:14
100 (2)
144:10,14
11 (9)
25:19;28:22;29:3;
30:22,23;31:1,2,10,16
11:12 (1)
66:6
11:24 (1)
66:11
11:25 (1)
66:7
11-1-52 (1)
154:21
12 (5)
33:13,18;34:24;
35:10;128:21
12:35 (1)
111:21

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 65 of 181 PageID #: 69

UNITED STATES DEPT OF JUSTICE - ATF V.
UNCLE SAM'S LOANS, INC.

ADMINISTRATIVE HEARING
September 13, 2016

**12:55 (1)**
122:23
**13 (9)**
4:2;37:14,18;39:1,2,
6,12;88:5,8
**136 (2)**
87:21,23
**137 (1)**
88:19
**13th (1)**
4:8
**14 (5)**
11:24;41:18,22;
42:18;43:1
**1400 (1)**
4:10
**14500 (1)**
11:8
**15 (7)**
16:17;43:5,9;44:2,5,
13;83:24
**15th (1)**
155:6
**16 (9)**
44:17,21;46:23;47:2,
10;88:6;108:20,23;
109:7
**17 (5)**
47:13,18;49:8,12,19
**18 (10)**
4:6;11:9;49:22;50:3;
51:5,9,19,24;106:8;
168:12
**19 (6)**
58:7,24;59:4;60:13,
22;61:2
**1975 (1)**
155:6
**1991 (1)**
64:5
**1997 (1)**
155:23

**2**

**2 (18)**
14:15;15:8,14,22;
78:24;79:4,8;81:2,2;
82:6,15,18;83:21,22;
84:5;137:8;149:18;
159:10
**20 (8)**
62:9,11,19;65:5,13;
87:22;88:11;155:24
**200 (6)**
12:20;59:14,18,19;
94:24;95:25
**2000 (1)**
146:11
**2003 (2)**
19:24;91:24
**2004 (5)**
20:1;92:15;146:11,

**15;159:12**
**2005 (1)**
159:10
**2006 (1)**
92:12
**2007 (5)**
62:5,5;63:19,23;
165:8
**2008 (2)**
63:10;165:9
**2009 (4)**
63:5;108:6,13;
141:21
**2010 (9)**
36:19,19,20,23,24,
24;62:2;133:18;159:6
**2011 (2)**
62:2;159:6
**2012 (1)**
50:10
**2013 (1)**
108:17
**2014 (8)**
62:12;79:17;80:19;
81:21;108:2;127:18;
163:7;165:13
**2015 (4)**
82:6;83:24;99:13;
151:7
**2016 (4)**
4:3,8;11:24;99:14
**20th (2)**
99:12,14
**21 (3)**
63:3,9;65:13
**22 (5)**
63:10,17;65:13;
88:13,15
**22nd (1)**
108:18
**23 (4)**
63:18;64:2;65:13;
88:14
**24 (4)**
64:3,8;65:13;158:22
**25 (6)**
64:10,16,19;65:6,7,
14
**25301 (1)**
4:21
**25735 (1)**
12:20
**25th (1)**
83:17
**26 (1)**
78:13
**27 (1)**
4:6
**28 (2)**
36:20,24

**3**

**3 (11)**
15:9,14,16,22;87:14,
18;103:1,5,13;106:21;
107:12
**30 (1)**
168:14
**300 (1)**
4:10

**4**

**4 (10)**
56:15,24;58:8,9,17;
85:6;102:23;103:14;
105:8;108:23
**40 (5)**
24:11,11;57:21;
104:8,11
**41 (4)**
95:11;108:1;161:23;
167:1
**42 (1)**
157:6
**44 (1)**
106:8
**4473 (26)**
14:1;22:3,10;24:6,
24;29:17,20,22;31:20;
33:4;34:19;38:2;40:8;
42:8;48:21;51:3;59:23;
90:9;94:9,20;95:19;
96:1;105:5;131:6;
139:13,22
**4473s (16)**
18:3,8;22:15;29:11,
12;36:6;39:16;48:11;
55:10;93:23;97:3,11;
100:11;101:14;104:8,
18
**4500 (1)**
13:7
**4501 (3)**
168:8,10,15
**4-55-045-02-5E-08677 (1)**
13:1
**478.74 (1)**
4:6

**5**

**5 (10)**
30:21;31:19,24;
32:20,22;33:10;79:17;
80:19;89:21,23
**500s (1)**
29:18

**6**

**6 (7)**
21:13;34:19;35:14,
21;100:24;137:8;153:8
**60 (1)**

168:14

**7**

**7 (4)**
39:15;40:1,8,16
**7-10-09 (1)**
108:9
**750 (2)**
68:18,19

**8**

**8 (12)**
13:23;14:2;22:15;
23:23;24:2;25:6,22,23;
26:1,7,17;91:16
**80 (1)**
128:17

**9**

**9 (11)**
16:20;52:3,5,8;56:2,
5,12;84:18;99:7,8;
144:12
**9:58 (1)**
66:14
**90 (2)**
144:14;166:23
**914 (1)**
59:20
**923 (1)**
11:9
**923F2 (1)**
4:5
**923f3 (1)**
168:12
**924a1A (1)**
106:3



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

2600 Century Parkway, N.E.



July 14, 2016
www.atf.gov

701140:crb
5340

Mr. Claude Maraist
1907 Duke Drive
Richardson, TX 75081

Dear Mr. Maraist:

You have been assigned as the Hearing Officer in the case of Uncle Sam's Loans, Inc., 200 Main Street, Man, West Virginia 25635.  Federal Firearms License Number 4-55-045-02-5E-08677.

The Director Industry Operations Louisville Field Division or their designate will contact you to schedule a date and time for the hearing that is acceptable to all parties.  This hearing will be held in Charleston, West Virginia.

At the conclusion of the hearing, please submit a hard copy of your report and all attachments and exhibits, a CD containing your report and audio recordings of the hearing and a copy of your completed invoice for payment to me at 775 Singley Drive, Lawrenceville, Georgia 30044.

If I can be of assistance to you, please feel free to contact me at (770) 736-8699.

Charles R. Bartlett

Attachments:

ATF Form 4500, Notice of Revocation of License

Uncle Sam's Loans Inc.

200 Main Street

Main, West Virginia 25635

4-55-045-02-5E-08677

Under the provisions of 18 U.S.C. § 923(e) and 27 C.F.R. § 478.73, notice is hereby given of the revocation of the Federal firearms license specified above, in that the Director, Industry Operations, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Louisville Field Division, has reason to believe that Uncle Sam's Loans Inc. ("Licensee"), 200 Main Street, Main, West Virginia 25635, a Dealer, including Pawnbroker, in Firearms Other than Destructive Devices, willfully violated the provisions of the Gun Control Act of 1968, as amended, 18 U.S.C. Chapter 44, and the regulations issued thereunder, 27 C.F.R. Part 478.

Compliance History

ATF issued a Federal firearms license to the Licensee following a qualification inspection conducted in 1982.  ATF conducted compliance inspections of the Licensee in 1990, 1991, 2007, 2008 and 2014.  Following each compliance inspection ATF issued a Report of Violations to the Licensee.  Following the 2007, 2008 and 2014 compliance inspections, the Licensee attended Warning Conferences with ATF at which point the cited violations and proposed corrective actions were discussed.  Following each Warning Conference, ATF sent the Licensee a letter advising that "any future violations, either repeat or otherwise, could be viewed as willful and may result in revocation of [its] license.

As a result of a criminal investigation in the Licensee in 2015, the following willful violations were disclosed:

Violations

Transfer in Violation of Law

1. The Licensee, by and through its agents and employees, willfully sold or delivered a firearm to a person the Licensee knew or had reasonable cause to believe was subject to a Federal firearms disability, in violation of 18 U.S.C. § 922(d) and 27 C.F.R. § 478.99(c).  See Appendix A, § 1.

Falsified Statement in Records

2. The Licensee, by and through its agents and employees, willfully made false statements or representations with respect to any information required by the provisions of Title 18, United States Code, Chapter 44 or Title 27, Code of Federal Regulations, Part 478, on 22 occasions, in violation of 18 U.S.C. § 922(m) and 27 C.F.R. § 478.128(c).  See Appendix A, § 2.

2

ATF Form 4500, Notice of Revocation of License


**Transfers on ATF Form 4473 to Christina Deer**

| | |
|---|---|
| 9/26/2009 | Item 34 |
| 11/13/2009 | Item 34 |
| 1/21/2010 | Item 34 |
| 11/4/2010 | Item 34 |


**Transfers on ATF Form 4473 to Scott Ellis**

| | |
|---|---|
| 11/3/2009 | Items 26-30 and Item 34; |
| 2/4/2010 | Item 34 |
| 3/10/2010 | Item 34 |
| 8/19/2010 | Item 34 |
| 8/28/2010 | Item 34 |
| 12/9/2010 | Item 34 |
| 4/8/2011 | Items 26-30 and Items 33-34 |
| 3/23/2010 | Items 26-30. |

## EXPLANATION OF THE HEARING PROCESS

weapons to the hearing. The hearing will not begin, or will cease, if it is determined this policy has been violated.

The hearing is generally scheduled not later than 90 days from the date of the letter notifying you of the date, time, and location of the hearing. There are, however, limited circumstances that may require the hearing to be rescheduled for good cause, as determined by the DIO.

The hearing itself is informal in nature, and adherence to civil court rules and procedures is not required. There is no sworn testimony and formal courtroom procedures are not required. The hearing is recorded via audiotape recorder. The resulting tape, along with exhibits presented at the hearing, constitute the official record of the hearing.

*ATF does not videotape the hearing proceedings and you will not be allowed to videotape the hearing.* You may make an audiotape recording of the proceedings, or have the proceedings recorded by a stenographer at your own expense, provided this recording is not disruptive to the proceedings. However, the ATF recording of the hearing is the official record of the proceeding.

### Hearing Officer

The hearing officer is designated by ATF. The selection of the hearing officer is dependent upon a number of factors, including the nature of your case. A hearing officer will be selected who has no prior knowledge of your case and has had no interactions with you or your licensed operations. In most cases, the assigned hearing officer will come from outside the

ATF field division in which your licensed business is located.

### Conduct of the Hearing

The hearing officer will ensure the proceedings are conducted in an orderly and professional manner. The purpose of the hearing is to allow both parties to fully present all relevant evidence and arguments regarding the denial or revocation of a license or permit. Most hearings require less than a single day to complete.

The government will be represented by an attorney and will present its evidence first. The government will generally call as a witness the ATF industry operations investigator(s) who conducted your application or compliance inspection, or other ATF employees who have relevant information concerning your case.

At the conclusion of the government's presentation, you will have the opportunity to respond. Make sure you state your case as clearly and factually as possible. The case you present will receive the same consideration by the hearing officer as the government's case. Be willing and prepared to address each violation described in the Notice you received. You may call witnesses. Your witnesses should be able to speak to the findings in the Notice, and may be, for example, the store manager, an employee, bookkeeper, or clerk. You may also present relevant evidence. Relevant evidence is evidence which tends to prove or disprove an issue at the hearing, such as whether the alleged violation occurred as stated in the Government's Notice of Denial or Revocation.

## EXPLANATION OF THE HEARING PROCESS

If you have any questions concerning the
hearing, please contact the DIO for the ATF
division in which you are located.

| | | | |
|---|---|---|---|
| Atlanta, GA | (404) 417-2600 | Miami, FL | (305) 597-4800 |
| Baltimore, MD | (443) 965-2000 | Nashville, TN | (615) 565-1400 |
| Boston, MA | (617) 557-1200 | New Orleans, LA | (504) 841-7000 |
| Charlotte, NC | (704) 716-1800 | New York, NY | (646) 335-9000 |
| Chicago, IL | (312) 846-7200 | Newark, NJ | (973) 413-1179 |
| Columbus, OH | (614) 827-8400 | Philadelphia, PA | (215) 446-7800 |
| Dallas, TX | (469) 227-4300 | Phoenix, AZ | (602) 776-5400 |
| Denver, CO | (303) 575-7600 | San Francisco, CA | (925) 557-2800 |
| Detroit, MI | (313) 202-3400 | Seattle, WA | (206) 204-3205 |
| Houston, TX | (281) 716-8200 | St. Paul, MN | (651) 726-0200 |
| Kansas City, MO | (816) 559-0700 | Tampa, FL | (813) 202-7300 |
| Los Angeles, CA | (818) 265-2500 | Washington, DC | (202) 648-8020 |
| Louisville, KY | (502) 753-3400 | | |

## ATF Field Divsions





**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*600 Dr. Martin Luther King Jr. Place, Suite 500
Louisville, KY 40202*

www.atf.gov

July 28, 2016

775000:CR
5370

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

James M. Cagle
Attorney at Law
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301

FFL #4-55-045-5E-08677

Dear Mr. Cagle:

This letter is in response to a request, on behalf of your client, Uncle Sam's Loans Inc., for a hearing regarding the Notice of Revocation, ATF F 4500, issued on June 7, 2016. This confirms a mutually agreed hearing date of September 13, 2016 at 10:00 A.M. at the Charleston Field Office, located at 300 Summers Street, Suite 1400, Charleston, West Virginia 25301.

You may bring witnesses with you and/or documentary evidence that you wish to have considered in support of your position. Prior to the hearing, please mark and number each piece of evidence as "Applicant's Exhibit #__" and bring three (3) copies of each exhibit; one for yourself, one for the Government attorney and one for the hearing officer. Also please note that video or audio tapes will not be accepted as exhibits unless a complete written transcript is included.

This hearing, which will be informal in nature, will be conducted under the provisions of Section 923(f)(2) of Title 18, United States Code and Section 478.74 of Title 27 of the Code of Federal Regulations. Attorney Mark J. Lowney, Louisville Field Division Counsel, will represent the government. The proceedings will be recorded by the hearing officer.

Please sign and date the enclosed statement confirming the date and time of the hearing and return it to this office in the enclosed, preaddressed envelope as soon as possible.



James M. Cagle
Attorney at Law
1200 Boulevard Tower
1018 Kanawha Boulevard, East
Charleston, West Virginia  25301

FFL #4-55-045-5E-08677

I hereby confirm the date and time of the hearing set for Tuesday, September 13, 2016 at 10:00
A.M. at the Charleston Field Office.  This office is located at 300 Summers Street, Suite 1400,
Charleston, West Virginia 25301.

_____        _____
Signature                                                                  Date

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2014
DECEMBER 15, 2015 SESSION



DEC 15 2015

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. 2:15-cr-245
                                      18 U.S.C. § 924(a)(1)(A)
                                      18 U.S.C. § 2(a)

STEVEN ADKINS
    AKA "NOODLE"

I N D I C T M E N T

The Grand Jury Charges:

1.    On or about December 21, 2010, in or near Man, Logan
County, West Virginia, and within the Southern District of West
Virginia, defendant STEVEN ADKINS knowingly aided, abetted,
counseled, commanded, induced, and procured the commission of an
offense against the United States, that is, a violation of 18
U.S.C. § 924(a)(1)(A), by a person known to the Grand Jury (the
"Known Person"), in that defendant STEVEN ADKINS directed and
induced the Known Person to make false statements and
representations with respect to the information required by
Chapter 44 of Title 18, United States Code, to be kept in the
records of a person licensed under Chapter 44 ("federal firearms
licensee"), that is, Uncle Sam's Loans, Inc. ("Uncle Sam's"). At


EXHIBIT



*United States Department of Justice*

*United States Attorney*
*Southern District of West Virginia*

FILED
MAR - 2 2016

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

*Robert C. Byrd United States Courthouse*
*300 Virginia Street, East*
*Suite 4000*
*Charleston, WV 25301*
*1-800-659-8726*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*304-345-2200*
*FAX: 304-347-5104*

February 17, 2016

Gregory Campbell
105 Capitol Street
Suite 300
Charleston, West Virginia 25301

    Re: <u>United States v. Steven Adkins</u>
       Criminal No. 2:15-00245

Dear Mr. Campbell:

    This will confirm our conversations with regard to your client, Steven Adkins (hereinafter "Mr. Adkins"). As a result of these conversations, it is agreed by and between the United States and Mr. Adkins as follows:

    1. **PENDING CHARGES.** Mr. Adkins is charged in a single-count indictment which charges him with a violation of 18 U.S.C. §§ 924(a)(1)(A) and (2) (making and aiding and abetting a false statement relating to firearms purchases).

    2. **RESOLUTION OF CHARGES.** Mr. Adkins will plead guilty to the single-count indictment, which charges him with a violation of 18 U.S.C. §§ 924(a)(1)(A) and (2) (making and aiding and abetting a false statement relating to firearms purchases).

    3. **MAXIMUM POTENTIAL PENALTY.** The maximum penalty to which Mr. Adkins will be exposed by virtue of this guilty plea is as follows:

    (a) Imprisonment for a period of 5 years;

    (b) A fine of $250,000, or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from defendant's conduct, whichever is greater;

*S L A*
Defendant's
Initials

Gregory Campbell
February 17, 2016                     Re: Steven Adkins
Page 3

all inquiries made pursuant to this agreement, and will give signed,
sworn statements and grand jury and trial testimony upon request of
the United States.  In complying with this provision, Mr. Adkins may
have counsel present except when appearing before a grand jury.
Further, Mr. Adkins agrees to be named as an unindicted
co-conspirator and unindicted aider and abettor, as appropriate, in
subsequent indictments or informations.

    7.   **USE IMMUNITY**.  Unless this agreement becomes void due to
a violation of any of its terms by Mr. Adkins, and except as expressly
provided for in paragraph 9 below, nothing contained in any statement
or testimony provided by him pursuant to this agreement, or any
evidence developed therefrom, will be used against him, directly or
indirectly, in any further criminal prosecutions or in determining
the applicable guideline range under the Federal Sentencing
Guidelines.

    8.   **LIMITATIONS ON IMMUNITY**.  Nothing contained in this
agreement restricts the use of information obtained by the United
States from an independent, legitimate source, separate and apart
from any information and testimony provided pursuant to this
agreement, in determining the applicable guideline range or in
prosecuting Mr. Adkins for any violations of federal or state laws.
The United States reserves the right to prosecute Mr. Adkins for
perjury or false statement if such a situation should occur pursuant
to this agreement.

    9.   **STIPULATION OF FACTS AND WAIVER OF FED. R. EVID. 410**. The
United States and Mr. Adkins stipulate and agree that the facts
comprising the offense of conviction and relevant conduct include
the facts outlined in the "Stipulation of Facts," a copy of which
is attached hereto as "Plea Agreement Exhibit A."

    Mr. Adkins agrees that if he withdraws from this agreement, or
this agreement is voided as a result of a breach of its terms by him,
and he is subsequently tried on any of the charges in the indictment,
the United States may use and introduce the Stipulation of Facts in
the United States case-in-chief, in cross-examination of Mr. Adkins

                                         _____
                                              Defendant's
                                              Initials

Gregory Campbell
February 17, 2016                    Re: Steven Adkins
Page 5


    11. **WAIVER OF APPEAL AND COLLATERAL ATTACK.** Mr. Adkins
knowingly and voluntarily waives the right to seek appellate review
of his conviction and of any sentence of imprisonment, fine or term
of supervised release imposed by the District Court, or the manner
in which the sentence was determined, on any ground whatsoever
including any ground set forth in 18 U.S.C. § 3742, so long as that
sentence of imprisonment, fine or term of supervised release is below
or within the Sentencing Guideline range corresponding to offense
level 22. if the Court finds §3B1.1(a) is applicable. The United
States also waives its right to seek appellate review of any sentence
of imprisonment or fine imposed by the District Court, or the manner
in which the sentence was determined, on any ground whatsoever
including any ground set forth in 18 U.S.C. § 3742, so long as that
sentence of imprisonment or fine is within or above the Sentencing
Guideline range corresponding to offense level 15. if the Court finds
§3B1.1(a) is inapplicable. ✏ CJC SCA

    Mr. Adkins also knowingly and voluntarily waives the right to
challenge his guilty plea and his conviction resulting from this plea
agreement, and any sentence imposed for the conviction, in any
collateral attack, including but not limited to a motion brought
under 28 U.S.C. § 2255.

    The waivers noted above shall not apply to a post-conviction
collateral attack or direct appeal based on a claim of ineffective
assistance of counsel.

    12. **WAIVER OF FOIA AND PRIVACY RIGHT.** Mr. Adkins knowingly
and voluntarily waives all rights, whether asserted directly or by
a representative, to request or receive from any department or agency
of the United States any records pertaining to the investigation or
prosecution of this case, including without any limitation any
records that may be sought under the Freedom of Information Act
(FOIA), 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a,
following final disposition.

    13. **FINAL DISPOSITION.** The matter of sentencing is within the
sole discretion of the Court. The United States has made no

                                    _____
                                    Defendant's
                                    Initials

Gregory Campbell
February 17, 2016                    Re: Steven Adkins
Page 7


         Acknowledged and agreed to on behalf of the United States:

                              CAROL A. CASTO
                              Acting United States Attorney


                    By:       *Erik S Goes*

                              ERIK S. GOES
                              Assistant United States Attorney


ESG/smw

I hereby acknowledge by my initials at the bottom of each of the
foregoing pages and by my signature on the last page of this
seven-page agreement that I have read and carefully discussed every
part of it with my attorney, that I understand the terms of this
agreement, and that I voluntarily agree to those terms and conditions
set forth in the agreement.  I further acknowledge that my attorney
has advised me of my rights, possible defenses, the Sentencing
Guideline provisions, and the consequences of entering into this
agreement, that no promises or inducements have been made to me other
than those in this agreement, and that no one has threatened me or
forced me in any way to enter into this agreement.  Finally, I am
satisfied with the representation of my attorney in this matter.



_____          2-19-16
Steven Adkins                             Date Signed
Defendant


_____          18 FEB 2016
Gregory Campbell                          Date Signed
Counsel for Defendant

The false statements and representations pertained to whether the Known Person was the actual transferee/buyer of the particular firearms listed on the Forms 4473, and whether the Known Person was an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or other controlled substance. On each Form 4473 involving the Known Person, the Known Person stated and certified that he was the actual transferee/buyer and that he was not an unlawful user of or addicted to any controlled substance. In fact, however, at the time he filled out each Form 4473, the Known Person was an unlawful user of, and was addicted to, opiate pills, a controlled substance and narcotic drug. Furthermore, for each firearms transaction, the Known Person was not the actual transferee/buyer. These types of transactions, where the person representing that he or she is the actual buyer or transferee of a firearm, but is not in fact the actual buyer or transferee, are commonly known as "straw purchases."

Mr. Adkins directed the Known Person to fill out the Form 4473. The Known Person often accompanied Mr. Adkins when Mr. Adkins transferred firearms to the actual transferee/buyer.

From approximately late-2009 through late-2011, Mr. Adkins and the Known Person carried out at least 13 straw purchases. During this period, Mr. Adkins knew that the Known Person was an unlawful user of, and was addicted to, controlled substances, and knew as well that the Known Person was not the actual transferee/buyer for any of the firearms transactions.

Mr. Adkins also arranged for straw purchases to be conducted using people other than the Known Person. From late 2008 through August 2014, Mr. Adkins conducted and carried out illegal straw purchases of over 50 firearms, on firearms transactions recorded on Forms 4473 that were kept by Uncle Sam's.

In the case of all of the straw purchases conducted by Mr. Adkins, both with the Known Person and with others, the firearms listed on the Forms 4473 were manufactured outside of West Virginia and were transferred to individuals other than the individuals listed on the Forms 4473. All of the firearms met the definition of firearm listed in 18 U.S.C. § 921(a)(3).

Defendant's
Initials

**PLEA AGREEMENT EXHIBIT A**

2

Stipulated and agreed to:

_____          _____
STEVEN ADKINS                             Date
Defendant

_____          18  FEB  2016
GREGORY CAMPBELL                          _____
Counsel for Defendant                     Date

_____          2/17/16
ERIK S. GOES                              _____
Assistant United States Attorney          Date

                                          _____
                                          Defendant's
                                          Initials

PLEA AGREEMENT EXHIBIT A

4

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Defini
on ATF Form 4473. I understand that answering "yes" to question 11.a. If I am not the actual buyer is a crime punishable as a felony u
Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. th
11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited
purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or
written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a fel
under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the pu
of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| | 12-21-10 |

| Section B - Must Be Completed By Transferor (Seller) |
|---|

**18. Type of firearm(s) to be transferred** *(check or mark all that apply):*

☑ Handgun   ☑ Long Gun *(rifles or shotguns)*   ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)*

**19. If sale at a gun show or other qualifying event.**

Name of Event

City, State

**20a. Identification** *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| we DL | F111232 | 8 | 17 | 201 |

**20b. Alternate Documentation** *(if driver's license or other identification document does not show current residence address)*

**20c. All Aliens:** Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question.*

| Type(s) of Document | Date(s) of residence indicated on documents |
|---|---|

**20d. Nonimmigrant Aliens Must Provide:** Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions Question 20.d.)*

| Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)* |
|---|

**21a.** Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)*

| Month | Day | Year |
|---|---|---|
| 12 | 21 | 2000 |

**21b.** The NICS or State transaction number *(if provided)* was:

1P1R-434

**21c.** The response initially provided by NICS or the appropriate State agency was:

☑ Proceed   ☐ Delayed *[The firearm(s) may be transferred on ___ (MDI date provided by NICS) if State law permits (optional)]*
☐ Denied
☐ Cancelled

**21d.** If initial NICS or State response was *"Delayed,"* the followin response was received from NICS or the appropriate State agency

☐ Proceed ___ *(date)*
☐ Denied ___ *(date)*
☐ Cancelled ___ *(date)*
☐ No resolution was provided within 3 business days.

**21e.** *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency
___ *(date).* ☐ Proceed   ☐ Denied   ☐ Cancelled

**21f.** The name and Brady identification number of the NICS examiner *(Optional)*

___ *(name)*   ___ *(number)*

**22.** ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

**23.** ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|

| Section C - Must Be Completed Personally By Transferee (Buyer) |
|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must comple
Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| | 12-21-10 |

Transferor (Seller) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised August 2008

OMB No. 1140-0020

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I -
Over-the-Counter**

| | Transferor's Transaction Serial Number *(If any)* |
|---|---|

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Read the Notices, Instructions, and Definitions on this form. **"PLEASE PRINT."** All entries must be handwritten in ink. Prepare in original only.

### Section A - Must Be Completed Personally By Transferee (Buyer)

**1. Transferee's Full Name**

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Noel | Shane | Tyler |

**2. Current Residence Address** (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 3 Cashran St | Mallory | Logan | WV | 25634 |

| 3. Place of Birth | 4. Height | 5. Weight (Lbs.) | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|
| City and State -OR- Foreign Country | Ft. 6 | 225 | Male ☑ | Month | Day | Year |
| Logan WV | In. 5 | | Female ☐ | 8 | 17 | 84 |

| 8. Social Security Number *(Optional, but may help prevent misidentification)* | 9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)* |
|---|---|
| 233 35 9608 | |

**10. Race** (Ethnicity) (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino   ☐ Asian   ☑ White

Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking *"yes"* or *"no"* in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| 11.a. Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | | ☑ | ☐ |
| b. Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | | ☐ | ☑ |
| c. Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | | ☐ | ☑ |
| d. Are you a fugitive from justice? | | ☐ | ☑ |
| e. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | | ☐ | ☑ |
| f. Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | | ☐ | ☑ |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | | ☐ | ☑ |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | | ☐ | ☑ |
| i. Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | | ☐ | ☑ |
| j. Have you ever renounced your United States citizenship? | | ☐ | ☑ |
| k. Are you an alien illegally in the United States? | | ☐ | ☑ |
| l. Are you a nonimmigrant alien? *(See Instructions for Question 11.l.) If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | | ☐ | ☑ |
| 12. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If *"yes,"* the licensee must complete question 20d.) *(See Instructions for Question 12.) If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | | ☒ | ☒ |

| 13. What is your State of residence *(if any)? (See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ☑ United States of America  ☐ Other *(Specify)* | |

Previous Editions Are Obsolete
Page 1 of 6

**Transferee (Buyer) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised August 2008

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Haken | Pro Cust | KR 118434 | Pistol | 45 |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)  *ONE*

30b. Is any part of this transaction a Pawn Redemption?   ☐ Yes ☑ No

30c. For Use by FFL (See Instructions for Question 30c.)

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

**Uncle Sam's Loans, Inc.**
**200 Main Street**
**Man, West Virginia 25635**

32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

**455-045-02-2E-08677**

### The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Steven Adkins | | Clerk | 12/21/10 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make a completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

Page 3 of 6

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Defin~
on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony u
Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. th
11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited
purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or
written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a fel
under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the pu
of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| | 12-21-10 |

| **Section B - Must Be Completed By Transferor (Seller)** | | |
|---|---|---|
| 18. Type of firearm(s) to be transferred (check or mark all that apply): | 19. If sale at a gun show or other qualifying event. | |
| ☑ Handgun   ☑ Long Gun   ☐ Other Firearm *(Frame, Receiver, etc.* | Name of Event _____ | |
| *(rifles or*   *See Instructions for Question 18.)* | | |
| *shotguns)* | City, State | |

| 20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)* | | | | | | For Use b |
|---|---|---|---|---|---|---|
| Issuing Authority and Type of Identification | Number on Identification | | Expiration Date of Identification *(if any)* | | | |
| MI DL | F111 232 | | Month 8 | Day 17 | Year 201 | Trade/corp |
| | | | | | | used.) |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question.*
Type(s) of Document                                 Date(s) of residence indicated on documents

20d. Nonimmigrant Aliens Must Provide: .Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instruction*
*Question 20.d.)*

| **Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions for Questions 21, 22 and 23.)* | |
|---|---|
| 21a. Date the transferee's identifying information in Section A was transmit-ted to NICS or the appropriate State agency: *(Month/Day/Year)* | 21b. The NICS or State transaction number *(if provided)* was: |
| Month 12   Day 2?   Year 2000 | 1P7R-434 |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was "Delayed," the following response was received from NICS or the appropriate State age |
|---|---|
| ☑ Proceed   ☐ Delayed | ☐ Proceed _____ (date) |
| ☐ Denied   *[The firearm(s) may be transferred on* | ☐ Denied _____ (date) |
| ☐ Cancelled   *_____ (MDI date provided by NICS)* | ☐ Cancelled _____ (date) |
|   *if State law permits (optional)]* | ☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency
*(date).* _____ ☐ Proceed _____ ☐ Denied _____ ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*
_____ _____
*(name)*                           *(number)*

22. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23. ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as
exemption to NICS *(See Instructions for Question 23.)*
Issuing State and Permit Type      Date of Issuance *(if any)*      Expiration Date *(if any)*      Permit Number *(if any)*

| **Section C - Must Be Completed Personally By Transferee (Buyer)** | | |
|---|---|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must comple
Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*
I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| | 12-21-10 |

Transferor (Seller) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised August 2008

If the buyer's name in question 1. is illegible, the seller must print the buyer's name above the name written by the buyer.

**Question 2. Current Residence Address:** U.S. Postal abbreviations are acceptable. (e.g., St., Rd., Dr., PA, NC, etc.). Address cannot be a post office box. County and Parish are one and the same.

If the buyer is a member of the Armed Forces on active duty acquiring a firearm in the State where his or her permanent duty station is located, but does not reside at his or her permanent duty station, the buyer must list both his or her permanent duty station address and his or her residence address in response to question 2. If you are a U.S. citizen with two States of residence, you should list your current residence address in response to question 2 (e.g. if you are buying a firearm while staying at your weekend home in State X, you should list your address in State X in response to question 2).

**Question 9. Unique Personal Identification Number (UPIN):** For purchasers approved to have information maintained about them in the FBI NICS Voluntary Appeal File, NICS will provide them with a Unique Personal Identification Number, which the buyer should record in question 9. The licensee may be asked to provide the UPIN to NICS or the State.

**Question 10. Race (Ethnicity):** Any other race or ethnicity that does not fall within those indicated, please select the closest representation.

**Question 11.a. Actual Transferee/Buyer:** For purposes of this form, you are the actual transferee/buyer if you are purchasing the firearm for yourself or otherwise acquiring the firearm for yourself (e.g., redeeming the firearm from pawn/retrieving it from consignment, firearm raffle winner). You are also the actual transferee/buyer if you are legitimately purchasing the firearm as a gift for a third party. **ACTUAL TRANSFEREE/BUYER EXAMPLES:** Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. Mr. Jones is **NOT THE ACTUAL TRANS-FEREE/BUYER** of the firearm and must answer "NO" to question 11.a. The licensee may not transfer the firearm to Mr. Jones. However, if Mr. Brown goes to buy a firearm with his own money to give to Mr. Black as a present, Mr. Brown is the actual transferee/buyer of the firearm and should answer "YES" to question 11.a. However, you may not transfer a firearm to any person you know or have reasonable cause to believe is prohibited under 18 U.S.C. § 922(g), (n), or (x). Please note: EXCEPTION: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.

**Question 11.b. - 11.l. Definition of Prohibited Person:** Generally, 18 U.S.C. § 922 prohibits the shipment, transportation, receipt, or possession in or affecting interstate commerce of a firearm by one who: has been convicted of a misdemeanor crime of domestic violence; has been convicted of a felony, or any other crime, punishable by imprisonment for a term exceeding one year (this does not include State misdemeanors punishable by imprisonment of two years or less); is a fugitive from justice; is an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance; has been adjudicated mentally defective or has been committed to a mental institution; has been discharged from the Armed Forces under dishonorable conditions; has renounced his or her U.S. citizenship; is an alien illegally in the United States or a nonimmigrant alien; or is subject to certain restraining orders. Furthermore, section 922 prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony, or any other crime, punishable by imprisonment for a term exceeding one year.

**Question 11.b. Under Indictment or Information or Convicted in any Court:** An indictment, information, or conviction in any Federal, State, or local court. An information is a formal accusation of a crime verified by a prosecutor.

*EXCEPTION to 11.c. and 11.i.:* A person who has been convicted of a felony, or any other crime, for which the judge could have imprisoned the person for more than one year, or who has been convicted of a misdemeanor crime of domestic violence, is not prohibited from purchasing, receiving, or possessing a firearm if: (1) under the law of the jurisdiction where the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has had their civil rights (the right to vote, sit on a jury, and hold public office) taken away and later restored AND (2) the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing firearms. Persons subject to this exception should answer "no" to 11.c. or 11.i., as applicable.

Page 4 of 6

**Question 11.f. Adjudicated Mentally Defective:** A determination by a board, commission, or other lawful authority that a person, as a result of subnormal intelligence, or mental illness, incompetency, condition, or di... (1) is a danger to himself or to others; or (2) lacks the mental capacity to ... or manage his own affairs. This term shall include: (1) a finding of insanity court in a criminal case; and (2) Those persons found incompetent to stan... found not guilty by reason of lack of mental responsibility.

**Committed to a Mental Institution:** A formal commitment of a person by mental institution by a court, board, commission, or other lawful authority. term includes a commitment to a mental institution involuntarily. The ter... includes commitment for mental defectiveness or mental illness. It also in... commitments for other reasons, such as for drug use. The term does not inc... person in a mental institution for observation or a voluntary admission to ... institution. Please also refer to Question 11.c. for the definition of a prohib... person.

*EXCEPTION to 11.f. NICS Improvement Amendments Act of 2007:* A ... who has been adjudicated as a mental defective or committed to a mental ... institution is not prohibited if: (1) the person was adjudicated or committed department or agency of the Federal Government, such as the United Stat... Department of Veteran's Affairs ("VA") (as opposed to a State court, State ... or other lawful State authority); and (2) either: (a) the person's adjudication ... commitment for mental incompetency was set-aside or expunged by the ... adjudicating/committing agency; (b) the person has been fully released or ... discharged from all mandatory treatment, supervision, or monitoring by th... agency; or (c) the person was found by the agency to no longer suffer from ... mental health condition that served as the basis of the initial adjudication. ... Persons who fit this exception should answer "no" to Item 11.f. This ... exception does not apply to any person who was adjudicated to be not guil... reason of insanity, or based on lack of mental responsibility, or found inco... tent to stand trial, in any criminal case or under the Uniform Code of Milit... Justice.

**Question 11.h. Definition of Restraining Order:** Under 18 U.S.C. § 922, ... firearms may not be sold to or received by persons subject to a court order th... (A) was issued after a hearing which the person received actual notice of a... an opportunity to participate in; (B) restrains such person from harassing, st... or threatening an intimate partner or child of such intimate partner or person, ... engaging in other conduct that would place an intimate partner in reasonable ... fear of bodily injury to the partner or child; and (C)(i) includes a finding tha... such person represents a credible threat to the physical safety of such intima... partner or child; or (ii) by its terms explicitly prohibits the use, attempted u... or threatened use of physical force against such intimate partner or child th... would reasonably be expected to cause bodily injury. An "intimate partner" ... a person is: the spouse or former spouse of the person, the parent of a child ... the person, or an individual who cohabitates or cohabitating with the person.

**Question 11.i. Definition of Misdemeanor Crime of Domestic Violence:** ... Federal, State, local, or tribal offense that is a misdemeanor under Federal, ... or tribal law and has, as an element, the use or attempted use of physical fo... the threatened use of a deadly weapon, committed by a current or former spo... parent, or guardian of the victim, by a person with whom the victim shares ... child in common, by a person who is cohabitating with, or has cohabitated wi... the victim as a spouse, parent, or guardian, or by a person similarly situated ... a spouse, parent, or guardian of the victim. The term includes all misdeme... that have as an element the use or attempted use of physical force or the ... threatened use of a deadly weapon. (See Exception to 11.c. and 11.i.) ... person who has been convicted of a misdemeanor crime of domestic violenc... is not prohibited unless: (1) the person was represented by a lawyer or gave ... the right to a lawyer; or (2) if the person was entitled to a jury, was tried by a ... or gave up the right to a jury trial. Persons subject to this exception should ... answer "no" to 11.i.

**Question 11.l. "Nonimmigrant Alien":** An alien in the United States in a ... nonimmigrant classification. The definition includes, among others, person... traveling temporarily in the United States for business or pleasure, persons st... in the United States who maintain a residence abroad, and certain foreign w... The definition does NOT include permanent resident aliens.

**Sale of Firearms to Legal Aliens:** Even if a nonimmigrant alien can esta... that he or she has a U.S.-issued alien registration number and has ... resided in a State for at least 90 continuous days immediately prior to the d...

ATF Form 4473 (5300.9) Part I ...
Revised August 2008 ... 5 of 6

er the buyer has completed Section A of the form and the licensee has
mpleted questions 18-20, and before transferring the firearm, the licensee
st contact NICS *(read below for NICS delay exceptions.)* However, the
nsee should NOT contact NICS and should stop the transaction if:  the buyer
wers "no" to question 11.a.; the buyer answers "yes" to any question in
b.-11.l., unless the buyer only has answered "yes" to question 11.l. and
o answers "yes" to question 12; or the buyer is unable to provide the
mumentation required by question 20.a, b, c, or d.

the time that NICS is contacted, the licensee must record in question 21.a-
the date of contact, the NICS *(or State)* transaction number, and the initial
ponse provided by NICS or the State. The licensee may record the Missing
Disposition Information (MDI) date in 21.c. that NICS provides for delayed
usactions *(States do not provide this number)*. If the licensee receives a
delayed" response, before transferring the firearm, the licensee must record
question 21.d. any response later provided by NICS or the State or that no
solution was provided within 3 business days.  If the licensee receives a
sponse from NICS or the State after the firearm has been transferred, he or
must record this information in question 21.e.  Note:  States acting as
ints of contact for NICS checks may use terms other than *"proceed,"*
*"delayed," "cancelled"* or *"denied."*  In such cases, the licensee should check
box that corresponds to the State's response.  Some States may not provide
unsaction number for denials.  However, if a firearm is transferred within
three business day period, a transaction number is required.

CS Responses:  If NICS provides a *"proceed"* response, the transaction
y proceed.  If NICS provides a *"cancelled"* response, the seller is
hibited from transferring the firearm to the buyer.  If NICS provides a
*nied"* response, the seller is prohibited from transferring the firearm to the
er.  If NICS provides a *"delayed"* response, the seller is prohibited from
isferring the firearm unless 3 business days have elapsed and, before the
nsfer, NICS or the State has not advised the seller that the buyer's receipt or
ssession of the firearm would be in violation of law.  (See 27 CFR § 478.102(a)
an example of how to calculate 3 business days.)  If NICS provides a
*delayed"* response, NICS also will provide a Missing Disposition Informa-
1 (MDI) date that calculates the 3 business days and reflects when the
earm(s) can be transferred under Federal law.  States may not provide an
DI date.  *Please note State law may impose a waiting period on transferring
arms.*

CEPTIONS TO NICS CHECK:  A NICS check is not required if the
nsfer qualifies for any of the exceptions in 27 CFR § 478.102(d).  Generally
se include:  (a) transfers where the buyer has presented the license with a
mit or license that allows the buyer to possess, acquire, or carry a firearm,
the permit has been recognized by ATF as a valid alternative to the NICS
ck requirement; (b) transfers of National Firearms Act weapons approved
ATF; or (c) transfers certified by ATF as exempt because compliance with
NICS check requirements is impracticable.  See 27 CFR § 478.102(d) for a
tailed explanation.  If the transfer qualifies for one of these exceptions, the
nsee must obtain the documentation required by 27 CFR § 478.131.  A
earm must not be transferred to any buyer who fails to provide such
umentation.

### Section C

estion 24 and 25. Transfer on a Different Day and Recertification:  If
transfer takes place on a different day from the date that the buyer signed
tion A, the licensee must again check the photo identification of the buyer
the time of transfer, and the buyer must complete the recertification in
tion C at the time of transfer.

### Section D

nediately prior to transferring the firearm, the seller must complete all of
questions in Section D.  In addition to completing this form, the seller
st report any multiple sale or other disposition of pistols or revolver on
F Form 3310.4 (see 27 CFR § 478.126a).

estion(s) 26, 27, 28, 29 and 30, Firearm(s) Description:  These blocks
uld be completed with the firearm(s) information. Firearms manufactured
er 1968 should all be marked with a serial number.  Should you acquire a
earm that is not marked with a serial number; you may answer question 28
h "NSN" (No Serial Number), "N/A" or "None."

If more than five firearms are involved in a transaction, the information req
Section D, questions 26-30, must be provided for the additional firearms on a
separate sheet of paper, which must be attached to the ATF Form 4473 coveri
transaction.

Types of firearms include: pistol, revolver, rifle, shotgun, receiver, frame
other firearms that are not either handguns or long guns (rifles or shotguns
as firearms having a pistol grip that expel a shotgun shell or National Firea
Act (NFA) firearms.

Additional firearms purchases by the same buyer may not be added to the f
after the seller has signed and dated it. A buyer who wishes to purchase additi
firearms after the seller has signed and dated the form must complete a new
Form 4473. The seller must conduct a new NICS check.

Question 30c.  This box is for the FFL's use in recording any information
she finds necessary to conduct business.

Question 32 Federal Firearms License Number:  Must contain at least the
three and last five digits of the FFL number, for instance X-XX-XXXXX.

Question 33-35 Transferor/Sellers Information:  For "denied" and "canc"
NICS transactions, the person who completed Section B must complete Sec
D, questions 33-35.

### Privacy Act Information

Solicitation of this information is authorized under 18 U.S.C. § 923(g).  Disc
sure of the individual's Social Security number is voluntary.  The number m
used to verify the buyer's identity.

### Paperwork Reduction Act Notice

The information required on this form is in accordance with the Paperwork
Reduction Act of 1995.  The purpose of the information is to determine the
eligibility of the transferee to receive firearms under Federal law.  The infor
tion is subject to inspection by ATF officers and is required by 18 U.S.C. §§
and 923.

The estimated average burden associated with this collection is 30 minutes p
respondent or recordkeeper, depending on individual circumstances.  Comm
about the accuracy of this burden estimate and suggestions for reducing it sh
be directed to Reports Management Officer, Document Services Section, Bu
of Alcohol, Tobacco, Firearms and Explosives, Washington, DC  20226.

An agency may not conduct or sponsor, and a person is not required to respo
to, a collection of information unless it displays a currently valid OMB cont
number.  Confidentiality is not assured.

GPO  U.S. GOVERNMENT PRINTING OFFICE: 2008-350-124

ATF Form 4473 (5300.9) Part I
Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

# Firearms Transaction Record Part I - Over-the-Counter

| | |
|---|---|
| **WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.<br><br>Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT." | Transferor's Transaction Serial Number *(If any)* |

## Section A - Must Be Completed Personally By Transferee (Buyer)

**1. Transferee's Full Name**

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Noel | Shane | Tyler |

**2. Current Residence Address** (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 301 Cashan St | Mallory | Logan | WV | 25634 |

| 3. Place of Birth | | 4. Height | 5. Weight (Lbs.) | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|---|
| U.S. City and State -OR- | Foreign Country | Ft. 6 | 225 | Male ☑ | Month | Day | Year |
| Gary  WV | | In. 5 | | Female ☐ | 8 | 17 | 84 |

| 8. Social Security Number *(Optional, but will help prevent misidentification)* | 9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)* |
|---|---|
| 233 35 9608 | |

**10. Race (Ethnicity)** (Check one or more boxes. See Instructions for Question 10.)

| | | | |
|---|---|---|---|
| ☑ American Indian or Alaska Native | ☐ Black or African American | | ☐ Native Hawaiian or Other Pacific Islander |
| ☐ Hispanic or Latino | ☐ Asian | ☑ White | |

**11.** Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Instructions for Question 11.a.)* Exception: *If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☑ | ☐ |
| b. Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. Are you a fugitive from justice? | ☐ | ☑ |
| e. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☑ |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. Are you an alien illegally in the United States? | ☐ | ☑ |
| l. Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |
| 12. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? *(If "yes," the licensee must complete question 20.d.)* *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☒ | ☒ |

| 13. What is your State of residence *(if any)? (See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ☑ United States of America<br>☐ Other *(Specify)* | |

Previous Editions Are Obsolete

ATF Form 4473 (5300.9) Part I
Revised August 2008

Page 1 of 6

Transferee (Buyer) Continue to Next Page
**STAPLE IF PAGES BECOME SEPARATED**

**Section D - Must Be Completed By Transferor (Seller)**

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See Instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Barber | Pro Cont | KR 118434 | Pistol | 45 |

| 30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.) | 30b. Is any part of this transaction a Pawn Redemption? |
|---|---|
| ONE | ☐ Yes ☒ No |

30c. For Use by FFL (See Instructions for Question 30c.)

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

| 31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.) | 32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.) |
|---|---|
| Uncle Sam's Loans, Inc.<br>200 Main Street<br>Man, West Virginia 25635 | 455-045-02-2E-08677 |

The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and any reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| John Hokes | | | |

**NOTICES, INSTRUCTIONS AND DEFINITIONS**

Purpose of the Form: The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. Determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and buyer's State.

After the seller has completed the firearms transaction, he or she must make a completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documentation, part of his permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transaction is not completed after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

Over-the-Counter Transaction: The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

State Laws and Published Ordinances: The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

Exportation of Firearms: The State or Commerce Departments may require you to obtain a license prior to export.

**Section A**

Question 1. Transferee's Full Name: The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

Page 3 of 6

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. throug 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited fron purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpos of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
| --- | --- |
| | 7-10-09 |

| **Section B - Must Be Completed By Transferor (Seller)** | |
| --- | --- |

18. Type of firearm(s) to be transferred *(check or mark all that apply):*

☐ Handgun ☑ Long Gun *(rifles or shotguns)* ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)*

19. If sale at a gun show or other qualifying event.

Name of Event _____

City, State _____

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
| --- | --- | --- | --- | --- |
| WVDL | F116232 | Month 8 | Day 17 | Year 2009 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c* 
Type(s) of Document | Date(s) of residence indicated on documents

20d. Nonimmigrant Aliens Must Provide: Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

| **Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions for Questions 21, 22 and 23.)* | |
| --- | --- |

21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)*

| Month 7 | Day 10 | Year 2009 |
| --- | --- | --- |

21b. The NICS or State transaction number *(if provided)* was:

NP3-VKH

21c. The response initially provided by NICS or the appropriate State agency was:

☑ Proceed ☐ Delayed
☐ Denied *[The firearm(s) may be transferred on*
☐ Cancelled _____ *(MDI date provided by NICS) if State law permits (optional)]*

21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency:

☐ Proceed _____ *(date)*
☐ Denied _____ *(date)*
☐ Cancelled _____ *(date)*
☐ No resolution was provided within 3 business days.

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).* ☐ Proceed ☐ Denied ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*

LIBOU *(name)* 4499 *(number)*

22. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23. ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
| --- | --- | --- | --- |

| **Section C - Must Be Completed Personally By Transferee (Buyer)** | |
| --- | --- |

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
| --- | --- |
| | 7-10-09 |

Transferor (Seller) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part 1
Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

**Firearms Transaction Record Part I -
Over-the-Counter**   9 -15

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

Transferor's Transaction Serial Number (*if any*)

24932

| Section A - Must Be Completed Personally By Transferee (Buyer) |
|---|

1. Transferee's Full Name

Last Name *Noel* | First Name *Shane* | Middle Name (*If no middle name, state "NMN"*) *Tyler*

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

Number and Street Address *37 Cashion Street* | City *Mallory* | County *Logan* | State *WV* | ZIP Code *25634*

3. Place of Birth U.S. City and State -OR- Foreign Country *Logan, WV* | 4. Height Ft. *6* In. *4* | 5. Weight (*Lbs.*) *225* | 6. Gender Male ☑ Female ☐ | 7. Birth Date Month *Aug* Day *17* Year *1984*

8. Social Security Number (*Optional, but will help prevent misidentification*) *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* | 9. Unique Personal Identification Number (*UPIN*) if applicable (*See Instructions for Question 9.*)

10. Race (*Ethnicity*) (Check one or more boxes. See Instructions for Question 10.)
- ☐ American Indian or Alaska Native
- ☐ Hispanic or Latino
- ☐ Black or African American
- ☐ Asian
- ☐ Native Hawaiian or Other Pacific Islander
- ☑ White

11. Answer questions 11.a. (*see exceptions*) through 11.l and 12 (*if applicable*) by checking or marking "*yes*" or "*no*" in the boxes to the right of the questions.

|  |  | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** (*See Instructions for Question 11.a.*) **Exception:** *If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☑ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? (*See Instructions for Question 11.b.*) | ☐ | ☑ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (*See Instructions for Question 11.c.*) | ☐ | ☑ |
| d. | Are you a fugitive from justice? | ☐ | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. | Have you ever been adjudicated mentally defective (*which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs*) OR have you ever been committed to a mental institution? (*See Instructions for Question 11.f.*) | ☐ | ☑ |
| g. | Have you been discharged from the Armed Forces under **dishonorable** conditions? | ☐ | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (*See Instructions for Question 11.h.*) | ☐ | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? (*See Instructions for Question 11.i.*) | ☐ | ☑ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. | Are you an alien **illegally** in the United States? | ☐ | ☑ |
| l. | Are you a nonimmigrant alien? (*See Instructions for Question 11.l.*) *If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | ☐ | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) (*See Instructions for Question 12.*) *If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | ☒ | No |

13. What is your State of residence (*if any*)? (*See Instructions for Question 13.*) *WV* | 14. What is your country of citizenship? (*List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.*) ☒ United States of America ☐ Other (*Specify*) | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number?

Note: Previous Editions Are Obsolete

**Transferee (Buyer) Continue to Next Page**
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised August 2008

## Section D - Must Be Completed By Transferor (Seller)

| 26.<br>Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27.<br>Model | 28.<br>Serial Number | 29.<br>Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30.<br>Caliber or Gauge |
|---|---|---|---|---|
| TAURUS | Judge | BU661484 | Revolver | 45/410 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)   One

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes ☑ No

30c. For Use by FFL (See Instructions for Question 30c.)

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

| 31. Trade/corporate name and address of transferor (seller)  (Hand stamp may be used.) | 32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.) |
|---|---|
| Uncle Sam's Loans, Inc.<br>200 Main Street<br>Man, West Virginia 25635 | 455-045-02-2E-08677 |

### The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Alice Blair | Alice Blair | Clerk | 9-15-09 |

## NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary editions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating:  (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I<br>Revised August 2008

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| | 11-11-09 |

| **Section B - Must Be Completed By Transferor (Seller)** | |
|---|---|
| 18. Type of firearm(s) to be transferred *(check or mark all that apply)*: <br> [✓] Handgun    [ ] Long Gun *(rifles or shotguns)*    [ ] Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* | 19. If sale at a gun show or other qualifying event. <br> Name of Event _____ <br> City, State _____ |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WVDL | F111232 | 08 | 17 | 2014 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*

| Type(s) of Document | Date(s) of residence indicated on documents |
|---|---|
| | |

20d. Nonimmigrant Aliens Must Provide: Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

| **Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions for Questions 21, 22 and 23.)* | |
|---|---|
| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* <br> Month: 11   Day: 11   Year: 2009 | 21b. The NICS or State transaction number *(if provided)* was: <br> IGJX - XGV |
| 21c. The response initially provided by NICS or the appropriate State agency was: <br> [✓] Proceed    [ ] Delayed <br> [ ] Denied    *[The firearm(s) may be transferred on* <br> [ ] Cancelled    _____ *(MDI date provided by NICS) if State law permits (optional)]* | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency: <br> [ ] Proceed _____ *(date)* <br> [ ] Denied _____ *(date)* <br> [ ] Cancelled _____ *(date)* <br> [ ] No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*   [ ] Proceed    [ ] Denied    [ ] Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*
_____ *(name)*    _____ *(number)*

22. [ ] No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23. [ ] No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

| **Section C - Must Be Completed Personally By Transferee (Buyer)** | |
|---|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| | 11-11-09 |

   Transferor (Seller) Continue to Next Page <br> STAPLE IF PAGES BECOME SEPARATED    ATF Form 4473 (5300.9) Part I <br> Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

**Firearms Transaction Record Part I -
Over-the-Counter**

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

Transferor's Transaction
Serial Number *(If any)*
66569 PTn
266666

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Noel | Shane | Tyler |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 37 Cashion St | Mallory | Logan | WV | 25634 |

3. Place of Birth

U.S. City and State  -OR-  Foreign Country
Logan  WV

| 4. Height | 5. Weight (Lbs.) | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|
| Ft. 6 In. 5 | 225 | Male ☑ Female ☐ | Month Aug | Day 17 | Year 1984 |

8. Social Security Number *(Optional, but will help prevent misidentification)*
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

9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)*

10. Race *(Ethnicity)* (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native  ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino  ☐ Asian  ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking *"yes" or "no"* in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning:** You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.)* Exception: *If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☑ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. | Are you a fugitive from justice? | ☐ | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. | Have you been discharged from the Armed Forces under **dishonorable** conditions? | ☐ | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. | Are you an alien illegally in the United States? | ☐ | ☑ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? **(If "yes," the licensee must complete question 20d.)** *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☑ | ☑ |

| 13. What is your State of residence (if any)? *(See Instructions for Question 13.)* WV | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* ☑ United States of America ☐ Other *(Specify)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|

Note: Previous Editions Are Obsolete

Page 1 of 6

Transferee (Buyer) Continue to Next Page
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised August 2008

### Section D - Must Be Completed By Transferor (Seller)

| 26.<br>Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27.<br>Model | 28.<br>Serial Number | 29.<br>Type (e.g., pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30.<br>Caliber or Gauge |
|---|---|---|---|---|
| Beretta | PX4 | PY45476 | Pistol | 40 |
| | | | | |

| 30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)  ONE | 30b. Is any part of this transaction a Pawn Redemption?  ☑Yes ☐ No |
|---|---|

30c. For Use by FFL (See Instructions for Question 30c.)

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

| 31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.) | 32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.) |
|---|---|
| Uncle Sam's Loans, Inc.<br>200 Main Street<br>Man, West Virginia 25635 | 455-045-02-2E-08677 |

**The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| | | | 7/9/18 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

Page 3 of 6

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
|  | 7-30-(0 |

### Section B - Must Be Completed By Transferor (Seller)

| 18. Type of firearm(s) to be transferred *(check or mark all that apply):* | 19. If sale at a gun show or other qualifying event. |
|---|---|
| ☑ Handgun ☐ Long Gun ☐ Other Firearm *(Frame, Receiver, etc.*  (rifles or   *See Instructions for Question 18.)*  shotguns) | Name of Event _____  City, State _____ |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification). (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | F111232 | 8 | 17 | 2014 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*
_____

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*

| Type(s) of Document | Date(s) of residence indicated on documents |
|---|---|
| | |

20d. Nonimmigrant Aliens Must Provide: Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

### Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* | 21b. The NICS or State transaction number *(if provided)* was: |
|---|---|
| Month  Day  Year  7  30  10 | 1LS0-0LL |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency: |
|---|---|
| ☑ Proceed   ☐ Delayed  ☐ Denied   *[The firearm(s) may be transferred on*  ☐ Cancelled   *(MDI date provided by NICS)*  *if State law permits (optional)]* | ☐ Proceed _____ *(date)*  ☐ Denied _____ *(date)*  ☐ Cancelled _____ *(date)*  ☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*   ☐ Proceed   ☐ Denied   ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*
_____ *(name)*   _____ *(number)*

| 22. | ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)* |
|---|---|

| 23. | ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)* |
|---|---|

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

### Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| | 7-30-10 |

Transferor (Seller) Continue to Next Page  STAPLE IF PAGES BECOME SEPARATED   ATF Form 4473 (5300.9) Part I  Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

**Firearms Transaction Record Part I - Over-the-Counter**

12-11

| | |
|---|---|
| **WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. | Transferor's Transaction Serial Number *(if any)* |
| Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT." | 27204 |

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

Last Name: Noel  First Name: Shane  Middle Name *(If no middle name, state "NMN")*: Tyler

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

Number and Street Address: 37 Cashron St  City: Mallory  County: Logan  State: WV  ZIP Code: 25639

3. Place of Birth
U.S. City and State: Logan WV  -OR- Foreign Country:

4. Height: Ft. 6 In. 5
5. Weight (Lbs.): 225
6. Gender: Male ☑ Female ☐
7. Birth Date: Month 08 Day 17 Year 1984

8. Social Security Number *(Optional, but will help prevent misidentification)*: 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

9. Unique Personal Identification Number *(UPIN) if applicable (See Instructions for Question 9.)*

10. Race *(Ethnicity) (Check one or more boxes. See Instructions for Question 10.)*
☐ American Indian or Alaska Native  ☐ Black or African American  ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino  ☐ Asian  ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. *(if applicable)* by checking or marking *"yes" or "no"* in the boxes to the right of the questions.

| | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. (See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.** | ☑ | ☐ |
| b. Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. Are you a fugitive from justice? | ☐ | ☑ |
| e. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☑ |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. Are you an alien illegally in the United States? | ☐ | ☑ |
| l. Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |
| 12. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? *(If "yes," the licensee must complete question 20d.) (See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☐ | ☒ |

13. What is your State of residence *(if any)? (See Instructions for Question 13.)*: WV

14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16):* ☑ United States of America  ☐ Other (Specify)

15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number?

Note: Previous Editions Are Obsolete
Page 1 of 6

**Transferee (Buyer) Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised August 2008

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Ruger | Single Six | 265-33532 | Revolver | 22 mag |
| | | | | |
| | | | | |
| | | | | |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)

one

30b. Is any part of this transaction a Pawn Redemption? ☐ Yes ☑ No

30c. For Use by FFL (See Instructions for Question 30c.)

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

Uncle Sam's Loans, Inc.
200 Main Street
Man, West Virginia 25635

32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

455-045-02-2E-08677

### The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Clifford Mullins | Clifford Mullins | Clerk | 12-11-10 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

Page 3 of 6

ATF Form 4473 (5300.9) Part I
Revised August 2008

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| | 12-13-10 |

## Section B - Must Be Completed By Transferor (Seller)

| 18. Type of firearm(s) to be transferred *(check or mark all that apply)*: | 19. If sale at a gun show or other qualifying event. |
|---|---|
| ☑ Handgun  ☐ Long Gun  ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* (rifles or shotguns) | Name of Event |
| | City, State |

**20a. Identification** *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | F111232 | 8 | 17 | 2014 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements).  (See Instructions for Question 20.c.)*

| Type(s) of Document | Date(s) of residence indicated on documents |
|---|---|

20d. Nonimmigrant Aliens Must Provide:  Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

## Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* | | | 21b. The NICS or State transaction number *(if provided)* was: |
|---|---|---|---|
| Month | Day | Year | |
| 12 | 13 | 2010 | 1P22-WRV |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency: |
|---|---|
| ☑ Proceed  ☐ Delayed | ☐ Proceed _____ *(date)* |
| ☐ Denied  *[The firearm(s) may be transferred on* | ☐ Denied _____ *(date)* |
| ☐ Cancelled  *_____ (MDI date provided by NICS)* | ☐ Cancelled _____ *(date)* |
| *if State law permits (optional)]* | ☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*   ☐ Proceed   ☐ Denied   ☐ Cancelled

21f.  The name and Brady identification number of the NICS examiner *(Optional)*

| *(name)* | *(number)* |
|---|---|

22.  ☐  No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23.  ☐  No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|

## Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| | 12-13-10 |

Page 2 of 6

**Transferor (Seller) Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part 1
Revised August 2008

OMB No. 1140-0020

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I -
Over-the-Counter**     9-14

| WARNING: You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. | Transferor's Transaction Serial Number *(If any)* |
|---|---|
| Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT." | 27637 |

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Noel | Sharie | Tyler |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 37 Cashion St | Mallory | Logan | WV | 25634 |

| 3. Place of Birth U.S. City and State -OR- Foreign Country | 4. Height | 5. Weight (Lbs.) | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|
| Logan, WV | Ft. 6 In. 5 | 225 | Male ✓ Female | Month 08 | Day 17 | Year 1984 |

| 8. Social Security Number *(Optional, but will help prevent misidentification)* | 9. Unique Personal Identification Number (UPIN) if applicable *(See Instructions for Question 9.)* |
|---|---|
| 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 | |

10. Race *(Ethnicity) (Check one or more boxes. See Instructions for Question 10.)*

☐ American Indian or Alaska Native   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino   ☐ Asian   ✓ White

| 11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions. | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are** acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ✓ | |
| b. Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | | ✓ |
| c. Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | | ✓ |
| d. Are you a fugitive from justice? | | ✓ |
| e. Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | | ✓ |
| f. Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | | ✓ |
| g. Have you been discharged from the Armed Forces under dishonorable conditions? | | ✓ |
| h. Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | | ✓ |
| i. Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | | ✓ |
| j. Have you ever renounced your United States citizenship? | | ✓ |
| k. Are you an alien illegally in the United States? | | ✓ |
| l. Are you a nonimmigrant alien? *(See Instructions for Question 11.l.) If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | | ✓ |
| 12. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.) If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | | ✕ |

| 13. What is your State of residence (if any)? *(See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ✓ United States of America   ☐ Other *(Specify)* | |

| Note: Previous Editions Are Obsolete | **Transferee (Buyer) Continue to Next Page STAPLE IF PAGES BECOME SEPARATED** | ATF Form 4473 (5300.9) Part I Revised August 2008 |
|---|---|---|

| Section D - Must Be Completed By Transferor (Seller) | | | | |
|---|---|---|---|---|
| 26.<br>Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27.<br>Model | 28.<br>Serial Number | 29.<br>Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See Instructions for question 29) | 30.<br>Caliber or Gauge |
| Ruger | 84C | RC01147 | Rifle | 270 |
| Remington | 870 | RS521470 | Shotgun | 410 |
| Beretta | UHa II | RU150389 | Pistol | 45 |
| Rossi | Cr. Judge | DZ8344 | Rifle | 45/ |
| Springfield | P19128C | NM243969 | Pistol | 45 |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)

FIVE

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes  ☒ No

30c. For Use by FFL (See Instructions for Question 30c.)

| Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days | |
|---|---|
| 31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)<br><br>Uncle Sam's Loans, Inc.<br>200 Main Street<br>Man, West Virginia 25635 | 32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)<br><br>455-045-02-2E-08677 |

The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions,
The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferr |
|---|---|---|---|
| Sarah Hibbits | | Clerk | 3/6/91 |

NOTICES, INSTRUCTIONS AND DEFINITIONS

Purpose of the Form: The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the seller of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

Page 3 of 6

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

Over-the-Counter Transaction: The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

State Laws and Published Ordinances: The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

Exportation of Firearms: The State or Commerce Departments may require you to obtain a license prior to export.

Section A

Question 1. Transferee's Full Name: The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions
n ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under
ederal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through
1.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from
urchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or
ritten statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony
nder Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose
f resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16)*.

| 6. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *[signature]* | 3 - 14 - 11 |

## Section B - Must Be Completed By Transferor (Seller)

**8. Type of firearm(s) to be transferred** *(check or mark all that apply):*

[X] Handgun  [ ] Long Gun *(rifles or shotguns)*  [ ] Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)*

**19.** If sale at a gun show or other qualifying event.

Name of Event _____

City, State _____

**20a. Identification** *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | F11 232 | 8 | 17 | 2014 |

**20b.** Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

**20c. All Aliens:** Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*

Type(s) of Document | Date(s) of residence indicated on documents

**20d. Nonimmigrant Aliens Must Provide:** Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

### Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

**21a.** Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)*

| Month | Day | Year |
|---|---|---|
| 3 | 14 | 2011 |

**21b.** The NICS or State transaction number *(if provided)* was:

IRWC - 4DF

**21c.** The response initially provided by NICS or the appropriate State agency was:

[X] Proceed  [ ] Delayed *[The firearm(s) may be transferred on _____ (MDI date provided by NICS) if State law permits (optional)]*
[ ] Denied
[ ] Cancelled

**21d.** If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency:

[ ] Proceed _____ (date)
[ ] Denied _____ (date)
[ ] Cancelled _____ (date)
[ ] No resolution was provided within 3 business days.

**21e.** *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on:
_____ (date).  [ ] Proceed  [ ] Denied  [ ] Cancelled

**21f.** The name and Brady identification number of the NICS examiner *(Optional)*

_____ (name)  _____ (number)

**22.** [ ] No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

**23.** [ ] No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

### Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| *[signature]* | 3 - 14 - 11 |

Transferor (Seller) Continue to Next Page

STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

**Firearms Transaction Record Part I –
Over-the-Counter**

*11-18*

| | |
|---|---|
| **WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. | Transferor's Transaction Serial Number *(If any)* |
| Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. **"PLEASE PRINT."** | 28559 |

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Noel | Shane | Tyler |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 37 Cashion St | Mallory | Logan | WV | 25634 |

3. Place of Birth

| U.S. City and State  -OR-  Foreign Country | 4. Height Ft. 6 In. 4 | 5. Weight (Lbs.) 220 | 6. Gender Male ✓ Female | 7. Birth Date Month 08 Day 17 Year 1984 |
|---|---|---|---|---|
| Logan WV | | | | |

8. Social Security Number *(Optional, but will help prevent misidentification)*
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

9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)*

10. Race *(Ethnicity)* (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native     ☐ Black or African American     ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino     ☐ Asian     ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. *(if applicable)* by checking or marking *"yes" or "no"* in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** (See Instructions for Question 11.a.) **Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.** | ☑ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. | Are you a fugitive from justice? | ☐ | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. | Are you an alien illegally in the United States? | ☐ | ☑ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? *(If "yes," the licensee must complete question 20d.)* (See Instructions for Question 12.) If you answered "no" to question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |

| 13. What is your State of residence *(if any)?* *(See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ☐ Other *(Specify)*   ☑ United States of America | |

Note: Previous Editions Are Obsolete

Page 1 of 6

Transferee (Buyer) Continue to Next Page
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised August 2008

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Browning | Bar | 311 2M 04 932 | Rifle | 243 |
| Ruger | N77 | 31122 DG341 | Rifle | 270 |
| Browning | X-Bolt | 740-0493 | Rifle | 357 |
| | | 0427 1WN 354 | Rifle | 300 us |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)  **four**

30c. For Use by FFL (See Instructions for Question 30c.)

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes  ☒ No

---

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

Uncle Sam's Loans, Inc.
200 Main Street
Man, West Virginia 25635

32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

455-045-02-2E-08677

**The Person Transferring The Firearm(s) Must Complete Questions 33-36.  For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-36.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Steve Atkins | | | 11/18/11 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the seller is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall separately maintained in alphabetical (by name) or chronological (by date of seller's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D.  The buyer should only make changes to Sections A and C.  Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete.  However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

3 of 6

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer of the firearm is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *Brian avest* | 6-2-12 |

| Section B - Must Be Completed By Transferor (Seller) | |
|---|---|
| 18. Type of firearm(s) to be transferred *(check or mark all that apply)*: [ ] Handgun  [✓] Long Gun *(rifles or shotguns)*  [ ] Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* | 19. If sale at a gun show or other qualifying event. Name of Event _____ City, State _____ |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| *WV DL* | *E620233* | 4 | 16 | 2013 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*

| Type(s) of Document | Date(s) of residence indicated on documents |
|---|---|

20d. Nonimmigrant Aliens Must Provide: Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

| Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)* | |
|---|---|
| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* Month 6  Day 2  Year 2012 | 21b. The NICS or State transaction number *(if provided)* was: *21FW-0NV* |

| 21c. The response initially provided by NICS or the appropriate State agency was: [✓] Proceed  [ ] Delayed  [ ] Denied  [ ] Cancelled  *[The firearm(s) may be transferred on _____ (MDI date provided by NICS) if State law permits (optional)]* | 21d. If initial NICS or State response was "Delayed," the following response are received from NICS or the appropriate State agency: [ ] Proceed _____ (date)  [ ] Denied _____ (date)  [ ] Cancelled _____ (date)  [ ] No resolution was provided within 3 business days. |
|---|---|

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ (date).  [ ] Proceed  [ ] Denied  [ ] Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*
_____ (name)     _____ (number)

22. [ ] No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23. [ ] No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|

| Section C - Must Be Completed Personally By Transferee (Buyer) |
|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| *Brian avest* | 6-2-12 |

Page 2 of 6

Transferor (Seller) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part 1
Revised August 2008

OMB No. 1140-0020

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I -
Over-the-Counter**

8-7

| | Transferor's Transaction Serial Number *(If any)* |
|---|---|
| **WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. | |
| **Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."** | 29780 |

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| West | Brian | Allen |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 1637 W 2nd St | Man | Logan | WV | 25635 |

| 3. Place of Birth | | 4. Height | 5. Weight *(Lbs.)* | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|---|
| U.S. City and State  -OR-  Foreign Country | | Ft. 5 | 221 | ☒ Male | Month | Day | Year |
| Man WV | | In. 4 | | ☐ Female | 04 | 16 | 1973 |

8. Social Security Number *(Optional, but will help prevent misidentification)*

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

9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)*

| 10.a. Ethnicity | 10.b. Race *(Check one or more boxes.)* | | |
|---|---|---|---|
| ☐ Hispanic or Latino | ☐ American Indian or Alaska Native | ☐ Black or African American | ☒ White |
| ☒ Not Hispanic or Latino | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking *"yes" or "no"* in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☒ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☒ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☒ |
| d. | Are you a fugitive from justice? | ☐ | ☒ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☒ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☒ |
| g. | Have you been discharged from the Armed Forces under **dishonorable** conditions? | ☐ | ☒ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☒ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☒ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☒ |
| k. | Are you an alien illegally in the United States? | ☐ | ☒ |
| l. | Are you an alien admitted to the United States under a nonimmigrant visa? *(See Instructions for Question 11.l.) If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | ☐ | ☒ |
| 12. | If you are an alien admitted to the United States under a nonimmigrant visa, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20c.) *(See Instructions for Question 12.) If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | ☒ | ☒ |

| 13. What is your State of residence *(if any)*? *(See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ☒ United States of America   ☐ Other *(Specify)* | |

| Note: Previous Editions Are Obsolete | **Transferee (Buyer) Continue to Next Page** | ATF Form 4473 (5300.9) Part I |
|---|---|---|
| Page 1 of 6 | **STAPLE IF PAGES BECOME SEPARATED** | Revised April 2012 |

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Kimber | Raptor | KU176429 | Pistol | 45 |
| FN | Scar | HC22134 | Rifle | 762X54 |
| FN | Scar | HC22402 | Rifle | 308 |
| FN | Five Seven | 386205479 | Pistol | 5.7X28 |
| FN | Five Seven | 386205382 | Pistol | 5.7X28 |

30a.  Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)  Five

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes  ☑ No

30c.  For Use by FFL (See Instructions for Question 30c.)

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

31.  Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

**Uncle Sam's Loans, Inc.**
**200 Main Street**
**Man, West Virginia 25635**

32.  Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

1-55-045-02-5E-08677

### The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33.  Transferor's/Seller's Name (Please print) | 34.  Transferor's/Seller's Signature | 35.  Transferor's/Seller's Title | 36.  Date Transferred |
|---|---|---|---|
| Eric Allen | Eric Allen | Clerk | 8-7-12 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the

ATF Form 4473 (5300.9) Part I
Revised April 2012

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "Yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *Brian Cavett* | 1-12-13 |

## Section B - Must Be Completed By Transferor (Seller)

| 18. Type of firearm(s) to be transferred *(check or mark all that apply)*: | 19. If sale at a gun show or other qualifying event. |
|---|---|
| ☐ Handgun ☑ Long Gun *(rifles or shotguns)* ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* | Name of Event _____ <br> City, State _____ |

**20a.** Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | E620233 | 4 | 16 | 2013 |

**20b.** Alternate Documentation *(if driver's license or other identification document does not show current residence address) (See Instructions for Question 20.b.)*

**20c.** Aliens Admitted to the United States Under a Nonimmigrant Visa Must Provide: Type of documentation showing an exception to the nonimmigrant visa prohibition. *(See Instructions for Question 20.c.)*

### Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* | | | 21b. The NICS or State transaction number *(if provided)* was: |
|---|---|---|---|
| Month | Day | Year | |
| 1 | 12 | 2013 | 26SF-DW6 |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency: |
|---|---|
| ☑ Proceed ☐ Delayed <br> ☐ Denied *[The firearm(s) may be transferred on* <br> ☐ Cancelled _____ *(Missing Disposition Information date provided by NICS) if State law permits (optional)]* | ☐ Proceed _____ *(date)* <br> ☐ Denied _____ *(date)* <br> ☐ Cancelled _____ *(date)* <br> ☐ No resolution was provided within 3 business days. |

**21e.** *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).* ☐ Proceed ☐ Denied ☐ Cancelled

**21f.** The name and Brady identification number of the NICS examiner *(Optional)*

_____ *(name)* _____ *(number)*

| 22. ☐ | No NICS check was required because the transfer involved only National Firearms Act firearm(s). *(See Instructions for Question 22.)* |
|---|---|

| 23. ☐ | No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)* |
|---|---|

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

## Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| *Brian Cavett* | 1-12-13 |

**Transferor (Seller) Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised April 2012

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

**Firearms Transaction Record Part I -
Over-the-Counter** 2-15

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will e used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

Transferor's Transaction Serial Number *(If any)*

30766

| Section A - Must Be Completed Personally By Transferee (Buyer) |
|---|

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| West | Brian | Allen |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 10342 W 2nd St | Man | Logan | WV | 25635 |

3. Place of Birth

U.S. City and State -OR- Foreign Country
Man WV

4. Height
Ft. 5
In. 4

5. Weight *(Lbs.)*
221

6. Gender
[X] Male
[ ] Female

7. Birth Date
Month 04  Day 16  Year 1923

8. Social Security Number *(Optional, but will help prevent misidentification)*
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

9. Unique Personal Identification Number (UPIN) if applicable *(See Instructions for Question 9.)*

10.a. Ethnicity
[ ] Hispanic or Latino
[X] Not Hispanic or Latino

10.b. Race *(Check one or more boxes.)*
[ ] American Indian or Alaska Native
[ ] Asian
[ ] Black or African American
[ ] Native Hawaiian or Other Pacific Islander
[X] White

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Instructions for Question 11.a.)* Exception: *If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | [X] | [ ] |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | [ ] | [X] |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | [ ] | [X] |
| d. | Are you a fugitive from justice? | [ ] | [X] |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | [ ] | [X] |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | [ ] | [X] |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | [ ] | [X] |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | [ ] | [X] |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | [ ] | [X] |
| j. | Have you ever renounced your United States citizenship? | [ ] | [X] |
| k. | Are you an alien illegally in the United States? | [ ] | [X] |
| l. | Are you an alien admitted to the United States under a nonimmigrant visa? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | [ ] | [X] |
| 12. | If you are an alien admitted to the United States under a nonimmigrant visa, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20c.) *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | [ ] | [ ] |

13. What is your State of residence *(if any)? (See Instructions for Question 13.)*
WV

14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)*
[X] United States of America
[ ] Other *(Specify)*

15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number?

Note: Previous Editions Are Obsolete
Page 1 of 6

Transferee (Buyer) Continue to Next Page
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised April 2012

## Section D - Must Be Completed By Transferor (Seller)

| 26.<br>Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27.<br>Model | 28.<br>Serial Number | 29.<br>Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30.<br>Caliber or Gauge |
|---|---|---|---|---|
| Glock | G19 | UBC297 | Pistol | 9mm |
| S&W | 367 | BKR3943 | Revolver | 38 |
| Glock | 21 | UH2446 | Pistol | 45 |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)

Three

30b. Is any part of this transaction a Pawn Redemption? ☐ Yes ☑ No

30c. For Use by FFL (See Instructions for Question 30c.)

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

Uncle Sam's Loans, Inc.
200 Main Street  4-55-045-02-5E-08677
Man, West Virginia 25635

32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

### The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Sean Story | Sean S | Clerk | 02-15-13 |

## NOTICES, INSTRUCTIONS AND DEFINITIONS

Purpose of the Form: The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

Over-the-Counter Transaction: The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

State Laws and Published Ordinances: The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

Exportation of Firearms: The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

Question 1. Transferee's Full Name: The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of

ATF Form 4473 (5300.9) Part I
Revised April 2012

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "Yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16.)*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *Brian west* | 2-22-13 |

| **Section B - Must Be Completed By Transferor (Seller)** | |
|---|---|
| 18. Type of firearm(s) to be transferred *(check or mark all that apply)*:<br>☐ Handgun   ☑ Long Gun *(rifles or shotguns)*   ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* | 19. If sale at a gun show or other qualifying event.<br>Name of Event _____<br>City, State _____ |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.)* *(See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WVDL | ~~Jes~~ ~~ELD~~ E620233 | 4 | 16 | 13 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address) (See Instructions for Question 20.b.)*

20c. Aliens Admitted to the United States Under a Nonimmigrant Visa Must Provide:  Type of documentation showing an exception to the nonimmigrant visa prohibition.  *(See Instructions for Question 20.c.)*

| **Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions for Questions 21, 22 and 23.)* | |
|---|---|
| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)*<br><br>Month 2   Day 22   Year 13 | 21b. The NICS or State transaction number *(if provided)* was:<br><br>2845-0VP |
| 21c. The response initially provided by NICS or the appropriate State agency was:<br>☑ Proceed<br>☐ Denied<br>☐ Cancelled<br>☐ Delayed<br>*[The firearm(s) may be transferred on _____ (Missing Disposition Information date provided by NICS) if State law permits (optional)]* | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency:<br>☐ Proceed _____ *(date)*<br>☐ Denied _____ *(date)*<br>☐ Cancelled _____ *(date)*<br>☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*   ☐ Proceed   ☐ Denied   ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*

_____   _____
(name)                          (number)

22. ☐ No NICS check was required because the transfer involved only National Firearms Act firearm(s). *(See Instructions for Question 22.)*

23. ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

| **Section C - Must Be Completed Personally By Transferee (Buyer)** |
|---|
| If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)* |
| I certify that my answers to the questions in Section A of this form are still true, correct and complete. |

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| *Brian west* | 2-22-13 |

Transferor (Seller) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised April 2012

OMB No. 1140-0020

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I - Over-the-Counter**   3-2

| | Transferor's Transaction |
|---|---|

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

Transferor's Transaction Serial Number *(If any)*

30904

**Section A - Must Be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| West | Brian | Allen |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 103½ W 2nd st | man | Logan | WV | 25635 |

| 3. Place of Birth | | 4. Height | 5. Weight | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|---|
| U.S. City and State   -OR- | Foreign Country | Ft. 5 | (Lbs.) | ☒ Male | Month | Day | Year |
| man WV | | In. 4 | 221 | ☐ Female | 04 | 16 | 1973 |

8. Social Security Number *(Optional, but will help prevent misidentification)*

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

9. Unique Personal Identification Number (UPIN) if applicable *(See Instructions for Question 9.)*

| 10.a. Ethnicity | 10.b. Race (Check one or more boxes.) | |
|---|---|---|
| ☐ Hispanic or Latino | ☐ American Indian or Alaska Native | ☐ Black or African American | ☒ White |
| ☒ Not Hispanic or Latino | ☐ Asian | ☐ Native Hawaiian or Other Pacific Islander | |

11. Answer questions 11.a. (see exceptions) through 11.l. and 12 (if applicable) by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are** acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☒ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☒ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☒ |
| d. | Are you a fugitive from justice? | ☐ | ☒ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☒ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☒ |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☒ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☒ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☒ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☒ |
| k. | Are you an alien illegally in the United States? | ☐ | ☒ |
| l. | Are you an alien admitted to the United States under a nonimmigrant visa? *(See Instructions for Question 11.l.) If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | ☐ | ☒ |
| 12. | If you are an alien admitted to the United States under a nonimmigrant visa, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20c.) *(See Instructions for Question 12.) If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | ☒ | ☒ |

| 13. What is your State of residence (if any)? *(See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* ☒ United States of America ☐ Other *(Specify)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | | |

Note:  Previous Editions Are Obsolete
Page 1 of 6

**Transferee (Buyer) Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised April 2012

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Beretta | 92 | K687992 | pistol | 9 |
| FN | FNS40 | GKU0031076 | pistol | 40 |
| | | | | |
| | | | | |

30a. Total Number of Firearms *(Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)*   Two

30b. Is any part of this transaction a Pawn Redemption?   ☐ Yes   ☑ No

30c. For Use by FFL *(See Instructions for Question 30c.)*

## Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

31. Trade/corporate name and address of transferor *(seller)* *(Hand stamp may be used.)*

32. Federal Firearms License Number *(Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.)* *(Hand stamp may be used.)*

Uncle Sam's Loans, Inc.
200 Main Street   4-55-045-02-5E-08677
Man, West Virginia 25635

## The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer *if the transfer does not occur on the day Section A was completed)*; and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name *(Please print)* | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Sean Stacy | Sean Stacy | Clerk | 3-2-13 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun *(rifle or shotgun)* to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 *(which includes the Notices, General Instructions, and Definitions)*, and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological *(by date)*, alphabetical *(by name)*, or numerical *(by transaction serial number)*, as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical *(by name)* or chronological *(by date of transferee's certification)* order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify *(sign)* that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers *(other than the signature)* may be completed by another person, excluding the seller. Two persons *(other than the seller)* must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the

ATF Form 4473 (5300.9) Part 1
Revised April 2012

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definition on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony unde Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. throu 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.i. is prohibited fre purchasing or receiving a firearm, unless the person also answers "Yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpo of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16.)*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *Brian avett* | 3-8-13 |

### Section B - Must Be Completed By Transferor (Seller)

| 18. Type of firearm(s) to be transferred *(check or mark all that apply):* | 19. If sale at a gun show or other qualifying event. |
|---|---|
| [✓] Handgun   [ ] Long Gun   [ ] Other Firearm *(Frame, Receiver, etc.* *(rifles or* *See Instructions for Question 18.)* *shotguns)* | Name of Event _____ <br> City, State _____ |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| SoS <br> WUTI  WVDL | EL20233 | 4 | 16 | 2013 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address) (See Instructions for Question 20.b.)*

20c. Aliens Admitted to the United States Under a Nonimmigrant Visa Must Provide: Type of documentation showing an exception to the nonimn grant visa prohibition. *(See Instructions for Question 20.c.)*

### Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

| 21a. Date the transferee's identifying information in Section A was transmit-ted to NICS or the appropriate State agency: *(Month/Day/Year)* | 21b. The NICS or State transaction number *(if provided)* was: |
|---|---|
| Month  3    Day  8    Year  13 | 28LG-RCF |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agenc |
|---|---|
| [✓] Proceed       [ ] Delayed <br> [ ] Denied        *[The firearm(s) may be transferred on* <br> [ ] Cancelled      *(Missing Disposition* <br> *Information date provided by NICS) if State law* <br> *permits (optional)]* | [ ] Proceed _____ *(date)* <br> [ ] Denied _____ *(date)* <br> [ ] Cancelled _____ *(date)* <br> [ ] No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency or _____ *(date).*      [ ] Proceed      [ ] Denied      [ ] Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*

_____ *(name)*                    _____ *(number)*

| 22. | [ ] No NICS check was required because the transfer involved only National Firearms Act firearm(s). *(See Instructions for Question 22.)* |
|---|---|

23.  [ ] No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

### Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complet Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct, and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| X *Brian avett* | X 3-8-13 |

Transferor (Seller) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised April 2012

OMB No. 1140-0020

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I -
Over-the-Counter** 9-26

| | Transferor's Transaction |
|---|---|
| **WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. | Serial Number *(If any)* 65023 |
| Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT." | 249163 |

**Section A - Must be Completed Personally By Transferee (Buyer)**

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Deer | Christina | Michelle |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 107 Powell Dr. | Man | Logan | WV | 25635 |

3. Place of Birth

| U.S. City and State -OR- Foreign Country | 4. Height Ft. 5 In. 3 | 5. Weight (Lbs.) 145 | 6. Gender ☐ Male ☑ Female | 7. Birth Date Month 05 Day 06 Year 1971 |
|---|---|---|---|---|
| Man WV | | | | |

8. Social Security Number *(Optional, but will help prevent misidentification)* 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

9. Unique Personal Identification Number (UPIN) if applicable *(See Instructions for Question 9.)*

10. Race *(Ethnicity)* (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native     ☐ Black or African American     ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino     ☐ Asian     ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning:** You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.)* Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b. | ☑ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. | Are you a fugitive from justice? | ☐ | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. | Have you been discharged from the Armed Forces under **dishonorable** conditions? | ☐ | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. | Are you an alien illegally in the United States? | ☐ | ☑ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☐ | ☐ |

| 13. What is your State of residence *(if any)? (See Instructions for Question 13.)* WV | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* ☑ United States of America ☐ Other *(Specify)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|

Note: Previous Editions Are Obsolete
Page 1 of 6

**Transferee (Buyer) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED**

EXHIBIT 1

| Section D - Must Be Completed By Transferor (Seller) | | | | |
|---|---|---|---|---|
| 26. Manufacturer and/or Importer *(If the manufacturer and importer are different, the FFL should include both )* | 27. Model | 28. Serial Number | 29. Type *(pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29)* | 30. Caliber or Gauge |
| Marlin | 336CS | 09666605 | Rifle | 30-30 |
| | | | | |
| | | | | |
| | | | | |

30a. Total Number of Firearms *(Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)*   One

30b. Is any part of this transaction a Pawn Redemption?   ☑ Yes   ☐ No

30c. For Use by FFL *(See Instructions for Question 30c.)*

---

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

31. Trade/corporate name and address of transferor *(seller)  (Hand stamp may be used.)*

Uncle Sam's Loans, Inc.
200 Main Street
Man, West Virginia 25635

32. Federal Firearms License Number *(Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)*

455-045-02-2E-08677

---

**The Person Transferring The Firearm(s) Must Complete Questions 33-36.  For Denied/Cancelled Transactions,
The Person Who Completed Section B Must Complete Questions 33-35.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer *if the transfer does not occur on the day Section A was completed)*; and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name *(Please print)* | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Eric Allen | Eric Allen | Clerk | 9-26-09 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun *(rifle or shotgun)* to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 *(which includes the Notices, General Instructions, and Definitions)*, and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological *(by date)*, alphabetical *(by name)*, or numerical *(by transaction serial number)*, as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical *(by name)* or chronological *(by date of transferee's certification)* order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

**Section A**

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify *(sign)* that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers *(other than the signature)* may be completed by another person, excluding the seller. Two persons *(other than the seller)* must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating:  (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part 1
Revised August 2008

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *Christina Michelle Woo* | 11-13-09 |

| **Section B - Must be Completed By Transferor (Seller)** | |
|---|---|
| 18. Type of firearm(s) to be transferred *(check or mark all that apply)*: <br> ☐ Handgun  ☑ Long Gun *(rifles or shotguns)*  ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* | 19. If sale at a gun show or other qualifying event. <br> Name of Event _____ <br> City, State _____ |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.)* *(See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | E878395 | 5 | 6 | 2011 |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements).* *(See Instructions for Question 20.c.)*
Type(s) of Document _____   Date(s) of residence indicated on documents _____

20d. Nonimmigrant Aliens Must Provide: Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

| **Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions for Questions 21, 22 and 23.)* | |
|---|---|
| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* <br> Month 10  Day 13  Year 2009 | 21b. The NICS or State transaction number *(if provided)* was: <br> *10KX-L7D* |
| 21c. The response initially provided by NICS or the appropriate State agency was: <br> ☑ Proceed  ☐ Delayed *[The firearm(s) may be transferred on _____ (MDI date provided by NICS) if State law permits (optional)]* <br> ☐ Denied <br> ☐ Cancelled | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency: <br> ☐ Proceed _____ *(date)* <br> ☐ Denied _____ *(date)* <br> ☐ Cancelled _____ *(date)* <br> ☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*  ☐ Proceed  ☐ Denied  ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*   *(name)* _____   *(number)* 1622

22. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23. ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

| **Section C - Must Be Completed Personally By Transferee (Buyer)** | |
|---|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| *Christina Michelle Woo* | 11-13-09 |

Transferor (Seller) Continue to Next Page <br> STAPLE IF PAGES BECOME SEPARATED   ATF Form 4473 (5300.9) Part I <br> Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No 1140-0020

**Firearms Transaction Record Part I -**
**Over-the-Counter**

| | Transferor's Transaction Serial Number *(If any)* |
|---|---|

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

**Prepare in original only.** All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

26023

### Section A - Must Be Completed Personally By Transferee (Buyer)

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Deer | Christina | Michelle |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 16 #3 Camp | Mallory | Logan | W,V | 25634 |

| 3. Place of Birth | 4. Height | 5. Weight *(Lbs.)* | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|
| U.S. City and State -OR- Foreign Country | Ft. | | Male ☐ | Month | Day | Year |
| Logan W,V | In. 5/3 | 140 | Female ☑ | 05 | 06 | 1971 |

| 8. Social Security Number *(Optional, but will help prevent misidentification)* | 9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)* |
|---|---|
| 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 | |

10. Race *(Ethnicity)* (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native    ☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino    ☐ Asian    ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "*yes*" *or* "*no*" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning:** You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☑ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. | Are you a fugitive from justice? | ☐ | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. | Are you an alien illegally in the United States? | ☐ | ☑ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.) If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | ☐ | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.) If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | ☐ | ☒ |

| 13. What is your State of residence *(if any)? (See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| W,V | ☑ United States of America    ☐ Other (Specify) | |

Note: Previous Editions Are Obsolete
Page 1 of 6

**Transferee (Buyer) Continue to Next Page**
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part 1
Revised August 2008

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Ruger | P95 | 317-23881 | pistol | 9mm |
| Smith Wesson | SW9VE | DTK0608 | pistol | 9mm |
| Smith Wesson | SW40VE | DTZ2852 | pistol | 40cal |
| | | | | |
| | | | | |

30a. Total Number of Firearms (Please handwrite by printing, e.g., one, two, three, etc. Do not use numerals.)   *Three*

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes ☑ No

30c. For Use by FFL (See Instructions for Question 30c.)

---

### Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days

| 31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.) | 32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.) |
|---|---|
| Uncle Sam's Loans, Inc. 200 Main Street Man, West Virginia 25635 | 455-045-02-2E-08677 |

### The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Steven Adkins | *(signature)* | Clerk | 1/21/10 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16)*.

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *Christina M. Deer* | 11-4-10 |

## Section B - Must Be Completed By Transferor (Seller)

**18. Type of firearm(s) to be transferred** *(check or mark all that apply)*:

☐ Handgun  ☑ Long Gun *(rifles or shotguns)*  ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)*

**19. If sale at a gun show or other qualifying event.**

Name of Event _____

City, State _____

**20a. Identification** *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | E 878395 | 5 | 6 | 2011 |

**20b. Alternate Documentation** *(if driver's license or other identification document does not show current residence address)*

**20c. All Aliens:** Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*

Type(s) of Document | Date(s) of residence indicated on documents

**20d. Nonimmigrant Aliens Must Provide:** Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

## Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

**21a.** Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)*

| Month | Day | Year |
|---|---|---|
| 11 | 4 | 10 |

**21b.** The NICS or State transaction number *(if provided)* was:

INBF-3KW

**21c.** The response initially provided by NICS or the appropriate State agency was:

☑ Proceed
☐ Denied
☐ Cancelled

☐ Delayed
*[The firearm(s) may be transferred on _____ (MDI date provided by NICS) if State law permits (optional)]*

**21d.** If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency:

☐ Proceed _____ *(date)*
☐ Denied _____ *(date)*
☐ Cancelled _____ *(date)*
☐ No resolution was provided within 3 business days.

**21e.** *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).* ☐ Proceed ☐ Denied ☐ Cancelled

**21f.** The name and Brady identification number of the NICS examiner *(Optional)*

| Pam | 1308 |
|---|---|
| *(name)* | *(number)* |

**22.** ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

**23.** ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

## Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| X *Christina M. Deer* | X 11-4-10 |

| Page 2 of 6 | Transferor (Seller) Continue to Next Page STAPLE IF PAGES BECOME SEPARATED | ATF Form 4473 (5300.9) Part I Revised August 2008 |

OMB No. 1140-0020

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I - Over-the-Counter.** 2-4-10

| | Transferor's Transaction Serial Number *(If any)* |
|---|---|

WARNING: You may not receive a firearm if prohibited by Federal or State law. The information you provide will oe used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

26098

### Section A - Must Be Completed Personally By Transferee (Buyer)

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Ellis | Scott | Edward |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 127 River Drive | Logan | Logan | WV | 25601 |

3. Place of Birth

| U.S. City and State -OR- Foreign Country | 4. Height Ft. 5 In. 11 | 5. Weight *(Lbs.)* 230 | 6. Gender Male ☑ Female ☐ | 7. Birth Date Month 10 Day 31 Year 69 |
|---|---|---|---|---|
| Logan WV | | | | |

8. Social Security Number *(Optional, but will help prevent misidentification)*
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

9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)*

10. Race *(Ethnicity)* (Check one or more boxes. See Instructions for Question 10.)

- ☐ American Indian or Alaska Native
- ☐ Black or African American
- ☐ Native Hawaiian or Other Pacific Islander
- ☐ Hispanic or Latino
- ☐ Asian
- ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.* | ☑ | |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | | ☑ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | | ☑ |
| d. | Are you a fugitive from justice? | | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | | ☑ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | | ☑ |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | | ☑ |
| j. | Have you ever renounced your United States citizenship? | | ☑ |
| k. | Are you an alien illegally in the United States? | | ☑ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.) If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13.* | | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.) If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13.* | ☒ | ☒ |

| 13. What is your State of residence *(if any)? (See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or adm... |
|---|---|---|
| WV | ☑ United States of America ☐ Other *(Specify)* | |

Note: Previous Editions Are Obsolete

Transferee (Buyer) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

Page 1 of 6

EXHIBIT 8

...) Part I

| Section D - Must Be Completed By Transferor (Seller) | | | | |
|---|---|---|---|---|
| 26. Manufacturer and/or Importer *(If the manufacturer and importer are different the FFL should include both.)* | 27. Model | 28. Serial Number | 29. Type *(pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29)* | 30. Caliber or Gauge |
| Remington | 31 | 114239 | Shotgun | 12 ga |
| Barrett | Rec 7 | B00606 | Rifle | 6.8 |
| Thompson | Pre | U001321 | Rifle | 243 |
| Thompson | Icon | 11430 | Rifle | 30.7C |
| Remington | 700 | GL562761 | Rifle | 9mm |

30a. Total Number of Firearms *(Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)*   FIVE

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes ☑ No

30c. For Use by FFL *(See Instructions for Question 30c.)*

---

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

31. Trade/corporate name and address of transferor *(seller)  (Hand stamp may be used.)*

Uncle Sam's Loans, Inc.
200 Main Street
Man, West Virginia 25635

32. Federal Firearms License Number *(Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)*

455-045-02-2E-08677

**The Person Transferring The Firearm(s) Must Complete Questions 33-36.  For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer *if the transfer does not occur on the day Section A was completed)*; and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name *(Please print)* | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Sherry Adkins | | | 2/4/00 |

---

**NOTICES, INSTRUCTIONS AND DEFINITIONS**

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun *(rifle or shotgun)* to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 *(which includes the Notices, General Instructions, and Definitions)*, and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological *(by date)*, alphabetical *(by name)*, or numerical *(by transaction serial number)*, as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED. If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical *(by name)* or chronological *(by date of transferee's certification)* order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify *(sign)* that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers *(other than the signature)* may be completed by another person, excluding the seller. Two persons *(other than the seller)* must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| | 3-23-10 |

### Section B - Must Be Completed By Transferor (Seller)

| 18. Type of firearm(s) to be transferred (check or mark all that apply): | 19. If sale at a gun show or other qualifying event. |
|---|---|
| ☑ Handgun  ☐ Long Gun *(rifles or shotguns)*  ☐ Other Firearm *(Frame, Receiver, etc. See Instructions for Question 18.)* | Name of Event _____  City, State _____ |

**20a. Identification** *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | E435776 | 10 | 31 | 2014 |

**20b. Alternate Documentation** *(if driver's license or other identification document does not show current residence address)*

**20c. All Aliens:** Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*
Type(s) of Document | Date(s) of residence indicated on documents

**20d. Nonimmigrant Aliens Must Provide:** Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

### Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s) *(See Instructions for Questions 21, 22 and 23.)*

| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* | 21b. The NICS or State transaction number *(if provided)* was: |
|---|---|
| Month: 3  Day: 23  Year: 2010 | IFVM-F4P |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was "Delayed," the following response was received from NICS or the appropriate State agency: |
|---|---|
| ☑ Proceed   ☐ Delayed  ☐ Denied   *[The firearm(s) may be transferred on*  ☐ Cancelled   *(MDI date provided by NICS) if State law permits (optional)]* | ☐ Proceed _____ *(date)*  ☐ Denied _____ *(date)*  ☐ Cancelled _____ *(date)*  ☐ No resolution was provided within 3 business days. |

**21e.** *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*   ☐ Proceed   ☐ Denied   ☐ Cancelled

**21f.** The name and Brady identification number of the NICS examiner *(Optional)*

_____ *(name)*          _____ *(number)*

**22.** ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

**23.** ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

### Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*
I certify that my answers to the questions in Section A of this form are still true, correct, and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| | 3-23-10 |

Transferor (Seller) Continue to Next Page

# 1

OMB No. 1140-0020

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Transaction Record Part I - Over-the-Counter** 11-3

| WARNING: You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine. | Transferor's Transaction Serial Number *(If any)* |
|---|---|
| Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT." | 25132 |

## Section A - Must Be Completed Personally By Transferee (Buyer)

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Ellis | Scott | Edward |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 127 River Drive | Logan | Logan | WV | 25601 |

| 3. Place of Birth | | 4. Height | 5. Weight *(Lbs.)* | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|---|
| U.S. City and State -OR- | Foreign Country | Ft. 5 | 270 | Male ✓ | Month 10 | Day 31 | Year 69 |
| Logan WV | | In. 11 | | Female ☐ | | | |

| 8. Social Security Number *(Optional, but will help prevent misidentification)* | 9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)* |
|---|---|
| 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 | |

10. Race (Ethnicity) (Check one or more boxes. See Instructions for Question 10.)

| ☐ American Indian or Alaska Native | ☐ Black or African American | ☐ Native Hawaiian or Other Pacific Islander |
|---|---|---|
| ☐ Hispanic or Latino | ☐ Asian | ✓ White |

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Instructions for Question 11.a.)* Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b. | ✓ | |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | | ✓ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | | ✓ |
| d. | Are you a fugitive from justice? | | ✓ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | | ✓ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | | ✓ |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | | ✓ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | | ✓ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | | ✓ |
| j. | Have you ever renounced your United States citizenship? | | ✓ |
| k. | Are you an alien illegally in the United States? | | ✓ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | | ✓ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | | ✓ |

| 13. What is your State of residence (if any)? *(See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ✓ United States of America ☐ Other *(Specify)* | |

| Note: Previous Editions Are Obsolete | Transferee (Buyer) Continue to Next Page | ATF Form 4473 (5300.9) Part I |
|---|---|---|
| Page 1 of 6 | STAPLE IF PAGES BECOME SEPARATED | Revised August 2008 |

| | | Section D - Must Be Completed By Transferor (Seller) | | |
|---|---|---|---|---|
| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type (pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
| Smith Wesson | 1911 | FRF2929 | Pstl | 45 |
| Walther | P22 | L355733 | Pstl | 22 |
| Glock | 17 | HYE056 | Pstl | 9mm |
| Ber Ha | 92FS | L647792 | Pstl | 9mm |
| Remy | 700 | C6683086 | Rfle | 243 |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)

FIVE

30b. Is any part of this transaction a Pawn Redemption? ☐ Yes ☒ No

30c. For Use by FFL (See Instructions for Question 30c.)

---

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

Uncle Sam's Loans, Inc.
200 Main Street
Man, West Virginia 25635

32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

455-045-02-2E-08677

**The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions,**
**The Person Who Completed Section B Must Complete Questions 33-35.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Steven Adkins | | Clk | 11/3/09 |

---

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

#### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
| *[signature]* | 12-9-10 |

### Section B - Must Be Completed By Transferor (Seller)

| 18. Type of firearm(s) to be transferred *(check or mark all that apply):* | 19. If sale at a gun show or other qualifying event. |
|---|---|
| ☒ Handgun  ☒ Long Gun  ☐ Other Firearm *(Frame, Receiver, etc.*<br>(rifles or  *See Instructions for Question 18.)*<br>shotguns) | Name of Event _____<br>City, State _____ |

**20a. Identification** *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* | | |
|---|---|---|---|---|
| | | Month | Day | Year |
| WV DL | E435776 | 10 | 31 | 2014 |

**20b. Alternate Documentation** *(if driver's license or other identification document does not show current residence address)*

**20c. All Aliens:** Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)*

| Type(s) of Document | Date(s) of residence indicated on documents |
|---|---|
| | |

**20d. Nonimmigrant Aliens Must Provide:** Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

### Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)  *(See Instructions for Questions 21, 22 and 23.)*

| 21a. Date the transferee's identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)* | 21b. The NICS or State transaction number *(if provided)* was: |
|---|---|
| Month 12  Day 9  Year 10 | 1NZW-J66 |

| 21c. The response initially provided by NICS or the appropriate State agency was: | 21d. If initial NICS or State response was "Delayed," the following response was received from NICS or the appropriate State agency: |
|---|---|
| ☐ Proceed  ☐ Delayed<br>☐ Denied  *[The firearm(s) may be transferred on*<br>☐ Cancelled  _____ *(MDI date provided by NICS)*<br>*if State law permits (optional)]* | ☐ Proceed _____ *(date)*<br>☐ Denied _____ *(date)*<br>☐ Cancelled _____ *(date)*<br>☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on: _____ *(date).*  ☐ Proceed  ☐ Denied  ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*
_____ *(name)*  _____ *(number)*

22. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23. ☐ No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
| | | | |

### Section C - Must Be Completed Personally By Transferee (Buyer)

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

**I certify that my answers to the questions in Section A of this form are still true, correct and complete.**

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
| *[signature]* | 12-9-10 |

Page 2 of 6

Transferor (Seller) Continue to Next Page
**STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I<br>Revised August 2008

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0020

**Firearms Transaction Record Part I -
Over-the-Counter**

*4-8*

| | Transferor's Transaction Serial Number *(If any)* |
|---|---|

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 *et. seq.*, are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

*27748*

### Section A - Must Be Completed Personally By Transferee (Buyer)

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| Ellis | Scott | Edward |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| 127 River drive | Logan | Logan | WV | 25601 |

3. Place of Birth

| U.S. City and State   -OR- | Foreign Country | 4. Height | 5. Weight *(Lbs.)* | 6. Gender | 7. Birth Date | | |
|---|---|---|---|---|---|---|---|
| Logan WV | | Ft. 5 / In. 11 | 225 | Male ☑ / Female ☐ | Month 10 | Day 31 | Year 69 |

8. Social Security Number *(Optional, but will help prevent misidentification)*
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

9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)*

10. Race *(Ethnicity)* (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native    ☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander

☐ Hispanic or Latino    ☐ Asian    ☑ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. and 12 *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** *(See Instructions for Question 11.a.)* Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b. | ☑ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☑ |
| c. | Have you ever been convicted in any court of a **felony**, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☑ |
| d. | Are you a fugitive from justice? | ☐ | ☑ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☑ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☑ |
| g. | Have you been discharged from the Armed Forces under **dishonorable** conditions? | ☐ | ☑ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☑ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☑ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☑ |
| k. | Are you an alien illegally in the United States? | ☐ | ☑ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☑ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (**If** "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☑ | ☑ |

| 13. What is your State of residence *(if any)? (See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| WV | ☑ United States of America    ☐ Other *(Specify)* | |

**Transferee (Buyer) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED**

ATF Form 4473 (5300.9) Part I
Revised August 2008

## Section D - Must Be Completed By Transferor (Seller)

| 26. Manufacturer and/or Importer (If the manufacturer and importer are different, the FFL should include both.) | 27. Model | 28. Serial Number | 29. Type(pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29) | 30. Caliber or Gauge |
|---|---|---|---|---|
| Barrett | B98 | 98B01375 | rifle | 338 cal. |
| Ruger | LCR 357 | 546-10110 | revolver | 357 cal |
| Rossi | Circuit Judge | E06622 | rifle | 45/410 cal. |
| UZI | A | 20311 | pistol | 9mm |
| Kimber | Ultra Crimson | KU151495 | pistol | 45 cal |

30a. Total Number of Firearms (Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)  five

30b. Is any part of this transaction a Pawn Redemption?  ☐ Yes  ☒ No

30c. For Use by FFL (See Instructions for Question 30c.)

---

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

31. Trade/corporate name and address of transferor (seller) (Hand stamp may be used.)

Uncle Sam's Loans, Inc.
200 Main Street
Man, West Virginia 25635

32. Federal Firearms License Number (Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.) (Hand stamp may be used.)

455-045-02-2E-08677

**The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions,**
**The Person Who Completed Section B Must Complete Questions 33-35.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer if the transfer does not occur on the day Section A was completed); and (3) the information in the current State laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

| 33. Transferor's/Seller's Name (Please print) | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred |
|---|---|---|---|
| Ricky Lee Allen Jr. | | Clerk | 4-8-11 |

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun (rifle or shotgun) to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 (which includes the Notices, General Instructions, and Definitions), and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological (by date), alphabetical (by name), or numerical (by transaction serial number), as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not complete after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical (by name) or chronological (by date of transferee's certification) order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify (sign) that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers (other than the signature) may be completed by another person, excluding the seller. Two persons (other than the seller) must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

Page 3 of 6

ATF Form 4473 (5300.9) Part I
Revised August 2008

"PROFFER AGREEMENT". Once this task was complete, the prosecution team returned to the conference room and the interview commenced.

3. Initially, S/A Cunningham inquired if ADKINS had ever solicited any person to complete an ATF Form 4473 at Uncle Sam's Loans, Inc., all while leaving the firearm section of the ATF Form 4473 blank and with the understanding that the individual depicted on the ATF Form 4473 never intended on purchasing a firearm. ADKINS denied ever participating in any sort of straw transactions through Uncle Sam's Loans. This topic was explored farther and ADKINS was adamant that he had not solicited anyone to complete any ATF Form 4473's, knowing that the firearms listed on the ATF Form 4473 were actually going to an undocumented third party. ADKINS also stated that at Uncle Sam's Loans they absolutely do not knowingly give firearms to "dope heads." ADKINS provided examples of firearms transactions where he has refused to consummate the transaction because ADKINS felt the transaction was a "straw" purchase or some other type of fraudulent purchase. ADKINS qualified the denials of having individuals falsely complete ATF Form 4473's by stating; "We did not have people fill out forms fraudulently, to the best of my knowledge."

4. As this topic was discussed further, ADKINS stated that not all of the firearms depicted on all of ATF Form 4473's that identify Shane Noel as the purchaser of the firearms are accurate. ADKINS stated that there are several firearms listed on ATF Form 4473's at Uncle Sam's Loans that identify Shane Noel as the actual purchaser of the firearms listed in the firearms section. ADKINS stated that several of the firearms in question were not purchased by Noel. ADKINS continued and related that many of the firearms listed on the ATF Form 4473's actually went to ADKINS' friend, Matt Justice. ADKINS justified these criminal actions by stating that Justice is not able to get into Uncle Sam's Loans during regular business hours, due to his work schedule. ADKINS rationalized that Uncle Sam's Loans is in the retail business and in order to sell Justice firearms ADKINS would accumulate several firearms for Justice over a period of time. When the number of firearms reached a point that ADKINS felt he needed to liquidate the cache of firearms to Justice, ADKINS would deliver the firearms to Justice after regular business hours. ADKINS continued and explained that he knew that Noel desired to obtain employment with Justice. As a result, ADKINS stated that he had Noel complete the ATF Form 4473's for firearms that went to Justice. Once this task was completed, ADKINS and Noel delivered several firearms to Justice. ADKINS related that Justice spoke to Noel about Noel using drugs and related that once Noel was off all "dope" that Noel should come back and talk to Justice about employment. ADKINS related that Noel indicated to Justice that Noel was using Suboxone and that Justice stated that once Noel was "clean" that Noel should come see Justice.

5. After explaining how ADKINS utilized Noel to complete ATF Form 4473's in order to distribute firearms to Matt Justice, ADKINS stated that no other firearms listed in Noel's name went to anyone else, other than to Matt Justice.

ATF EF 3120.2 (10-2004)
For Official Use Only

business hours and a variety of individuals would be invited to attend. ADKINS stated that when a firearm was won during these raffles the winner had to have a NICS check performed before securing the firearm. ADKINS stated that Uncle Sam's Loans would typically run the NICS check for the won firearm purchaser the following day during regular business hours. ADKINS stated that he believes that Shane Noel and his father, Norman Noel only attended one of these "gun parties". ADKINS related that he did not believe that either one (1) of the Noel's ever won a firearm at one of the "gun parties". ADKINS related that under the cash register at Uncle Sam's Loans there was a list of names on notebook paper. ADKINS held that the list in question consists of the individuals who were invited to the "gun parties." ADKINS stated that the checkmarks beside the individuals name indicates that that individual has been contacted and invited to attend the "gun party".

12. ADKINS related that currently he owns ten percent (10%) of Uncle Sam's Loans. ADKINS stated that the remaining ninety percent (90%) ownership in the business is held by Roger and Louise Muncy. ADKINS indicated that his goal is to eventually own Uncle Sam's Loans himself.

13. ADKINS advised that Chad Lusk ran a credit account at Uncle Sam's Loans. ADKINS stated that often Lusk would complete a "PO" (purchase order) listing boots, or some other product on the PO, that was billed to Mountain Laurel Coal. ADKINS stated that instead of boots, the products Lusk obtained were actuality hunting clothes and one (1) time a compound bow. ADKINS represented that these personal items were billed to and paid for by Mountain Laurel Coal, a subsidiary of Arch Coal.

14. ADKINS related that he understands that the Investigators have been told about ADKINS buying and selling untaxed moonshine liquor. ADKINS confirmed that he is supplied untaxed moonshine liquor from Tom and Bob Hypes from Charleston, West Virginia. ADKINS stated that he currently has four (4) quarts of untaxed moonshine in his refrigerator at ADKINS' residence. ADKINS stated that he enjoys consuming the moonshine from time to time.

15. ADKINS advised that Greg Glick operated a "parlay service" out of the 317 restaurant in Logan, West Virginia. ADKINS stated that "Little Bill" Toler actually ran the parlay service for Glick. ADKINS admitted that his name will be listed in the parlay records on two (2) separate occasions. ADKINS stated that he did not participate in the sports betting other than the two (2) occasions. ADKINS related that Scott Johnson has been involved in the parlay gambling for a while. ADKINS continued and related that since Glick was arrested, a barber in Man, West Virginia, Brian Blankenship has picked up the "parlay service" and is operating the sports gambling out of his barber shop in Man, West Virginia.

16. ADKINS related that a contractor named Sammy Stacy told him about a scheme involving fuel bills and Don Blankenship. ADKINS explained that Stacy told him that Stacy had complained

ATF EF 3120.2 (10-2004)<br>For Official Use Only

| Title of Investigation | Investigation Number | Report Number: |
|---|---|---|
| Uncle Sam's Loans | 775020-15-0120 | 25 |

ATF EF 3120.2 (10-2004)
For Official Use Only

shares in the UNCLE SAM'S LOANS Corporation.

3. ADKINS represented that the motivation behind the MUNCY'S "terminating" ADKINS is that Roger MUNCY wants ADKINS out of the UNCLE SAM'S LOANS business because Roger MUNCY fears that ADKINS will sign a plea agreement, cooperate with the United States Government and provide information to Law Enforcement concerning criminal acts on behalf of Roger and Louise MUNCY.

4. ADKINS stated that when Louise MUNCY was interviewed by the West Virginia State Police, pursuant to the Mount Laurel Coal Company investigation, Louise MUNCY lied to the Investigating Officers. ADKINS stated that Louise MUNCY has actually cashed checks for Scottie ELLIS and Scott Johnson in order to facilitate the "kick back" scheme that ELLIS and Johnson were actively involved. ADKINS related that he understands that Ellis and Johnson needed to generate cash in order to make their "kick back" payments at the Mount Laurel Coal Mine. These cash payments were made in order to maintain their contractor/vendor work at the Coal Mine in question. ADKINS stated that Louise MUNCY represented to Law Enforcement that she simply provided ELLIS change from checks that ELLIS wrote to cover purchases from UNCLE SAM'S LOANS. ADKINS related that Louise MUNCY'S representation to Law Enforcement was untruthful. ADKINS related that he recalls Louise MUNCY cashing one (1) check for Johnson at the Christmas party at UNCLE SAM'S LOANS in 2014. ADKINS stated that the check amount that Louise MUNCY cashed on this occasion was "a couple thousand dollars."

5. ADKINS proceeded to relate that ELLIS also wrote a check that was made out to Roger MUNCY. This check was cashed by MUNCY at B&B Loans in Logan, West Virginia. ADKINS stated that this check was written to Roger MUNCY in order for ELLIS to obtain cash to pay his portion of the kickback payments at the Mount Laurel Coal Mine. ADKINS stated that at the time, B&B Loans was owned by Roger MUNCY'S brother, Donald Muncy, who has since become deceased.

6. At this point, S/A Cunningham informed ADKINS that it appears that the information being provided by ADKINS in relation to Roger and Louise MUNCY is different from the information ADKINS provided to Law Enforcement in the August 20, 2015 proffer interview. The original proffer interview was documented in Report of Investigation (ROI) Number 25 of the UNCLE SAM'S LOANS, Incorporated investigation, ATF IN#: 775020-15-0120. ADKINS explained that he was not completely forthright in the previous interview due to the fear of being terminated from his position at UNCLE SAM'S LOANS by the MUNCY'S. ADKINS advised that prior to meeting with the Investigating Agents on August 20, 2015, Roger and Louise MUNCY met with ADKINS. During this meeting, Roger MUNCY directed ADKINS to refrain from telling Law Enforcement anything pertaining to "check cashing" and "Mount Laurel". ADKINS related that Roger MUNCY told ADKINS "That's the stuff you go

ATF EF 3120.2 (10-2004)
For Official Use Only

9. ADKINS related that an underlying reason for using Brian West and Shane Noel to complete many of these ATF Form 4473's for firearms being delivered to Matt Justice was that West and Noel both indicated that they were interested in employment opportunities with Justice at his coal mine. ADKINS estimated that Noel accompanied him approximately two (2) or three (3) times to deliver firearms to Matt Justice. ADKINS related that he did not recall Brian West ever accompanying ADKINS to deliver firearms to Justice. ADKINS stated that during these firearm deliveries to Justice, Noel did talk with Justice about the possibility of gaining employment with Justice's coal company.

10. ADKINS addressed the Smith & Wesson .500 revolvers described in the charged incident from December 2010. ADKINS related that the Smith & Wesson revolvers in question were ordered for Paul Collins, of Pineville Machine Shop. ADKINS confirmed that Noel completed the ATF Form 4473 for the revolvers in question and that Noel was not the actual purchaser of the firearms in question. ADKINS explained that he utilized Noel to complete the ATF Form 4473 in question because Roger MUNCY had dictated that the ordered firearms not be stored at UNCLE SAM'S LOANS. ADKINS explained that MUNCY had mandated that the ordered firearms should be moved out of the store quickly, in order to complete the firearm sales and receive payment.

11. After discussing many of the straw ATF Form 4473's, ADKINS advised that Roger MUNCY was the individual who came up with the scheme of having the firearms listed on the ATF Form 4473's completed by people other than the actual purchaser of the listed firearms. ADKINS explained that Roger MUNCY related that the firearms would appear to be lawfully transferred in the A&D book, the firearm sale would be completed and UNCLE SAM'S LOANS would collect the money from the firearm transactions. ADKINS related that Roger MUNCY was not concerned that the firearm transaction be conducted correctly, just that the transaction appeared on the books to be conducted correctly.

12. ADKINS explained that Roger MUNCY would fire an employee who stopped a firearm transaction because one (1) of the qualifying answers on the ATF Form 4473 was answered in a manner that would exclude the applicant from purchasing a firearm. ADKINS related that in the past, if an employee stopped a firearm transaction because of how the purchaser answered a question on the ATF Form 4473, Roger MUNCY was "furious" at the employee for "blocking a sale." ADKINS related that Phillip Muncy can authenticate that Roger MUNCY has given his employees instruction to make sure they do not "block a sale" because of the answers provided on the ATF Form 4473. ADKINS related that approximately seventy (70%) percent of the firearms transactions completed at UNCLE SAM'S LOANS are illegal transfers. ADKINS elaborated and stated that the vast majority of the customers at UNCLE SAM'S LOANS are illegal users of illegal controlled substances. ADKINS explained that the employees at UNCLE SAM'S LOANS know that many of the people who complete the ATF Form 4473 does not answer the drug use question correctly. Despite this knowledge, the employees conduct the

Title of Investigation
Uncle Sam's Loans

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 132 of 181 PageID #: 136

Investigation Number
775020-15-0120

Report Number
50

spoke to ADKINS. Glen Adkins called concerning his not receiving his box of shells with the firearm purchase. Again, ADKINS directed Glen Adkins to speak with Roger Muncy about the box of ammunition for the firearm in question.

16. ADKINS submitted that UNCLE SAM'S LOANS routinely operates a "tip board" for a firearm. ADKINS stated that one time Mark Copley, of Buffalo Creek Road, near Man, West Virginia won a handgun on the "tip board." ADKINS stated that Copley is a convicted felon. When Copley won the firearm, ADKINS stated that MUNCY directed ADKINS to go ahead and provide Copley the firearm, even though Copley was prohibited from possessing firearms. ADKINS stated that he went ahead and paid Copley for the firearm and then put the firearm in ADKINS' name on the A&D book at UNCLE SAM'S LOANS. ADKINS stressed that he did not distribute the firearm in question to Copley.

17. ADKINS advised that Roger MUNCY'S son, Roger Muncy Jr. is also prohibited from possessing firearms. ADKINS stated that he believes Muncy Jr. is prohibited from possessing firearms because ADKINS is aware of Muncy Jr. being declined by the NICS Center for a firearm transaction. Despite Muncy Jr. being declined on the aforementioned firearm transaction, Muncy Jr. regularly carries a revolver upon his person.

18. In addition to facilitating the above described illegal firearms transactions, ADKINS related that when Roger MUNCY takes firearms to gun shows and various events, like the National Wild Turkey Federation dinner, MUNCY never logs the firearms out of the A&D book at UNCLE SAM'S LOANS. ADKINS explained that MUNCY takes the firearms to the event and simply returns them to the store without any record of the firearms leaving the licensed business location.

19. ADKINS stated that at the last National Wild Turkey Federation dinner he attended with MUNCY, ADKINS observed Roger MUNCY give Chad Lusk approximately five hundred ($500) dollars to bid on the items in the silent auction. ADKINS stated that MUNCY added the five hundred ($500) dollars he provided to Lusk on the credit account Mount Laurel Coal Mine had established at UNCLE SAM'S LOANS.

20. ADKINS was asked about Jim Grimmett and Grimmett's possession of firearms. ADKINS acknowledged that he was aware that Grimmett is a convicted felon. ADKINS stated that he has had multiple conversations with Jim Grimmett concerning Grimmett's collection of firearms. ADKINS related that Jim Grimmett stores his firearms at his brother, Rick Grimmett's residence in Nibert, West Virginia. ADKINS stated that he knows that Rick Grimmett purchased a large safe to store his and Jim Grimmett's firearms. ADKINS maintained that he delivered the safe in question to Grimmett's residence. ADKINS related that he has seen a portion of Jim Grimmett's firearm collection at Rick Grimmett's residence in the past.

ATF EF 3120.2 (10-2004)
For Official Use Only

UNCLE SAM'S LOANS, ADKINS also reported that he received approximately three hundred ($300) dollars per month as his portion of the rent received from MUNCY Properties. ADKINS explained that his interest in MUNCY Properties came when he bought into UNCLE SAM'S LOANS in August 2013.

26. ADKINS related that he received his cash payments from UNCLE SAM'S LOANS once a month. ADKINS related that Roger MUNCY directed ADKINS to refrain from depositing the cash received in a checking account or any other bank account. ADKINS stated that Roger MUNCY directed him to put his cash money in a safe and to use the cash for personal expenses, like going to the grocery store.

27. ADKINS submitted that when he started buying into UNCLE SAM'S LOANS in 2013, ADKINS attempted to get Roger & Louise MUNCY to stop the cash payments to the employees. ADKINS stated that he suggested raising the amount of the salary for the employees and stop making cash payments to the employees. ADKINS stated that Roger MUNCY refused to change the way he was conducting business because it would increase the tax liability of UNCLE SAM'S LOANS. ADKINS related that for the nineteen (19) years he worked at UNCLE SAM'S LOANS all of the employees received some form of cash payments for their services rendered.

28. ADKINS related that the day after the West Virginia State Police executed a search warrant at UNCLE SAM'S LOANS in furtherance of the Mount Laurel Coal Mine investigation, Roger & Louise MUNCY removed five hundred thousand ($500,000) dollars in cash from MUNCY'S residence on Hensley Heights Road in Man, West Virginia. ADKINS submitted that the MUNCY'S transported the five hundred thousand dollars in cash to William & Carolyn Bowling's residence in Portsmouth, Ohio. ADKINS stated that Roger MUNCY told him that he transported the money because the MUNCY'S feared that Law Enforcement would execute a search warrant at MUNCY'S residence and seize the money in question. ADKINS submitted that he understands that approximately six (6) or seven (7) months ago the MUNCY'S retrieved the half a million dollars in cash from the Bowling's residence. ADKINS is unsure where the MUNCY'S currently have the currency in question stored. ADKINS related that the Bowlings are related to Louise MUNCY.

29. ADKINS advised that he knows that the MUNCYS historically secured large sums of cash inside large video games consoles and safes located inside the MUNCY'S residence on Hensley Heights Road near Man, West Virginia.

30. ADKINS stated that in 2008 and 2009 he knows that the gross sales at UNCLE SAM'S LOANS was in excess of four hundred thousand ($400,000) dollars. In December of 2008 and December of 2009 Louise MUNCY removed in excess of one hundred thousand ($100,000) dollars each year from the records. ADKINS stated that each year (2008-09) Louise MUNCY

ATF EF 3120.2 (10-2004)
For Official Use Only

Title of Investigation
Uncle Sam's Loans

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 134 of 181 PageID #: 138

Investigation Number
775020-15-0120

Report Number:
50

36. ADKINS explained that Roger MUNCY and Brian K. Blankenship started a "parlay service" in Logan County, West Virginia. ADKINS explained that the "parlay service" provided an unregulated gambling business for individuals to wager on sporting events. ADKINS explained that MUNCY and Blankenship each contributed twenty thousand ($20,000) dollars to start the "parlay service".

37. ADKINS related that MUNCY is a member of the Board of Directors of the Bank of Mingo. As a result of MUNCY'S membership on the Board of Directors, MUNCY took Blankenship to the Bank of Mingo and co-signed for Blankenship to secure a twenty thousand ($20,000) dollar loan to start this illegal gambling business. ADKINS advised that MUNCY secured his twenty thousand ($20,000) dollars to start the illegal gambling business by cashing in a CD MUNCY had at the Bank of Mingo. ADKINS submitted that the CD in question was in Roger and Louise MUNCY'S name. When Roger MUNCY cashed out the CD in question, an unknown Bank of Mingo employee forged Louise MUNCY'S signature on the CD.

38. ADKINS advised that Blankenship is a barber by trade and that much of the "parlay service" is operated out of Blankenship's barbershop in Man, West Virginia.

39. ADKINS identified "Gooze" as being an employee of Roger MUNCY'S in the "parlay service". ADKINS stated that "Gooze" is a black, male.

40. ADKINS stated that Roger MUNCY employs Randall Bragg to assist MUNCY with collections associated with the "parlay service."

41. ADKINS related that he understands that Roger MUNCY extends an approximate debt limit of five thousand ($5,000) dollars to the people who play the "parlay service." S/A Cunningham inquired about what happens to the individuals who max out their gambling debt. ADKINS identified Darren McDaniel as the owner of Jack's Service Center on Buffalo Creek Road, near Man, West Virginia. ADKINS explained that in late 2013 or early 2014 McDaniel got indebted to MUNCY'S "parlay service" for five thousand ($5,000) dollars. Roger MUNCY went to Jack's Service Center with a baseball bat and started striking furniture and other inanimate objects in the garage with the baseball bat. After exhibiting this show of force, MUNCY allegedly informed McDaniel that if he did not commence with weekly payments to fulfill his gambling debt, that MUNCY would return to his place of business and destroy the business computer system with the baseball bat. As a result of this exhibition of terror, McDaniel complied with MUNCY'S demands and commenced with making two hundred fifty ($250) dollar per week payments to MUNCY. These weekly payments were made each Friday and made until the debt was satisfied.

42. ADKINS stated that he understands that at one time Blankenship became indebted to the "parlay service" for approximately ten thousand ($10,000) dollars. ADKINS does not know

ATF EF 3120.2 (10-2004)
For Official Use Only

- Terry and April Albright – Both are illegal drug users; DNR Officer Terry Ballard searched Albright's residence related to a bear poaching complaint; Officer Ballard could authenticate Albright's drug usage
- Cecil Keeney and his son, Aaron Keeney – Drug users
- Benny Gilco – was denied by NICS; never did receive the firearm

47. ADKINS submitted that his cousin, Randy Blair (304) 752-9278 contacted ADKINS on August 31, 2015 and related that he was approached by Roger MUNCY. Blair related that MUNCY had in excess of two hundred (200) firearms in the bed of MUNCY'S vehicle. ADKINS related that he was told that MUNCY was offering the firearms for sale at a very low price. ADKINS related that Blair advised that he declined MUNCY'S offer to buy firearms in question. ADKINS related that August 31, 2015 was the same date that he was "terminated" at UNCLE SAM'S LOANS.

48. ADKINS advised that he knows that before B&B Loans was sold, but following the death of Donald Muncy, Roger MUNCY was obtaining numerous firearms from B&B Loans, on behalf of MUNCY'S son. ADKINS related that MUNCY'S son is opening a gun store in Sissonville, West Virginia. ADKINS advised that MUNCY was securing the firearms in question to be stocked as inventory at his son's new gun store.

49. At this point in this interview, ADKINS offered a list of the individuals who are engaged in the illegal distribution of controlled substance(s) in the Logan County, West Virginia area;

- Terry & April Albright – Lives in Curtis, WV and sells prescription medication
- Belva Lusk – Lives in Curtis, WV and sells prescription medication
- Donald "Slick" Bragg – Sells prescription medication
- Terry Hoosier – Lives in Crown, WV, sell prescription medication and Heroin
- Randal & Rick Gene Bragg – Both sell prescription medication
- Steven Rittz – Lives in "Hunky bottom" in Man, WV, sells prescription medication; Rittz traded a large sum of prescription medication to Drew Bias, in exchange for a piece of property on Greenville Road near Man, WV
- Kenneth Newman AKA: "KW" – Sells prescription medication
- Jerry Jackson & Terrell Monroe – Lives in a white house, with a blue metal roof, behind the Man Junior High School. There is a car with Ohio registration routinely parked in the driveway of their residence. There are multiple visitors and "heavy" foot traffic at the residence
- Mark & Stella Copley – In the summer of 2015 purchased a golf cart from UNCLE SAM'S LOANS for three thousand ($3,000) dollars cash. The money reeked of Marijuana

individuals to complete ATF Form 4473's was to enable the firearm transactions to appear as legitamate firearm transactions on the A&D book so the firearms could be sold and paid for as quickly as possible. ADKINS explained that Roger MUNCY wanted to make sure that the firearm inventory at UNCLE SAM'S LOANS was sold and paid for as quickly as possible, which is why the "straw purchaser" scheme was developed. ADKINS again related that the motivation to commit the "straw purchases" in question was not to divert the firearms to prohibited people, but simply to secure payment for the firearms in order to prevent losing a firearm sale.

Sam's Loans. Ellis explained that in 2003 he took over the ownership of Tri-State machine shop. As a way of soliciting business from individuals involved in the Coal industry in the Logan County, West Virginia area Ellis started purchasing knives from Uncle Sam's Loans. Ellis would give these knives away to people at the coal mines in an attempt to solicit business for Ellis' business. Ellis submitted that in addition to the knives, Ellis would occasionally purchase a firearm to give to an individual at the coal mines. Ellis stated that early on, he did not purchase very many firearms, in comparison to the number he purchased in the late 2000's through 2012. Ellis explained that the vast majority of the firearms he purchased during this period of time was purchased to give away to individuals in the coal industry.

4. Ellis submitted that in late 2003 he began paying David Runyon cash as a way to secure work for Ellis' company. Ellis explained that initially, in order to generate cash, Ellis was writing himself company checks and cashing the checks. Ellis advised that it made him uneasy to cash so many checks in his name. As a result, Ellis sought out an alternative method to generate his needed cash flow. Ellis submitted that he solicited Roger Muncy and asked if Muncy would cash business checks for Ellis at Uncle Sam's Loans. Ellis related that at the time, Roger and Louise Muncy were fully aware that Ellis needed a method to generate cash flow in order to continue to secure work at the coal mines. As a result, Roger Muncy agreed to cash Ellis' checks, but Muncy charged Ellis a ten (10%) percent fee for cashing Ellis' checks. Ellis explained that when he needed cash to pay the kickbacks to secure work at the coal mines, Ellis would issue a business check made out to Uncle Sam's Loans. Ellis explained that when he cashed the business checks with Roger Muncy, Ellis was only required to pay a ten (10%) check cashing fee. When Ellis cashed the checks with Louise Muncy, she would require a ten (10%) percent check cashing fee, plus Louise Muncy would charge Ellis sales tax on the transaction.

5. Ellis explained that this scheme to generate a cash flow and traffic firearms evolved from a small number of firearms being diverted to numerous firearms being trafficked from Uncle Sam's Loans and diverted to undocumented individuals. Ellis provided a couple instances that initially came to mind in relation to Uncle Sam's Loans being aware that Ellis was securing firearms for other individuals. Ellis related that there was an occasion approximately in 2004 or 2005 that an individual who was a mine supervisor for Massey Coal in Logan County, West Virginia who wanted a special edition Rocky Mountain Elk Foundation 7mm-08 caliber rifle that was at Uncle Sam's Loans. Ellis related that when Ellis picked up the firearm at Uncle Sam's Loans, Roger Muncy knew that Ellis was buying the firearm for the individual known to Ellis as "Red" who worked at Massey Coal. Ellis noted that he only purchased one (1) firearm that went to "Red", because after giving "Red" the above described firearm, Ellis did not receive any work from Massey Coal.

6. Another individual that Ellis recalled was readily known to Uncle Sam's Loans as an individual who received firearms from Ellis was Brock Atwell. Ellis related that Atwell is from Virginia.

11. Ellis explained that "a couple times" Ellis paid ADKINS for firearms, left the firearms at Uncle Sam's Loans and someone else came and picked up the firearms from ADKINS. Ellis stated that on some of these occasions, the firearms being picked up were documented in the firearms records in somebody else's name. Ellis recalled a "few" times that Ellis paid for firearms, but ADKINS put the firearms on the ATF paperwork in another individual's name. Ellis seemed to remember the firearms being put in a woman and a man's name, but Ellis did not have a vivid recollection of the incident.

12. Ellis stated that this scheme continued to evolve starting in approximately 2010 through 2012. Ellis described that this scheme blossomed to the point that when Ellis showed up at Uncle Sam's Loans, ADKINS would point out the firearms that ADKINS wanted. Ellis stated that these firearms were very expensive. Ellis estimated that he would write a check to cover the cost of the firearms to Uncle Sam's Loans in the amount of as much as fifteen thousand ($15,000) dollars. Ellis stated that there were times that ADKINS picked out the firearms, Ellis wrote the check for amount to cover the firearms retail value, Ellis would then complete the ATF Form 4473 and ADKINS would keep the firearms and give Ellis cash in a smaller amount than the cash value of the check that Ellis wrote. Ellis provided an example of if he wrote a ten thousand ($10,000) dollar check to Uncle Sam's Loans, ADKINS would give Ellis back approximately seven or eight thousand ($7,000 - $8,000) dollars in cash. Ellis estimated that between thirty (30) and forty (40) firearms were documented in this fashion.

13. Ellis advised that there was also approximately four (4) or five (5) occasions when Ellis showed up at Uncle Sam's Loans to cash a check. Ellis stated that on these occasions, ADKINS would have approximately ten (10) to fifteen (15) firearms identified. Ellis would complete the ATF Form 4473's for the firearms ADKINS identified and Ellis gave ADKINS a business check. After this part was complete, ADKINS would assist Ellis with taking the purchased firearms to Ellis's truck. Ellis would then drive over to ADKINS' residence and meet ADKINS. Ellis and ADKINS would then unload the firearms from Ellis' truck and store the purchased firearms in ADKINS' basement. Once this task was complete, ADKINS would then pay Ellis the cash amount that Ellis originally went to Uncle Sam's Loans to obtain. Ellis stated that the only other people who observed ADKINS and Ellis loading firearms into ADKINS'S basement was ADKINS' ex-wife, Beth Adkins and their children. Ellis added that most all of the firearms that were documented in Ellis' name that went to ADKINS were long guns.

14. Ellis related that ADKINS has visited Ellis' home in the past to purchase firearms. Ellis estimates that ADKINS purchased approximately fifty (50) to sixty (60) firearms from Ellis' residence. Ellis stated that ADKINS was "definitely" purchasing the firearms from Ellis in order to re-sale the firearms.

15. Ellis related that he felt like ADKINS was accumulating firearms at ADKINS' residence in order to set up his own store, separate from Uncle Sam's Loans.

22. At the conclusion of the interview, Ellis clarified that when he started dealing with Uncle Sam's Loans, Roger and Louise Muncy both knew what Ellis was doing and why Ellis needed to generate cash. Ellis stated that once Roger Muncy got sick and Ellis started dealing with ADKINS, Louise Muncy was aware that Ellis was conducting the same sort of transactions with ADKINS, on behalf of Uncle Sam's Loans.

the file copy of this report.

4. Initially, Ellis was provided the spreadsheet of his documented firearms purchases. As Ellis reviewed the document, S/A Cunningham instructed Ellis to review the document and identify the firearms listed that Ellis knows he purchased for himself by placing a check mark (√) beside each of the listed firearms that Ellis purchased from UNCLE SAM'S LOANS for himself. Ellis did as instructed and was able to identify forty three (43) firearms listed as being firearms that he purchased for his own personal firearms collection. Ellis related that the forty three (43) firearms he identified, was most all of his personal collection. Ellis went on to explain that once he became prohibited from possessing firearms, he transferred approximately fifty (50) to sixty (60) firearms from his residence to a third party.

5. Once Ellis conclude his identification of the firearms listed on the inventory that he definitely purchased for himself, S/A Cunningham instructed Ellis to identify the firearms that he definitely knows were sold from UNCLE SAM'S LOANS in Ellis' name, but were picked out by, purchased for and delivered to Steven "Noodle" ADKINS. S/A Cunningham related to Ellis that S/A Cunningham was looking to identify the firearms that Ellis previously identified as being the firearms that ADKINS already had picked out for Ellis to appear to purchase and then deliver to ADKINS at ADKINS'S residence. Ellis meticulously went through the inventory of firearms and denoted these firearms by placing an "N" beside the firearms/groups of firearms that Ellis recalls as being listed in Ellis' name, but bought for Steven ADKINS. S/A Cunningham instructed Ellis that if he has a doubt concerning if a firearm was one that ADKINS picked out and received, that Ellis should not mark the firearms. S/A Cunningham emphasized that if Ellis has any doubt, that Ellis should give ADKINS the benefit of the doubt. After Ellis carefully reviewed the firearm inventory, Ellis identified forty three (43) firearms that were purchased on ATF Form 4473's in Ellis' name, but were picked out by ADKINS and delivered to ADKINS' residence. The firearms that Ellis did not mark as being delivered to ADKINS or being purchased by Ellis for his personal collection were definitely not obtained by Ellis. Ellis explained that he did not know who received the unmarked firearms on the firearms inventory, but Ellis suspects that ADKINS also took possession of the firearms.

6. After Ellis completed the review of the inventory list of firearms, Ellis expressed a couple concerns related to the descriptions of some of the firearms listed as being sold to Ellis. First of all, Ellis stated that he noted there were a couple rifles in .30-06 caliber listed in the inventory. Ellis stated that he never would have purchased a .30-06 caliber rifle. Ellis explained that he did not like the .30-06 caliber rifle.

7. Ellis noted that there were two (2) .338 caliber rifles on the firearms inventory. Ellis related that he specifically recalls that he only purchased one (1) .338 caliber rifle. Ellis advised that he purchased the .338 caliber rifle in 2011, filled out the paperwork and that ELLIS never even carried the firearm out UNCLE SAM'S LOANS. Ellis related that when he completed the

explained that after buying the four (4) Colt M-4 rifles, ADKINS came to Ellis' residence and paid Ellis an inflated price in order to buy two (2) of the Colt M-4 rifles. Ellis stated that he believes ADKINS paid him three thousand ($3,000) to three thousand five hundred ($3,500) a piece to buy back two (2) of the Colt M-4 rifles.

12. S/A Cunningham inquired if Ellis sold the M-4 rifle to ADKINS as an individual or to UNCLE SAM'S LOANS. Ellis related that he did not know if ADKINS was buying the firearms himself or on behalf of UNCLE SAM'S LOANS, but Ellis did not complete any paperwork to consummate the transaction.

13. At this point, Ellis related that he noticed that ADKINS always seemed to have a large amount of cash in his pocket. Ellis stated that he owned his own business and that Ellis made a great deal of money, but ADKINS always seemed to have more money in his pocket than Ellis. Scott Ellis related that he figured that ADKINS made ten ($10) to twelve ($12) dollars per hour working at UNCLE SAM'S LOANS, which was why Ellis was puzzled about how ADKINS was able to carry such a large amount of cash, unless the cash belonged to Roger MUNCY.

14. Ellis related that he spoke to ADKINS when ADKINS was considering buying an interest of UNCLE SAM'S LOANS, with the intentions of ultimately buying the MUNCY'S out of UNCLE SAM'S LOANS. Ellis advised that he understands that Roger and Louise MUNCY are board members of the Bank of Mingo. As a result, the MUNCY'S were able to push through a loan for ADKINS to be able to purchase an interest in UNCLE SAM'S LOANS. Ellis submitted that ADKINS told him that the MUNCY'S were able to get ADKINS a three hundred thousand ($300,000) dollar loan. In turn, ADKINS paid the three hundred thousand ($300,000) dollars to Roger and Louise MUNCY. Ellis related that ADKINS explained to him that ADKINS would pay the loan debt off by working at UNCLE SAM'S LOANS. Ellis added that it was a win for the MUNCY'S because if ADKINS defaulted on the loan, the MUNCY'S would maintain the ownership of UNCLE SAM'S LOANS, as well as the three hundred thousand ($300,000) dollars that ADKINS originally paid for his interest in the business.

15. Ellis advised that after reviewing the list of firearms provided, Ellis is able to discern that in 2010 was when ADKINS began picking out the firearms to be placed on Ellis' ATF Form 4473's. These were the same firearms that after the paperwork was completed, Ellis would deliver to ADKINS' residence, receive his cash payments that were used to facilitate his payments at Mt. Laurel to assure that Ellis' company was hired to perform work at the mine. Ellis related that he definitely delivered more firearms from UNCLE SAM'S LOANS to ADKINS' residence than are listed on the firearms inventory supplied.

16. Ellis noted that a Sig Sauer handgun was listed on the firearm inventory. Ellis advised that the only Sig Sauer pistol he recalls buying was a .40 caliber pistol for David Runyon. Ellis related

release, just like Ellis.  One of the terms of Ellis' release was that he could not possess a deadly weapon, like a compound bow and arrow.  Ellis stated that Herndon has been shooting his compound bow and has been going deer hunting with his compound bow.  Ellis related that he did not think it was right that Herndon could enjoy hunting and shooting a compound bow and Ellis was not permitted to partake in similar activities.  S/A Cunningham related that he would share the information with the United States Attorney's office.

Attachment: Spreadsheet of Scott Ellis Purchases

that in 2008, Melinda Boyd was the firearms manager at Uncle Sam's. Not long after Noel started working at Uncle Sam's Loans, Muncy was planning on promoting Boyd to a General Manager position at Uncle Sam's Loans. Noel stated that ADKINS realized that if BOYD became the General Manager that ADKINS would not be able to obtain the position he desired as part owner in Uncle Sam's Loans. As a result, ADKINS set up Boyd to make it look like Boyd stole a sum of money from Uncle Sam's Loans. Noel advised that in reality, ADKINS stole the money, but made it look like Boyd was responsible. Ultimately, Boyd quit Uncle Sam's Loans and ADKINS was elevated to the position of partial owner in Uncle Sam's Loans.

4. Noel advised that when he started working with Muncy and ADKINS he told ADKINS that Noel was addicted to pain pills. In addition to Noel advising ADKINS of his addiction, Noel's father also informed ADKINS that Noel was addicted to drugs. Noel explained that the entirety of the time he worked with ADKINS, Noel was addicted to prescription pain medicine. Noel advised that he is now being treated for his addiction and is prescribed Suboxone to treat his addiction.

5. Noel explained that when Boyd was the firearms manager at Uncle Sam's Loans, ADKINS started a scam to have straw ATF Form 4473's completed in order to divert firearms to the secondary market. Noel stated that ADKINS was initially very subversive in this practice because ADKINS believed that Boyd would have turned ADKINS in for breaking the law. Once Boyd was no longer employed at Uncle Sam's Loans, ADKINS became more brazen in this criminal practice. Noel estimated that in approximately 2010 ADKINS had this scheme up and running on a pretty large scale. Noel explained that ADKINS began paying people to complete and sign ATF Form 4473's. ADKINS would then divert the firearms from a legitimate firearms transaction after the NICS check was returned. These firearms were funneled to prohibited individuals, as well as individuals who did not desire to have the firearms "registered in their name."

6. At this point, S/A Cunningham inquired why ADKINS would go to the trouble of conspiring with and paying people to complete straw ATF Form 4473's, when many of the people receiving the firearms were not prohibited. Noel explained the majority of the people who we not prohibited that obtained the diverted firearms did so because they were giving the firearms away as gifts to people involved in the coal business. Noel estimated that ADKINS had approximately twenty (20) different people who ADKINS directed Noel to deliver firearms. Noel identified the following individuals who definitely obtained some of these diverted firearms, just so they could give the firearms away to employees, customers and others associated with the coal business; Scott JOHNSON, Matt JUSTICE, Trampas SHANNON, the owner of Reno's in Logan, West Virginia, Stoney WHITE, the owner of American Hydraulics, Kenny MORGAN and Paul COLLINS of Pineville Machine Services. Noel continued and explained that there were others who received these firearms and if Noel recalls their names he will contact S/A Cunningham. Noel continued and explained that most of the aforementioned

ATF EF 3120.2 (10-2004)
For Official Use Only

a sum of money for each firearms listed on the form. Noel continued and explained that usually, ADKINS would already have the ATF Form 4473 completed when the individuals showed up at Uncle Sam's Loans. All the straw purchasers would be required to do was simply sign their names and collect their fees from ADKINS. Noel added that Christina Deer-Miller and her daughter, Brittany Browning both probably completed the ATF Form 4473's at the direction of ADKINS, but Noel never did observe either of them complete the forms.

12. S/A Cunningham asked for Noel to identify the individuals that ADKINS knew was prohibited, but ADKINS knowingly provided firearms. Noel stated that first of all, he was a drug addict and ADKINS provided him hundreds, if not thousands of firearms to deliver to people. In addition to himself, Noel stated that Clifford Mullins' uncle "Rocky" Mullins is a convicted felon. Noel explained that he knows that Rocky Mullins paid ADKINS an additional fifty ($50.00) dollars in order to secure a firearm from ADKINS. Noel identified Ralph Caudill as being an illegal drug user. Noel stated that he does not know if Ralph Caudill ever obtained a firearm from ADKINS, but he certainly did complete ATF Form 4473's at the direction of ADKINS.

13. Noel stated that Mickey Shawn Caudill obtained firearms from ADKINS. Noel was not sure if Mickey Shawn Caudill obtained the firearms from ADKINS before or after he was convicted of a felony. Noel stated that ADKINS did provide firearms to Mickey Caudill Sr. after Caudill Sr. was a convicted felon. Noel related that he does not know whose name the firearms were sold under that went to Mickey Shawn Caudill and Mickey Caudill Sr.

14. Noel related that in approximately 2012 through 2013 ADKINS directed Noel to deliver a quantity of firearms to Jim GRIMMETT on approximately three (3) or four (4) separate occasions. S/A Cunningham inquired about the circumstances surrounding the firearms deliveries to Jim GRIMMETT. Noel explained that ADKINS told Noel to pull his truck around the back of Uncle Sam's Loans. When Noel got to the rear of Uncle Sam's Loans, ADKINS brought out several firearms and loaded them in Noel's truck. ADKINS directed Noel to deliver the firearms to Jim GRIMMETT at GRIMMETT'S residence and to tell GRIMMETT that ADKINS would get with GRIMMETT at a later time to even up for the firearms in question. Noel related that he did as directed. Noel explained that each time he arrived at GRIMMETT'S residence, Jim GRIMMETT met him in the driveway. Noel explained that he unloaded the firearms, gave the firearms to GRIMMETT and departed.

15. Noel stated that the last time he delivered firearms from Uncle Sam's Loans to Jim GRIMMETT, Noel delivered two (2) Kimber pistols, a Remington model 700, .243 caliber rifle and a Browning A-Bolt, .270 caliber rifle.

16. S/A Cunningham inquired if Noel was aware if GRIMMETT'S brother, Rick Grimmett would buy firearms in his name in order to provide the firearms to his brother, Jim GRIMMETT. Noel

was occasions that ADKINS provided Noel firearms to deliver to Morgan.  Noel recalled that the last firearm he delivered to MORGAN was a limited edition, .22 caliber lever action rifle.  Noel stated that he completed the ATF Form 4473 in his name for this particular firearm.  Noel explained that right around the time that ADKINS was going through his divorce, ADKINS started getting supplied Marijuana and Cocaine (HCL) from MORGAN.  Noel stated that ADKINS consumed the Marijuana and sold the Cocaine (HCL).  At this point, Noel explained that ADKINS was not making very much money working at Uncle Sam's Loans.  Noel stated that despite ADKINS' meager wages, ADKINS purchased a big, nice home, with a pool in South Man, West Virginia.

ATF EF 3120.2 (10-2004)
For Official Use Only

Title of Investigation
Uncle Sam's Loan

Case 2:16-cv-12549   Document 1-1   Filed 12/23/16   Page 181 PageID #: 150

Investigation Number
778020-18-0120

Report Number
6

totality of firearms depicted in the Multiple Sale Reports total thirteen (13) firearms. A copy of each of the identified Multiple Sales Reports shall be attached to the file copy of this report. After reciting the aforementioned thirteen (13) firearms in question, S/A Cunningham inquired if West recalled purchasing the firearms. West stated that he did not purchase any of the firearms in question. S/A Cunningham inquired of West if he did not purchase the firearms in question, how did the Multiple Sale Reports have West listed as the purchaser of each of the firearms. West explained that on each of the above incidents, West received a telephone call from his ex-brother-in-law, Steven Lamar "Noodle" ADKINS, who works at and is a partial owner of Uncle Sam's Loans. West continued and explained that ADKINS requested that West visit Uncle Sam's Loans and execute the ATF Form 4473 forms by affixing his signature. West advised that in return for signing the forms in question, ADKINS paid West twenty ($20.00) dollars per executed ATF Form 4473. West continued and explained that on each occasion he was contacted by ADKINS to sign an ATF Form 4473, the form was already filled out by ADKINS when West arrived. West stated that he simply signed his name on the form and collected his fee from ADKINS. West submitted that he knows that his actions were wrong, but receiving twenty ($20.00) dollars from ADKINS simply for signing his name was hard to pass up since West was unemployed at the time. West estimated that he signed ATF Form 4473's at the direction of ADKINS approximately four (4) to five (5) times.

5. West stated that the only individual he has definitely heard of that also filled out ATF Form 4473's in exchange for payment from ADKINS was Shane Noel. West stated that he does not know the names of the other people ADKINS utilized to falsely complete ATF Form 4473's, but West stated that he understands that ADKINS utilizes several different "crackheads" and drug users to sign ATF Form 4473's. As the interview progressed, West stated that he understands that Matt Ellis, a chiropractor in Man, West Virginia may have also signed false ATF Form 4473's at the request of ADKINS.

6. West explained that he only quit signing the ATF Form 4473's for ADKINS because West's driver's license expired and that ADKINS and West's sister, Beth Adkins got divorced. In addition, in approximately April 2013 West related that he started working a regular job. As a result of these circumstances, ADKINS quit soliciting West to sign ATF Form 4473's in exchange for payment.

7. S/A Cunningham inquired of West who could authenticate that ADKINS completed ATF Form 4473's and paid West to sign each form. West stated that there were other Uncle Sam's Loans employees present on the occasions ADKINS solicited West to sign fraudulent ATF Form 4473's. West identified the Uncle Sam's Loans employees as Phillip Gillespie, Eric Allen and Brent (LNU).

8. S/A Cunningham inquired if West knew what happened to the firearms listed on the above described Multiple Sale Reports. West stated that he was not positive, but West understood that

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Uncle Sam's Loans | 775020-15-0120 | 10 |

## SUMMARY OF EVENTS:

Interview of Christina Michelle Deer-Miller

## NARRATIVE:

1. On Wednesday, July 8, 2015 at approximately 1555 hours, Special Agent (S/A) G. Robert Cunningham located Christina Michelle Deer-Miller, a white, female, Date of Birth: 5-6-1971, Social Security Number: ████████, of ████████ ████████████████████, ████████, ████████, phone: ████████. Deer-Miller was walking south along West Virginia Route 10, near the unincorporated community of Crown, West Virginia. At this time, S/A Cunningham stopped his Government Owned Vehicle (GOV), and spoke with Deer-Miller. Immediately, S/A Cunningham verbally identified himself as a Special Agent with ATF and subsequently displayed his ATF issued credentials and badge for Deer-Miller's visual inspection. After Deer-Miller visually inspected S/A Cunningham ATF issued credentials, Deer-Miller related that she was willing to submit to an interview with S/A Cunningham, but Deer-Miller was late for work. S/A Cunningham offered to provide Deer-Miller a ride the remaining distance to her place of employment. Deer-Miller accepted and while traveling to Deer-Miller's job site, S/A Cunningham initiated the interview in question.

2. Upon arrival at Deer-Miller's place of employment, Deer-Miller indicated that she needed to tell her employer that she was meeting with S/A Cunningham in the parking lot and that she would report to work at the conclusion of the interview.

3. Once this task was complete, Deer-Miller returned to S/A Cunningham's GOV and indicated that she was prepared to commence with the interview in question.

4. S/A Cunningham inquired if Deer-Miller has ever purchased any firearms. Deer-Miller related

| Prepared by: Guy R. Cunningham | Title: Special Agent, Charleston Field Office | Signature: | Date: |
|---|---|---|---|
| Authorized by: Lissa G. Jordan | Title: Resident Agent in Charge, Charleston Field Office | Signature: | Date: |
| Second level reviewer (optional): Stuart L. Lowrey | Title: Special Agent in Charge, Louisville Field Division | Signature: | Date: |

EXHIBIT

10-2004)
Only

| Title of Investigation:<br>Uncle Sam's Loans | Investigation Number:<br>775020-15-0120 | Report Number:<br>10 |
|---|---|---|

already completed.  Deer-Miller advised that she had to sign her name two (2) or three (3) different occasions on that particular occasion.

8. Deer-Miller related that she did not know if her daughter, Brittany Browning ever completed the ATF Form 4473's for ADKINS.  Deer-Miller explained that she did not doubt if Browning would have signed the forms, especially if ADKINS was paying people to execute the forms. Deer-Miller added that if Browning did complete ATF Form 4473's for ADKINS that her boyfriend at the time, Ricky Gene Grimmett would have also completed the forms for ADKINS.

9. Deer-Miller related that Shane Noel told her that he also completed ATF Form 4473's at the direction of ADKINS.  Deer-Miller advised that Noel told her that he completed several ATF Form 4473's for ADKINS.  Deer-Miller also stated that Noel informed her that ADKINS got Noel in some sort of trouble over a firearm.  Deer-Miller did not know the specifics of this incident, other than what Noel told her.  Deer-Miller added that Noel told her that since ADKINS got him in trouble, ADKINS has stopped having Noel fill out ATF Form 4473's for other people to obtain firearms.

10. At the conclusion of the interview, S/A Cunningham asked Deer-Miller to try and think of any person(s) who could verify the process Deer-Miller described concerning the instances where Deer-Miller completed ATF Form 4473's at the direction of ADKINS.  Deer-Miller stated that her daughter, Brittany Browning was with her once or twice when Deer-Miller completed the ATF Form 4473's.  In addition, Deer-Miller related that she recalls an employee named "Eric" who was working at Uncle Sam's Loans with ADKINS on one (1) or more of the occasions Deer-Miller completed the fraudulent ATF Form 4473's.

11. Deer-Miller added that she recalls that she initially started completing the ATF Form 4473's around the same time period as when ADKINS was in the process of moving from Accoville, West Virginia to his current residence in South Man, West Virginia.  Deer-Miller reiterated that she only completed these ATF Form 4473's at the direction of ADKINS for a "couple months" and then ADKINS never requested Deer-Miller's assistance again.

ATF EF 3120.2 (10-2004)<br>For Official Use Only

| Title of Investigation: Uncle Sam's Loans | Investigation Number: 775020-15-0001 | Report Number: 1 |
|---|---|---|

4. Vest reiterated that she has never purchased a firearm. Vest added that she could not afford to buy any of the above described firearms.

5. Vest related that she previously rented an apartment from Roger Muncy, the owner of Uncle Sam's Loans. In addition, Vest stated that approximately three (3) to four (4) years ago Vest's boyfriend, Clifford Mullins worked at Uncle Sam's Loans. Vest stated that Mullins ultimately got fired from his position as a result of being accused of stealing. Vest held that Scotty "Noodle" Adkins, who is a part owner in Uncle Sam's Loans, was the individual who was actually stealing the merchandise.

6. Vest confirmed that she supplied her personal identifiers to Muncy when she rented the apartment from Muncy. Vest suspects that Muncy obtained her personal identifiers from the rental papers she completed.

7. Vest stated that while her boyfriend was working at Uncle Sam's Loans Adkins asked Vest to fill out some paperwork like she was making a firearms purchase. Vest stated that she denied Adkins' request and until recently when she found out that the aforementioned firearms were "in her name" did she ever suspect anything about Adkins' request.

8. Vest related that while she was a renter of Muncy's, one of the employees at Uncle Sam's was Melinda Fields. Vest estimated that Fields worked at Uncle Sam's Loans in excess of ten (10) years. Vest stated that she understands that Fields got fired from Uncle Sam's Loans because Fields was going to tell ATF about several unscrupulous acts that Muncy was doing in conducting his firearm business.

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Uncle Sam's Loans | 775020-15-0001 | 3 |



4. At this time, S/A Cunningham provided Vest with a blank ATF Form 4473 and requested that Vest complete the document in her own handwriting. Once Vest completed this task, S/A Cunningham collected the first writing sample. S/A Cunningham provided Vest with another blank ATF Form 4473 and requested that Vest again complete the ATF Form 4473. After this task was complete, S/A Cunningham collected the second exemplar and repeated the same process a third time. After the third writing exemplar was secured, S/A Cunningham provided Vest with copies of two (2) ATF Form 4473's that were obtained from Uncle Sam's Loans. These ATF Form 4473's are identified as NICS Transaction Number(s): 1T3X-XMB and 1SRB-7LX. The known handwriting exemplars are identified as "Sample #1, Sample #2, Sample #3" and each has S/A Cunningham's initials "GRC" at the top of each exemplar. The original of these documents shall be attached to the file copy of this report.

5. After reviewing the two (2) ATF Form 4473's obtained from Uncle Sam's Loans, Vest conceded that she had filled out both of the ATF Form 4473's in question. Vest explained that during the time period that the ATF Form 4473's were completed, Vest was renting an apartment from Roger Muncy, the principal owner at Uncle Sam's Loans in Man, West Virginia. In addition, Vest related that during the time period in question, Vest was unemployed and that Steve "Noodle" ADKINS was simply an employee at Uncle Sam's Loans. Vest explained that at some point, ADKINS became a business partner of Muncy and part

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation:<br>Uncle Sam's Loans | Investigation Number:<br>775020-15-0001 | Report Number:<br>3 |
| --- | --- | --- |

11. In the process of preparing this typed interview, S/A Cunningham reviewed a West Virginia State Police Case Study Report and an Memo of Interview Report of Chad Lusk. Each of these documents contain pertinent criminal intelligence associated with Uncle Sam's Loans in Man, West Virginia. As a result, each of these items shall be attached to the file copy of this report.

Attachments:    Three (3) handwriting exemplars
Two (2) ATF 4473's
WVSP Case summary
WVSP Chad Lusk interview

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation: Uncle Sam's Loans | Investigation Number: 775020-15-0120 | Report Number: 5 |
|---|---|---|

were shown in the A&D Book at Uncle Sam's Loans as going to Noel, but ADKINS diverted those firearms to ELLIS or JUSTICE. Mullins estimated that he first observed ADKINS having Noel complete ATF Form 4473's in order to provide firearms to other people in approximately 2009 or 2010.

4. Mullins stated that in addition to working at Uncle Sam's Loans, ADKINS runs a black market sporting goods business out of ADKINS' residence. Mullins advised that ADKINS has several thousand rounds of ammunition, a plethora of firearms, compound bows and various other items associated with hunting that ADKINS sells from his residence. Mullins explained that ADKINS has individuals who steal ammunition, hunting broad heads, as well as other items associated with outdoor activities. These individuals bring the stolen property to ADKINS, who either sells the items from his residence or he sells the items from Uncle Sam's Loans. Mullins explained that he has watched ADKINS bring in a box of stolen broad heads, stock them as inventory at Uncle Sam's Loans and then credit his account for the retail cost of the stolen broad heads that he stocked as inventory. Mullins related that much of the stolen property ADKINS takes in is stolen from Gander Mountain in Beckley and Charleston, West Virginia. Mullins identified some of the individuals who provide ADKINS with stolen property as Anthony COPLEY and Gary WHITT.

5. Mullins advised that the way he found out about the scheme that Noel and ADKINS had with Noel falsely completing ATF Form 4473's was that Mullins purchased a set of broad heads from ADKINS, at ADKINS' residence for a much discounted rate than the employees paid at Uncle Sam's Loans. After this purchase, Mullins became more knowledgeable about the different criminal schemes that ADKINS was involved. Mullins stated that after this purchase, ADKINS informed Mullins that the firearms listed on Shane Noel's ATF Form 4473's was being diverted to Scott ELLIS and Matt JUSTICE. Mullins explained that after observing Noel complete the ATF Form 4473's at ADKINS' direction and ADKINS' statement that the firearms listed on Noel's ATF Form 4473's were being diverted to JUSTICE and ELLIS, confirmed Mullins's suspicion of ADKINS' illegal criminal activity.

6. Mullins stated that he does not know of a specific instance where ADKINS diverted a firearm from Uncle Sam's Loans to a prohibited person, but Mullins believes it has happened. Mullins advised that his uncle, Rocky Mullins, who is prohibited from possessing firearms, told Mullins that if he wants a gun all he has to do is pay ADKINS an extra fifty ($50.00) dollars and Rocky Mullins would be able to purchase the firearm from ADKINS. S/A Cunningham encouraged Mullins to speak with his uncle and arrange a meeting with Rocky Mullins and S/A Cunningham.

7. Mullins identified Phillip Gillespie, Thomas Riley and Melinda Boyd as employees who worked at Uncle Sam's Loans during Mullins' term of employment. Mullins suggested that S/A Cunningham interview each of the individuals listed. Mullins stated that Gillespie still

ATF EF 3120.2 (10-2004)
For Official Use Only

,U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: Uncle Sam's Loans | Investigation Number: 775020-15-0120 | Report Number: 8 |
|---|---|---|

## SUMMARY OF EVENTS:

Interview of Stephen Brent Herndon

## NARRATIVE:

1. On Thursday, June 25, 2015 at approximately 1400 hours, FBI Special Agent Sherry Payette, AUSA Meredith Thomas, USAO Investigator Steve Rowley and Special Agent (S/A) G. Robert Cunningham conducted an interview at the United States Attorney's Office (USAO) in Charleston, West Virginia with Stephen Brent HERNDON, a white, male, Date of Birth: 2-13-1977, Social Security Number: ██████████, of ████████████████████████. This interview was conducted pursuant to a signed plea agreement between HERNDON and the United States of America.

2. Upon initiation of the interview, AUSA Thomas explained to HERNDON that his attorney was aware of the interview in question and that his counsel was unable to attend the interview. HERNDON conceded that that he was comfortable with speaking to the representatives of the United States Government without his attorney. In addition, AUSA Thomas directed HERNDON to immediately stop the interview if any questions posed to him created any uneasiness and arrangements would be made to continue the interview in the future, after HERNDON had consulted his attorney. HERNDON reiterated that he was comfortable with continuing the interview in question and that he would definitely advise if he believed he needed to speak to his attorney.

3. The initial part of this interview dealt with questions surrounding the financial investigation involving a charged "kickback" scheme involving several individuals doing business with Arch Coal. The minutia of this portion of HERNDON'S interview were documented by S/A Payette and shall be memorialized in an FBI 302.

| Prepared by: Guy R. Cunningham | Title: Special Agent, Charleston Field Office | Signature: | Date: |
|---|---|---|---|
| Authorized by: Lissa G. Jordan | Title: Resident Agent in Charge, Charleston Field Office | Signature: | Date: |
| Second level reviewer (optional): Stuart L. Lowrey | Title: Special Agent in Charge, Louisville Field Division | Signature: | Date: |

EXHIBIT

(10-2004)
e Only

| Title of Investigation: Uncle Sam's Loans | Investigation Number: 775020-15-0120 | Report Number: 8 |
|---|---|---|

problems, ELLIS started going directly to ADKINS to complete the money laundering transactions.

8. HERNDON related that ELLIS obtained several firearms from Uncle Sam's Loans. HERNDON estimated that ELLIS had approximately forty (40) firearms stored at his residence, prior to his felony conviction. HERNDON explained that ELLIS routinely gave firearms to people who worked at the different coal mines. HERNDON stated that ELLIS has given HERNDON a firearm in the past. HERNDON described the firearms ELLIS distributed as being "new in the box". HERNDON also identified Gary Griffith, Jason Stratton and Brock Atwell as being individuals who ELLIS gave firearms.

9. HERNDON stated that ADKINS was also running a business out of ADKINS' residence. HERNDON stated that ADKINS sold the exact same merchandise that was for sale at Uncle Sam's Loans, except that the merchandise was marked down a couple hundred dollars less than you were able to buy at Uncle Sam's Loans. HERNDON explained that a specific compound bow costs eight hundred ($800) dollars at Uncle Sam's Loans. ADKINS sold the same compound bow, brand new, for six hundred ($600) dollars. HERNDON related that in approximately 2010-11, HERNDON purchased a compound bow from ADKINS' residence. In addition to HERNDON purchasing a compound bow from ADKINS' residence, HERNDON stated that Bucky Sergeant purchased a new compound bow from ADKINS at ADKINS' residence.

10. As this interview concluded, HERNDON advised that ELLIS was the individual who originally provided HERNDON with the information concerning ADKINS and Uncle Sam's Loans. HERNDON suggested that S/A Cunningham speak with ELLIS in order to garner additional information concerning ADKINS and Uncle Sam's Loans.

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation: Uncle Sam's Loans | Investigation Number: 775020-15-0120 | Report Number: 32 |
|---|---|---|

4. Blair stated that when she started working at Uncle Sam's Loans, her son, Steven Lamar ADKINS was a clerk at the store. In addition, Blair identified Melinda Boyd as the store manager and Phillip Gillespie as another clerk at Uncle Sam's Loans. Blair explained that it was Boyd's responsibility to train Blair concerning how to properly sell firearms. Blair stated that in addition to Boyd training Blair, Phillip Gillespie also was involved in training Blair concerning the proper way to conduct firearm sales. At this time, S/A Cunningham asked Blair several questions concerning the process she followed when selling a firearm. During this portion of the interview, Blair informed S/A Cunningham that she last worked at Uncle Sam's Loans in approximately 2012, but Blair still knows the ATF Form 4473 "like the back of my hand." Blair indicated that during her period of employment with Uncle Sam's Loans, she has been involved in numerous firearms transactions. At this time, Blair recited a lengthy number that Blair represented to be the ATF Federal Firearms License Number for Uncle Sam's Loans. S/A Cunningham inquired why her son, ADKINS did not train her in the proper way to conduct firearms transactions. Blair stated that ADKINS was always too busy to instruct her. Blair submitted that she and ADKINS have a strained relationship.

5. At this time, S/A Cunningham questioned Blair concerning several firearms transactions involving Scott Ellis and Shane Noel where Blair signed the form as the individual conducting the transaction. Blair related that she does not recall Ellis, but stated that if she signed the ATF form 4473 that she conducted the firearm sale. Blair related that she knows Noel and that she recalls selling him firearms. Blair confirmed that "a couple years ago" a friend of Blair's told her that Noel was a drug addict. Blair continued and advised that Noel's father, Norman Noel also informed Blair that Shane Noel was addicted to drugs.

6. Blair denied that ADKINS or anyone else ever asked Blair to just sign an ATF Form 4473, without the listed purchaser actually being the individual taking possession of the firearm(s). Blair stated that every time she signed an ATF Form 4473 as the person conducting the firearms transaction, Blair observed the listed purchaser exit the store with the firearm. Blair held that she does not know of any illegal firearms transactions taking place at Uncle Sam's Loans. S/A Cunningham inquired if Blair ever attempted to conduct a firearms transaction and the individual purported to be purchasing the firearm was denied by the NICS Center. Blair stated that she does not recall anyone she sold firearms being delayed or denied the firearm transaction.

7. Blair stated that she was not aware that Shane Noel ever worked at Uncle Sam's Loans. Blair related that Noel must have worked at Uncle Sam's Loans after Blair quit working at Uncle Sam's Loans. Blair stated that she quit working at Uncle Sam's Loans due to her deteriorating health.

ATF EF 3120.2 (10-2004)
For Official Use Only

U.S. Department of Justice                          **Report of Investigation**
Bureau of Alcohol, Tobacco, Firearms and Explosives

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Uncle Sam's Loans | 775020-15-0120 | 7 |

## SUMMARY OF EVENTS:

Interview of Elizabeth Ann Adkins

## NARRATIVE:

1. On Tuesday, June 23, 2015, at approximately 1440 hours, Special Agent (S/A) G. Robert Cunningham traveled to the Rite Aid Pharmacy on Huff Creek Road in Man, West Virginia in an attempt to locate and interview Elizabeth Ann Adkins, a white, female, Date of Birth: 8-1-1977, Social Security Number: ███████, ████████████████████████████, phone: ████████████.

2. Upon arrival, S/A Cunningham was greeted by Adkins.  Initially, S/A Cunningham verbally identified himself as a Special Agent with ATF and subsequently displayed his ATF issued credentials and badge for Adkins' visual inspection.  After Adkins visually inspected S/A Cunningham ATF issued credentials, Adkins related that she was willing to submit to an interview with S/A Cunningham.

3. At this time, S/A Cunningham and Adkins proceeded to S/A Cunningham's ATF issued GOV in order to commence with the interview in question.  Adkins initially related that she was expecting S/A Cunningham to come speak with her.  Adkins continued and explained that she has already spoken to her brother, Brian "Gummy" West and Clifford Mullins, who both advised Adkins that S/A Cunningham had interviewed them concerning Uncle Sam's Loans and Steven ADKINS.

4. Adkins confirmed that she and Steven "Noodle" ADKINS, phone ██████████████, were married, have two (2) children together and have been divorced for a little bit more than one (1) year.  Adkins continued and submitted that she previously was employed at Uncle Sam's Loans

| Prepared by: Guy R. Cunningham | Title: Special Agent, Charleston Field Office | Signature: | Date: |
|---|---|---|---|
| Authorized by: Lissa G. Jordan | Title: Resident Agent in Charge, Charleston Field Office | Signature: | Date: |
| Second level reviewer (optional): Stuart L. Lowrey | Title: Special Agent in Charge, Louisville Field Division | Sig | Date: |

EXHIBIT

120.2 (10-2004)
...nal Use Only

| Title of Investigation:<br>Uncle Sam's Loans | Investigation Number:<br>775020-15-0120 | Report Number:<br>7 |
|---|---|---|

related that she knows that Steven ADKINS has provided firearms to Jim GRIMMETT, who is a convicted felon. Adkins explained that Jim GRIMMETT would come into the store and pick out a specific firearm that he wanted. As a result, Steven ADKINS would set the firearm aside and wait for GRIMMETT'S brother, Rick Grimmett to come into the store. At this time, Rick Grimmett would complete the ATF Form 4473, as the purchaser of the firearm Jim GRIMMETT had picked out. After Rick Grimmett's NICS check was complete, Rick Grimmett would depart with the firearm in question. Adkins added that Rick Grimmett does purchase firearms for himself at Uncle Sam's Loans, but he also completes the form and takes the firearms from Uncle Sam's Loans that Jim GRIMMETT had picked out and had set aside until Rick Grimmett could secure the firearm(s) in question on behalf of Jim GRIMMETT. Adkins related that Rick Grimmett lives in a double wide trailer beside the car wash on Huff Creek in Man, West Virginia.

8. At this time, S/A Cunningham asked Adkins to identify the people she personally knows of that has completed ATF Form 4473's at the direction of Steven ADKINS in exchange for money. Adkins stated that she observed Christy Vest, Brian West, Shane Noel, Brittany Browning and Browning's mother, Christine (LNU) each complete ATF Form 4473's at the direction of Steven ADKINS, at Uncle Sam's Loans. Adkins related that Browning is addicted to prescription medication and described Browning as "a pill head".

9. Adkins stated that Donna Vest, of Buffalo Creek Road routinely borrowed money from Steven ADKINS, so Adkins believes that Vest would have completed ATF Forms at the direction of Steven ADKINS, but Elizabeth Adkins has not observed Vest complete any ATF Form 4473's.

10. S/A Cunningham inquired about what benefit Steven ADKINS has to causing false ATF Form 4473's to be completed, only to provide the firearms listed on the ATF Form 4473 to people who are not prohibited from possessing firearms. Adkins explained that a great number of the firearms listed on the false ATF Form 4473's leave Uncle Sam's Loans and are taken over to ADKINS' house, where Steven ADKINS sells them for a profit. Adkins explained that the people associated with the coal companies would come to Uncle Sam's Loans and pick out the firearms. They would not want the purchase to be tied to the individual picking up the firearms, so the receipt for the firearms would not show the purchase of a firearm, but would show the purchase of mining boots or some other non-firearm product. The sale price of the firearm would be undervalued on the bogus receipt and the firearm descriptions would be added to the false ATF Form 4473's. Once this was complete, the ATF Form 4473 was submitted to the NICS Center and the individual making the purchase would leave with the purchased firearms. Adkins continued and stated that the purchaser of the firearms would often deliver several, if not all of the firearms to Steven ADKINS at his residence, where ADKINS purchased the firearms back at the discounted price. ADKINS then sold the firearms from his unlicensed, pseudo-firearms business that he runs out of his residence. ADKINS sold these firearms cheaper than retail, but for a profit from what he had in each firearm.

ATF EF 3120.2 (10-2004)<br>For Official Use Only

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| Uncle Sam's Loans | 775020-15-0120 | 7 |

ADKINS and subsequently placed a consensual telephone call to Louise Muncy during the interview.

15. On this same date, at approximately 1510 hours the interview was stopped so Adkins could return to work without being docked any money.  Adkins indicated that she was amicable to continuing this interview in the future.

ATF EF 3120.2 (10-2004)
For Official Use Only

| Title of Investigation: Uncle Sam's Loans | Investigation Number: 775020-15-0120 | Report Number: 37 |
|---|---|---|



2. Upon reviewing the map, S/A Cunningham was able to discern that the residential address for Roger and Louise Muncy, 914 Hensley Heights Road Man, West Virginia is clearly located outside of the boundaries of the City of Man, West Virginia.  A visual delineation of the location of the Muncy's residence compared to the City Limits of Man, West Virginia are

ATF EF 3120.2 (10-2004)
For Official Use Only

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation:<br>Uncle Sam's Loans | Investigation Number:<br>775020-15-0120 | Report Number:<br>41 |
|---|---|---|

## SUMMARY OF EVENTS:

Distance estimate from 914 Hensley Heights Road Man, West Virginia to the nearest Municipal boundary of the City of Man, West Virginia

## NARRATIVE:

1. On Thursday, October 8, 2015 at approximately 1145 hours, Special Agent (S/A) G. Robert Cunningham initiated an approximate distance estimate from 914 Hensley Heights Road, Man, West Virginia (Muncy residence) to the closest City Limit boundary for the Municipality of Man, West Virginia.

2. S/A Cunningham initiated this measurement by resetting the trip odometer on his assigned Government Owned Vehicle (GOV) to zero while being situated directly in front of 914 Hensley Heights Road Man, West Virginia. Once this task was complete, S/A Cunningham traveled north on Hensley Heights Road, to the intersection at Greenville Road. At this intersection, S/A Cunningham turned west (left) onto Greenville Road and then north (right) onto East McDonald Road. At the intersection of East McDonald Road and Rockhouse Creek Road, S/A Cunningham turned east (right) onto Rockhouse Creek Road and traveled east to the intersection of Rockhouse Creek Road and West Virginia Route 80 (Mingo Highway), which is the approximate location of the nearest boundary of City of Man, West Virginia to the residence of Roger MUNCY of 914 Hensley Heights Road (Muncy residence) Man, West Virginia. Upon reaching this intersection, S/A Cunningham stopped his assigned GOV and observed that the trip odometer indicated that S/A Cunningham had traveled 0.4 miles from 914 Hensley Heights Road Man, West Virginia.

| Prepared by:<br>Guy R. Cunningham | Title:<br>Special Agent, Charleston Field Office | Signature: | Date: |
|---|---|---|---|
| Authorized by:<br>Lissa G. Jordan | Title:<br>Resident Agent in Charge, Charleston Field Office | Signature: | Date: |
| Second level reviewer (optional):<br>Peter A. Pappas | Title:<br>Acting Special Agent in Charge, Louisville Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

Mr. Stephen Adkins
Uncle Sams Loans, Inc.

2

into the A&D Record. Also, you are acquiring a new computer program to assist you with the A&D record.

Regarding violation #4, involving the failure to distribute the Youth Handgun Safety Act Notices, you stated notices are currently available and, you are distributing the notices to non-licensee purchasers of handguns.

Regarding violation #5, involving change in control for Mr. Steven Adkins, you stated a photo id, fingerprint card, and written notification were forwarded to ATF licensing.

The violations for which you were cited could adversely impact law enforcement's ability to reduce violent crime and protect the public. You are reminded that future violations, repeat or otherwise, could be viewed as willful and may result in the revocation of your license. You may anticipate further inspections to ensure your compliance.

Please contact us at 304-340-7820 if you have any questions concerning your responsibilities as a licensee or if you require further clarification about particular requirements of Federal firearms laws.

Sincerely,

Daniel L. Moorman
Area Supervisor
Charleston, WV IO Field Office

Enclosure

cc: Federal Firearms Licensing Center
    Louisville Field Division
    Licensee File



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives
300 Summers Street, Suite 1400
Charleston, West Virginia 25301

www.atf.gov
September 26, 2014

775060:DLM
5300

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Dorothy Muncy, President
Uncle Sams Loans, Inc.
200 Main Street
Man, WV  25635

Dear Mrs. Muncy:

During a recent compliance inspection at your Federal Firearms business Uncle Sams Loans, Incorporated, covering the period of 04 24 2013 to 04 24 2014, you were cited for violations of 27 Code of Federal Regulations, Part 478. The violations were discussed with you during the inspection. A copy of the Report of Violations. Form 5030.5, issued at the time of the inspection, is enclosed.

You should be aware that any willful violations of Federal Firearms laws and regulations may result in revocation of your Federal Firearms license. As a result of the recently cited violations, it is important that we have a meeting with you to discuss the violations found. The conference will be held on October 8, 2014 at 10:00 a.m. at 300 Summers Street, Suite 1400, Charleston, WV. The agenda for the meeting will include a discussion of the reasons for the violations, a review of the legal requirements, and a discussion of steps to be taken by you to ensure future compliance. Although we do not believe it necessary, legal counsel may assist you at your own expense if you so choose. Please bring with you documentation verifying the corrective action you have taken.

The records you are required to maintain and the business operations you conduct are important to law enforcement in our continuing efforts to reduce violent crime and ensure the public's safety. It is essential that you comply with all firearms laws and regulations that govern your firearms business.

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   Mrs. Dorothy Muncy
   Uncle Sams Loans, Inc.
   200 Main Street
   Man, WV 25635

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X *Steven Adkins*  ☒ Agent  ☐ Addressee

B. Received by ( *Printed Name* )   C. Date of Delivery
9/27/14

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   *(Transfer from service label)*   7008 1830 0003 3806 1583

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540



**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ .48 |
| Certified Fee | 3.46 |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 3.94 |

Postmark
Here

Sent To
Dorthay Muncy - Uncle Sams Loans
Street, Apt. No.; or PO Box No.  200 Main street
City, State, ZIP+4  Man WV 25635

PS Form 3800, August 2006        See Reverse for Instructions

7008 1830 0003 3806 1583

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Violations

## Instructions

Please write firmly with a ball point pen when completing this form. ATF officers will prepare this form in triplicate. The original copy will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files.

| Name of Proprietor | Street Address | City | State | Zip Code | County | Page 1 of |
|---|---|---|---|---|---|---|
| UNCLE SAMS LOANS INC | 200 MAIN STREET | MAN | WV | 25635- | LOGAN | 4 Pages |

| License/Permit/Registry Number *(If any)* | Expiration Date | Date(s) or Period of Inspection |
|---|---|---|
| 455045025E08677 | 5/15/2015 | 04/24/2014 through 05/10/2014 |

## Inspection Results

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

| | |
|---|---|
| | Date Corrections to be Made: *(If not corrected immediately)* |
| | Corrective Action to be Taken: On 04/24/2014 – 05/05/2014, the licensee filed three (3) |
| *(If not corrected immediately)* | belated ATF Form 3310.4, Report of Multiple Sales or Other Disposition of Pistols and Revolvers, to report the multiple sale, to ATF and to the local CLEO. |

**Number:** 1

**Nature of Violation:**
Failure to properly execute ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers. In one (1) instance, on consecutive days, the licensee sold a handgun to the same individual. However, the licensee failed to report the multiple sale, on ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers, involving two (2) firearms. Furthermore, the licensee failed to complete and submit ATF Form 3310.4, on two (2) other instance involving six (6) firearms.

"REPEAT VIOLATION FROM 4/30/2007"

**Citation:** 27 CFR 478.126a

ATF E-Form 5030.5
Revised April 2005

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Violations

**Instructions**

Please write firmly with a ball point pen when completing this form. ATF officers will prepare this form in triplicate. The original copy will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files.

| Name of Proprietor UNCLE SAMS LOANS INC | Street Address 200 MAIN STREET | | City MAN | State WV | Zip Code 25635- | County LOGAN | Page 3 of 4 Pages |
|---|---|---|---|---|---|---|---|

| License/Permit/Registry Number *(If any)* 455045025E08677 | Expiration Date 5/15/2015 | Date(s) or Period of Inspection 04/24/2014 through 05/10/2014 |
|---|---|---|

## Inspection Results

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

**Number:** 3

**Nature of Violation:**
Failure to properly maintain complete and accurate the record of firearms Acquisitions and Dispositions, (A&D) Records. A two (2) firearms discrepancy between the A&D Record and the physical inventory was found. The one (1) firearm was reported as missing inventory on ATF Form 3310.11, FFL Firearms Inventory Theft/Loss Report and, one (1) firearm was recorded as logged out when it was found in the physical inventory.

**"REPEAT VIOLATION FROM 4/16/2008 & 4/30/2007"**

**Citation:** 27 CFR 478.125(e)

**Date Corrections to be Made:**
*(If not corrected immediately)*

**Corrective Action to be Taken:** The licensee was instructed to enter the Remington, S/N *(If not corrected immediately)* 489312, 22 cal. back into the Acquisition Side of the Bound Book. Furthermore, the licensee submitted ATF Form 3310.11 Firearms Theft/Loss Report for one (1) unaccounted for firearm.

**Number:** 4

**Nature of Violation:**
On an unknown number of occasions, the licensee failed to distribute the Youth Handgun Safety Act Notices to non-licensee purchasers of handguns.

**"REPEAT VIOLATION FROM 4/30/2007"**

**Citation:** 27 CFR 478.103(a)

**Date Corrections to be Made:**
*(If not corrected immediately)*

**Corrective Action to be Taken:** The licensee was provided the Youth Handgun Safety Act *(If not corrected immediately)* Notices to distribute to non-license purchasers of handguns.

ATF E-Form 5030.5
Revised April 2005

## Acknowledgement of Federal Firearms Regulations
Page references are in ATF P 5300.4** (Sept. 2005)

| Licensee Name: | UI Number: | |
|---|---|---|
| Uncle Sam's Loans, LLC | 775060-2014-0076 | |

| **TOPIC** | **18 U.S.C., 27 CFR & Other References** | **Page Number** |
|---|---|---|
| **1.  REQUIRED RECORDS & REPORTS** | | |
| Acquisition and Disposition Record | 478.125(e) | 66 |
| Computerized Acquisition and Disposition Record | ATF Ruling 2008-2 | |
| Transaction Record/ATF F 4473** | 478.124 | 63-65 |
| Identification Document | 478.11 | 37 |
| Report of Multiple Handgun Sales/ATF F 3310.4** | 478.126a | 68 |
| Report of Multiple Rifle Sales/ATF F 3310.12** | 923(g)(5)(A) & Demand Letter 3 | 18 |
| (CA, AZ, NM, and TX FFLs ONLY) | | |
| Reporting Thefts or Losses/ATF F 3310.11** | 478.39a | 44 |
| Retention of Records | 478.129 | 68-69 |
| **2.  CONDUCT OF BUSINESS** | | |
| Firearm Frame or Receiver | 478.11 | 36 |
| NICS Requirements | 478.102 & 478.131 | 54-55 & 69 |
| Secure Gun Storage or Safety Device | 921(a), 922(z), & 923(d)(1)(G) | 4 & 15-16 |
| Child Safety Lock Act | 18 U.S.C. 922(z) | 15-16 |
| Sales or Deliveries between Licensees | 478.94 & 478.95 | 52 |
| FFL EZ Check | www.atfonline.gov/fflezcheck | |
| Gun Show Guidelines** | 478.100 | 54 |
| Out of State/Mail Order and Internet Sales | 478.96 | 52 |
| Prohibited Sales and Deliveries | 478.99 | 53-54 |
| Ammunition - Age Requirements for Handgun Ammunition | 478.99(b)(1) | 53 |
| Sales to Law Enforcement Officers | 478.134 | 69-70 |
| Youth Handgun Safety Act- Sales of Handguns / Poster and Notices** | 478.103 | 55-56 |
| Obliterated Serial Number | 478.34 | 43 |
| Short Barreled Rifle & Shotgun | 478.11 | 39 |
| **3.  LICENSES** | | |
| Engaged in the Business | 478.11 | 36 |
| Correction of Error | 478.48 | 48 |
| Posting of License | 478.91 | 50 |
| Renewal/Duration | 478.45 & 478.49 | 47 & 48 |
| Premises Covered | 478.50 | 48 |
| Reporting Changes of Address / ATF F 5300.38** | 478.52 | 48 |
| Reporting Changes in Trade Name | 478.53 | 48 |
| Reporting Changes of Control | 478.54 | 48 |
| Discontinuance of Business | 478.57 & 478.127 | 49 & 68 |
| **4.  MISCELLANEOUS PROVISIONS** | | |
| Right of Entry and Examination | 478.23 | 40 |
| Tracing Request from ATF | 478.25a | 41 |
| "Straw" Purchase | 478.128 & General Info. # 15 | 68 & 165 |
| Curios or Relics / ATF P 5300.11** | 478.11 | 35 |
| Antique Firearm | 478.11 | 35-36 |
| Compliance with State Law Publication / ATF P 5300.5** | 478.24 | 40-41 |
| Consignment of Firearms | 478.124(a), Q&A Section F15. | 63 & 182-183 |
| Personal Firearms / ATF P 3312.8** | 478.125a | 67 |
| Firearm Transportation | 478.38 | 44 |
| **5.  STATE LAWS AND LOCAL ORDINANCES** | | |
| Review of basic requirements including additional licenses, waiting periods, concealed carry permits, and firearms permits. | | |
| **6.  GUNSMITH ACTIVITIES** | N/A | |
| Gunsmithing Definition | 478.11 - Engaged in the business (d) | 36 |
| Gunsmith Recordkeeping | 478.124(a) & .125(e), ATF Ruling 77-1 | 63,66 & 125-126 |
| Return of Repaired Firearm | 478.124(a), Q&A Section I | 63 & 184 |
| Firearms & Ammunition Excise Tax - Contact Tax & Trade Bureau | www.ttb.gov/firearms | 877-882-3277 |

** Provide a copy of the form or publication and explain the requirements for completing the forms.

## Acknowledgement of Federal Firearms Regulations
Page references are in ATF P 5300.4 (Sept. 2005)

| Licensee Name: | UI Number: |
|---|---|
| Uncle Sam's Loans, Inc. | 775060-2009-0041 |

| Topic | 27 CFR | Page Number |
|---|---|---|
| **1. DEFINITIONS** | | |
| ☑ Ammunition | 478.11 | 36 |
| ☑ Antique Firearms | 478.11 | 36 |
| ☑ Curios and Relics | 478.11 | 36 |
| ☑ Engaged in the Business | 478.11 | 37 |
| ☑ Firearm Frame or Receiver | 478.11 | 37 |
| ☑ Identification Document | 478.11 | 38 |
| ☐ Short Barreled Rifles & Shotguns | 478.11 | 40 |
| **2. MISCELLANEOUS PROVISIONS** | | |
| ☑ Right of Entry and Examination | 478.23 | 41 |
| ☑ "Straw" Purchase | 478.128 & General Infor. # 15 | 69 & 166 |
| ☑ Tracing Request from ATF | 478.25a | 42 |
| ☑ Compliance with State Law Publication/ATF P 5300.5 | 478.24 | 41 |
| ☑ Firearm Transportation | 478.38 | 45 |
| ☑ Reporting Thefts or Losses/ATF F 3310.11 ** | 478.39a | 45 |
| **3. LICENSES** | | |
| ☑ Correction of Error | 478.48 | 49 |
| ☑ Renewal/Duration | 478.45 & 478.49 | 48 & 49 |
| ☑ Premises Covered | 478.50 | 49 |
| ☑ Reporting Changes of Address/ATF F 5300.38 | 478.52 | 49 |
| ☑ Reporting Changes in Trade Name | 478.53 | 49 |
| ☑ Reporting Changes of Control | 478.54 | 49 |
| ☐ Discontinuance of Business | 478.57 & 478.127 | 50 & 69 |
| **4. CONDUCT OF BUSINESS** | | |
| ☑ Posting of License | 478.91 | 51 |
| ☑ Sales or Deliveries Between Licensees | 478.94 & 478.95 | 53 |
| ☑ Gun Show Guidelines ** | 478.100 | 55 |
| ☑ Out of State and Mail Order Sales | 478.96 | 53 |
| ☑ Prohibited Sales and Deliveries | 478.99 | 54-55 |
| ☑ NICS Requirements | 478.102 & 478.131 | 55-56 & 70 |
| ☑ Obliterated Serial Number | 478.34 | 44 |
| ☑ Youth Handgun Safety Act (YHSA)-Sales of Handguns | 18 U.S.C. 922(x) | 15-16 |
| ☑ Youth Handgun Safety Act Poster and Notices | 18 U.S.C. 922(x) & 478.103 | 15-16 & 56-57 |
| ☑ Secure Gun Storage or Safety Device | 921(a)(34), 922(z) & 923(d)(1)(G) | 8 & 16-18 |
| ☑ Non-resident Aliens | 478.29a & ATF Ruf. 2004-1 | 43 & 144-145 |
| ☐ Sales to Law Enforcement Officers | 478.134 | 70-71 |
| **5. REQUIRED RECORDS** | | |
| ☑ Retention of Records | 478.129 | 69-70 |
| ☑ Transaction Record/ATF F 4473 ** | 478.124 | 64-66 |
| ☑ Acquisition and Disposition Record | 478.125(e) | 67 |
| ☑ Report of Multiple Handgun Sales/ATF F 3310.4 ** | 478.126a | 69 |
| ☑ Personal Firearms | 478.125a | 68 |
| ☐ Consignment of Firearms (Also, see Q&A section F15) | 478.124(a) | 64 & 183 |
| **6. STATE LAWS AND LOCAL ORDINANCES** | | |
| ☐ Review of basic concepts including licenses, waiting periods, concealed carry permits. | | |

**\*\* Provide copy of form and explain requirements to complete.**





**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

600 Dr. Martin Luther King Jr. Place, Suite 322
Louisville, Kentucky 40202

July 10, 2008
www.atf.gov

775000:DDJ
5300

**CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**

Ms. Dorothy L. Muncy, President
Uncle Sam's Loans, Inc.
200 Main St.
Man, WV 25635

FFL # 4-55-045-02-9E-08677

Dear Ms. Muncy:

During a recent compliance inspection at your firearms business covering the period of
April 16, 2007 through April 16, 2008, you were cited for violations of Title 27, Code of Federal
Regulations, Part 478. The violations were discussed with you during the inspection. A copy of
the Report of Violations, Form 5030.5, issued at the time of the inspection is enclosed.

You should be aware that willful violations of the Gun Control Act may result in revocation of
your Federal firearms license. As a result of the recently cited violations, please arrange to
attend a meeting to discuss the violations found. The meeting will be held at 10:00 a.m. on
Tuesday, July 29, 2008, at the ATF office located at 300 Summers St., Suite 1400, Charleston,
WV 25301. The agenda for the meeting will include a discussion of the reasons for the
violations, a review of the legal requirements that accompany your license, and a discussion of
steps that you have initiated or will initiate to ensure future compliance. Although we do not
believe it necessary, legal counsel may assist you at your own expense if you so choose. Please
bring with you documentation that demonstrates the corrective actions taken to date and the steps
that you have taken to ensure future compliance.

The records you are required to maintain and the business operations you conduct are important
to law enforcement in our continuing efforts to reduce violent crime and protect the public. It is
essential that you comply with all Federal laws and regulations that govern your firearms
business to aid in this effort to combat violent crime.


EXHIBIT

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

Revised Copy 5/29/2008

# Report of Violations

## Instructions

Please write firmly with a ball point pen when completing this form. ATF officers will prepare this form in triplicate. The original copy will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files.

| Name of Proprietor | Street Address | City | State | Zip Code | County | Page 1 of |
| Uncle Sams Loans, Inc. | 200 Main Street | Man | WV | 25635- | Logan | 4 Pages |

| License/Permit/Registry Number (If any) | Expiration Date | Date(s) or Period of Inspection |
| 455045029E08677 | 5/1/2009 | 04/16/2008 through 05/06/2008 |

## Inspection Results

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

**Number: 1**

**Nature of Violation:**
Transfer of a firearm when the licensee had reasonable cause to believe the transferee/buyer was prohibited. On one occasion the licensee transferred a firearm to an individual who answered "Yes" to a prohibiting question. On one ATF Form 4473 item 11g, Have you been discharged from the Armed Forces under dishonorable conditions?, was answered with a "Yes". The licensee completed the ATF Form 4473, recorded a "Proceed" response from NICS and transferred the firearm to the purchaser.

**Citation:** 27 CFR 478.99(c)

**Date Corrections to be Made:**
*(If not corrected immediately)*

**Corrective Action to be Taken:** If a transferee/buyer answers "NO" he or she is not the actual buyer (item 11a) or "YES" to a prohibiting question (items 11b through 11l) the transfer can not take place. Further if the seller has some knowledge that the transferee is prohibited or receives a "Denied" response from NICS the transfer can not take place. Review section A especially the answers in item 11 before continuing with a transfer.

**Number: 2**

**Nature of Violation:**
The licensee failed to execute three ATF Forms 4473, Firearms Transaction Record Part I-Over-the-Counter. On three occasions the licensee transferred a firearm to a non-licensee without completing an ATF Form 4473. The licensee transferred all three firearms to a gunsmith for repairs. The licensee retrieved all three firearms from the gunsmith during the inspection. The gunsmith does not have an FFL.

**Citation:** 27 CFR 478.124(a)

**Date Corrections to be Made:**
*(If not corrected immediately)*

**Corrective Action to be Taken:** Ensure to execute an ATF Form 4473 and conduct a NICS check prior to transferring a firearm to any non-licensee.

ATF E-Form 5300.5

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Violations

**Instructions**

Please write firmly with a ball point pen when completing this form. ATF officers will prepare this form in triplicate. The original copy will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files.

| Name of Proprietor | Street Address | City | | State | Zip Code | County | Page 3 of |
| Uncle Sams Loans, Inc. | 200 Main Street | Man | . | WV | 25635- | Logan | 4 Pages |

| License/Permit/Registry Number (If any) | Expiration Date |
| 455045029E08677 | 5/1/2009 |

| Date(s) or Period of Inspection |
| 04/16/2008 through 05/06/2008 |

**Inspection Results**

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

Date Corrections to be Made: 05/06/2008
*(If not corrected immediately)*

Corrective Action to be Taken: Ensure to timely record the acquisition and disposition of all
*(If not corrected immediately)* firearms.

**Number: 4**

**Nature of Violation:**

Failure to maintain complete and accurate Acquisition and Disposition Records (Bound Book).
The licensee failed to timely record the acquisition of 13 firearms. The firearms were in
physical inventory but they were not listed as acquisitions in the Bound Book. Four of these
firearms were brought in for repair and never logged in. Six of the firearms were in a "junk"
box and not logged in. The acquisition of one firearm had been recorded in the pawn register
but not in the bound book. The licensee did not have an explanation for the other two firearms.

The licensee failed to timely record the disposition of nine firearms. The acquisition
information for the firearms was recorded in the bound book but the firearms could not be found
in physical inventory. Three of these firearms were sent to a gunsmith for repair without being
logged out to the gunsmith. The firearms were retrieved from the gunsmith during the
inspection. Three firearms were transferred on ATF Forms 4473 without being logged out of
the bound book. The ATF Forms 4473 were found documenting the disposition. No
explanation was found for the other three firearms and they were reported as lost or stolen on an
ATF Form 3310.11. The licensee also recorded incorrect disposition information for seven
firearms. Two of the firearms had been logged out as missing during the last inspection by
mistake. Three of the firearms were logged out automatically by the computer when the pawn
was paid off but the firearms did not leave the store. One firearm was logged out by mistake
when a different firearm was transferred. One firearm was sold to a customer, then the customer

ATF E-Form 5010 C

## Acknowledgement of Federal Firearms Regulations
Page references are in ATF P 5300.4 (Sept. 2005)

| Licensee Name: | UI Number: |
|---|---|
| Uncle Sam's Loans, Inc. | 775025-2008-0234 |

| Topic | | 27 CFR | Page Number |
|---|---|---|---|
| 1. DEFINITIONS | | | |
| ☒ | Ammunition | 478.11 | 36 |
| ☒ | Antique Firearms | 478.11 | 36 |
| ☒ | Curios and Relics | 478.11 | 36 |
| ☒ | Engaged in the Business | 478.11 | 37 |
| ☒ | Firearm Frame or Receiver | 478.11 | 37 |
| ☒ | Identification Document | 478.11 | 38 |
| ☒ | Short Barreled Rifles & Shotguns | 478.11 | 40 |
| 2. MISCELLANEOUS PROVISIONS | | | |
| ☒ | Right of Entry and Examination | 478.23 | 41 |
| ☒ | "Straw" Purchase | 478.128 & General Infor. # 15 | 69 & 166 |
| ☒ | Tracing Request from ATF | 478.25a | 42 |
| ☒ | Compliance with State Law Publication/ATF P 5300.5 | 478.24 | 41 |
| ☒ | Firearm Transportation | 478.38 | 45 |
| ☒ | Reporting Thefts or Losses/ATF F 3310.11 ** | 478.39a | 45 |
| 3. LICENSES | | | |
| ☒ | Correction of Error | 478.48 | 49 |
| ☒ | Renewal/Duration | 478.45 & 478.49 | 48 & 49 |
| ☒ | Premises Covered | 478.50 | 49 |
| ☒ | Reporting Changes of Address/ATF F 5300.38 | 478.52 | 49 |
| ☒ | Reporting Changes in Trade Name | 478.53 | 49 |
| ☒ | Reporting Changes of Control | 478.54 | 49 |
| ☒ | Discontinuance of Business | 478.57 & 478.127 | 50 & 69 |
| 4. CONDUCT OF BUSINESS | | | |
| ☒ | Posting of License | 478.91 | 51 |
| ☒ | Sales or Deliveries Between Licensees | 478.94 & 478.95 | 53 |
| ☒ | Gun Show Guidelines ** | 478.100 | 55 |
| ☒ | Out of State and Mail Order Sales | 478.96 | 53 |
| ☒ | Prohibited Sales and Deliveries | 478.99 | 54-55 |
| ☒ | NICS Requirements | 478.102 & 478.131 | 55-56 & 70 |
| ☒ | Obliterated Serial Number | 478.34 | 44 |
| ☒ | Youth Handgun Safety Act (YHSA)-Sales of Handguns | 18 U.S.C. 922(x) | 15-16 |
| ☒ | Youth Handgun Safety Act Poster and Notices | 18 U.S.C. 922(x) & 478.103 | 15-16 & 56-57 |
| ☒ | Secure Gun Storage or Safety Device | 921(a)(34), 922(z) & 923(d)(1)(G) | 8 & 16-18 |
| ☒ | Non-resident Aliens | 478.29a & ATF Rul. 2004-1 | 43 & 144-145 |
| ☒ | Sales to Law Enforcement Officers | 478.134 | 70-71 |
| 5. REQUIRED RECORDS | | | |
| ☒ | Retention of Records | 478.129 | 69-70 |
| ☒ | Transaction Record/ATF F 4473 ** | 478.124 | 64-66 |
| ☒ | Acquisition and Disposition Record | 478.125(e) | 67 |
| ☒ | Report of Multiple Handgun Sales/ATF F 3310.4 ** | 478.126a | 69 |
| ☒ | Personal Firearms | 478.125a | 68 |
| ☒ | Consignment of Firearms (Also, see Q&A section F15) | 478.124(a) | 64 & 183 |
| 6. STATE LAWS AND LOCAL ORDINANCES | | | |
| ☒ | Review of basic concepts including licenses, waiting periods, concealed carry permits. | | |

** Provide copy of form and explain requirements to complete.



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives
1040 Monarch Street, Suite 250
Lexington, Kentucky 40513

September 26, 2007
www.atf.gov

775025:CKY:rod
5300

**CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**

Uncle Sam's Loans, Inc.
200 Main St.
Man, WV 25635

Dear licensee:

During a recent compliance inspection at your firearms business covering the period of April 30, 2006 through April 30, 2007, you were cited for violations of 27 Code of Federal Regulations, Part 478. The violations were discussed with you during the inspection. A copy of the Report of Violations, Form 5030.5, issued at the time of the inspection is enclosed.

You should be aware that willful violations of the Gun Control Act may result in revocation of your Federal firearms license. As a result of the recently cited violations, it is important that we have a meeting with you to discuss the violations found. The conference will be held on Monday, October 29, 2007 at 10:00 a.m. at the Charleston ATF Industry Operations Office at 300 Summers Street, Suite 1400, Charleston, West Virginia. The agenda for the meeting will include a discussion of the reasons for the violation, a review of the legal requirements, and a discussion of steps to be taken by you to ensure future compliance. Although we do not believe it necessary, legal counsel may assist you at your own expense if you so choose. Please bring with you documentation verifying the corrective action you have taken.

The records you are required to maintain and the business operations you conduct are important to law enforcement in our continuing efforts to reduce violent crime and protect the public. It is essential that you comply with all Federal laws and regulations that govern your firearms business to aid in this effort to combat violent crime.

We will conduct a follow-up inspection in the future. Any violations, either repeat or otherwise, could be viewed as willful and may result in the revocation of your license.





**U.S. Departmen~~t~~ ~~o~~f Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

1040 Monarch Street, Suite 250
Lexington, Kentucky 40513

www.atf.gov
October 30, 2007

775025:CKY
5300

**CERTIFIED MAIL/
RETURN RECEIPT REQUESTED**

Uncle Sam's Loans, Inc.
200 Main St.
Man, WV 25635

Dear Licensee:

This letter is a follow-up to the warning conference held with you on October 29, 2007 at the
Charleston ATF Industry Operations Office at 300 Summers St., Suite 1400, Charleston, West
Virginia. During this conference, the violations cited during the inspection covering the period
from 4/30/2006 through 4/30/2007 and the necessary corrective action to prevent the violations
from reoccurring were discussed.

You were given the opportunity to comment on the violations and what specific action you have
taken to ensure that the violations will not reoccur. Regarding violation numbers one, five, and
six, in which ATF Forms 4473 errors and/or omissions were found, you stated that your current
policy is to have the manager review all executed ATF Forms 4473. You further explained that
the manager's review of the Forms would help eliminate errors and omissions made by the
transferees and the sales clerks executing the Forms. The inspection uncovered that you failed to
maintain a copy of your recordkeeping variance approval letter and failed to print out your
acquisition and disposition record biannually (violation number two). During the conference you
stated that you have since printed a hard copy of the entire acquisition and disposition record at
least every three months. You have also maintained a copy of the ATF recordkeeping variance
approval letter on the business premises. You were cited for failing to provide ATF Information
5300.2, Youth Handgun Safety Act Notice, to handgun transferees (violation number three).
During the conference you stated that prior to the inspection you were not aware of this
requirement. Since the inspection, you reported that you keep the ATF I 5300.2 pamphlets in
supply and provide them with all handgun transfers. You were cited for failing to report one
multiple handgun sale (violation number four). You stated that the manager's review of all ATF
Forms 4473 and the creation of a manual acquisition and disposition record, used for back-up
purposes, allow you to be more effective in tracking and reporting multiple handgun sales. You
were cited for failing to properly maintain your A&D record. You advised that procedures have

Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Violations

## Instructions

Please write firmly with a ball point pen when completing this form. ATF officers will prepare this form in triplicate. The original copy will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files.

| Name of Proprietor | Street Address | City | State | Zip Code | County | Page 1 of |
|---|---|---|---|---|---|---|
| Uncle Sams Loans, Inc. | 200 Main Street | Man | WV | 25635- | Logan | 3 Pages |

| License/Permit/Registry Number (If any) | Expiration Date | Date(s) or Period of Inspection |
|---|---|---|
| 74502JE08677 | 5/1/2009 | 04/30/2007 through 05/25/2007 |

## Inspection Results

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

**Number:** 1

**Nature of Violation:**
On two ATF Forms 4473 item 11a was left blank

**Citation:** 27 CFR 478.21(a)

**Date Corrections to be Made:** 05/09/2007
*(If not corrected Immediately)*

**Corrective Action to be Taken:** Verify that all items on ATF Form 4473 are completed prior
*(If not corrected Immediately)* to transfer of firearm

**Number:** 2

**Nature of Violation:**
Failure to comply with an alternate method or procedure. The licensee began using an alternate format for the acquisition and disposition record prior to obtaining approval by ATF. ATF approved for the licensee to keep the acquisition and disposition record (A&D record) by computer in September 1996. It was found that licensee started keeping the A&D record via computer in lieu of a hard bound book in 1993.

Conditions of the approved recordkeeping variance were not maintained. A printout of the variance was not on file. A printout of all A&D records was never prepared. The licensee was initially unable to print the A&D records for the inspection.

**Citation:** 27 CFR 478.22(a)(3)

**Date Corrections to be Made:** 04/30/2007
*(If not corrected Immediately)*

**Corrective Action to be Taken:** Print all A&D records every six months. Maintain copy of
*(If not corrected Immediately)* letter approving the variance on the premises.

ATF E-Form 5030.5
Revised April 2005

Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Violations

## Instructions

Please write firmly with a ball point pen when completing this form. ATF officers will prepare this form in triplicate. The original copy will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files.

| Name of Proprietor | Street Address | City | State | Zip Code | County | Page 3 of |
| --- | --- | --- | --- | --- | --- | --- |
| Uncle Sams Loans, Inc. | 200 Main Street | Man | WV | 25635- | Logan | 3 Pages |

| License/Permit/Registry Number (If any) | Expiration Date | Date(s) or Period of Inspection |
| --- | --- | --- |
| 1•-\•••\•7•45029E08677 | 5/1/2009 | 04/30/2007 through 05/25/2007 |

## Inspection Results

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

**Number:** 6

**Nature of Violation:**
Omissions and/or improper documentation was found on ATF Forms 4473.  On two Forms items 11b through 11i were omitted.  On sixteen Forms item 2, residence address, was improperly documented.  On those Forms a post office box was documented instead of a physical address.

**Citation:** 27 CFR 478.124(c)(1)

**Date Corrections to be Made:** 05/09/2007
(If not corrected immediately)

**Corrective Action to be Taken:** Verify items on 4473 are properly executed prior to transfer of firearm.  Obtain physical address in item 2 prior to transfer of firearm.
(If not corrected immediately)

**Number:** 7

**Nature of Violation:**
Failure to properly maintain A&D record.  Discrepancy between the number of firearms on hand and the number of firearms on hand according to the A&D record.  On the premises, 1,082 firearms were on hand.  According to the A&D record, 1661 firearms were on hand.

At least 30 instances, incorrect disposition date was recorded.  The date 01/01/00 was found to be documented incorrectly for numerous dispositions.

**Citation:** 27 CFR 478.125(e)

**Date Corrections to be Made:** 05/25/2007
(If not corrected immediately)

**Corrective Action to be Taken:** Reconcile physical inventory and the inventory according to the A&D record.  Search the ATF Forms 4473 to find firearms that have been sold but were not document as dispositions in the A&D record.  Any firearms not found, report on ATF Form 3310.11 as lost or stolen.

For disposition dates incorrectly recorded, find correct dates using ATF Forms 4473.
(If not corrected immediately)

| I Have Received a Copy of This Report of Violations | (Proprietor's signature and title) Roger O'Money for us at | | |
| --- | --- | --- | --- |
| Signature and Title ATF Officer | dba Melinda Baird – Manager | Date: 6-31-07 |
| Ann Devine  Investigator | | | Date: 5-31-07 |

For Official Use Only

ATF E-Form 5030.5
Revised April 2005

# Acknowledgement of Federal Firearms Regulations
Page references are in ATF P 5300.4 (Sept. 2005)

| Licensee Name: | UI Number: |
|---|---|
| 0   UNCLE SAM'S   LOANS, INC | 0  77600-2006-0074 |

| Topic | 27 CFR | Page Number |
|---|---|---|
| **1. DEFINITIONS** | | |
| ✓ Ammunition | 478.11 | 36 |
| ✓ Antique Firearms | 478.11 | 36 |
| ✓ Curios and Relics | 478.11 | 36 |
| ✓ Engaged in the Business | 478.11 | 37 |
| ✓ Firearm Frame or Receiver | 478.11 | 37 |
| ✓ Identification Document | 478.11 | 38 |
| ✓ Short Barreled Rifles & Shotguns | 478.11 | 40 |
| **2. MISCELLANEOUS PROVISIONS** | | |
| ✓ Right of Entry and Examination | 478.23 | 41 |
| ✓ "Straw" Purchase | 478.128 & General Infor. # 15 | 69 & 166 |
| ✓ Tracing Request from ATF | 478.25a | 42 |
| ✓ Compliance with State Law Publication/ATF P 5300.5 | 478.24 | 41 |
| ✓ Firearm Transportation | 478.38 | 45 |
| ✓ Reporting Thefts or Losses/ATF F 3310.11 ** | 478.39a | 45 |
| **3. LICENSES** | | |
| ✓ Correction of Error | 478.48 | 49 |
| ✓ Renewal/Duration | 478.45 & 478.49 | 48 & 49 |
| ✓ Premises Covered | 478.50 | 49 |
| ✓ Reporting Changes of Address/ATF F 5300.38 | 478.52 | 49 |
| ✓ Reporting Changes in Trade Name | 478.53 | 49 |
| ✓ Reporting Changes of Control | 478.54 | 49 |
| ✓ Discontinuance of Business | 478.57 & 478.127 | 50 & 69 |
| **4. CONDUCT OF BUSINESS** | | |
| ✓ Posting of License | 478.91 | 51 |
| ✓ Sales or Deliveries Between Licensees | 478.94 & 478.95 | 53 |
| ✓ Gun Show Guidelines ** | 478.100 | 55 |
| ✓ Out of State and Mail Order Sales | 478.96 | 53 |
| ✓ Prohibited Sales and Deliveries | 478.99 | 54-55 |
| ✓ NICS Requirements | 478.102 & 478.131 | 55-56 & 70 |
| ✓ Obliterated Serial Number | 478.34 | 44 |
| ✓ Youth Handgun Safety Act (YHSA)-Sales of Handguns | 18 U.S.C. 922(x) | 15-16 |
| ✓ Youth Handgun Safety Act Poster and Notices | 18 U.S.C. 922(x) & 478.103 | 15-16 & 56-57 |
| ✓ Secure Gun Storage or Safety Device | 921(a)(34), 922(z) & 923(d)(1)(G) | 8 & 16-18 |
| ✓ Non-resident Aliens | 478.29a & ATF Rul. 2004-1 | 43 & 144-145 |
| ✓ Sales to Law Enforcement Officers | 478.134 | 70-71 |
| **5. REQUIRED RECORDS** | | |
| ✓ Retention of Records | 478.129 | 69-70 |
| ✓ Transaction Record/ATF F 4473 ** | 478.124 | 64-66 |
| ✓ Acquisition and Disposition Record | 478.125(e) | 67 |
| ✓ Report of Multiple Handgun Sales/ATF F 3310.4 ** | 478.126a | 69 |
| ✓ Personal Firearms | 478.125a | 68 |
| ✓ Consignment of Firearms (Also, see Q&A section F15) | 478.124(a) | 64 & 183 |
| **6. STATE LAWS AND LOCAL ORDINANCES** | | |
| ✓ Review of basic concepts including licenses, waiting periods, concealed carry permits. | | |

** Provide copy of form and explain requirements to complete.

ED    Page 1 of 2

DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
REPORT OF VIOLATIONS

| LICENSE/PERMIT REGISTRY NUMBER (if any) | EXPIRATION DATE (if any) | PAGE 1 OF 1 PAGES |
|---|---|---|
| 4-55-023 02 1F-034-7 | 5/1/91 | |

NAME AND ADDRESS OF PROPRIETOR
Roger D. Murey, Uncle Sam's Loans, Inc.
108 Main St., Man, W.V. 25635

| COUNTY (F & E only) | DATE(S) OR PERIOD OF INSPECTION |
|---|---|
| Logan | 4/9/91 |

**INSTRUCTIONS**

ATF officers will prepare this form in quadruplicate. The original copy and the suspense copy (where required) will be given to the proprietor or a responsible representative. The remaining copies will be submitted with the completed inspection report. Supervisors will detach one copy from the completed report for their files. Where - corrective action cannot be taken during the inspection, proprietors will submit the suspense copy to the Area Supervisor as soon as the required corrections have been made.

**INSPECTION RESULTS**

An examination of your premises, records and operations has disclosed the following violations which have been explained to you:

| NO. | USC OR CFR CITATION | NATURE OF VIOLATION | CORRECTIVE ACTION TO BE TAKEN (if not corrected immediately) | DATE CORREC- TIONS TO BE MADE (if not corrected immediately) |
|---|---|---|---|---|
| 1 | 27-CFR 178.125(e) | Firearms disposition was not properly recorded in at least 7 instances. Therefore, bound book + physical inventory do not agree. | | 5/9/91 |

| | |
|---|---|
| I HAVE PREPARED A COPY OF THIS REPORT OF VIOLATIONS (Proprietor's signature and title) | DATE |
| SIGNATURE AND TITLE OF INSPECTING OFFICER | DATE 4/9/91 |
| William J. Condon, Inspector | |

ATF F 5030.5 (2/84)   PREVIOUS EDITIONS ARE OBSOLETE

EXHIBIT


LexisNexis®

**STEIN'S INC., d/b/a Harry Stein's Loan, Plaintiff-Appellant, v. W. MICHAEL BLUMENTHAL, Secretary of the Treasury, et al., Defendants-Appellees .**

No. 79-1766

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

649 F.2d 463; 1980 U.S. App. LEXIS 14229; 61 A.L.R. Fed. 496

**February 29, 1980, Argued**
**September 10, 1980, Decided**

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Eastern District of Wisconsin. No. 78-C-388 -- John W. Reynolds, Chief Judge.

**COUNSEL:** Michael J. Colgan, Milwaukee, Wis., for plaintiff-appellant.

Joseph P. Stadtmueller, Asst. U. S. Atty., Milwaukee, Wis., for defendants-appellees.

**JUDGES:** Before FAIRCHILD, Chief Judge, SWYGERT and SPRECHER, Circuit Judges.

**OPINION BY:** FAIRCHILD

**OPINION**

[*463] This is an action brought under 18 U.S.C. § 923(f)(3) to review the decision of the Secretary of the Treasury denying an application for a license to deal in firearms. The plaintiff, Stein's Inc., d/b/a Harry Stein's Loan, appeals from the district court's judgment upholding the Secretary's decision. The plaintiff argues that the district court had an obligation pursuant to 18 U.S.C. § 923(f)(3) to try the case de novo and that its summary disposition of the case on the basis of the administrative record and without taking additional evidence was inconsistent with that obligation. Our review of the proceedings before the district court convinces us that the district court's disposition of the cause was consistent with the statutory provision authorizing judicial review and that the [**2] district court's judgment is correct. Accordingly, we affirm.

[*464]   I.

The plaintiff, a Wisconsin corporation with its principal place of business in Milwaukee, is a pawnbroker dealing in firearms. Pursuant to the provisions of the Gun Control Act of 1968, the plaintiff must obtain from the Secretary of the Treasury a license to deal in such instrumentalities. The plaintiff did possess a license prior to 1978 and applied for the license's renewal in late 1977. The Regional Regulatory Administrator of the Bureau of Alcohol, Tobacco and Firearms on February 7, 1978, denied the plaintiff's application because of the plaintiff's repeated violations of 18 U.S.C. § 922(m), 27 C.F.R. § 178.124(c) and 27 C.F.R. § 178.125(e). The Administrator found that this pattern of violations demonstrated "a careless and willful disregard" of the gun control law and regulations justifying nonrenewal under 18 U.S.C. § 923(d) (1). [1] The notice of the Administrator's action informed the plaintiff of its right to have that action reviewed pursuant to 18 U.S.C. § 923(f)(2).

1.    18 U.S.C. § 923(d)(1) provides that an application for a license shall be approved if

(A) the applicant is twenty-one years of age or over;

(B) the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (h) of this chapter;

(C) the applicant has not willfully violated any of the provisions of this chapter or regulations issued thereunder;

(D) the applicant has not willfully failed to disclose any material information required, or has

649 F.2d 463, *; 1980 U.S. App. LEXIS 14229, **;
61 A.L.R. Fed. 496

[**6]  The district court granted the government's motion for summary judgment. The district court held that it was unnecessary to decide the proper standard of review because

> the uncontested evidence already in the administrative record . . . reveals that despite plaintiff's admitted knowledge of the recordkeeping requirements and the prohibition of delivery of firearms to certain individuals, it violated the law continually for about three years. . . . The failure to maintain proper records when a dealer is aware of his legal duty to do so has been held to be a willful violation of 18 U.S.C. § 923(c) (sic).

The district court held that the conclusory denials of any willful violations in the affidavit submitted by the plaintiff did not require a contrary conclusion.

II.

The crux of the plaintiff's argument concerns the scope of and procedure for judicial review mandated by 18 U.S.C. § 923(f)(3). The government, however, has not chosen to address this issue. We believe that an orderly disposition of this appeal requires that we explore the nature of review authorized by statute before examining the particular facts of this case, and, consequently, we examine the issue here.  [**7]

Section 923(f)(3) provides in part that the district "court may consider any evidence submitted by the parties to the proceeding. If the court decides that the Secretary was not authorized to deny the application or to revoke the license, the court shall order the Secretary to take such action as may be necessary to comply with the judgment of the court." As one court has noted, the section "is unclear and in some respects appears to contain contradictory language." Weidner v. Kennedy, 309 F. Supp. 1018, 1019 (C.D.Cal.1970). Some courts have held that the decision of the Secretary may be upheld if supported by substantial evidence in the administrative record. See McLemore v. United States Treasury Department, 317 F. Supp. 1077 (N.D.Fla.1970); Lewin v. Blumenthal, 590 F.2d 268, 269 (8th Cir. 1979) (semble as to standard applied, but court noted that "substantial evidence" supported license [*466] nonrenewal). Other courts, however, have noted that the section permits the court to "consider any evidence submitted by the parties." Finding this phrase ambiguous, they have looked to the provision's legislative history. That history evidences Congress' intention to "provide broad [**8] judicial review" or "de novo review" of license nore-

newals and revocations. H.R.Rep.No.1577, 90 Cong., 2d Sess., reprinted in (1968) U.S.Code Cong. & Admin.News, pp. 4410, 4411, 4423. Relying on that scant legislative history, those courts have concluded that the statute requires de novo review of the Secretary's decisions. See, e. g., Prino v. Simon, 606 F.2d 449, 451 (4th Cir. 1979); Fin & Feather Sport Shop, Inc. v. United States Treasury Department, 481 F. Supp. 800 (D.Neb.1979); Service Arms Co. v. United States, 76 F.R.D. 109 (W.D.Okl.1977); Shyda v. Director, 448 F. Supp. 409 (M.D.Pa.1977); Rich v. United States, 383 F. Supp. 797 (S.D.Ohio 1974); Weidner v. Kennedy, 309 F. Supp. 1018 (C.D.Cal.1970).

We agree with the latter decisions that the statute requires de novo review. We do not, however, view those decisions as necessarily irreconcilable with those upholding the Secretary's decision if based on substantial evidence. This is because of our view of the nature of the review authorized by 18 U.S.C. § 923(f)(3). Although the legislative history of § 923(f)(3) speaks of "de novo review," we do not understand that history to require the district court to hold a hearing and [**9] receive evidence beyond that contained in the administrative record in every case. The language of the statute itself is permissive: "the court may consider any evidence submitted by the parties." (Emphasis added.) Instead we believe that Congress intended to afford the district court the discretion to receive additional evidence to be considered along with that in the administrative record when some good reason to do so either appears in the administrative record or is presented by the party petitioning for judicial review. [4] In other words, there is a difference between the "de novo review" required by 18 U.S.C. § 923(f)(3) and a "trial de novo." Cf. United States v. Raddatz, 447 U.S. 667, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980) (the "de novo determination" required by the Federal Magistrates Act does not always require a de novo hearing). We hold that while the statute requires the former, it does not in every case require the latter. [5] Considerations of judicial economy suggest that trial anew of factual matters already litigated should be avoided unless substantial doubt infects the agency's findings of fact. See Guilday v. United States Department of Justice, 385 F. Supp. [**10] 1096, 1098-99 (D.Del.1974) ("In the absence of clear guidelines from Congress, it is appropriate for the courts to consider the interests of judicial economy and fairness before requiring an automatic trial de novo. To the extent that a trial de novo would require pretrial discovery and trial proof of factual background already developed in administrative proceedings, it would be unjustifiably duplicative").

4.   To aid the district court in determining which factual matters might warrant the taking of additional evidence, the party petitioning for re-

prohibited,-irrespective of evil motive or reliance on erroneous advice, or 2) acts with careless disregard of statutory requirements, the violation is willful") ~~it comes where as here [*468] the license is a corporation it is chargeable with the conduct and knowledge of its employees Fin & Feather Sport Shop Inc. v. United States Treasury Department 481 F. Supp. 800, 807 (D.Neb.1979) (and cases cited therein)~~

The next question is whether the district court applied the proper scope of review. Our examination of the district court's memorandum order convinces us that the trial court in essence reviewed the Secretary's decision de novo and adopted as its own the Secretary's finding [**15] that the plaintiff's violations were willful. The district court recognized that courts have disagreed about the appropriate scope of review and held that under any standard the decision of the Secretary was justified. We take this, along with the district court's assessment of the evidence in the administrative record, as indicating that the court exercised its own independent judgment as to the facts and concluded that the Secretary correctly found the relevant facts. [7]

7.    It is true that procedurally this case was decided on a motion for summary judgment where technically fact finding is inappropriate and all reasonable inferences must be drawn in favor of the party opposing the motion. Nevertheless, because the procedure for review pursuant to 18 U.S.C. § 923(f) (3) permits the district court to enter judgment on the basis of the administrative record when no substantial reason to receive additional evidence is present, the practice of the courts has been to grant judgment summarily when the "material facts developed at the administrative hearing, which the court also concludes justify nonrenewal" are not substantially drawn into question by the party petitioning for review. Mayesh v. Schultz, 58 F.R.D. 537, 539 (S.D.Ill.1973). See, e. g., Fin & Feather Sport Shop, Inc. v. United States Treasury Department, 481 F. Supp. 800 (D.Neb.1979); Shyda v. Director, 448 F. Supp. 409 (M.D.Pa.1977). We find no substantial error with this procedure as long as the district court provides a statement of reasons sufficient to inform the parties and the appellate court of the basis of the court's decision.

[**16] The district court's finding is amply supported by the record and we cannot say that it is clearly erroneous. The record shows that the plaintiff's agents were instructed on the requirements of the law and acknowledged an understanding of the Secretary's regulations. [8] Nevertheless, and despite repeated warnings from the Secretary, violations continued to occur. Evidence of repeated violations with knowledge of the law's requirements has been held sufficient to establish willfulness. See, e. g., Lewin v. Blumenthal, 590 F.2d 268 (8th Cir. 1979). Although the plaintiff has attempted to dismiss those violations as "unintentional, unavoidable and de minimis," see Modica v. United States, 518 F.2d 374, 375 (5th Cir. 1975), we do not regard the evidence to that effect as so compelling as to warrant our disturbing the finding of the district court.

8.    One document in the administrative record, for example, is signed by Kenneth Stein and acknowledges that the recordkeeping requirements were explained to him and that

to the best of my knowledge and belief, I understand the laws and regulations, and will operate my firearms business in accordance therewith. If I receive a license, I understand that I am responsible for the acts or omissions of any employee or agent acting for me in the conduct of the firearms business.

[**17] What has already been said largely disposes of the final question before us: Whether the district court abused its discretion in declining to receive additional evidence bearing on the issue of willfulness. The evidence in the administrative record showed a persistent pattern of violations even after warnings from the Secretary. The inference that the violations were willful is compelling, notwithstanding the plaintiff's president's protestations to the contrary before the hearing officer. Certainly the trial judge was free to draw the same inference that the Secretary did on the basis of the evidence in the administrative record. Moreover, the plaintiff did not offer to produce any additional evidence before the district court which had not already been considered by the Secretary. Although the plaintiff did submit an affidavit in which its president denied in general and conclusory terms that any of the violations were willful, we are not persuaded that such an affidavit established a good reason for the district court to exercise its discretion to receive additional evidence. The trial court did not abuse its discretion here.

[*469]    IV.

Our decision here does not deprive [**18] those denied dealer's licenses of the opportunity to have the Secretary's decisions reviewed in the courts. The district court here did review the Secretary's decision and found it authorized in law and supported by the facts. Had the plaintiff shown some good reason to do so, we are confident that the district court would have liberally exercised its discretion to permit the introduction of additional evidence. Absent such a showing by the plaintiff, however, we cannot say that the district court erred in

649 F.2d 463, *; 1980 U.S. App. LEXIS 14229, **;
61 A.L.R. Fed. 496

ing Dunn's inspection, to the disruption caused by the business's move. He denied that the violations were willful. Stein explained that when he noticed omissions or errors on forms completed by other employees, even if he knew the omitted or correct information, he would not alter the forms because he did not believe it correct to do so. He also indicated that steps had been taken to ensure compliance in the future. These included relieving Kenneth Stein's [**23] seventy-eight year old father and a seventy-two year old employee of any involvement with firearms transactions [2] and hiring a former Milwaukee police detective to manage Stein's firearms business.

> 2.    Apparently, these two persons experienced the most difficulty with the required forms.

In sum, the testimony and other proof adduced at the hearing revealed that Stein's had committed numerous violations, some more serious than others. Initially, the Administrator presumed that the violations must have been willful, because so many occurred over a long period of time despite warnings and explanations regarding correct procedures. But Stein denied that the violations were willful and offered plausible explanations for them. The agents partially supported Stein's denial of willfulness. The hearing officer concluded that license renewal was warranted. [3] Nevertheless, Administrator Chupp, without having seen and heard the testimony, was unmoved. In a hastily scrawled note, he rejected the hearing officer's recommendation [**24] for the reasons initially given. Apparently, in Chupp's mind, the presumption that the violations were willful had not been overcome.

> 3.    One can only speculate whether this recommendation was based upon a finding that the violations were not willful. On this point the record is unclear. The majority's assertion that the hearing officer's recommendation was based upon his belief that nonrenewal "was too severe a penalty for the infractions found . . . ," is, however, equally speculative.

Having exhausted its administrative remedies, Stein's invoked its right to judicial review under 18 U.S.C. § 923(f)(3). The Secretary's answer "affirmatively alleged that the decision of the Treasury . . . is supported by substantial evidence. . . ." The Secretary then moved for summary judgment, relying on the administrative record and his answer. In opposition, Stein's submitted the affidavit of Kenneth Stein, who generally denied that the violations were willful. The district court granted summary judgment in favor of [**25] the Secretary.

In its memorandum, the district court alluded to the split in authority regarding the appropriate standard of judicial review under section 923(f)(3), but purported to find it unnecessary to decide whether the [*471] "sub-

stantial evidence" test or de novo review was appropriate. The majority is convinced that de novo review was undertaken. See majority opinion at 468. The district court apparently applied the "substantial evidence" test, however, as evidenced by the district court's conclusion that "substantial evidence exists in the record supporting the finding of a willful violation " The fact that this case was decided on summary judgment is additional evidence that the wrong test was applied, because in this circuit substantial evidence is a question of law, appropriately decided on summary judgment. Milton v. Harris, 616 F.2d 968, 975 (7th Cir. 1980) (per curiam ). Moreover, the district court refused to accept additional evidence only because Stein's failed to overcome the substantial evidence supporting the Secretary's decision. [4] This violated the applicable law because in so doing the district court viewed the administrative decision as presumptively [**26] correct.

> 4.    Although Kenneth Stein's affidavit was conclusory, the administrative record was before the district court. Stein's was entitled to rely upon it, at least to the extent that the Secretary did so. Thus, the district court's refusal ultimately could not have been based upon the inadequacy of Stein's affidavit.

Neither the district court nor the Secretary heard testimony but characterized the evidence in the administrative record as "uncontroverted." As discussed above, however, Kenneth Stein offered plausible explanations for the violations which were supported partially by the agents. These explanations were disregarded. The only reasonable basis for so doing must have been a determination that Kenneth Stein was not a credible witness. Thus, the district court's conclusion that summary judgment was appropriate because credibility was not at issue was incorrect. Credibility is precisely what was and remains at issue. In this regard, the fact that the hearing officer, who was the person who heard [**27] Kenneth Stein's testimony, recommended license renewal is most significant. At the very least, the district court was required to explain its "findings" in the light of all the evidence, including Stein's testimony.

In conclusion, if the appropriate standard of review were the "substantial evidence" test, the district court's disposition of this case would have been correct. Similarly, even on de novo review, the obligation to hear live witnesses might have been abrogated if Stein's had not come forth with plausible explanations for the violations. See, e. g., Mayesh v. Schultz, 58 F.R.D. 537 (S.D.Ill.1973). But, because Stein's did offer explanations, the rejection of which could only have been because of credibility determinations, the district court was obliged to make those determinations itself. Otherwise,